## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KEVAUGHN DINGLE

     Plaintiff,

v.                           CASE NO.: 8:21-CV-02861

UNIVERSITY OF SOUTH FLORIDA
and UNIVERSITY OF SOUTH
FLORIDA BOARD OF TRUSTEES

     Defendants.

_____/

### COMPLAINT AND JURY DEMAND

Plaintiff Kevaughn Dingle (hereinafter referred to as "Plaintiff" or "Mr. Dingle"), sues the University of South Florida ("USF") and the University of South Florida Board of Trustees ("USF BOT") (collectively, "Defendants") and alleges as follows:

### INTRODUCTION AND BACKGROUND

1.    Mr. Dingle is an African American male student-athlete who attended college at USF as a scholarship student-athlete on the USF football team. On a Thursday afternoon in November 2017, Mr. Dingle, an eighteen-year-old freshman at the time, engaged in consensual sex with a twenty-year-old African American female USF student, Jane Roe.[1] After the two engaged in consensual sex, and after exchanging text messages with Mr. Dingle, Jane Roe

_____

[1] Jane Roe is a pseudonym.

mentioned the act to a group of friends and claimed that she may have been sexually assaulted. The friends pressured Jane Roe to report the incident telling her that if she did not report the incident that they would despite her unwillingness to do so. Jane Roe reported the incident and an "investigation" ensued. Student disciplinary proceedings were commenced resulting in Mr. Dingle's arrest and subsequent permanent expulsion from USF.

2.      Under mounting pressure from federal investigations, and during the societal rise of the "Me Too Movement," Defendants rushed to judgment while depriving Mr. Dingle of the most basic tenets of due process to save face in light of the Defendants' past missteps while handling sexual assault allegations.

3.      This case represents an egregious miscarriage of justice against Mr. Dingle caused by Defendants' flawed and biased Title IX sexual misconduct process and student disciplinary code of conduct process, both of which were conducted under a presumption of guilt, and Defendants' willful ignorance of major inconsistencies in the complainant's false allegations of nonconsensual sexual contact against Mr. Dingle.

4.      After a sham investigation conducted by Defendants' appointed Title IX Investigator Maria Cutsinger who, as set forth in detail below, had a clear conflict of interest and known bias towards males accused of sexual assault, Mr. Dingle was "provisionally suspended" and his case was set for an emergency student disciplinary hearing (the "Formal Hearing"). The hearing officer, Lauren Keroack, an academic advisor in the Psychology Department, had no formal or

2

4878-2911-3860, v. 1

informal legal training. More troubling, Ms. Keroack had participated in the research for published papers focused on the negative impact of male masculinity in today's society.

5.      The conduct of the Defendants' representatives was intentionally and inherently discriminatory because of Mr. Dingle's race, ethnicity, and gender. As alleged below, the Defendants have a history of treating Caucasian males accused of similar violations differently, to wit: less severe punishments and, in some instances, completely ignoring the alleged conduct.

6.      USF Campus Police arrested Mr. Dingle on November 17, 2017 – the same day that he voluntarily appeared for an interview with Campus Police and waived his Miranda rights. At the time, USF Campus Police had been investigating the incident for less than 24 hours and had only interviewed Jane Roe and Mr. Dingle.

7.      Without sufficient supporting evidence, and in the face of ignored and outrageous inconsistencies in the complainant's story, USF permanently expelled Mr. Dingle on December 13, 2017 at the conclusion of their biased and flawed disciplinary proceedings. At the time, Mr. Dingle had an unblemished disciplinary and academic record, was well-respected by his coaches and teammates, and had demonstrated impeccable character while surviving and thriving despite a difficult upbringing.

8.      On February 13, 2018, 45 days after Defendants' erroneous decision to expel Mr. Dingle, the State Attorney for the Thirteenth Judicial Circuit,

3

recognizing the lack of credible evidence to constitute probable cause for criminal charges against Mr. Dingle,  closed its investigation with no further action and no charges were filed against Mr. Dingle.

9.      Because Mr. Dingle was subjected to a biased and flawed process, a process in which the individuals responsible for investigating the alleged incident, conducting the formal hearing, and rendering a decision were partial and biased, the incident remains in his educational record and Mr. Dingle has been prohibited from pursuing his educational and athletic career at the same level as he did at USF.

10.     Astonishingly, to add insult to injury, Defendants placed a financial hold on the release of Mr. Dingle's transcripts based on Mr. Dingle's alleged failure to pay for student housing after he was expelled; notwithstanding the fact that Mr. Dingle's housing was covered under his athletic scholarship.

11.     Mr. Dingle's case is an example of the injustice that has occurred as a result of colleges and universities applying a low burden of proof—the preponderance of the evidence standard—in sexual misconduct cases.

12.     When Defendants subjected Mr. Dingle to disciplinary action, they did so in a way that deprived him of due process and discriminated against him because of his gender and race. The Defendants' policies and regulations as promulgated are biased and discriminatory and entirely insufficient to protect the rights of male students accused of sexual misconduct.

13.     Mr. Dingle's reputation, life, and future have been completely and

4

irreparably destroyed. Although the damage is done and Defendants' conduct cannot be undone, this lawsuit seeks redress for Defendants' intentional, malicious, self-serving, and damaging conduct.

## **PARTIES**

14.     Plaintiff is a natural person and a resident of Broward County, Florida.

15.     USF is a public university of the State of Florida, maintaining its principal place of business in Hillsborough County, Florida.

16.     USF BOT is a constitutionally created public body corporate that administers the university and is responsible for ensuring that USF's policies and programs and are administered in compliance with the law and educational standards, including those established by Title IX and Title VI.

## **JURISDICTION AND VENUE**

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the constitution and statutes of the United States.

18.     This Court has personal jurisdiction over Defendants because Defendants are conducting business within the State of Florida and committed improper and illegal acts in this judicial district.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims raised herein occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.   Defendants Face Federal and Local Pressure to Comply with Title IX.**

**A. Federal Pressure and Threat of Loss of Federal Funding**

20.     On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL" or "2011 Dear Colleague Letter"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

21.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth

adherence on college campuses (*e.g.,* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

22.    The DCL further relied on faulty statistics in making a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline...when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

23.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a

7

trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

24.     In April 2014, the White House issued a report entitled "*Not Alone*" which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report also suggested that college and universities undergo "trauma-informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual assault.

25.     On May 1, 2014, the DOE issued a press release identifying 55 colleges and universities being investigated for violating Title IX. Then Assistant

Secretary of Education Catherine Llhamon ("Llhamon") stated that "[a]ll universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action." In June 2014, Llhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

26.     On September 1, 2014, the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

27.     Defendants expressly recognized the external pressure to comply

9

with Title IX directives by informing their employees through various trainings of the potential threat of loss of federal funding for failing to comply with Title IX; specifically, in regard to protecting alleged female victims of sexual assault.

28.     On September 22, 2017, DOE repealed the April 2011 Dear Colleague Letter relating to use of the "preponderance of evidence standard" and issued new guidance permitting colleges and universities to apply the "clear and convincing evidence standard." As set forth below, despite the guidance being published over two months prior to Mr. Dingle's formal hearing, USF continued to apply the "preponderance of evidence" standard.

**B. Defendants' Prior Improper Handling of Sexual Assault Cases Created a Rush to Judgment Culture**

29.     Unfortunately for Plaintiff, the unsubstantiated sexual assault allegations lodged against him came at the same time that Defendants' egregious mishandling of sexual assault allegations against a white male USF student were brought to light by local media and resulted in a second OCR investigation aimed at USF. That, combined with the Federal pressure alleged above in paragraphs 20-28, sealed Plaintiff's fate the moment the allegations were made.

30.     On November 2, 2017, the Tampa Bay Times published an article titled "New federal investigation targets USF handling of sexual violence case" which identified that a week prior USF had been notified by the OCR that USF was under investigation following a student complaint in August regarding USF's mishandling        of        her        sexual        assault        complaint.

https://www.tampabay.com/news/education/college/New-federal-investigation-targets-USF-handling-of-sexual-violence-case_162227030/. The article also stated that USF was still under investigation related to another student's claim that USF failed to investigate her case thoroughly. *Id.*

31.    On November 13, 2017, an article was published detailing Safe HOME at USF's first Annual "Slut Walk" protest which was described as "an effort to call to attention that University of South Florida was not doing enough to ensure the safety of their students, instead opting to continue to accept the tuition checks of perpetrators." The protest was centered on how USF does not have a zero-tolerance       policy       in       place       towards       sexual       assault. https://ncfcatalyst.com/respect-my-existence-or-expect-resistance-safe-home-at-university-of-south-florida-hosts-first-annual-slut-walk/.

32.    On November 30, 2017, eight days before Mr. Dingle's formal hearing, a USF student filed a lawsuit in this court against Defendants alleging that Defendants failed to adequately punish a sexual assault perpetrator and attempted to silence those speaking out against the inadequate punishment. *See Garrett v. University Board of Trustees*, Case No. 8:17-CV-2874-T-33AAS, Dkt. 1. The Complaint alleged, among other things, that:

      i.    A white male USF student raped her at his apartment on the evening of November 12, 2016 and then did not allow her to leave until the following morning.

     ii.    On December 6, 2016, USF Title IX officials acknowledged Ms.

Garrett's complaint and issued a "Title IX initial contact letter." And, on December 9, 2016, USF Title IX officials assigned Investigator Joanna Ellwood to investigate the case.

iii.   Ms. Ellwood concluded that there was "sufficient evidence to substantiate" that the accused violated the USF Student Code of Conduct, Sections 4.14 (b) and 4.14(c), [2] by having "non-consensual intercourse and non-consensual sexual contact" against Ms. Garrett.

iv.   On March 9, 2017, over three months after the complaint was filed, USF Title IX officials issued a "no contact" letter to the accused. The same day, the USF Office of Student Rights and Responsibilities issued a written notice that recommend certain sanctions in the event the accused accepted responsibility.

v.   The accused accepted the recommended sanctions and waived his right to a formal hearing. As such, the accused received the following sanctions for violating Sections 4.14 (b) and 4.14(c) of USF's Student Code of Conduct:

- Deferred suspension through May 4, 2018, which meant he would not actually miss any classes;

- That he would have to attend two meetings with the Interim Director of the Office of Student Rights and Responsibilities, Maria Cutsinger; and

---

[2] Mr. Dingle was charged with violation of the same sections of the USF Student Code of Conduct.

- That he would refrain from contacting Ms. Garrett.

33.    The accused in Ms. Garrett's case was given the choice to accept responsibility or face a formal hearing. In accepting responsibility, the accused was merely given a deferred suspension. In sum, a white male student, accused of the same violations as Plaintiff, based on more egregious facts received a deferred suspension and no expulsion. In contrast, Plaintiff, an African American student athlete, was permanently expelled and arrested for the same alleged conduct.

34.    The Tampa Bay Times, on November 30, 2017, published a story titled "Lawsuit: USF ignored student's fears after she alleged sexual assault" relating to Ms. Garrett's Complaint. Lawsuit: USF ignored student's fears after she alleged sexual assault (tampabay.com). The story also referenced the two pending federal investigations related to USF's potential mishandling of sexual violence cases. *Id.*

35.    On December 6, 2017, two days before Mr. Dingle's Formal Hearing, the Tampa Bay Times published an editorial titled "USF should revisit approach to Title IX protections" which highlighted USF's struggles with dealing with sexual assault allegations.

36.    Undoubtedly, the public knowledge of the two pending federal investigations, the public nature of the allegations of Ms. Garrett's Complaint, and the numerous news articles detailing USF's mishandling of sexual assault allegations created an even more directed effort by Defendants to avoid loss of

13

future funding for failing to comply with Title IX, at the expense of Mr. Dingle's constitutional rights.

37.     In light of the negative publicity and mounting pressure from the Federal investigations, which could have resulted in the loss of funding, USF needed to "save face" and Plaintiff became the easy target: a freshman African American student-athlete.

38.     Defendants sacrificed Mr. Dingle's future to save face for their prior deficiencies in handling sexual assault cases.

## II.     Mr. Dingle's Unblemished Academic and Disciplinary Record.

39.     Prior to USF's imposition of the unwarranted sanction of expulsion against Mr. Dingle, he was in good standing at USF, had no prior disciplinary record, and was well positioned as a member of the football team.

40.     Prior to accepting a full athletic scholarship to attend USF, Mr. Dingle demonstrated similar strength of character throughout his childhood and high school career while helping raise his six siblings, being a 4-year member of his high school football team, and maintaining good grades.

## III.     The Relationship Between Plaintiff and Jane Roe.

41.     Plaintiff and Jane Roe met on November 12, 2017, approximately four days prior to the alleged incident, as Jane Roe was coming out of the cafeteria on USF's Tampa campus.

42.     Plaintiff and Jane Roe exchanged Snapchat accounts.

14

43.     Two days later, Jane Roe was walking home from the campus recreation center and saw Plaintiff again as he was standing outside his dormitory.

44.     Plaintiff called Jane Roe over and asked why she had not texted him after they previously exchanged Snapchat accounts. Jane Roe responded that the exchange of Snapchat information was unsuccessful and, therefore, she had no way to contact him.

45.     Plaintiff and Jane Roe again exchanged Snapchat information, this time successfully. Plaintiff and Jane Roe also agreed to meet up the following day around 11 a.m. at Plaintiff's dorm room.

46.     On November 16, 2017, Jane Roe texted Plaintiff that she was out of class and headed to his dorm. When she arrived, she was let in by the janitor.

47.     Plaintiff let Jane Roe into his dorm and the two proceeded to his room where they initially sat on the bed, played with Plaintiff's dog, and  watched the movie "Lizzy McGuire."

48.     During the movie, Jane Roe asked Plaintiff what his intentions were, and he responded that he wanted to get know her. Jane Roe then responded that they both knew that was not true and then Plaintiff told her he wanted to get to know her sexually. Jane Roe said she appreciated his honesty and told him she wanted to see if he was bold enough to say it.

49.     Plaintiff then lifted Jane Roe up and turned her around and she fell on the bed. Plaintiff began touching Jane Roe. Plaintiff asked if she liked it and

15

Jane Roe responded yes.

50.    Jane Roe then told Plaintiff that she had to go to the bathroom, and she got off the bed, exited his dorm room, and went to the bathroom. The bathroom was not located in Plaintiff's actual dorm room, but in a common area shared with three other dorm rooms.

51.    At all times material to the facts alleged in this Complaint, Jane Roe was free to leave, and Plaintiff took no actions to prevent her from doing so.

52.    After going to the bathroom, Jane Roe returned to Plaintiff's dorm and closed the door when she entered. Plaintiff was on the phone at the time.

53.    Plaintiff hung-up the phone then Plaintiff and Jane Roe moved to Plaintiff's bed.

54.    Jane Roe removed Plaintiff's shirt and told him she was "wet."

55.    Plaintiff and Jane Roe engaged in kissing and fondling, she told him that if they were going to have sex, he needed a condom. Plaintiff texted a friend for a condom but could not locate one.

56.    Despite Plaintiff's inability to get a condom, Jane Roe proceeded to have consensual sex with Plaintiff.

57.    After they had sex, and after a short passage of time, Jane Roe voluntarily performed oral sex on Plaintiff. At the Plaintiff's disciplinary hearing, when asked to reconcile her performance of voluntary oral sex with her claim that sex was non-consensual, she stated she did it "because she didn't want to pass on anything she might have to him" and that her "fluids might irritate him." Jane

16

Roe had also previously told Detective Pearson that "she didn't want her secretions on him" and "didn't want [Plaintiff] to get any kind of disease."

58.    Jane Roe admitted that during the encounter she did hear someone come into the dorm suite but did not say anything or scream for help.

59.    At no time did Jane Roe try to leave during the encounter and, in fact, was completely free to do so prior to the sexual intercourse when she left to go to the bathroom. Instead, she came back to Plaintiff's room, closed the door, and had sex with Plaintiff.

60.    After leaving Plaintiff's dorm room, Jane Roe met up with some friends at the campus student center. She told them she "thought" she had been sexually assaulted. Jane Roe's friends told her to report the incident and, if she did not, they threatened to report the incident.

## IV.    <u>Jane Roe's University Complaint Against Plaintiff and USF's Ensuing Sham Investigation.</u>

61.    The OCR has reported that a typical investigation takes up to 60 calendar days following receipt of the complaint. DCL at 12.

62.    Moreover, USF's deputy Title IX coordinator for USF Health and a Title IX investigator for the USF System, Kristin Steffen, had been quoted in 2018 as saying that some Title IX investigations "can take six months or longer to complete."

63.    Upon information and belief, representatives of Defendants have stated that their policy relating to sexual assault allegations required them to find

4878-2911-3860, v. 1

in favor of the female making the allegations. In other words, it is an institutional policy that, when a female alleges she has been sexually assaulted, Defendants always determine that a sexual assault occurred.

64.     Defendants have created an environment in which accused male students, especially those who are African American, are fundamentally denied due process and almost assuredly will be found guilty, regardless of the evidence or lack thereof. Therefore, Defendants have historically and systematically discriminated against males of accused of sexual assault by females. Such a biased and one-sided process deprived Plaintiff, as a male student, of educational opportunities based on sex.

65.     On or about November 16, 2017, Jane Roe's friends pressured her to file a report against Plaintiff. Jane Roe was reluctant to do so, so her friends took her to the Dean's office on USF's main campus. The incident was then reported to USF's Title IX Office and the Campus Police.

66.     USF's Title IX Office commenced its investigation on November 17, 2017 and the Campus Police commenced its criminal investigation into Jane Roe's allegations the same day.

67.     Although a typical investigation takes up to 60 days, in Plaintiff's case, from the start of the "investigation" to the Formal Hearing, a total of only 21 days had elapsed.

68.     USF assigned Maria Cutsinger ("Cutsinger") to "investigate" Jane Roe's allegations against Plaintiff. Cutsinger had at the very least, an appearance

18

of bias and partiality because of her role as the Interim Director of USF's Office of Students Rights and Responsibilities which included, among other things, ensuring that USF's policies and procedures complied with Title IX; namely, ensuring that USF did not lose federal funding as a result of mishandling sexual assault allegations made by female victims against males. Also, Cutsinger's prior job as a law enforcement officer created an appearance of bias in favoring the veracity of the Campus Police investigators.

69.   Officer Danyelle Madsen (USF Campus Police) responded to the initial report of sexual battery and spoke with the Nurse Practitioner who had examined Jane Roe.

70.   Detective Brian Pearson (USF Campus Police) was then assigned to continue the investigation.

71.   Detective Pearson's investigation was limited to interviewing Jane Roe, interviewing Plaintiff, and executing a search warrant of Plaintiff's dorm room.

72.   Plaintiff voluntarily appeared for questioning and agreed to speak with Detective Pearson without the presence of a lawyer. Detective Pearson recorded the interview. However, as alleged below, the actual recording was not presented at the Formal Hearing but, instead, the officer assisting Detective Pearson testified based on his own recollection of Plaintiff's recorded statement.

73.   Based solely on Jane Doe's statement, Detective Pearson prepared an affidavit to obtain a search warrant for Plaintiff's dorm room. Detective

19

Pearson's Affidavit in Support of a Search Warrant omitted three critical facts from Jane Roe's statement that militated against a finding of probable cause:

- When Jane Roe returned to Plaintiff's dorm room after using the bathroom, she shut the door behind her;

- During the alleged incident, Jane Roe asked Plaintiff to use a condom and he texted a friend looking for a condom; and

- After sexual intercourse, Jane Roe initiated and performed oral sex on Plaintiff because "she didn't want her secretions on him" and "didn't want [Plaintiff] to get any kind of disease or infection."

74.    The omission of the foregoing facts, which Jane Roe admitted, and which Detective Pearson recorded, support the conclusion that Defendants pre-determined Mr. Dingle's fate in light of the well-known and documented external and internal pressures Defendants were facing as a result of their prior gross mishandling of sexual assault allegations.

75.    Based on Detective Pearson's investigation and the results of the search warrant, on November 22, 2017 (the day before Thanksgiving), an Emergency Provisional Suspension Hearing was held at which Cutsinger—the same person responsible for the investigation—functioned as the hearing officer. Cutsinger, relying solely on the information received from the Campus Police, Jane Roe, and her interview of Plaintiff, determined that there "is sufficient evidence to substantiate that violations of the rules and regulations of the University of South Florida have occurred."

76.    On November 28, 2017, Cutsinger then scheduled a formal

4878-2911-3860, v. 1

Administrative Hearing on December 8, 2017 at 1:00 p.m. (eight business days later) (the "Formal Hearing"). Cutsinger identified Lauren Keroack ("Keroack") as the Administrative Hearing Officer. Keroack, at the time, was an academic advisor in the Psychology Department.

77.     Cutsinger provided Plaintiff with an agenda for the Hearing which provided that Plaintiff could prepare "questions in writing ***for possible use*** when questioning the complainant and other witnesses" (emphasis added). Keroack was solely responsible for determining the relevance of the questions submitted and could rephrase the questions in any manner she deemed necessary. Keroack could also refuse to ask any of Plaintiff's questions—which she did.

78.     Cutsinger identified only two witnesses who would present testimony at the December 8, 2017 hearing: Officer D. Madsen and Jane Roe. Lead Detective Pearson did not participate in the December 8, 2017 hearing despite leading the Campus Police's investigation.

79.     Keroack was charged with determining which evidence was relevant to Jane Roe's allegations, evaluating that evidence under the preponderance of the evidence standard (which had previously been withdrawn by the September 22, 2017 Dear Colleague Letter), and determining whether Plaintiff violated USF's Student Conduct Codes.

80.     While Plaintiff was allowed to review the investigative after receipt of the notice of Formal hearing and prior to the hearing (a period of eight business

21

days), an administrator was present during the file review, preventing Plaintiff from discussing the file contents with his attorney. Plaintiff and his attorney were also prohibited  from making copies of any documents in the file. They were allowed only to take notes.

81.    The Formal Hearing was conducted on December 8, 2017 – only eleven days after the notice of the hearing was served.

82.    During the hearing, only Officer Madsen and Jane Roe testified. None of the recorded audio statements were offered as evidence. Instead, Officer Madsen relied on his observations and recollection of Plaintiff's answers to Detective Pearson's questioning. As a result, Officer Madsen testified that Plaintiff "confessed" despite the fact that the full audio tape supported no such conclusion.

83.    Plaintiff was allowed have his counsel, attorney Lyann Goudie, present, yet Attorney Goudie was not allowed to participate in the hearing beyond submitting questions to Keroack. Attorney Goudie was not allowed to cross examine of the witnesses on Plaintiff's behalf. Keroack refused to ask all of the questions provided by Attorney Goudie.

84.    Notably, based on Jane Roe's explanation of why she performed oral sex on Plaintiff as alleged above in paragraph 57, Plaintiff's counsel submitted a question inquiring as to whether Jane Roe actually had any sexually transmitted diseases. Keroack refused to ask this material and relevant question.

85.    Upon information and belief, Cutsinger and Keroack did not receive "appropriate training," as required under both the Student Conduct Code and

22

USF's Title IX Policies and Procedures.

## V.     **The Erroneous Finding.**

86.     On December 13, 2017, Plaintiff received an email with Keroack's determination and imposition of sanctions. Keroack's concluded as follows:

- USF Code of Conduct/4.14 Sexual Harassment/4.14(b) Non-Consensual Sexual Intercourse: Based on the information provided, **it is more likely than not** that vaginal intercourse occurred without expressed ongoing affirmative consent. Jane Roe verbally indicated "no" to vaginal sexual intercourse to Plaintiff and Plaintiff acknowledged to University officials that he heard her say "no" during the course of the incident on November 16, 2017.

- USF Code of Conduct/4.14 Sexual Harassment/4.14(c) Non-Consensual Sexual Contact: Based on the information provided, **it is more likely than not** that non-consensual sexual contact occurred without expressed ongoing affirmative consent. Specifically, non-consensual sexual contact occurred when Plaintiff used force to intentionally make contact to touch Jane Roe's breasts and buttocks in a sexual manner.

(emphasis added).

87.     Keroack's rationale is inconsistent with USF's own definition of consent, ignores legal standards and definitions of consent, and defies logic and common sense.

88.     Although Jane Roe may have initially declined wanting to have intercourse, Jane Roe later consented to sexual touching and intercourse through her actions and words, which she did. For example, the following occurred after Jane Roe told Plaintiff sexual intercourse was not for her "right now":

- Jane Roe exited Plaintiff's dorm to use the bathroom and when she returned, shut the door behind her;

23

- Jane Roe removed Plaintiff's shirt;

- Jane Roe told Plaintiff that she was "wet;"

- Jane Roe asked Plaintiff to find a condom; and

- Jane Roe initiated and performed oral sex on Plaintiff after they completed sexual intercourse.

89.    Keroack found a violation was "more likely than not" without considering any of the numerous facts supporting the contrary. In simplest terms, Keroack ignored the truth. Jane Roe did not deny any of the facts alleged above in paragraph 87.

90.    At the time of Mr. Dingle's hearing, USF's Title IX Office defined consent as:

> An informed, knowing, and voluntary agreement to engage in sexual activity. Consent to engage in sexual activity must exist from beginning to end of each instance of sexual activity. Consent is demonstrated through mutually understandable words ***and/or actions that clearly indicate a willingness to engage in a specific sexual activity.*** Silence or an absence of resistance alone, without actions evidencing permission, does not imply consent.

(emphasis supplied).

91.    Keroack, along with Detective Pearson, Officer Madsen, and Cutsinger, completely ignored Jane Roe's actions and words after she made one statement that intercourse was not for her "right now." Detective Pearson told Jane Roe that because she said no that was all she needed to say, regardless of her subsequent verbal and non-verbal conduct.

92.    However, as alleged above in paragraph 88, Jane Roe consented to

24

sexual intercourse by the actions she initiated before, during, and after sexual intercourse, as well as her verbal conduct before, during, and after sexual intercourse.

93.    Today, USF's Title IX Office more appropriately defines consent as:

Consent is knowing, voluntary and **clear permission by word _or action_ to engage in sexual activity**. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to determine that the other has consented before engaging in the activity. If consent is not clearly provided prior to engaging in the activity, **consent may be ratified by word or action at some point during the interaction or thereafter**, but clear communication from the outset is strongly encouraged. For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Reasonable reciprocation can be implied. Consent in relationships must also be considered in context. When parties consent to BDSM or other forms of kink, non-consent may be shown by the use of a safe word.

Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time. Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent. **Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on USF to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred** and any similar, previous patterns that may be evidenced.

94.    The current definition of consent recognizes the reality of human sexual interaction and provides some degree of safeguard against a rush to

judgment based on uncorroborated testimony of the alleged victim.

95.   Notwithstanding, under either definition of consent, the facts do not support Keroack's determination that Jane Roe's initial declination of intercourse during the encounter alone constituted a violation of USF's Student Conduct Code and subsequent sanctions.

96.   Keroack's decision was motivated by gender and racial bias stemming from her background and the external and internal pressures facing Defendants.

## VI.   <u>The Unwarranted and Disproportionate Sanction.</u>

97.   Keroack was solely responsible for determining the sanctions levied against Plaintiff; specifically, expulsion and a no-contact order. The sanction resulted in a termination of Plaintiff's athletic scholarship.

98.   In her role as the hearing officer, Keroack had a preconceived bias, or at least the appearance of same,  which should have precluded her from deciding Plaintiff's case or any other sexual misconduct case.

99.   Keroack publicly supported women's advocacy groups during the timeframe in which Jane Roe's allegations against Plaintiff were investigated. Keroack also assisted in the research for a paper published in 2014 titled "Precarious Manhood and Displays of Physical Aggression." The paper was co-authored by four USF employees.

100.   Upon information and belief, Keroack's background caused her to take a partial and biased adversarial role rather than a detached inquisitorial view

26

of USF's sexual misconduct process. Her potential for bias in determining the sanction in Plaintiff's case was clear and obvious.[3]

101. As a result, Keroack issued an unwarranted and unduly severe sanction expelling Plaintiff from USF and thereby terminating his Division I football scholarship.

## VII.   <u>Denial of Appellate Rights.</u>

102.   The December 13, 2017 correspondence notifying Plaintiff of the hearing officer's determination and imposition of sanctions also provided that Plaintiff could appeal the decision within five business days. If accepted, the appeal would have been heard by the Dean for Students and Plaintiff would have been entitled to access the record from the formal hearing – which Defendants did not want to happen given their shoddy and biased investigation.

103.   The five business days deadline to appeal was arbitrarily created by the Defendants.

104.   Due to the holidays and school no longer being in session, Plaintiff submitted his appeal on January 3, 2018 – only  thirteen business days after the decision.

105.   On January 9, 2018, Plaintiff received an email refusing to accept his appeal because he "missed the deadline for the appeal and did not have a strong

---

[3] The OCR warned against conflicts of interest in the April 2011 Dear Colleague Letter "Title IX Coordinators should not have other job responsibilities that may create a conflict of interest…"

rationale for missing that deadline."

106.   The rejection of Plaintiff's explanation of the delay in pursuing an appeal was arbitrary, capricious, and punitive.

107.   Had the appeal been accepted, the Dean of Students would have reviewed the case rather than Plaintiff once again facing Keroack's biased and singular scrutiny.

108.   As alleged above in Paragraphs 98 through 100, Keroack had a conflict of interest as a decision maker in Plaintiff's case based upon, at the very least, the appearance of particularity and preconceived bias. The entire process was a sham designed to compensate for Defendants' past mishandling of sexual assault allegations.

109.   USF's policies and procedures, as misapplied by Cutsinger and Keroack, denied Plaintiff his right to a fair and impartial process. The conflicting and inconsistent evidence gathered did not support a finding that Plaintiff violated a section of the Student Conduct Code.

110.   Upon information and belief, at all times material to this case, USF trained Title IX personnel to adopt a trauma-informed approach, which presumes that female complainants always tell the truth, discourages investigators from asking questions relating to complainant credibility and presumes that male respondents are typically the sexual aggressors in sexual interactions between students.

4878-2911-3860, v. 1

VIII.  **No Criminal Prosecution.**

111.  On February 13, 2018, only two months after Plaintiff was expelled from USF, the State Attorneys' Office in and for the Thirteen Judicial Circuit, Hillsborough County, Florida, after reviewing all of the evidence compiled by Detective Pearson and conducting its own investigation, found insufficient evidence to constitute probable cause to file criminal charges against Plaintiff.

112.  In doing so, the State Attorney determined that there was insufficient evidence that Plaintiff had engaged in nonconsensual sex.

113.  Although USF declined to issue a statement following the State Attorney's determination not to file charges against Plaintiff, USF's student newspaper "The Oracle" published a story titled "Sexual battery charge against former football player dropped" which reported that the charges had been dropped against Plaintiff. https://www.usforacle.com/2018/04/01/sexual-battery-charge-against-former-football-player-dropped/. In addition, "The Daily Stampede"—USF football's fan blog—published a story titled "Kevaughn Dingle Has All Felony Sexual Battery Charges Dropped." https://www.thedailystampede.com/2018/3/30/17180320/kevaughn-dingle-has-all-felony-sexual-battery-charges-dropped. The Daily Stampede concluded the piece by stating that it wanted to make sure that everyone knew that the charges were dropped "[b]ecause it's the right thing to do."

114.  Notwithstanding the State Attorneys' no file decision, Defendants actions had already damaged Plaintiff, who was unable to obtain another Division

29

I scholarship or education despite his ongoing efforts to do so.

115.   All conditions precedent to the bringing and maintenance of this action, and the granting of relief requested, have occurred, have been performed, or have been waived.

116.   Plaintiff has retained the law firm of Bajo Cuva Cohen Turkel, P.A. to represent him in this case and is obligated to pay his attorneys a reasonable fee for the services rendered in connection with this case.

## COUNT I
## Violation of Title VI of the Civil Rights Act of 1964

117.   Plaintiff re-alleges paragraphs 1 through 116.

118.   Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq*., provides in pertinent part that:

> [n]o person shall, on the ground of race, color, or national origin, be excluded from participation in, be the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

119.   Title VI applies to USF. More specifically, Title VI applies to all of the programs, activities, and operations of USF, including but not limited to, the investigation and disciplinary proceedings that are the subject of this lawsuit.

120.   Pursuant to Title VI, Defendants are prohibited from intentionally discriminating against any persons, including Plaintiff, on the basis of race, color, or national origin.

121.   Defendants intentionally discriminated against Plaintiff on the basis

30

of race, color, or national origin. Indeed, Defendants' conduct during the sham investigation was motivated by race and Plaintiff's race was a determining factor throughout the process. Defendants' decision to suspend and expel Plaintiff from school was also motivated by race and Plaintiff's race was a determining factor in the outcome of the sham investigation and disciplinary proceedings.

122.   Plaintiff, who is African American, is part of a protected class.

123.   Plaintiff and Jane Roe engaged in voluntary and consensual sexual activity.

124.   Plaintiff informed the Defendants that the sexual activity between Plaintiff and Jane Roe was voluntary and consensual.

125.   White students accused of the same conduct violations as Plaintiff were provided less severe sanctions, subject to more thorough and time-intensive investigations, and provided due process during the investigation and hearing process.

126.   Rather than question and/or cross-examine any of Jane Roe's testimony, or providing Plaintiff the unfettered right to do same, Defendants failed and/or refused to do so and elected instead to accept her account of the incident wholesale and without doubt.

127.   Defendants completely discounted and ignored Plaintiff's version of the events. The Defendants' decision to do so was motivated by Plaintiff being African American.

128.   Defendants have a pattern of decision-making demonstrating that

they consistently discriminate against African American males when investigating allegations of sexual assault as compared to white males.

129.   Upon information and belief, if Plaintiff was white, as in previous USF cases including the case initiated by Ms. Garrett's allegations, Defendants would not have dismissed Plaintiff from USF.

130.   As a direct and proximate result of the above-referenced racial discrimination, Plaintiff has been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000, based upon the following: mental anguish, emotional distress, injury to reputation, past and future economic loss, deprivation of due process, loss of educational and athletic opportunities, and loss of future career prospects and/or earnings.

131.   As a direct and proximate result of the above-referenced racial discrimination, Plaintiff is entitled to compensatory and punitive damages.

132.   Pursuant to 42 U.S.C. § 1988(b), Plaintiff demands an award of his reasonable attorneys' fees incurred in this matter.

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows: a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against Defendants as a result of Defendants'

violation of Title VI, which resulted in an unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing Defendants to:

    a. reverse the outcome and findings regarding Jane Roe's complaint;
    b. expunge Plaintiff's disciplinary record;
    c. remove any record of Plaintiff's suspension from his education file;
    d. permanently destroy any record of Jane Roe's complaint; and
    e. allow Plaintiff to return to USF at a time of his choosing without the imposition of any conditions for readmission to USF.

## COUNT II
### Violation of Title IX of the Education Amendments of 1972

133.    Plaintiff re-alleges paragraphs 1 through 116.

134.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

135.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendants.

136.    Students attending public universities such as USF who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties --*

33

*Title IX* (2001) at 22 (the "2001 OCR Guidance"); April 2011 Dear Colleague Letter at 12.

137.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[4]

138.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

   i.   "Notice . . . of the procedure, including where complaints may be filed";

   ii.   "Application of the procedure to complaints alleging [sexual] harassment...";

   iii.   "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

   iv.   "Designated and reasonably prompt timeframes for the major stagesof the complaint process"; and

---

[4] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

v.   "Notice to the parties of the outcome of the complaint  "[5]

139.   Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.

140.   Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

141.   An "erroneous outcome" occurred in this case, as Plaintiff was innocent and wrongly found to have committed a violation of USF's policies with gender bias as a motivating factor.

142.   Based on the foregoing, USF failed to conduct an adequate, reliable, and impartial investigation of Jane Roe's complaint.

143.   USF also denied Plaintiff's right to due process by: i) misapplying the definition of consent; ii) denying Plaintiff the right to ask questions of Jane Roe or the witnesses in the case, to test credibility or for purposes of cross-examination; iii) designating investigator Cutsinger and hearing officer Keroack with the duty of investigating the allegation and issuing the finding despite their clear and obvious bias against male students accused of sexual misconduct; iv) failing to give Plaintiff adequate time to review the investigative file and otherwise placing unreasonable restrictions on Plaintiff's review of the file; and v) denying Plaintiff

_____

[5] *Id.* at 20.

35

the right to an appeal.

144.    Students accused of far lesser violations than sexual misconduct were permitted to submit written questions for witnesses and were granted an appeal which was reviewed by person(s) other than the hearing officer.

145.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous finding and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, without limitation:

i. Beginning in 2011 and through the time when Jane Roe's complaint was investigated, USF was subject to immense federal, local and campus pressure to take measures to protect female victims of sexual assault, adopt a trauma-informed approach to investigating sexual misconduct complaints; and issue more severe sanctions to those found responsible for sexual misconduct. Such pressure included the ongoing OCR investigation, student outcry regarding USF's lack of a zero-tolerance policy involving sexual assault, and the public announcement that OCR was investigating USF;

ii. Upon information and belief, investigator Cutsinger and hearing officer Keroack received "trauma-informed investigation" training which Keroack perpetuated the idea that female victims of sexual assault should never be questioned, that trauma excuses all memory lapses and credibility issues and that complainants

always tell the truth. This approach caused Cutsinger and Keroack to overlook profound inconsistencies in Jane Roe's account of the incident;

iii. The evidence collected during the investigation did not support Jane Roe's account of non-consensual sexual contact. Rather, the evidence supported Plaintiff's account;

iv. Investigator Cutsinger had a conflict of interest in her role because she was a former Campus Police officer and because part of her responsibilities included ensuring USF's compliance with Title IX;

v. Investigator Cutsinger had a lengthy career as a women's advocate, working with victims of domestic violence and sexual assault;

vi. Hearing Officer Keroack, who was tasked with issuing the sanction, had a conflict of interest because of her background in social work dealing with domestic violence victims and participation in the paper titled "Precarious Manhood and Displays of Physical Aggression."

146. The above-referenced allegations demonstrate that Defendants intentionally discriminated against Plaintiff on the basis of gender. Indeed, the Defendants' decision to suspend and expel Plaintiff from school was motivated by gender and Plaintiff's gender was a determining factor in the outcome of the sham

37

investigation and disciplinary proceedings.

147.  The above-referenced allegations demonstrate that the Defendants reached an erroneous outcome against Plaintiff due to their gender discrimination and bias toward Plaintiff.

148.  The above referenced allegations demonstrate the Defendants' deliberate indifference in their gender discrimination towards Plaintiff because their conduct was clearly unreasonable in light of the circumstances.

149.  Upon information and belief, Defendants possesses communications and documents evidencing a predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

150.  Upon information and belief, Defendants have demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of sexual misconduct.

151.   Upon information and belief, Defendants mishandling of Jane Roe's allegations was motivated by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

152.  Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and punished severely for it.

153.  As a direct and proximate result of the above conduct, Plaintiff

sustained damages including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

154. As a result of Defendants' violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing Defendants to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) allow Plaintiff to return to USF at a time of his choosing without the imposition of any conditions for readmission to USF.

155. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees incurred in this matter, expenses, costs, and disbursements.

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows: a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against Defendants as a result of Defendants'

4878-2911-3860, v. 1

violation   of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing Defendants to:

 a. reverse the outcome and findings regarding Jane Roe's complaint;
 b. expunge Plaintiff's disciplinary record;
 c. remove any record of Plaintiff's suspension from his education file;
 d. permanently destroy any record of Jane Roe's complaint; and
 e. allow Plaintiff to return to USF at a time of his choosing without the imposition of any conditions for readmission to USF.

## COUNT III
## 42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process

156. Plaintiff re-alleges paragraphs 1 through 116.

157. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

158. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

159. A person has a protected property interest in pursuing his

education, as well as in future educational and employment opportunities and occupational liberty, of which he cannotbe deprived without due process.

160. Plaintiff's constitutionally protected property interest in his continued enrollment at USF and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by USF.

161. Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between USF and Plaintiff.

162. It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

163. USF has a duty to provide its students equal protection and due process of law by and through any and all procedures set forth by Defendants.

164. Plaintiff had obeyed all institutional rules when he was wrongly suspended and expelled from USF.

165. Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Plaintiff was deprived of a fundamentally fair process. Plaintiff's right to due process was violated when:

    i.    Plaintiff was provided only eight business days to prepare for the Formal hearing from the time the notice of hearing was provided to Plaintiff.

    ii.    Defendants misapplied their own definition of "consent" and, in doing so, Defendants essentially re-wrote their own policies and

procedures specific to Plaintiff's case.

iii. Defendants denied Plaintiff the right to ask questions of Jane Roe or the witnesses in the case, to test credibility or for purposes of cross-examination.

iv. Defendants refused to ask the witnesses prepared and submitted by Plaintiff.

v. Plaintiff was not given adequate time and notice to review the investigative file and Defendants otherwise placed unreasonable restrictions on Plaintiff's review of the file, including, without limitation, prohibiting Plaintiff from copying documents and placing a representative of Defendants in the room to restrict attorney client communication.

vi. Cutsinger and Keroack failed to question Jane Roe's credibility and misstated facts about her allegations in order to find Plaintiff responsible for violating the Student Conduct Code.

vii. The Standing Review Committee took less than one day to review the investigative file and read the 55-page report;

viii. Keroack, who had a vested interest in the outcome of Title IX cases at USF, issued the sanction.

ix. Plaintiff was denied the right to an appeal.

166. USF deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to be notified of the charges against him, his right to a fair adjudication, his right to be heard by an impartial factfinder, his right to question his accuser, his right to challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

167. USF failed to provide Plaintiff with the basic due process protections that it was required to provide students accused of sexual misconduct at a state

university.

168.   Defendants, as well as their agents, representatives, and employees, intentionally, willfully, wantonly, oppressively, and maliciously violated Plaintiff's due process rights.

169.   Defendants deprived Plaintiff of the requisite due process because Defendants had a pecuniary interest in the outcome of the adjudication. Specifically, USF was under OCR investigation at the time of the investigation into Jane Roe's allegations and potentially risked the loss of federal funding or other penalty if they found in favor of Plaintiff.

170. Based on the foregoing, Defendants violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of Jane Roe's allegations.

171.   As a result of the foregoing, Plaintiff is entitled to prospective injunctive relief expunging Plaintiff's disciplinary record; removing any record of Plaintiff's suspension from his education file; destroying any and all records pertaining to Jane Roe's complaint; and allowing Plaintiff to return to USF at a time of his choosing in order without the imposition of any conditions for readmissionto USF.

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows: a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages

4878-2911-3860, v. 1

to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction directing Defendants to (i) expunge Plaintiff's disciplinary record; (ii) remove any record of Plaintiff's suspension from his education file; permanently destroy any record of Jane Roe's complaint; and (iv) allow Plaintiff to return to USF at a time of his choosing without the imposition of any conditions for readmission to USF.

## COUNT IV
## 42 U.S.C. §1981: Racial Discrimination

172.   Plaintiff re-alleges paragraphs 1 through 116.

173.   Title 42, section 1981 of the United States Code prohibits intentional race discrimination in the making and enforcing of contracts, both public and private.

174.   The Defendants are subject to the requirements of 42 U.S.C. § 1981.

175.   The relationship between Defendants and Plaintiff is contractual in nature, with USF's Sexual Assault Policy, Student Handbook, Student Code of Conduct, Title IX Investigation Policy, and Anti-Discrimination Policy, as well as other policies and procedures, supplying the contract terms between the parties.

176.   USF's Anti-Discrimination Policy promises and agrees that:

USF strives to provide a work and study environment for faculty, staff and students that is free from discrimination and harassment on the basis of race, color, marital status, sex, religion, national origin, disability, age, or genetic information as provided by law.

44

177.   Defendants have breached their contracts with Plaintiff and, in doing so, discriminated against Plaintiff on the basis of race.

178.   Defendants, throughout the investigation, as well as in determining the outcome, were motivated by race.

179.   Plaintiff's race was a determining factor in the outcome of the investigation and disciplinary proceedings.

180.   Plaintiff was not given a fair, impartial, or thorough investigation and hearing as required by the Student Handbook and Student Code of Conduct, the Sexual Assault Policy, and the Title Investigation Procedures because he was an African American male.

181.   As a direct and proximate result of the above-referenced racial discrimination, Plaintiff has been substantially damaged in an amount to be proven at trial, in excess of $75,000, based on upon the following: mental anguish, severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, loss of educational and athletic opportunities, and loss of future career prospects and/or earnings.

182.   As a direct and proximate result of the above-referenced racial discrimination, Plaintiff is entitled to compensatory and punitive damages.

183.   Pursuant to 42 U.S.C. §§ 1988(b) and (c), Plaintiff demands an award of his reasonable attorneys' fees.

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment

4878-2911-3860, v. 1

against Defendants as follows: a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction directing Defendants to (i) expunge Plaintiff's disciplinary record; (ii) remove any record of Plaintiff's suspension from his education file; permanently destroy any record of Jane Roe's complaint; and (iv) allow Plaintiff to return to USF at a time of his choosing without the imposition of any conditions for readmission to USF.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: December 8, 2021

> Respectfully Submitted,
>
> */s/ Kenneth G. Turkel*
> Kenneth G. Turkel - FBN 867233
> E-mail:  kturkel@bajocuva.com
> Anthony J. Severino – FBN 093452
> E-mail:  aseverino@bajocuva.com
> BAJO | CUVA | COHEN | TURKEL
> 100 North Tampa Street, Suite 1900
> Tampa, FL 33602
> Telephone: (813) 443-2199
> Facsimile: (813) 443-2193
> *Attorney for Kevaughn Dingle*

46