## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**KEVAUGHN DINGLE,**

       **Plaintiff,**

**vs.**                        **Case No.: 8:21-cv-02861-T-35AEP**

**UNIVERSITY OF SOUTH FLORIDA**
**BOARD OF TRUSTEES,**

       **Defendant.**

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES ("USF" or "Defendant"), moves for summary judgment on Plaintiff's claims for race[1] and gender[2] discrimination. Specifically, Plaintiff, an African-American male, challenges his expulsion from USF for committing sexual misconduct against an African-American female student ("Jane Roe"). He claims that his expulsion was because of his race and sex instead of his own misconduct. As demonstrated by Plaintiff's own deposition where he was unable to identify any evidence, basis, or instance of discrimination (Pl. 167:12-174:21), the undisputed facts show that Plaintiff cannot establish a claim of discrimination and summary judgment must be granted in favor of USF on all counts.

---

[1] Title VI of the Civil Rights Act of 1964 ("Title VI")

[2] Title IX of the Education Amendments of 1972 ("Title IX")

## MEMORANDUM OF LAW

In this action, Plaintiff cannot establish that USF discriminated against Plaintiff based on his race or gender.  Instead, upon receipt of a complaint from Jane Roe of a forcible sexual assault by Dingle, USF conducted an investigation, held a hearing on Dingle's provisional suspension, and held a formal hearing where Plaintiff had the opportunity to question Roe and call witnesses.  After the hearing officer found Dingle responsible for sexual misconduct, Dingle had an opportunity to appeal and then had an opportunity to seek judicial review of his expulsion.  He failed to take advantage of both opportunities – only filing a untimely appeal.  In his deposition, Dingle could not identify any evidence of discrimination, including any student, facing materially similar allegations, who was treated differently, or any basis for his claims. (Pl. 104:1-12; 125:23-126:4; 127:13-128:4; 167:12-170:1, 19-21; 171:19-173:21; 174:11-21).   In short, Plaintiff cannot marshal sufficient evidence to create any genuine issue of material fact on his claims, and USF is entitled to judgment as a matter of law.

## I.    STATEMENT OF UNDISPUTED FACTS[3]

Plaintiff and Roe were both students enrolled at USF in the fall of 2017. (McDonald Decl. ¶ 3).  They met for the first time in a brief encounter on November 14, 2017, where they attempted to exchange contact information through Snapchat.

---

[3] Defendant's supporting materials are attached along with an index.  Defendant cites to the declaration or depositions by using the declarant's or deponent's last name along with a pinpoint citation, except for Plaintiff who is referred to as "Pl." or "PX" for exhibits.  References to interrogatory answers are made by identifying the answering party, followed by the number of the pertinent response.  The facts recited herein are for purposes of summary judgment only.  Defendant reserves the right to challenge Plaintiff's assertions should this motion be denied.

(PX20:000085, 000128).  They had no prior relationship nor any contact until around noon on November 16, 2017, when the events at issue occurred. (Pl. 110:18-24).

### A.     Jane Roe reports Plaintiff sexually assaulted her

Immediately after leaving Dingle's room, Roe went to find her friends and report that Dingle had sexually assaulted her.  (PX20:000135-36).  One of her friends accompanied Roe to Dean McDonald's office to report the sexual assault.[4] (PX24:000016).  Thus, on November 16, 2017, at 1:35 p.m. (thirty-five minutes after she left Dingle's room), Roe reported to Dean McDonald that she had been sexually assaulted. (PX24:000015–16; PX20:000093; PX29).  Dean McDonald provided Roe with the resources available to her, including seeking medical treatment, informing the police, or reporting to USF's Center for Victim Advocacy and Violence Prevention.[5] (PX24:000016). Roe agreed to go to the Center for Victim Advocacy and Violence Prevention,   and   Dean   McDonald   escorted   her   there.   (PX24:000016–17; PX20:000137). Dean McDonald then submitted a Title IX report. (PX24:000015–17).

After meeting with an advocate and being transported to the crisis center, Roe contacted   the   USF   Police   Department   ("USFPD")   to   report   the   assault. (PX25:000025; PX20:000136).  Officer Danyelle Madsen   took   the   report   and

---

[4] Jane Roe did not provide her name or Plaintiff's name to Dean McDonald, as Roe wished to remain anonymous at that time.  (PX24:000016).  USF later determined that this report was related to Roe and Plaintiff.  (PX24:000015; PX20:000093).

[5] The Center for Victim Advocacy and Violence Prevention provides confidential and non-confidential resources available to students and employees who are victims of sexual assault, dating violence, domestic violence, and stalking.  (McDonald Decl. ¶ 4).

transported Roe to USFPD.[6] (PX25:000025). On November 17, 2017, at 4:13 a.m.,

Officer Madsen submitted a Title IX report. (PX26:000003–05). The report provided

the following summary of the incident:

> On 11/16/2017, I spoke with [Roe] victim, who stated that she had been
> sexually assaulted by male, later identified as Kevaughn Dingle. She
> advised she went to Dingles room . . . to hang out and get to know him.
> [Roe] stated that Dingle began to make sexual advances which she denied.
> She advised that he pushed her on the bed, removed her clothes and
> began to have unconsensual sex. She stated that she advised him to stop
> several times and stated "no" however he continued.

(PX26:000004).

### B.    USF investigates Roe's report of sexual assault by Plaintiff

Based on the description of the incident—that there was forced, nonconsensual

sexual intercourse—USF provisionally suspended[7] Plaintiff pending investigation of

the complaint. (PX30:000036; PX20:000082; Pl. 94:10–12). USF's policies expressly

prohibited nonconsensual sexual intercourse and provided sanctions up to and

---

[6] A year before filing this action, Plaintiff obtained an order expunging all records of his criminal arrest. (PX38:000530–32). In response USFPD and the state attorney's office deleted all of their records. During discovery, Plaintiff produced some records that he purports were created or maintained by the state attorney's office. However, these records cannot be authenticated because Plaintiff caused the official records to be deleted and USF does not have access to the complete files of USFPD or the state attorney's office. (Id.). To the extent that Plaintiff now attempts to rely on these purported records, which also were not considered during the student conduct process and cannot be authenticated, they are irrelevant and inadmissible. See Fed. R. Civ. P. 56(c)(2); Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").

[7] As provided in its policy, USF may impose a provisional suspension at any time during the conduct process, which immediately suspends a student from USF or from participating in official USF activities. (PX19:000224-25). A provisional suspension may be imposed to ensure the safety and well-being of members of the USF community or preservation of USF property; to ensure the physical or emotional safety and well-being of the members of USF community; or when the student's continued presence or use of privileges at USF is likely to pose an ongoing threat of disruption or interference with the normal operations of USF. (Id.).

including expulsion. (PX19:000214–15; PX21:0000503-04; PX30:000034). The Sexual

Misconduct Policy provided USF's definition of consent:

> "Consent" means an informed, knowing, and voluntary agreement to engage in sexual activity. Consent to engage in sexual activity must exist from beginning to end of each instance of sexual activity. Consent is demonstrated through mutually understandable words and/or actions that clearly indicate a willingness to engage in a specific sexual activity. Silence or an absence of resistance alone, without actions evidencing permission, does not imply consent.

(PX21:000519–21; Pl. 105:23–106:12).

On November 22, 2017, Maria Zale Cutsinger, the interim director of USF's

Office of Student Rights and Responsibilities, held a provisional suspension hearing to

determine if Plaintiff's suspension should be continued until a formal hearing could be

held to determine responsibility for the violations. (Pl. 94:13–15, 124:15–125:2;

PX30:000029; Cutsinger 55:4–13). Plaintiff appeared at the hearing. (PX30:000030).

Plaintiff was offered an opportunity to accept responsibility for violating the Code of

Conduct and request or accept recommended sanctions. (PX30:000032–33, 000064–

65). He declined to accept responsibility. (PX30:000064–65). Plaintiff maintained that

the entire encounter was consensual and the only time Roe said "no" was when she

explained that it was too early. (PX30:000065, 000045–46). Cutsinger withheld

making a decision on the suspension because Cutsinger had not had an opportunity to

interview Roe. (PX30:000068–69). However, Cutsinger did explain the disciplinary

process to Plaintiff, including his opportunity to appeal. (PX30:000069).

On November 27, 2017, Cutsinger conducted a phone interview with Roe.

(Cutsinger Ex.1:000006–07). Cutsinger also received a synopsis from USFPD

detailing its investigation and interviews of Plaintiff and Roe on November 17, 2017.[8] (PX20:000083; PX27:000022–24).

According to Roe's report, Plaintiff and Roe met on or around November 14, 2017, exchanged contact information, and agreed to meet later. (PX27:000022). On November 16, 2017, they met in Plaintiff's dorm room around noon. (Id.). At some point during this encounter in Plaintiff's dorm room, they began talking about the reason they were hanging out. (Id.). Dingle replied he wanted to get to know Roe sexually. (Id.). Roe replied not today, maybe some other time, but not right now. (Id.). Plaintiff began to touch Roe, and Roe then intended on leaving. (Id.). Plaintiff asked for a hug before she left. (Id.). Roe went in for a hug, but Plaintiff began holding her tight in a way that did not allow her to move. (Id.). Plaintiff began kissing Roe's neck. (Id.). Roe told him "no, I've got to go study." (Id.). Plaintiff would not move or get off. (Id.). At some point, Roe told Plaintiff that she had to use the bathroom. (Id.). Plaintiff moved away from her and she went to the bathroom. (Id.). As she left the room, Plaintiff stated, "You make me get more aggressive when you fight back." (Id.). Roe felt the time in the bathroom would allow Plaintiff time to settle down. (Id.). Roe returned to the room to gather her belongings. (Id.). Dingle grabbed for Roe's arm and brought her back between him and the bed. (Id.). Plaintiff kept placing Roe's arms around Plaintiff's neck. (Id.). Plaintiff groped Roe. (PX27:000023). Plaintiff lifted Roe's legs and she fell on the bed. (Id.). Plaintiff removed Roe's pants and turned her

---

[8] This interview was audio recorded (PX27:000023), but that recording was deleted as a result of the expungement order Plaintiff obtained prior to filing this lawsuit (PX38:000530-532).

over. (Id.). Roe advised that he use a condom. (Id.). Plaintiff replied that he was an expert and not to worry. (Id.). Plaintiff had sex with Roe. (Id.). After, Roe initiated oral sex on Plaintiff. (Id.). When asked about why she willingly gave Plaintiff oral sex after the incident that occurred, Roe stated that she wanted to make sure he was safe and had no reason to talk bad about her. (Id.). As Roe left Plaintiff's room, he stated, "It's a turn off when girls fight back, makes me have to work." (Id.).

Det. Pearson interviewed Plaintiff, which was summarized in the synopsis. (PX27:000023-24; Madsen 25:1-5).  According to the synopsis, Plaintiff confirmed that Roe stated that she did not want to have sex at that time, as it was too early. (PX27:000024). Plaintiff explained that "at first she was like no, no, no . . . then we were talking and, agreed to have sex." (Id.). Plaintiff told her she knew what she was coming over there for. (Id.). Roe responded that she did not want to have sex and got off the bed. (Id.). Plaintiff admitted that Roe was saying no at first. (Id.). Plaintiff was rubbing and "feeling up" on Roe. (Id.). Roe had to use the bathroom. (Id.). When she returned, Plaintiff grabbed her, put her on the bed, and tried to take her shoes off. (Id.). Roe said no. (Id.). Plaintiff started to take Roe's bra off, she said, "Wait, and Wait." (Id.). Plaintiff continued to take her bra off and Roe gave no resistance, at which point Plaintiff continued to take her shirt and pants off. (Id.). Plaintiff stated that Roe took his shirt off. (Id.). Roe asked if Plaintiff had a condom. (Id.). Plaintiff texted a friend if he had a condom, which he did not. (Id.). Plaintiff could not find a condom and Roe said nothing. (Id.). Plaintiff explained that he heard Roe say no but thought her body language was saying that she wanted to have sex. (Id.). Plaintiff stated, "Once she

stopped all that moving and that fighting it was a go for me." (Id.). Plaintiff advised it was a "no" in the beginning, and Roe never said yes, but the situation showed that she wanted to have sex. (Id.).

Based on information received from Plaintiff, USFPD, and Roe,[9] on November 28, 2017, Cutsinger determined there was sufficient evidence to maintain the provisional suspension and set a formal hearing for December 8, 2017. (PX31:000071; PX20:000084; Pl. 133:24–134:3). As set forth in USF's policy, this conclusion is not a finding of responsibility, but a conclusion that sufficient evidence exists to warrant a formal hearing to determine responsibility. (PX19:000225-226). Cutsinger provided Dingle with the opportunity to choose an administrative hearing officer or University conduct board. (PX31:000071). Plaintiff elected to proceed with a hearing officer. (PX31:000071; PX20). Plaintiff was informed of the procedure for the hearing, the burden of proof (preponderance of the evidence), and his rights, including that the right to review the evidence to be used at the hearing; his right to submit records, exhibits, and written statements for consideration; as well as his ability to present and inquire of the witnesses. (PX31:000072).

### C.   USF held a formal hearing to determine if Plaintiff violated policy

On December 8, 2017, Kristin Steffen[10] presided over the formal hearing.

---

[9] Plaintiff did not identify any other witnesses to the interactions between he and Roe on November 16, 2017. (Pl. 157:11-25; 158: 1-18). He also had the opportunity to arrange for any witnesses to testify at the formal hearing. (PX31; Pl. 158:1-18).

[10] Steffen was identified as the hearing officer on the agenda that was attached to the notice of the formal hearing. (PX31; PX32).

(PX20:000077–78). Plaintiff appeared at the hearing along with his attorney advisor, Lyann Goudie. (PX20:000078). Roe also appeared along with her advisor (victim advocate). (Id.). While Officer Madsen was identified as a witness, she did not attend the hearing. (PX31). At the hearing, Steffen considered the USFPD synopsis, Title IX incident reports, command notification, a text message provided by Dingle, and the testimony presented. (PX20:000095, 000100, 000110).[11]   As Cutsinger informed Dingle on November 28, 2017, the decision is based solely on the evidence presented and any prior meetings with the charged student. (PX31: 000073).

During the hearing, Plaintiff again refused to accept responsibility for the charges. (PX20:000081–82). Cutsinger provided a summary of her investigation and basis for the charges. (PX20:000082–95). Cutsinger's role at the hearing was to present the information she gathered so the hearing officer could consider that in rendering her decision. (Cutsinger 73:1–6, 73:19–74:4). Plaintiff was allowed to question Cutsinger through Steffen. (PX20:000096–101). Plaintiff was invited to call witnesses. (PX31:000072; PX20:000101–02). He called one witness, his roommate. (PX20:000101–02).[12] The roommate testified that he did not hear screaming or yelling

---

[11] Det. Pearson was not identified as a witness in USF's correspondence. (PX31). Officer Madsen, who interviewed Roe, was identified as a witness. (Id.). Officer Madsen did not interview Dingle. (Madsen 15:23-25; 16:1-10). While Officer Madsen did not attend the hearing, Roe did and she provided a statement and answered questions, including those directed to her by Dingle. (PX20:000110-138). Plaintiff did not request for Det. Pearson to attend nor did Dingle ask for a postponement to request his presence. (PX20:000138-139). Nonetheless, Plaintiff was provided with an opportunity to explain his objection to the synopsis of his interview by Det. Pearson and why he disagreed with it. (Id.).

[12] At his deposition, Plaintiff testified that he could not recall being denied the opportunity to present any witness at the hearing. (Pl. 97:2–4). Plaintiff testified that he did not contact any other witnesses

for help from Plaintiff's room. (PX20:000107).

Roe also testified at the hearing and provided a detailed statement of her version of the events. (PX20:000111–16). Roe explained that she told Plaintiff that she did not want to have sex that day. (PX20:000112). Roe and Plaintiff hugged, but Plaintiff "wouldn't let go." (PX20:000113). Roe pushed against Plaintiff and told Plaintiff to let her go, but he would not. (Id.). Plaintiff made her lose her balance, causing her to fall onto his bed. (Id.). Plaintiff laid most of his body weight on Roe and ignored her repeated attempts to push him off. (Id.). Roe told him no again, to which Plaintiff said, "No, it's too late" and "I like it when you fight back." (Id.). Plaintiff forced Roe to kiss him and groped her. (PX20:000114). Roe told Plaintiff that she had to use the bathroom, hoping to give him time to cool off. (Id.).

As soon as Roe returned, Plaintiff grabbed her and held her to him. (Id.). Plaintiff lifted her onto the bed and lifted her legs so that he was in between them. (Id.). Plaintiff continued to grope her and attempted to take off her sweater and bra. (Id.). Plaintiff turned her around and pulled her pants down. (PX20:000115). She tried to brace herself to move away or stop Plaintiff from doing it. (Id.). Plaintiff took off her bra and her sweater, all the while continuing to grope her. (Id.). Plaintiff slid his pants down and "dry-humped" her with his penis. (Id.). At this point she felt actual fear, knowing that Plaintiff was not going to listen. (Id.). She tried to distract him by saying, "At least put on a condom. Where are your condoms?" (PX20:000115–16). Plaintiff

---

to testify at the hearing, and did not identify any other witnesses to USF that he wanted to have present at the hearing. (Pl. 136:2–8).

said that he did not have any more and that he was good. (PX20:000116). She attempted to push him away with her hips and turn so that he was not behind her anymore, and tried to stand upright so that Plaintiff could not penetrate her, but Plaintiff threw her into the position he wanted her in. (Id.). Plaintiff inserted himself, and she stopped fighting and did what Plaintiff wanted her to do in hopes of it being over faster. (Id.). Plaintiff ejaculated on her butt and back. (Id.). Roe then initiated oral sex because she "was humiliated and feared the repercussions of what had just happened." (Id.). She gathered her things and as she left, Plaintiff stated, "You shouldn't have fought back like that. It's a turnoff for me." (Id.).

After Roe gave her statement, Steffen asked her a number of questions. (PX20:000116–25). In response to Steffen's questions, Roe emphasized that she was resisting Plaintiff's advances throughout the encounter. (PX20:000120). Roe repeated that she verbalized her refusal to have sex at that time, and that she used non-verbal signals as well. (PX20:000120–22). Roe explained that she initiated oral sex because she was humiliated, did not want him to talk about her, and did not want to pass on anything that she might have had to him. (PX20:000124). Plaintiff was then allowed to question Roe through Steffen. (PX20:000125–37).[13] Roe answered all of the questions posed, including those posed by Dingle. (PX20:000116–37).

Plaintiff was provided an opportunity to make a statement about the events, but

---

[13] At his deposition, Plaintiff testified that he could not recall being denied the opportunity to ask any questions of any witness at the hearing nor was there any document that would refresh his recollection. (Pl. 97:16–23; 100:8-18).

he declined, instead simply stating that the intercourse was consensual. (PX20:000137–38). Plaintiff also claimed that the USFPD synopsis was inaccurate because he never said that any sexual activity was nonconsensual. (PX20:000138–39).[14] Steffen asked Plaintiff several questions about the incident, including asking him to explain specifically whether he had consent. (PX20:000141–45). Dingle repeatedly declined to answer the questions. (PX20:000141–45).

At the end of the hearing, Steffen explained to Plaintiff that he would receive the hearing outcome within ten business days via university e-mail. (PX20:000149). Steffen also explained that he could appeal a decision of the administrative officer within five business days to the Dean of Students, that the basis for appeal was defined in the Student Code of Conduct, and that the decision of the Dean of Students is the final decision of USF. (Id.).

### D.   The Hearing Officer's determination and Plaintiff's untimely appeal

On December 13, 2017, USF notified Plaintiff of Steffen's determination finding Plaintiff violated USF's policy, explaining why she reached this conclusion, and imposing sanctions, which included expulsion from USF. (PX33:000153–54; Pl. 142:23–25). Specifically, Plaintiff was found responsible for violation of Rule 4.14(b) of the Student Code of Conduct because it was more likely than not that vaginal sexual intercourse occurred without expressed ongoing affirmative consent, as Roe "verbally indicated 'no' to vaginal sexual intercourse to [Plaintiff] and [Plaintiff] acknowledged

---

[14] At his deposition, Plaintiff testified that he could not recall if the synopsis was inaccurate or incomplete, and nothing would refresh his recollection.  (Pl. 116:8–13).

to University officials that he heard [Roe] say 'no' during the course of the incident on November 16, 2017." (PX33:000153). Plaintiff was found responsible for violation of Rule 4.14(c) of the Student Code of Conduct because it was more likely than not that non-consensual sexual contact occurred without expressed ongoing affirmative consent, as Plaintiff "used force to intentionally make contact to touch [Roe's] breasts and buttocks in a sexual manner." (Id.). As a result, Plaintiff was expelled and ordered to have no contact with Roe. (PX33:000154).

The letter again informed Plaintiff that he had five business days to appeal the determination of responsibility and sanctions. (Id.). Despite having the opportunity to appeal and being represented by an attorney, Plaintiff failed to submit an appeal within five business days.[15] (Pl. 151:6–25, 155:7–13). On December 21, 2017, Plaintiff was informed that the sanction of expulsion became effective that day. (Pl. 152:17–25).

On January 3, 2018, Plaintiff submitted an untimely appeal. (Pl. 153:18–154:4; PX36:000157–58). Plaintiff asked USF to consider his "belated appeal" because he was "emotionally and mentally upset over this incident and didn't realize that he had to appeal within five days of the letter." (Id.). Plaintiff also stated that he had just started a job with FedEx.[16] (Id.). Plaintiff stated that he appealed based on being denied

---

[15] Plaintiff forwarded a copy of the determination to his attorney on December 14, 2017, but did not file an appeal or seek an extension of time to do so. (Pl.'s Priv. Log at 1). His attorney responded to Dingle on December 26, 2017, and Dingle again did not file an appeal or seek an extension of time. (Id.). Instead, Plaintiff waited until January 3, 2018, to file an appeal, even though he had been informed on December 21, 2017, that the sanction of expulsion was final. (Pl. 22:21-24).

[16] At his deposition, Plaintiff testified that he was referencing a job with UPS, not FedEx, and that his job with UPS actually started in June of 2017. (Pl. 155:24-156:16).

due process. (<u>Id.</u>). Plaintiff's appeal did not mention discrimination or bias by anyone. (<u>Id.</u>; Pl. 161:19–23). On January 9, 2018, USF denied Plaintiff's appeal because he missed the deadline for appeal. (PX37:000163–64). USF informed Dingle of his right to seek judicial review, but he failed to do so. (<u>Id.</u>; Pl. 162:22–163:4).

### E. Dingle immediately enrolls in another institution and is expelled for misconduct; he thereafter enrolls in two other institutions

After Plaintiff was expelled from USF, he attended Iowa Central Community College, enrolling for the spring semester of 2018. (Pl. 7:10–8:1, 23:7–9; PX2:500154). A football coach at Iowa Central recruited him, knew he had been expelled from USF, and concluded that USF's action had no impact on Plaintiff's enrollment. (Pl. 19:13–20:25, 21:7–12). Plaintiff was awarded a full athletic scholarship to attend Iowa Central, which Plaintiff accepted on January 25, 2018. (Pl. 21:15–22:16; PX1:500146). Dingle was expelled from Iowa Central in October of 2018 for violating the code of conduct by engaging in a fight and failing a drug test. (Pl. 8:13–15; 32:21–23; 33:2–9, 35:4-15, 36:10-15; PX7:500153; PX8:500152). As a result of the expulsion for misconduct, Plaintiff lost his scholarship with Iowa Central and could no longer complete his degree there. (Pl. 35:16–23).

After Plaintiff was expelled from Iowa Central, a football coach with Garden City Community College recruited Plaintiff and offered him a full scholarship. (Pl. 36:16–24, 37:9–13, 19-20, 48:8-12). Plaintiff's expulsions from USF and Iowa Central did not impact the offer. (Pl. 37:21–24). Two other schools also offered Plaintiff opportunities to enroll, but Plaintiff turned those offers down to enroll in Garden City.

(Pl. 38:3–24). Plaintiff enrolled in Garden City in the spring of 2019 and pursued his Associate's degree, which he received. (Pl. 8:4–8). Garden City also provided a Bachelor's degree program. (Pl. 39:13–16, 40:6–9). Plaintiff did not pursue a Bachelor's degree because he was not interested in it. (Pl. 39:21–40:5).[17]

After graduating in the fall of 2019, Plaintiff attended Florida Memorial University in the fall of 2020. (Pl. 58:1–23, 59:3–12, 191:9–16). Plaintiff received a full scholarship to attend Florida Memorial. (Pl. 64:17–19, 191:9–16). Plaintiff stopped attending classes at Florida Memorial once the remainder of the football season was cancelled due to the COVID-19 pandemic. (Pl. 62:6–63:21). Florida Memorial resumed the football program in the fall of 2021, but Plaintiff did not seek to return. (Pl. 64:1–9). Plaintiff did not seek admission at any other university or college since leaving Florida Memorial. (Pl. 64:10–13). Plaintiff has not sought to complete his Bachelor's degree since leaving Florida Memorial. (Pl. 64:14–16).

## II.   Legal Argument

### A.   Plaintiff Cannot State a Race Discrimination Claim

Title VI prohibits discrimination on account of race in all programs and activities receiving federal financial assistance. 42 U.S.C. § 2000d; Regents of U. of Cal. v. Bakke, 438 U.S. 265, 284 (1978). Title VI prohibits only intentional discrimination. See Alexander v. Sandoval, 532 U.S. 275, 280 (2001). To state a claim under Title VI, Plaintiff must show that he was "denied participation in a federally

---

[17] At his deposition, Plaintiff testified that he did not seek admission to any institution that did not have a football program because he just wanted to play football.  (Pl. 48:2–8).

funded program because of his race." <u>Farrukh v. Univ. of S. Fla. Bd. of Trustees</u>, No. 8:20-CV-73-T-33TGW, 2020 WL 6136642, at *3 (M.D. Fla. Sept. 30, 2020); <u>see also</u> <u>Farrukh v. Univ. of S. Fla. Bd. of Trustees</u>, No. 21-13345, 2022 WL 3973703, at *3 (11th Cir. Sept. 1, 2022) ("Plaintiff identifies no student who was treated more favorably than Plaintiff under comparable circumstances. Nor does Plaintiff allege factual details about the circumstances surrounding his alleged mistreatment or about the circumstances and treatment of other non-Pakistani students that would support a plausible inference" of discrimination).

Thus, in this action, Plaintiff must show that he was expelled because of his race.[18]  Specifically, he must show that a similarly situated individual was treated differently or other evidence of race discrimination.  <u>Rollins v. Bd. of Trustees of the Univ. of Alabama</u>, 647 F. App'x 924, 938 (11th Cir. 2016) (quoting <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 n. 14 (11th Cir. 2004)).  To be similarly situated, the plaintiff and the person he identifies as a comparator must be similarly situated in all relevant respects. <u>Lewis v. City of Union City, Ga.</u>, 918 F.3d 1213, 1229 (11th Cir. 2019) (en banc); <u>see also</u> <u>Holley v. Georgia Dep't of Corr.</u>, 845 F. App'x 886, 889 (11th

---

[18] To the extent that Plaintiff also complains about the denial of his untimely appeal, Plaintiff undisputedly filed this appeal out of time.  It also is undisputed that his explanation was not accurate.  He asserted that he "didn't realize that [he] had to appeal within five days of the letter" and he has reading comprehension issues. (PX36).  However, he was verbally told this information at the formal hearing, which he acknowledged.  (PX20:000149; Pl. 155:7-17).  He forwarded the determination to his counsel the day after receiving it, but did not file an appeal or seek an extension of time to do so.  (Pl.'s Priv. Log at 1).  While Plaintiff also asserted that he "had just started a job with Fed Ex," he admitted in his deposition that this statement was not true.  (Pl. 155:24-25; 156:1-16).  Moreover, Plaintiff has not and cannot show any disparate treatment in the denial of the untimely appeal.  He does not identify any comparator who was permitted to file an untimely appeal.

Cir. 2021) ("Although the similarly-situated standard requires a case-by-case analysis, a similarly situated comparator will ordinarily have engaged in the same basic misconduct as the plaintiff (if applicable); have been subject to the same employment policy, guideline, or rule; shared the same supervisor; and shared the plaintiff's employment or disciplinary history.").

In his deposition, Plaintiff could not identify any similarly situated individual who was treated differently. (Id.). In his answers to interrogatories, Plaintiff only identified one comparator – Andrew Thurston. (PX41: I#10 at 9–10). The student conduct issues involving in Thurston were litigated in Garrett v. University Board of Trustees, Case No. 8:17-CV-2874-T-23AAS. The court's rulings in that case, which are published on Westlaw, establish why the accused student in Garrett is not similarly situated to Plaintiff in any respect. See Garrett v. Univ. of S. Fla. Bd. of Trustees, 448 F. Supp. 3d 1286, 1290 (M.D. Fla.), aff'd, 824 F. App'x 959 (11th Cir. 2020).

In Garrett, a female graduate student (Garrett) at USF accused a male graduate student, her intimate friend at the time (Thurston), of violating USF's student conduct code by exceeding the bounds of her consent to sexual contact. See 448 F. Supp. 3d at 1290. Specifically, the following undisputed facts, as found by the courts, establish that the facts of this case differ in nearly every respect from Garrett:

- Garrett and Thurston had known each other and were friends for a year before the alleged incident. Garrett, 448 F. Supp. at 1291.
- Garrett and Thurston exchanged thousands of text-messages in which they routinely called each other "best friends" and expressed "love" for each other. Id. at 1291–92.
- On the night in question, after Garrett "said 'no' and 'this is not going to

17

happen,' Thurston engaged in what a faculty member later described as 'non-consensual digital penetration.'" Id. at 1292.

- After using the bathroom, Garrett returned to Thurston's bed and slept for the remainder of the night. Id.

- The following morning, Garrett and Thurston agreed to never cross "the friend line" again. Id.

- Garrett did not immediately report the conduct. Instead, she waited three weeks before she reported it to the University. Id.

- During that three-week period of time, the following events occurred:

  o Thurston and Garrett exchanged almost 1,500 text messages. Garrett, 824 F. App'x at 960.

  o In text-messages exchanged the following day, Thurston expressed dismay about possibly having ruined Thurston and Garrett's friendship. Garrett responded, "We made out. It's not a big deal. Everything's still the exact same." Id.

  o Twice within a few days after the incident and once at Garrett's instance, Garrett slept at Thurston's apartment. Eleven days after the incident, Thurston accepted an invitation from Garrett to watch television at Garrett's apartment, and Garrett accepted an invitation from Thurston to celebrate Thanksgiving two days later with Thurston's family. Id.

  o The same day, Garrett sent Thurston nine text-messages between 5:30 p.m. and 6:30 p.m. After receiving no response by 8:00 p.m., Garrett wrote, "Ok so since you haven't told me anything about [Thanksgiving] I'm going to assume that's your way of making sure I don't come ... I tried ... Just do me a favor and if I don't answer [in] [t]he mornin[g] come Check on [my dog]." Garrett wrote that the "[l]ast time I did this I ended up throwing up in my sleep and I'm not trying to leave [my dog] ... un[fed]." Thurston responded, "What did you do? I'm on my way." Garrett replied that she was "taking two more Sleeping pills and another Xanax in [case] you need to kno[w]" and that "[i]n all honesty, all of this would be a lot easier for me if you just shot me." Garrett asked Thurston to "just come back, watch me drink, and make sure I sleep on my back." Id. at 1292–93.

  o After Thurston arrived at Garrett's apartment, Garrett told Thurston to leave and locked the door. Thurston, to whom Garrett had given a key to the apartment, unlocked the door and called the police. After arriving, the police reviewed the text-messages on Garrett's cellular telephone and involuntarily committed Garrett under Florida's Baker Act. After receiving "stabilization" at a wellness center, Garrett sent to another student a text-message stating that Thurston "will be dropping out" because "after this there's no way I'm

ok with him staying in the program." Id.

- Eleven days after her release from the wellness center, Garrett told the director of the psychology doctoral program about the incident. Id. at 1293. While Garrett "decided to file a formal complaint," she "did not want to report the incident to law enforcement." Garrett, 824 F. App'x at 961. She also "requested that no interim measures be put in place," including a no-contact order. Id. USF commenced an investigation of Garrett's sexual misconduct complaint. Garrett, 448 F. Supp. 3d at 1293.

- Thurston accepted responsibility for violating the Student Code of Conduct and, as a result, waived his formal hearing and accepted imposition of both the no-contact order and the deferred suspension. Id. at 1294–95.

The undisputed facts in Garrett, as recognized by the courts, demonstrate that the accused student in Garrett was not similarly situated to Plaintiff in all material respects. Carr v. Bd. of Regents of Univ. Sys. of Georgia, 249 F. App'x 146, 149 (11th Cir. 2007) ("But so too, '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'"). The accused student in Garrett and Plaintiff in this case did not engage in the same basic conduct as required to establish that Thurston is a proper comparator. The constellation of surrounding circumstances involved in Garrett and the facts here are not even in the same universe. Garrett involved a different relationship between the students; different action in the incident at issue; different statements by the student accuser immediately after the incident; different conduct by the student accuser following the incident; a different response by the student accuser, including her rejection of the imposition of any interim measures, including a no-contact order, the three-week delay in reporting the incident, and the decision to report the incident only after Thurston had reported the accuser's threats of self-harm to the police; and a different response by the accused

student in accepting responsibility for the misconduct.  Thus, the disposition of the <u>Garrett</u> case is not evidence of disparate treatment, and Plaintiff has not identified any comparator to support his claim of race discrimination.

Plaintiff also does not marshal evidence of any other facts to show race discrimination. Indeed, Plaintiff merely contends that Defendant treated a student of Plaintiff's *same* race (Roe) more favorably than him by accepting her account and finding that Roe's complaint was substantiated.  The formal hearing transcript, however, undisputedly establishes that the decision was made based on the evidence presented at that hearing, including Roe's fully cooperative and forthcoming statements.  (PX20).  Nonetheless, even if Dingle's contention were supported by evidence, it does not support a claim of race discrimination – there is no disparate treatment based on race when Roe and Dingle were the same race.

Plaintiff's deposition testimony also defeats his claim.  Plaintiff has not identified any individual who was biased or discriminated against him nor does he identify any basis or evidence for his race discrimination claim.  (Pl. 104:1-12; 125:23-126:4; 127:13-128:4; 167:12-170:1, 19-21; 171:19-173:1-21; 174:11-21).  He does not identify any discriminatory remarks or comments.  (<u>Id.</u>).  He does not identify any substantial disparate impact,[19] a history of discriminatory actions, procedural or

---

[19] Plaintiff's Amended Complaint provides that he is only proceeding under a disparate treatment theory.  (Am. Compl. ¶¶ 122-135).

substantive departure from the norms by the decisionmaker,[20] or any discriminatory statements.  (Id.).  In short, Plaintiff concedes that he does not have any other evidence of discrimination.

USF's records of sexual misconduct cases further show that there was no race discrimination. (Def. I#2 at 5-6, 000896–000899). Plaintiff only alleges that one entry on this chart was a comparator (Thurston), which is addressed supra and did not involve the same decisionmaker (Steffen).  (PX41: I#10 at 9–10).  Moreover, during the years 2016 through 2019, Steffen acted as either an administrative officer or a member of the University Conduct Board in three sexual misconduct cases, including Plaintiff's case. (Def. I#2 at 5-6, 000896–000899). Each case involved respondents who identified as black. (Def. I#2 at 5-6, 000898). Only Plaintiff was expelled.[21] (Id.). As this evidence concretely demonstrates, Steffen's determination was not based on race.  Instead, as she described in her deposition and the University confirmed in its deposition, each decision was made based on the specific circumstances presented and

---

[20] As the transcript of the formal hearing demonstrates, there is no evidence that Steffen departed from any USF procedure in handling this case.  (PX20).  More importantly, there is no evidence that she did so in a disparate manner, which is necessary to show discriminatory intent.  While Plaintiff complains about a purported lack of due process, there is no evidence to support his contention.  He was given two hearings and an opportunity to file an appeal.  He also was provided with an opportunity to seek judicial review, which he failed to do and is fatal to his due process claim. McKinney v. Pate, 20 F.3d 1550, 1565 (11th Cir. 1994) ("Since the Florida courts possess the power to remedy any deficiency in the process by which McKinney was terminated, McKinney can not claim that he was deprived of procedural due process.").  Although Plaintiff complains about the period of time between the complaint and the formal hearing, USF's policy specifically provides for an expedited hearing when a respondent has been provisionally suspended and removed from the educational setting.  (PX19:000226).

[21] Of the three students, Dingle also was the only one found responsible for nonconsensual sexual contact and had been provisionally suspended. (Def. I#2 at 5-6, 000896–000899).

the sanctions were determined based on a number of factors, including the circumstances of the violation, whether the student accepted responsibility, the accounts of the students, any mitigating circumstances, reports of witnesses, prior disciplinary history, the health, safety, and welfare of the USF community, and the impact on the USF community. (Steffen 62:8-12; USF 49:17-19, 53:12-19).  Plaintiff has not and cannot present any evidence to refute this testimony.

Furthermore, the other decisions made by different decisionmakers also show that race was not a factor.  Indeed, when black students were respondents, the chart shows that these students also had cases dismissed or had lesser discipline imposed just like the white students.  (Def. I#2 at 5-6, 000896–000899).  There is no evidence of race discrimination.  Plaintiff has not and cannot present evidence that the sanctions or decisions made in each of these cases were due to anything other than the particular circumstances presented.  (Cutchens 40:23-25).

Without presenting any evidence of race discrimination, Plaintiff is attempting to use this action to challenge the sanctions imposed.  The Supreme Court has been clear – a student has no "right to make particular remedial demands."  Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648-49 (1999).  Instead, the opportunity for that type of review only lies in seeking judicial review of the expulsion decision under state law or filing a timely appeal under USF's policy.  Dingle relinquished both of those remedies.  As the court in Garrett recognized, the student could not state a claim for a violation of Title IX when she "elect[ed] to relinquish her opportunity to achieve the same remedy" through an appeal.  Garrett, 448 F. Supp. 3d at 1303; see also id. at

1286 (concluding that "the availability of a reasonable appellate remedy argues persuasively for the reasonableness of the response" and the lack of a discrimination claim as a matter of law).  The same conclusion lies here.  <u>United States v. Sec'y Fla. Agency for Health Care Admin.</u>, 21 F.4th 730, 746 (11th Cir. 2021).  Plaintiff has failed to establish a claim of race discrimination, and USF is entitled to judgment as a matter of law on Plaintiff's Title VI claim.

**B.    Plaintiff fails to state a claim under Title IX**

To establish a violation of Title IX, Plaintiff must show that Defendant discriminated against Plaintiff on the basis of sex. <u>Doe v. Samford Univ.</u>, 29 F.4th 675, 686 (11th Cir. 2022); <u>see also</u> 20 U.S.C. § 1681(a). Plaintiff contends that Defendant reached the wrong outcome in his disciplinary proceeding.  However, Title IX only requires recipients refrain from discriminating against individuals because of sex—it does not require that the institution make correct decisions. Thus, this issue in this case is not what occurred between Plaintiff and Roe, but instead turns on whether USF's actions were clearly unreasonable based on the information known at the time it made its decision. <u>Davis v. Monroe Cnty. Bd. of Educ.</u>, 526 U.S. 629, 648 (1999) (concluding that a university is liable under Title IX only when the university's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.").

The "erroneous outcome" standard cited in Plaintiff's Amended Complaint is not supported by the plain language of Title IX or the Supreme Court precedent

recognizing a private right of action under Title IX.[22] This standard improperly suggests the court should focus on the correctness of the outcome of the disciplinary proceedings, rather than the existence of gender bias prohibited by Title IX. That approach is inconsistent with Title IX, as well as the body of binding precedent recognizing that courts must give deference to the educational decisions of college administrators. Specifically, the standard's focus on whether an accused student is "wrongly found to have committed an offense" is contrary to the Supreme Court's instruction that courts should not second-guess decisions of school administrators or advocate for a particular outcome. See Davis, 526 U.S. at 648-49. The court can and should only be concerned with whether discrimination occurred in violation of a federal statute, and not whether the decision-maker "got it right." Jones v. Gerwens, 874 F.2d 1534 (11th Cir. 1989). Indeed, in Samford Univ., 29 F.4th at 686-87, the Eleventh Circuit addressed the threshold question of the legal framework for establishing a violation of Title IX in the context of university disciplinary proceedings. The court refused to adopt the erroneous outcome standard and, instead, described the framework (in the context of a motion to dismiss) as "whether the alleged facts, if true,

---

[22] The "erroneous outcome" theory of liability under Title IX originated with the Second Circuit's opinion in Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994), which pre-dated the Supreme Court's decision in Davis. Under that theory, a student must show both that he was innocent and wrongly found to have committed an offense and that there is a causal connection between the flawed outcome and gender bias. Even if this theory were a viable one, which it is not, Plaintiff still could not prevail as the formal hearing transcript demonstrates a violation of USF's policy by a preponderance of the evidence. Roe provided a detailed description of the events and answered questions, including those posed by Dingle. (PX20). For his part, Dingle declined to answer question or provide any details about the events, including specifically declining to explain how he had consent. (PX20). In other words, Plaintiff cannot show that there was an erroneous outcome. (PX20).

permit a reasonable inference that the university discriminated against [plaintiff] on the basis of sex." Samford Univ., 29 F.4th at 686–87.

Therefore, the intimate details of what, in fact, occurred between Plaintiff and Roe are not at issue. The only question before the Court is whether USF discriminated against Plaintiff because of his gender. As recognized in Davis, this is a consideration of whether USF's response was clearly unreasonable in light of the known circumstances.

Plaintiff fails to show that the outcome of his disciplinary process was in any way related to his sex. As an initial matter, Plaintiff fails to show that any decision-maker had gender animus or bias. Plaintiff claims that Cutsinger was biased against males "because of her role as the Interim Director of USF's Office of Students Rights and Responsibilities." (PX41: I#2 at 4). Plaintiff also alleges that "Cutsinger's prior job as a law enforcement officer made her biased in favoring the veracity of the Campus Police investigators." (Id.). Plaintiff also claims that Cutsinger received "training which perpetuated the idea that female victims of sexual assault should never be questioned." (Id.).[23]  There is no evidence to support these conclusions.  Indeed, Cutsinger only served as a law enforcement officer for three of the eighteen years she worked at USF.  (Cutsinger 16:7; 21:15-16).  Regardless, Cutsinger was not the

---

[23] Improper training cannot support an inference of sex bias by Defendant because there is no logical connection between inadequate training and sex bias. See Mancini v. Rollins Coll., No. 616CV2232ORL37KRS, 2017 WL 3088102, at *6 (M.D. Fla. July 20, 2017); see also Samford Univ., 29 F.4th at 689 ("So, ineptitude—a sex-neutral explanation that does not violate Title IX, see Davis, 526 U.S. at 642, 119 S.Ct. 1661—is the likelier, more "obvious ... explanation" for the investigator's departures from the policy.").

decision maker with respect to Plaintiff's expulsion, and these assertions are irrelevant to Plaintiff's Title IX claim.

Steffen, the hearing officer, found that Plaintiff violated USF's policy and imposed sanctions. Plaintiff has not provided any facts showing that Steffen acted with discriminatory intent. Steffen testified that prior to a formal hearing, she would review the case file and available materials. (Steffen 51:11–21). When acting as a hearing officer, she would receive information from all parties involved, and, in an unbiased way, review and make a decision based on good faith and the best of her ability. (Steffen 53:24–54:14). Her "role was not to choose a complainant over a respondent or a respondent over complainant." (Steffen 54:21–25). Instead, she would look at the evidence and determine whether it was more likely than not that a violation occurred. (Id.). The determination of appropriate sanctions depended on the allegations of each particular case. (Steffen 62:2–63:24). Plaintiff testified in his deposition that he could not recall if he had any reason to believe that Steffen was biased against him. (Pl. 103:12–25). He could not recall Steffen making any comments about his gender or sex. (Pl. 104:7–12). Indeed, Plaintiff's appeal did not mention discrimination or bias on the part of any individual involved in the investigation of the complaint against him or the determination of responsibility. (PX36). Moreover, a review of the transcript of the formal hearing, which undisputedly shows the information known to the university, demonstrates that USF did not acted clearly unreasonably in concluding that Dingle had violated its policies. Davis, 526 U.S. 649 ("This is not a mere 'reasonableness' standard . . . [and thus,] [i]n an appropriate case,

there is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law").

Plaintiff also does not allege any comparator or any facts to show disparate treatment based on gender. Dingle has failed to identify any similarly situated female student who was treated more favorably than him. Sahm v. Miami University, 110 F. Supp. 3d 774 (S.D. Ohio 2015); King v. DePauw Univ., No. 2:14-cv-70-WTL-DKL, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males). Indeed, USF records show that many cases were dismissed against male respondents and not all male respondents were expelled or found responsible. (Def. I#2 at 5-6, 000896–000899).

While Plaintiff generally alleges "immense federal, local and campus pressure to take measures to protect female victims of sexual assault" (PX41: I#2 at 4), "without more, the allegations that [a defendant] was cognizant of national pressure to prosecute and punish male students accused of sexual assault by female students [does] not suffice to support a plausible inference of gender bias." Doe v. Lynn Univ., Inc., No. 9:16-CV-80850, 2017 WL 237631, at *5 (S.D. Fla. Jan 19, 2017); Ruff v. Board of Regents of Univ. of New Mexico, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017). Plaintiff has not marshalled any evidence to establish these allegations. Instead, the undisputed evidences shows that the decisionmakers did not feel any such pressure. (Steffen 90:9-10). USF does not make student conduct decisions based on external pressure or because of information reported in the news media. (USF 98:17-22; 100:21-25; 171:5-

172:20).  Additionally, such reports do not impact, alter, or influence the University's decision on how to handle a particular case.  (Id.).  They had no role in the University's handling of the matter involving Mr. Dingle.  (Id.).

Even if the purported national or local pressures had been considered, the allegations at most are consistent with an inference of pro-complainant bias, not pro-female bias.  Samford Univ., 29 F.4th at 690 ("These allegations, taken together with university's alleged procedural missteps, might permit a reasonable inference that the decision to suspend Doe was motivated by a pro-complainant, anti-respondent bias. But discrimination against respondents is not discrimination 'on the basis of sex'"). Any assertion that public pressure led USF to discriminate on the basis of sex is not supported by evidence. See Samford Univ., 29 F.4th at 691-92; Doe v. Columbia Coll. Chicago, 933 F.3d 849, 855–56 (7th Cir. 2019); see also Doe v. Cummins, 662 F. App'x 437, 453 (6th Cir. 2016).

As Plaintiff cannot show that USF acted clearly unreasonable in light of the known circumstances when it decided to expel Plaintiff and Plaintiff has not presented any other evidence of gender discrimination, Plaintiff's Title IX claim fails as a matter of law and judgment must be entered in favor of USF.

**C.   Plaintiff fails to establish that USF caused Plaintiff injury.**

Plaintiff has not and cannot show he suffered any injury from the USF expulsion, which is fatal to his claims. Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562, 1569 (2022) (affirming dismissal of a spending clause statutory claim for failure to allege a compensable injury and applying a contract-law analogy to such

claims); <u>PNC Bank, Nat. Ass'n v. Colonial Bank, N.A.</u>, 451 F. App'x 835, 837 (11th Cir. 2012) (recognizing that damages are an element of a breach of contract claim).  In his interrogatory answers, he identified his only injury from the USF expulsion as the loss of an opportunity to complete his bachelor's degree.  (PX41: I#14 at 12; PX44: 200389, 200393–94).

However, the undisputed evidence establishes that Plaintiff had several opportunities to complete his bachelor's degree after his expulsion from USF and his expulsion had no impact on those opportunities. (Pl. 21:7–12; 37:21-24).  Plaintiff admits that he received full scholarships from and enrolled in three different institutions after being expelled from USF, at least two of which offered the opportunity to pursue a Bachelor's degree.  Plaintiff was expelled from one institution and voluntarily elected not to pursue his bachelor's degree at the other two.  Plaintiff has not and cannot show that his expulsion from USF prevented Plaintiff from pursuing his Bachelor's degree. Accordingly, because Plaintiff cannot establish any injury caused by USF, USF is entitled to judgment as a matter of law.

### D.    Plaintiff's claims are barred by the statute of limitations.

Because Title VI and Title IX contain no express statute of limitations, the Supreme Court has instructed courts to "borrow" one from "the most closely analogous . . . state law." <u>DelCostello v. Int'l Bhd. of Teamsters</u>, 462 U.S. 151, 158 (1983). Plaintiff's Title VI and Title IX claims are analogous to claims under the Florida Civil Rights Act, section 760 <u>et</u> <u>seq.</u>, Florida Statutes ("FCRA"). Similar to Title VI and IX, the FCRA specifically prohibits discrimination in the education

context. Id. § 760.07. The FCRA furnishes a sufficiently similar cause of action for race and sex discrimination in education to be the most closely analogous state statute to Title IX and Title VI. Accordingly, the FCRA's one-year period to file a complaint applies to Plaintiff's claims. Fla. Stat. § 760.11 (2017).

No binding Eleventh Circuit or Supreme Court case law precludes this Court from determining the appropriate Florida-law analogue to discrimination claims under Title VI and Title IX in the education context. Burton v. City of Belle Glade, 178 F.3d 1175, 1204 n.32 (11th Cir. 1999) (commenting on the statute of limitation in dicta in a footnote and relying on a Georgia case where no state antidiscrimination statute exists); M.H.D. v. Westminster Sch., 172 F.3d 797, 803 (11th Cir. 1999) (applying Georgia law to a Title IX claim where no state antidiscrimination statute exists).

Accordingly, the FCRA's one-year period to file a complaint is the applicable statute, and Plaintiff's claims are untimely.

Dated this 7th day of August, 2023.

Respectfully submitted,

KEVIN M. SULLIVAN
Florida Bar No. 1003812
kevin.sullivan@gray-robinson.com

*/s/ Sacha Dyson*
THOMAS M. GONZALEZ
Lead Counsel
Florida Bar No. 192341
thomas.gonzalez@gray-robinson.com
SACHA DYSON
Florida Bar No. 509191
sacha.dyson@gray-robinson.com

GRAYROBINSON, P.A.
401 E. Jackson Street, Suite 2700
P.O. Box 3324 (33601-3324)
Tampa, Florida 33602
Telephone: (813) 273-5000
Fax: (813) 273-5145
Attorneys for Defendant