UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEVAUGHN DINGLE,
Plaintiff,
v. Case No.
UNIVERSITY OF SOUTH 8:21-CV-02861-MSS-MRM
FLORIDA BOARD OF
TRUSTEES,
Defendants.

DEPOSITION OF KRISTEN STEFFEN-ZONSIUS
NOTICED AS: KRISTEN STEFFEN
DATE: Tuesday, June 13, 2023
TIME: 10:02 a.m.
LOCATION: Remote Proceeding - CA
Los Angeles, CA 90017
REPORTED BY: Melissa McCann, Notary Public
JOB No.: 5937596

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
ANTHONY SEVERINO, ESQUIRE
TURKAL CUVA BARRIOS, P.A
400 North Tampa Street
Tampa, FL 33602
aseverino@tcb-law.com
813-868-6167

ON BEHALF OF DEFENDANT:
SACHA DYSON, ESQUIRE
GrayRobinson Tampa Law Firm
401 East Jackson Street
Tampa, FL 33602
sacha.dyson@gray-robinson.com
813-273-5000

ALSO PRESENT:
JASMINE SINKAVITCH
JOANNE ADAMCHAK



I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Severino | 6 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena Notice | 8 |
| Exhibit 2 | Screenshot of LinkedIn Page | 32 |
| Exhibit 3 | Passionate About Making a Difference Page Vault | 43 |
| Exhibit 4 | Hearing Transcript | 53 |
| Exhibit 5 | Documents of Alleged Violations of the Student Code of Conduct | 58 |
| Exhibit 6 | Documents of Alleged Violations of the Student Code of Conduct | 61 |
| Exhibit 7 | Handwritten Note on Document | 74 |




P R O C E E D I N G S

REPORTER: Good morning again. My name is Melissa McCann. I am the deposition officer assigned by Veritext to take the record of this proceeding. We are now on the record at 10:02 a.m.

This is a deposition of Kristin Steffen taken in the matter of Kevaughn Dingle vs. University of South Florida Board of Trustees on Tuesday, June 13, 2023, in Campbell, California.

I am a notary authorized to take acknowledgements and administer oaths in California. Parties agree that as a deposition officer, I will swear in the witness remotely. Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding is intended for all purposes -- for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means and shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourselves for the record. We can begin with Mr. Severino.

MR. SEVERINO: Anthony Severino, on



behalf of the Plaintiff, Kevaughn Dingle.

MS. DYSON: Good morning -- good morning. Good afternoon, depending on the time zone you're in. I'm Sacha Dyson of the law firm GrayRobinson. I'm here with Joanne Adamchak, representing the University of South Florida.

MS. STEFFEN-ZONSIUS: Melissa, did you want me to go next? Sorry.

REPORTER: Sure, yes. Please. Thank you.

THE WITNESS: Okay. I think you're on mute, Melissa, but I'm Kristin Steffen-Zonsius. I believe I am identified as the witness today that has been subpoenaed.

REPORTER: Thank you. Hearing no objection, I will now swear in the witness.

Ms. Steffen, can you please raise your right hand? Do you swear or affirm that the testimony you give today will be the truth, the whole truth, and nothing but the truth.

THE WITNESS: I do.

REPORTER: Thank you. Counselors, when you're ready.

THE WITNESS: Melissa, for the record, my name is changed. I have recently gotten married.

Page 6

So my legal name is Steffen-Zonsius.
REPORTER: I believe counsel will cover that in questioning.
THE WITNESS: Okay. Thank you.
REPORTER: Thank you.
WHEREUPON,
KRISTIN STEFFEN,
called as a witness, and having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:
EXAMINATION
BY MR. SEVERINO:
Q So that was going to be my first question. Can you spell your last name for us?
A So my last name is Steffen, S-T-E-F-F-E-N, dash, Zonsius, Z-O-N-S-I-U-S.
Q Okay. So I assume you go by Ms. Steffen-Zonsius? Did I pronounce that correctly?
A Yes. Kristin is also fine.
Q Okay. So you mentioned a minute ago that you were subpoenaed today to be here as a witness in this case. So what I'm going to do first, just to get this out of the way, I'm going to share my screen with you. And I will show you the subpoena to make sure that this is what you received, and this is what you

Page 7

are here for today.
MR. SEVERINO: Melissa? It says the host has disabled screen sharing.
REPORTER: Sure. Give me one moment.
MR. SEVERINO: Thank you.
REPORTER: You should be able to proceed now.
MR. SEVERINO: Thank you. No, it still says, "Host disabled participant sharing."
REPORTER: Okay. Let me try it a different way. Oh, I see. Can you try that again, Mr. Severino?
MR. SEVERINO: Same message, but a minute ago, for a split second, it allowed me to. But now I'm getting that again.
REPORTER: Hm, okay.
MS. SINKAVITCH: I just made it so you should be able to do it, so...
MR. SEVERINO: Okay. All right, I'm in. Thank you.
REPORTER: Thank you, Jasmine.
BY MR. SEVERINO:
Q Ms. Steffen-Zonsius, can you see what's on the screen?
A Yes.

Page 8

Q Okay. So I will just slowly scroll through it here, and this is a subpoena to testify at deposition in civil action. And that is you, Kristin Steffen, which we now know is Kristin Steffen-Zonsius. And this is in the case Kevaughn Dingle vs. The University of South Florida Board of Trustees. Have you seen this document before today?
A Yes.
Q Okay. And you're here today pursuant to this subpoena; correct?
A Yes.
MR. SEVERINO: I'll go ahead and mark this as Exhibit 1. So we have that.
(Exhibit 1 was marked for Identification.)
BY MR. SEVERINO:
Q Have you ever been deposed before?
A Yes.
Q Okay. How many times, do you recall?
A I don't recall.
Q When was the last time you were deposed?
A I don't remember.
Q Was it in the last year?
A No.
Q In the last two years?

Page 9

A No, before.
Q Okay. And we'll come back to that. Do you remember where you were employed when you were deposed?
A Yes.
Q Where was that?
A The State of Florida Department of Revenue Child Support Enforcement Program.
Q Okay. And, just to close the loop on this one, when were you employed there?
A 2006.
Q Okay. So based on that, last time you did a deposition or testimony was approximately 2006?
MS. DYSON: Object to form.
BY MR. SEVERINO:
A Perhaps.
Q All right. You don't recall any other time more recently than that as we sit here today?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
Q You can answer.
A I don't recall.
Q And at time, Ms. Dyson may object to the form of the question. That is her objection -- a legal issue that her and I can handle if necessary.

Page 10

But unless you're instructed not to answer, you can go ahead and answer once she makes that objection.

In that regard, are you represented by counsel today?

A I believe I have privileges as it relates to this subpoena as my work from USF.

Q Okay. So is Ms. Dyson representing you in this deposition?

MS. DYSON: Well, just to be clear, I think I can provide clarity there as to the extent that she's asked questions in her former capacity as an employee of USF, she's represented in that capacity.

BY MR. SEVERINO:

Q The court reporter kind of gave you the basic ground rules of a deposition, and I know it may have been a while since you've last been deposed. So just a couple more ground rules before we get into everything.

First, if you answer my question, I'll assume that you understand the question. If you don't, please let me know, and I will try to rephrase it so that we can get a good question for you to answer.

If you need a break at any time, just let me

Page 11

finish my question. Just let me know and we'll stop and you can use the restroom, phone call, whatever you need to do. So keep that in mind.

Folks shouldn't be answered part way.

MR. SEVERINO: I don't know who that is, but I'm getting feedback. Anyone else getting that?

MS. DYSON: No, I'm not hearing that.

MS. SINKAVITCH: I heard it a little bit, too.

MR. SEVERINO: Is anybody on the phone?

MS. DYSON: No. No one that's not muted. It's just me and you that aren't muted, and the witness.

MR. SEVERINO: Huh. Okay. All right, we'll try and work through that.

BY MR. SEVERINO:

Q Okay. So in preparation for your deposition today, did you do anything to prepare?

A I don't know what you mean.

Q Okay. Did you talk to anyone about your deposition?

A Yes.

Q Okay. Who did you speak with?

A Counsel.

Page 12

Q Counsel. You're referring to Ms. Dyson?

A Correct.

Q Okay. And did you review any documents in preparation for your deposition today?

A No.

Q Okay. Did you review any notes that you may have had, personal notes from your time at USF, or anything like that in preparation for today?

A No.

Q Did you speak with anyone else other than Ms. Dyson about your deposition today?

A Joanne Adamchak.

Q When did you speak with Ms. Dyson about your deposition today?

A June 8th.

Q And do you recall about how long you spoke with Ms. Dyson on June 8th?

A I do not.

Q Okay. And when did you speak with Ms. Adamchak about your deposition today?

A June 8th.

Q Were they both present at the same time?

A Yes.

Q Is that the only time you spoke to either Ms. Dyson or Ms. Adamchak about your deposition today?

Page 13

A Yes.

Q So we're going to go through -- I'll just kind of give you a roadmap here just to start. Mainly some background information to get your educational background, employment history, those sorts of things.

So we'll start with your education. If you want, we can do this one of two ways. I can ask all the questions, or you can give me a brief summary and I can try and fill in the gaps. So if you want, just give me a brief summary of your educational background.

A I have two master's degrees, two graduate certificates, a bachelor's degree, and associate's degree, and multiple certifications.

Q So two master's, two certifications, a bachelor's, and then you said something after that as well.

A I have an associate's degree and I have two graduate certificates.

Q Okay. Sorry about that. Where did you obtain your associate's degree?

A Florida State University.

Q And when did you obtain that degree?

A 1998.

Q Okay. And then two bachelor's degrees.

Page 14

A I have one bachelor's degree.
Q One. I'm sorry. Where did you obtain your bachelor's degree?
A Florida State University.
Q When was that?
A 2011.
Q And what was that bachelor's degree in?
A Social sciences.
Q Okay. And your first master's degree. When did you obtain that?
A 2014.
Q From where?
A University of South Florida.
Q And what is that master's in?
A Public health.
Q And your second master's. When did you obtain that?
A 2017.
Q Where from?
A University of South Florida.
Q And what is that master's degree in?
A Management.
Q Okay. And the two certificates. Can you describe or explain those for me?
A I have a graduate certificate in building

Page 15

sustainable enterprise.
Q Where is that from?
A University of South Florida.
Q And when did you obtain that?
A I don't recall the exact date.
Q Okay. And what about the other certificate?
A My other graduate certificate is in health management and leadership I believe.
Q And where did you obtain that?
A University of South Florida.
Q Do you recall when?
A I don't recall the exact date of that one.
Q Okay. Just generally, what is a graduate certificate? What does that mean?
A It means you're taking graduate courses, graduate level courses, versus undergraduate courses.
Q Okay. So is a graduate certificate kind of in between a bachelor's and a master's?
A I don't know. I don't work in academic resources.
Q Do you have any other certificates?
A I have certifications.
Q Okay. Why don't you tell me those certifications?
A I am certified as a human resource

Page 16

professional by the Society of Human Resource Management.
Q Okay. And when were you certified as a human resource professional?
A 2021
Q And who provides that certification?
A The Society of Human Resource Management.
Q Okay. And what does that certification allow or permit you to do?
A I'm a human resource professional.
Q Okay. What does that mean?
A It means that I have a body of knowledge regarding human resources.
Q Okay. Is that a certification that you use in your employment?
A Yes.
Q Okay. In what ways?
A I work in workforce planning.
Q You currently work in workforce planning?
A Yes.
Q Okay. Where at?
A Kaiser Permanente Medical Group.
Q And what is your official title at Kaiser?
A Senior Managerial Consultant.
Q And what are your responsibilities in that

Page 17

role?
A I have oversight of creating workforce pipelines into healthcare positions?
Q Can you tell me what that means? Workforce pipelines into healthcare positions?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A It simply means that I help people find jobs and keep them in our healthcare workforce.
Q Okay. All right. And how long have you worked at -- served in that role?
A Since January of 2023.
Q And so I'm just going to kind of work backwards now through your employment history. So you were in that role in January 2023. Where were you working before that?
A University of Nevada Las Vegas.
Q Okay. And when did you begin employment at UNLV?
A 2019.
Q All right. And when you started in 2019, what was your job title?
A Senior Director.
Q Just Senior Director or Senior Director of a certain department?

A Senior Director of Faculty Affairs.
Q And how long did you hold that position at UNLV?
A About two years.
Q And what were your responsibilities and roles in that position as Senior Director of Faculty Affairs?
A I had oversight of all of our School of Medicine faculty, promotion, recognition, hiring, and recruitment, and as well as compliance.
Q Compliance with what?
A Adhering to our policies and our regulations.
Q UNLV specific regulations and policies?
A I would say yes.
Q Okay. Any compliance with federal regulations and policies?
A At times, yes.
Q Okay. What federal regulations were you responsible for overseeing compliance with?
A I was not specifically responsible for oversight of federal regulations.
Q During that approximate two years as Senior Director of Faculty Affairs, did you have any involvement with Title IX?



A Yes.
Q Okay. In what ways?
A I was asked to consult.
Q Consult with who?
A The Title IX office of the university system.
Q Okay. Was that a separate role that they asked you to perform, or was that something that was encompassed within your Senior Director of Faculty Affairs?
A That would be a separate role.
Q And in what ways did you consult the Title IX office at UNLV?
A We are a young medical school, and they needed more experience in the Title IX arena in medical school.
Q Okay. So what types of things did you do when you were consulting?
A Provided support to respondents and complainants.
Q Does UNLV have a what I'll refer to as a student code of conduct?
A I don't know. I was not involved in any of that.
Q So when you consulted with Title IX, you



were not involved in the school disciplinary process that may or may not have resulted from those investigations; is that correct?
A I had no role in student Title IX at UNLV.
Q All right. So that's for about two years. So sometime in 2021, you transitioned to a new role at UNLV?
A Yes. I was promoted.
Q Okay. And promoted to what role?
A Executive Director of Faculty Affairs and Strategic Programs.
Q Did you continue to provide consulting work to the Title IX office during that time?
A No, not particularly.
Q Any other job title while at UNLV?
A Yes.
Q Okay. So how long were you Executive Director of Faculty Affairs?
A About a year.
Q All right. And then where did you go within UNLV after that?
A I also was the Interim Director of Continuing Director in addition to the executive director role.
Q Any other job titles while at UNLV?



A I am an instructor in the Executive Master of Healthcare Administration program.
Q So do you teach courses?
A I do.
Q Okay. What courses do you teach?
A I teach Foundations of Public Health.
Q And I know you're at Kaiser right now. Are you still teaching at UNLV while you work at Kaiser?
A Yes.
Q Okay. All right. So tell me again the name of the course that you teach?
A Foundations of Public Health.
Q All right. Any other courses?
A No.
Q All right. Where were you in -- I'm sorry. There's occasional feedback. I don't know if you're getting that, but I keep getting it, so --
A I can hear you okay. Thank you for asking.
Q Okay. All right. So prior to your time at UNLV, where were you employed?
A University of South Florida.
Q Okay. So when did you first become employed at the University of South Florida?
A 2011.
Q Okay. And what was your job title at that

time?
A Contract Administrator.
Q And what did you do as Contract Administrator?
A I oversaw contracts.
Q Within a specific department, or university-wide? How did that work?
A University of South Florida USF Health.
Q Okay. And these contracts -- what types of contracts were they?
A Affiliation agreements.
Q Would that be with hospitals and other clinics?
A Yes.
Q Okay.
MS. DYSON: Object to the form.
BY MR. SEVERINO:
Q How long ere you in that role?
A I don't know.
Q Okay. While you were a contract administrator, did you have any involvement in Title IX at USF?
A I don't recall.
Q Okay. How about any disciplinary process that was part of the university's student code of



conduct?
A As it relates to being a contract administrator?
Q Yeah, when you were in that role. I mean, I know you did consulting at UNLV --
A I don't recall.
Q Okay. All right.
THE WITNESS: Anthony?
MR. SEVERINO: Yes.
THE WITNESS: I just want to tell you I've had an incredible amount of life that has happened to me in the last five years or so. I've had cancer twice. I've had uterine and breast cancer. I've gotten divorced. I've moved to three different states. I mean, I just -- I'm going to try to be helpful to you, Anthony, but I just want you to understand that I -- I don't recall a lot of specifics.
MR. SEVERINO: And that's fine and thank you for letting me know that. I hope -- hope your health is okay. So like I said, if you need a break for any reason, just tell me to take a break. This isn't a marathon. And I don't know if your counsel told you, but I suspect we'll be a couple hours, and that should be it.



THE WITNESS: I understand.
MR. SEVERINO: So thank you for that, and I will keep that in mind as we go.
BY MR. SEVERINO:
Q So after Contract Administrator, what was your next role?
A I was a project manager.
Q Project manager with respect to a specific department at USF?
A I worked in the Senior Vice President's office of USF Health.
Q And it that role as project manager, what did you do?
A I oversaw projects.
Q What types of projects?
A Anything that was assigned to me. I had a multitude of projects.
Q Okay. And in that role, anything to do with Title IX?
A Not specifically in that role. No.
Q Okay. But during that time when you were in that role, did you have any involvement with Title IX at USF?
A I don't know. I just don't know the timing, Anthony, and I don't remember.



Q That's fine. After -- did you take on a new role after your project manager role at USF?
A Yes.
Q Okay. And what was your next role at USF?
A I was promoted to the Assistant Director role.
Q Okay. Assistant Director of what?
A I'd have to look at my resume. I don't remember specifically.
Q Okay. So let me -- let me share my screen with you. Just bear with me a second.
THE WITNESS: Anthony, I just -- I don't want to speculate my timing.
MR. SEVERINO: That's fine. All right. I understand. I'm just -- give me a sec. I'm going to pull something up that may help us if I can find out where this is. Hold on.
THE WITNESS: Okay.
MR. SEVERINO: Okay, there we go.
BY MR. SEVERINO:
Q Can you see what's on my screen? Or it should be on your screen as well.
A Yes.
Q So this is the top of the recent page vault and the page loaded Tuesday, 13th of June, 2023. And

if we go down here, this is essentially a screenshot or capture of your LinkedIn page.
A Yes.
MS. DYSON: Is this a document that's been produced?
MR. SEVERINO: What's that?
MS. DYSON: Has this document been produced?
MR. SEVERINO: No. We just got it this morning. It's a LinkedIn page.
BY MR. SEVERINO:
Q So I'm going to go down to the bottom here. And it is five pages. And I'll just go back up to the top and see if you can -- if you recognize this. Does this look like your LinkedIn page?
MS. DYSON: I object to this. Asking a question about a document that hasn't been produced.
BY MR. SEVERINO:
Q You can go ahead an answer.
A Yes.
Q Okay. I'm only doing this because you have experience on here. Right now, we're talking about USF. And if you look here, it says Assistant Director, Deputy Title IX Coordinator, and Investigator. Is that the role that you took on after



being a project manager at USF?
A No.
MS. DYSON: Objection. That is three specific roles.
BY MR. SEVERINO:
Q Okay. Explain those to me if you would, please.
A My primary role was Assistant Director. My secondary roles were Deputy Title IX Coordinator and Investigator.
Q Okay. And as a Deputy Title IX Coordinator, what would be your responsibilities?
A Coordination of Title IX.
Q Do you recall when you took on that role?
A I do not.
Q Okay. And is the Deputy Title IX Investigator -- you said that's a separate role apart from the coordinator role?
A Yes, depending on how you were appointed by the Title IX office.
Q Okay. All right. So you served as both a deputy Title IX coordinator and a deputy Title IX investigator; correct?
A Yes.
Q Okay. As a Title IX investigator, what were



your roles and responsibilities?
A Investigate allegations of Title IX violations.
Q And in both of those roles as coordinator and investigator, who was your, for lack of a better term, superior?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't recall her name. I can see her face, but I don't recall her name. Sorry.
Q It's okay.
A I don't remember her name.
Q That's fine. I know you don't recall when you began as Assistant Director, but do you recall the timeframe when you became a deputy Title IX coordinator or investigator?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Anthony, I don't remember the specific time. I just don't want to speculate.
Q That's fine. Did you have -- prior to becoming a deputy Title IX coordinator, did you have any experience with Title IX?
A No.
Q Did you have any -- okay. So you didn't



have any training with respect to Title IX prior to this?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I became trained at the same time I took the role.
Q Okay. What do you recall was the training that you took when you --
A I was trained through ATIXA.
Q Okay. I -- I think I've seen that's an acronym. What is it? A-T-I-X-A? Is that right?
A Mm-hmm.
Q What does that stand for if you know?
A I would have to look it up. I'm sorry, Anthony. It's been a number of years since I've worked in --
Q What -- strike that. Was the ATIXA training something that was provided by USF?
A No, it was provided by ATIXA.
Q Okay. Do you recall if that training was a requirement to you becoming a deputy Title IX coordinator at USF?
A I do not.
Q Okay. And now, as far as a Title IX investigator, did you have any experience with that

Page 30

prior to taking on this role at USF?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Being a Title IX investigator?
Q Yes.
A No. prior to working at USF, I had never been a TITLE IX investigator.
Q Okay. How did you come to be involved with Title IX at USF? Meaning, was this something you were pursuing and interested in, or were you approached by someone at USF to maybe fill these roles?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
Q You can answer.
A I -- I was not pursuing it, Anthony. This is -- I wouldn't consider this a role where people enjoy it. It's more -- it's -- I'm trying to think when I -- how I got into it. I believe I was asked. But again, I would be speculating, Anthony. I did not pursue it. I can tell you that.
Q Okay. All right. All right. You know, I've got here on this LinkedIn page here, following Assistant Director, Deputy Title IX Coordinator, and Investigator, it says from November 2011 to October 2019. And then it goes into realtor and your time at

Page 31

UNLV. Is this accurate as to the time you spent at USF?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Yes.
Q And so, before going to UNLV, it looks like -- did you spend some time as a realtor?
A Yes.
Q Okay. Why did you leave USF?
A I obtained a job with UNLV that was a promotion.
Q That was going to be mt next question. So it was a promotion?
A Mm-hmm. My mother had died, and I was her caregiver. I don't mind saying this on the record, Anthony. It was a very, very difficult four years for me to watch my mother fight ovarian cancer for which I attain I got cancer as well. And I was ready for a change.
Q I can -- I can sympathize with being a caregiver for your mother. I do the same thing, so --
A It was a very difficult four years.
Q I understand.
A So I had an opportunity for a promotion. I went.

Page 32

Q I understand.
MR. SEVERINO: So I'm going to mark the LinkedIn that we just had up -- screenshot or page wall as Exhibit 2.
(Exhibit 2 marked for Identification.)
BY MR. SEVERINO:
Q During your time at USF, did you receive any awards?
A Yes.
Q Okay. What awards did you receive?
A Actually, I've got one of them sitting on my desk here. Let's see. I retrieved the University Conduct Award in 2017.
Q And do you recall what that was for?
A Participating in student conduct.
Q Okay. And when you say participating, what do you mean?
A Sometimes I was a member on various boards. Other times I was a hearing officer.
Q All right. Let's -- let's talk about that for a minute. Do you recall when you first served as a hearing officer or on a student conduct board?
A No.
Q Okay. And prior to serving in those roles,

Page 33

did you receive any specific training on how to perform that role?
A Yes.
Q Okay. What training was that?
A I don't recall the specifics of the training.
Q Was the training -- who provided the training?
A The Office of Student Rights and Responsibilities at USF.
Q And do you recall if that training was required before you could actually serve as a hearing officer or on a student conduct board?
A I do not recall.
Q If -- if you know, can you explain for me the difference between the Title IX office where you worked at USF and the Office of Student Rights and Responsibilities?
Ms. DYSON: Object to the form.
BY MR. SEVERINO:
A I can't explain that.
Q Are they two separate offices or departments?
A I don't know.
MS. DYSON: Object to form.

Page 34

BY MR. SEVERINO:
A I'm sorry, Anthony. I just don't remember these --
Q No, listen, you don't have to -- you don't have to apologize. It's not a memory contest. I'm just here to gather information. And if you know, you know. And if you don't, you don't.
I had -- on your LinkedIn, it said that you were the chair on the Title IX Presidential Committee?
A Yes.
Q What was that?
A I oversaw as the chair a committee that was appointed by the President of the university regarding matters of Title IX.
Q Okay. And what did that -- what was that committee's role?
A What was the -- I'm sorry.
Q What was that committee's role?
A The last word is not coming out.
Q Role. What did you -- what did that committee --
A Role.
Q Yeah, sorry.
A I -- I -- we would make recommendations to the President to take action.

Page 35

Q Take action with respect to Title IX?
A Title IX matters. Mm-hmm.
Q So let me break that down for a minute. Are you referring to specific Title IX investigations at the university?
A No.
Q Are you referring to USF Title IX policies and procedures?
A Yes.
Q Okay. So kind of explain to me how that would work. You're appointed president -- chair of this committee. And does this committee make recommendations about policies and procedures that USF should implement or discontinue as part of its Title IX office?
A I don't recall specifically.
MS. DYSON: Object to form.
BY MR. SEVERINO:
Q Okay. Do you recall who appointed you to this position?
A Judy Genshaft.
Q All right. Did you know Ms. Genshaft prior to being appointed to that role?
A In what regard? Yes. She was the president of the university.

Page 36

Q Were you friends with her?
A No.
Q Okay. So your relationship with Ms. Genshaft was professional?
A Yes.
Q Do you recall who else was on that committee?
A I do not.
Q Okay. So can you recall any other training that you received with respect to your involvement with Title IX at USF, other than the ATIXA?
A No.
MS. DYSON: Object to form.
BY MR. SEVERINO:
Q Just a second.
All right. So you should have on your screen now a chart, which down at the bottom right you'll see a number. That's what us lawyers refer to as the Bates label 566. And this was produced by USF.
Let me ask you this: have you seen this document before?
A No.
Q So at the top here, it says SCEDEIX Training. I assume that's some form of Title IX training. Do you know what SCED means?

Page 37

A No.
Q I'm going to go down here. Your name is listed on here a couple of times, so I'm just going to start at the top here where my cursor is. It says "Date 5/25/16. Type: Responsible Employee." Do you know what that was?
A No.
Q All right. Go to the next one. "9/14/17 through 9/15/17. Type, again, Title IX Conference 2017." Do you know what that was?
A Looks like it was a Title IX Conference 2017.
Q Okay. Do you recall attending that conference?
A I mean, Counselor, are we just going to read a document? Because I could sit here and read the document along with you, but --
Q I'm asking you do you recall attending a Title IX conference in 2017?
A That specific date? No. But yes, I attended conferences.
Q Okay. And then, there are four more entries after that that appear to be various ATIXA trainings. Do you recall those trainings at all?
A I don't recall the specific dates, but yes,

I attended ATIXA training.
Q Okay. Do you recall what those trainings were about?
A They're related to me being an investigator and a coordinator.
Q Do any of the trainings that are listed here on 566, do they have anything to do with conducting a hearing as an administrative hearing officer?
A I don't recall.
Q And same question as a student conduct board member?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A No. I don't recall.
Q Does the federal government issue guidance or guidance letters on how to deal with Title IX?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A In what aspect?
Q Well, the way that I've seen them referred to are these "dear colleague" letters. Are you familiar with that term?
A Yes.
Q Okay. What is a "dear colleague' letter?
A I wouldn't consider myself a subject expert



on "dear colleague" letters. I believe it provides, just as you indicated, guidance regarding Title IX matters.
Q Do you recall in your role as Deputy Title IX Coordinator and Investigator ever reviewing "dear colleague" letters?
A Yes.
Q Okay. And was that just something that you just did on your own because you were interested, or was that something that was a requirement of USF?
A To the first part of your question, yes, I was interested in it. To the second part of your question, no, I do not recall it being a requirement.
Q Do you recall during your time at USF as the Deputy Title IX Investigator and Coordinator relying on those "dear colleague" letters for guidance in that role.
A No.
MS. DYSON: Object to form.
Anthony, are you marking this document as Exhibit 3?
MR. SEVERINO: Oh, yeah. When I'm done, I will. Yes.
BY MR. SEVERINO:
Q All right. So generally, I know you've said



that you acted as a hearing officer and as a member of the student board of conduct. Is that -- am I saying that correctly? I have that --
A Yes? Yeah, member of. Yes.
Q Okay. In that role -- what did you do to prepare to serve in that role?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Took training.
Q Okay. And would it be the training that's here on the screen?
A No. Not as it pertains to being on the student conduct board.
Q Okay. So what training do you recall that you received to serve on the student conduct board?
A I do not recall the specifics.
Q Do you recall, generally, the subject matters of the training?
A Student conduct board.
Q Was there training on how that process was supposed to be implemented?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A What do you mean by process?
Q Well, why don't you tell me? What did you



do as a member of the student conduct board?
A Overheard alleged misconduct of students at the University of South Florida.
Q Okay. And did you adjudicate those alleged violations.
A Yes, sometime.
Q Okay. And what training did you have, if any, to enable you to sit on the student conduct board and adjudicate those alleged violations.
MS. DYSON: Objection. Asked and answered.
BY MR. SEVERINO:
Q You can go ahead if you know. If you don't that's fine, too.
A I just recall having training, Anthony.
Q Okay. Do you recall receiving any training on how to assess the credibility of witnesses during those proceedings?
A I do not recall.
Q Okay. Do you recall receiving any training on how to weigh the evidence that was presented in those proceedings?
A Yes.
Q Okay. What training did you receive for that?

A I don't recall specifically.
Q Okay. Were you provided any training with respect to determining the type of sanction to impose if you did find someone violated the student code of conduct?
A Yes.
Q Okay. Do you recall that training?
A No.
Q Okay. As the -- or in your role as the Deputy Title IX Coordinator, was part of your responsibility ensuring the university's compliance with Title IX?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I would say no.
Q Okay. What were your responsibilities then as the Deputy Title IX Coordinator?
A I would consider my responsibility in that role to be more -- to mitigate discrimination based on sex. So I was more proactive instead of reactive in that role as the coordinator.
MR. SEVERINO: Oh, and for the record, Madam Court Reporter, this is going to be Exhibit 3. So I'm going to stop sharing, but we'll go ahead and mark this as Exhibit 3.



(Exhibit 3 was marked for Identification.)
Okay. So this is another page vault. Essentially screenshot from today. Let's see here. Tuesday, June 13, 2023. And I'm going to go down here and I will just scroll through it real quick. But the title is "Passionate About Making a Difference." And I'll go down here.
BY MR. SEVERINO:
Q Do you -- you recognize this?
MS. DYSON: Objection. Anthony, you can't use documents that haven't been produced in this case. I'm not going to allow her to answer questions about documents that haven't been provided.
MR SEVERINO: If you're going to instruct her not to answer, that's fine.
BY MR. SEVERINO:
Q But do you recognize this document?
A I'm going to decline to answer based on Counsel's remarks.
MR. SEVERINO: So just so we're clear, Ms. Dyson, are you instructing her not to answer?
MS. DYSON: You are using documents that should've been provided before this deposition. Discovery has closed. You are using documents that



apparently are pulled from the internet. That certainly could have been pulled before today if you intended to rely on them in this deposition. You want to ask her questions?
MR. SEVERINO: Let's not -- let's not address the time of production.
MS. DYSON: No, let me finish.
MR. SEVERINO: You dumped 500 pages on me before the last depo that should've been produced a year ago. So if you're instructing her not to answer, that's fine. I just want the record to reflect that.
MS. DYSON: You are interrupting me is what you're doing. And you had plenty of time to review any documents. You never made any objection in any prior deposition. But rather what you're doing is you are producing documents for the first time in this deposition that I have never seen before by sharing your screen. And that's not appropriate.
You can certainly ask her, if you want to ask her about things in that document. But to use the document in this case is completely inappropriate.
MR. SEVERINO: I haven't -- I haven't even attached it yet. I'm going to ask her two questions about this document. I asked her if she had seen it before. That's the first step. So if you're



--
MS. DYSON: You're asking her about documents that should have been produced in discovery and were not.
MR. SEVERINO: Are you instructing her not to answer? I understand your position. Are you instructing her not to answer?
MS. DYSON: Yes, I'm instructing her not to answer.
MR. SEVERINO: Okay.
BY MR. SEVERINO:
Q Down here, it says in her Title IX position, she would uncover a sex discrimination case that resulted in personnel changes at the university. Her experience -- expertise was recognized with her being awarded the Individual Outstanding Achievement Award and as the chair of the Title IX Presidential Advisory Committee by the USF system.
So what I'd like to ask you about is this sex discrimination case that was uncovered. Are you familiar with that?
MS. DYSON: To the extent that you're quoting from a document, I object to it. If you want to ask her generally that question, you should ask her that question. But to the extent you're relying on a

document that's never been produced in discovery, that's inappropriate.
BY MR. SEVERINO:
Q You can answer, Ms. Steffen.
A Counselor, are you going to ask me the question outside of it as Ms. Dyson has said?
Q Did you uncover -- did you uncover a sex discrimination case at USF that resulted in personnel changes at USF?
A Yes.
Q Okay. What was that about?
A I'm -- it was about a professor who was grooming and molesting students.
Q Okay. And were there personnel changes as a result of your investigation?
A Not as a result of my investigation. As a result of the adjudication of my findings.
Q And your findings, were those conducted in your role as Title IX Investigator?
A Yes.
Q Okay.
A So Title IX investigations, Anthony, result in findings. We do not handle adjudication as a Title IX Coordinator or Investigator.
Q Correct. Okay. But you do handle



adjudication as a hearing officer or as a member of the student board of conduct?
A Yes.
Q Okay. And do you recall whether this investigation or your findings of fact with this professor ultimately led to either an administrative hearing or a student board of conduct hearing?
A I don't know.
Q Okay. But you do know that there were personnel changes with respect to that professor, whatever they may have been?
A Yes, I did find that out.
Q And with respect to that investigation that we're discussing right now, was that initiated by someone making a complaint?
A I don't recall.
Q While you were at USF, were you a part of any on-campus organizations?
A I don't remember.
Q Outside of your employment at USF, would you say you were active with the university?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Oh, yes. I'm a lifetime member of the USF Alumni Association.



Q Okay. As am I, by the way.
A Nice. Go Bulls.
Q Okay. So other than the Alumni Association, were you -- do you recall being a part of any other organizations?
A As it relates to USF?
Q Yes. Yes.
A I don't recall.
Q Are you familiar with an organization at USF called Safe Home?
A Safe Home? No. Not home.
Q Safe what then?
A Zone.
Q Safe Zone? Okay. What's that?
A It is -- I wouldn't -- I wouldn't call it necessarily an organization. I was a Safe Zone facilitator.
Q What is a Safe Zone Facilitator?
A Yeah. So I received training to be able to be a champion for the LGBTQ+ community to help our USF community understand that specific community better.
Q Do you recall when you were a -- it's Safe Zone, but I don't remember what your title was. Was it coordinator? Or what did you --
A Facilitator I think it was.



Q Do you recall when you became a Safe Zone Facilitator?
A I don't.
Q Sharing my screen with you again. And this is another page vault. This is from January 11th of 2023. Down on the bottom right you'll see those Bates numbers. It says Dingle 218. And I'll go down here to the bottom, so we can get the whole document through Dingle 225.
And we'll start up here at the top. This is an article from November 13, 2017 titles "Safe HOME at University of South Florida Hosts First Annual," pardon me, "Slut Walk." Are you familiar with this at all?
A I don't recall.
Q Seeing this name, Safe, in all caps, HOME, does that refresh your recollection at all about whether or not that organization --
A Not at all. No.
Q All right. So when we took a look earlier at Exhibit 1, which was a subpoena, we agreed that the case we're here today about was Kevaughn Dingle vs. the University of South Florida. So let me first ask do you know who Kevaughn Dingle is?
A No. I don't recall.

Q I'm sharing my screen with you again. For the record, this is Bates label 14. This was produced by USF. Have you ever seen this document before?
A I don't recall it. No.
Q Not this specific document, but have you seen -- or did you -- do you recall seeing other documents like this during your time at USF?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't recall. I mean, just looking at this document, Anthony, this was five and a half years ago.
Q Mm-hmm.
A That's a long time.
Q So it does have up here administrative officer hearing Friday, December 8, 2017 at 1:00 p.m. And then this has Hearing Officer. And that's you; correct?
A Yes.
Q I understand you don't recall this document or seeing this, but when you would serve as an administrative hearing officer or as a member of the student conduct board, how would you be notified that you would be serving in that role?
A Email.



Q And did the email come from a specific person, or was it just a random person?
A I don't recall.
Q Do you recall typically how many days prior to a scheduled hearing that you would be notified that you would be serving in the role as a hearing officer or as -- or as part of the student conduct board?
A I do not.
MS. DYSON: Object to the form.
BY MR. SEVERINO:
Q Once you were notified via email that you were going to be serving as a hearing officer or as part of the student conduct board, what would you do to prepare yourself for that proceeding?
A I would go and look at materials available.
Q And those materials that are available, would those also be emailed to you at the same time that you were notified?
A No. I don't recall.
Q How would you obtain those materials?
A I would go to the Student Conduct office.
Q Right. And so at the Student Conduct office, there would be a case file for you to review? Is that correct?
A Yes. I recall that.



Anthony?
Q Yes.
A I recall that this was private and very personal. And so therefore that information was not shared over email.
Q Okay. So you had to physically go look at it for privacy?
A No. You couldn't -- you couldn't -- I don't recall being able to take documents out of the Student Conduct office for privacy reasons. I felt that was the right thing to do.
Q All right. So in addition to reviewing the physical file at the -- was it at the OSRR office? Was that where it was?
A The Office of Student Rights and Responsibilities?
Q Yes.
A Yes.
Q Okay. All right. So -- is it okay if I say OSRR?
A Yes. Yes.
Q So other than reviewing the physical file at OSRR, did you do anything else to prepare yourself to serve in the role as a hearing officer or as part of the student conduct board?



A I received training.
Q I understand that, but with respect to a specific case, right. So you would go the specific case file, and with respect to that specific case, is there anything else you would do to prepare for the hearing?
A No.
MR. SEVERINO: We'll mark this. It should be on Exhibit 4. And I'll stop sharing this.
(Exhibit 4 was marked and Identified.)
MR. SEVERINO: Just bear with me. I'm trying to pull something up
All right. I've -- I've shared another document on our screens, and it's labeled 71 through 74.
BY MR. SEVERINO:
Q Are you familiar with this document?
A No.
Q I know you may not be familiar with this specific document, but have you seen documents like this?
A No.
Q So when you serve as an administrative hearing officer or on the student conduct board, can

Page 54

you just describe to me what you do and what your role is?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Listen to the facts of the case. Seek a preponderance of the case, more likely than not, that there was an incident, or the alleged allegation or allegations are true, based on the individual allegations, not as a totalitarian. Because some students were affected by multiple allegations.
Seek, in an unbiased way, to review and receive information from all parties involved, and make a decision based on good faith and the best of my ability.
Q In -- let me back up. You mentioned the preponderance of the evidence standard that was employed. Whose burden at these hearings was it to prove the alleged violation.
A I believe it was equitable.
Q Okay. What do you mean by that?
A Well, my role was not to choose a complainant over a respondent or a respondent over a complainant. It was to look at the evidence involved, and -- and see if there was, more likely than not, that the alleged allegation had occurred, or violation

Page 55

of the student conduct from this standpoint.
Q How would you resolve discrepancies or differing accounts of what happened at these hearings?
A Depends on the case specifically.
Q Would you have to assess the credibility of witnesses in doing that?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Depends on the case.
Q Do you recall, at any time when you served as an administrative hearing officer or on the student conduct board, postponing a hearing in order to gather additional evidence or information?
A I don't recall.
Q Do you recall if that's something you had the discretion to do when you served in those roles?
A Yes.
Q So if there was evidence or information that wasn't presented because someone didn't show up, or it wasn't available, would you have the discretion to postpone that hearing until you could gather that information or evidence?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A If appropriate, I believe so. Yes. I can

Page 56

speculate on that.
MR. SEVERINO: All right. Let me take this down.
So I am sharing my screen with you again. And let me just do this real quick for the record, because this is a long document. First page is Bates label 77. And then it goes through 150. Okay.
BY MR. SEVERINO:
Q And I will stop here at this first page and let you take a look at that. And then I'm going to ask you whether or not you recognize this document.
A No. I have never seen this document.
Q Now that you see it today, do you know what this is?
A It looks like a transcript.
Q Okay. And administrative hearing. The date is December 8, 2017. The charged student, Devaughn Dingle. And then the Administrative Hearing Officer is you, Kristin Steffen. And also, the Initial Review Officer is Maria Zale Cutsinger. Can you see that?
A Yes.
Q Who is Ms. Cutsinger?
A She works in the Student Conduct Office.
Q Did you work with her at all during your

Page 57

time at USF?
A What do you mean "work with her?"
Q Were you in the same department?
A No. Not in the same department.
Q Okay. Then how would you have worked with her during your time at USF?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A She worked in the Office of Student Rights and Responsibilities, and I served as a hearing officer and a member of the Student Conduct Board.
Q Do you know whether she worked in the Title IX Office at all?
A I do not.
Q Okay. And we talked about this a little earlier, but I just want to clarify to make sure I understand. With respect to your role as a hearing officer or Student Conduct Board member, your involvement in a specific case, would that begin when you receive that email notification that you're going to serve in that role?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Yes.
Q Okay. Is there anything before you receive

Page 58

that email where you're involved in this disciplinary process?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A No. I don't recall
MR. SEVERINO: Let me -- hold on. I'm going to mark this as Exhibit 5, and we're going to come back to it in just a minute.
(Exhibit 5 was marked for identification.)
MR. SEVERINO: So sharing another document. I know that the font is small right now. I will zoom in in just a minute, but for the record, this is Bates label 540 through 543. All right. Okay. Let's see if I can zoom in.
BY MR. SEVERINO:
Q Okay. Have you seen this document before today?
A No.
Q Okay. This was a document that was produced by USF in this case identifying alleged violations of the student code of conduct beginning in November of 2015 through July of 2019. And as you can see, there's various bits of information here, but for now I just want to focus on this column here that has name

Page 59

and Administrative Officer or member of the UCB. You see that?
A Yes.
Q All right. So I'm going to scroll down. Okay. So the first time that you're identified I think is 542, as the Administrative Hearing Officer is line number 20. Do you see that right here?
A Yes.
Q And the date of the complaint is November 16, 2017, and the date of the formal hearing is December 8, 2017. So my question is do you recall whether you served as an Administrative Hearing Officer or member of the UCB prior to December 8, 2017?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't recall the dates, Anthony.
Q Okay. And that's fine, but I didn't see you listed. And again, this was produced by USF based on the time period they provided. So let me ask it this way. Do you recall whether you were serving as an Administrative Officer or member of the UCB prior to November of 2015?
A I don't recall. Though I will say, the initial allegations look very specific in this

Page 60

document. I heard a lot of cases that had nothing to do with these allegations.
Q Okay. So --
A Types of allegations. I see a theme here. I don't know from this document you provided.
Q Correct. Okay. So you don't recall whether you may have served as an Administrative Officer or member of the UCB in cases involving allegations not common to these, basically?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Okay. I need you to ask that one again.
Q Yeah. I just want to make sure that I'm understanding what you're saying, which is you don't recall, but you may serve as an Administrative Officer or member of the UCB with respect to other alleged violations of the Student Code of Conduct that are not similar to the ones identified here?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I did serve in other places that were non-related to what you're showing me in this initial allegation. I just don't know the timing of it.
Q Okay. All right.
A And I started as a member and a hearing

Page 61

officer in those other unrelated types of themed cases.
Q Understood. Okay. Do you recall -- let me back up.
MR. SEVERINO: I'll mark this as Exhibit 6. We can keep track here.
(Exhibit 6 was marked for Identification.)
BY MR. SEVERINO:
Q When adjudicating alleged violations of the Student Code of Conduct in your role as an administrative hearing officer or member of the UCB, do you recall the types of sanctions you could impose if you found someone violated specific code of conduct?
A Not specifically. I can recall, Anthony, that there were different types of sanctions. I just don't recall specifically what they were.
Q And I understand, and we can look at that in a minute if we need to. Although you don't recall the specific sanctions, do you recall how you would determine which sanction to impose?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A Depends on the allegations and if

adjudication was necessary.
Q Okay. So let's start with line 20. It says, "Sanctions imposed: Expulsion and No Contact Order." Are there any specific factors in a case that would warrant expulsion?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I would say is there a threat to the university community and their safety. Certainly, in decision making such as something that is expulsion, I would very much be concerned with the safety of the university community as a whole.
Q Okay. And what do you mean by the safety of the university community as a whole?
A Would any member of the public that is on the university campus feel safe or be safe given the adjudication or what this allegation, preponderance of the evidence showed.
If I scroll over to the left side, it looks like it was non-consensual sexual intercourse and non-consensual sexual contact. Is there a threat to the community in a case like that that could affect the rest of the community. That would certainly warrant potentially being expelled.
Q Okay. And so, if you look at line 21, again



it's got non-consensual sexual intercourse. And the sanction imposed was suspension, no contact order, conduct probation, and meeting with staff member. So what I'm just trying to figure out is how do you determine to expel someone versus suspend them?
A I wasn't involved in that case, Anthony. I couldn't tell you.
Q Well, it says University Board Member up there, Kristin Steffen?
A But I was the Hearing Officer. I didn't make the determination ultimately.
Q Okay. So in this instance where there's a UCB, or University Community Board, tell me how kind of that hierarchy works and who makes the decision.
A I don't recall the specifics of how the decisions were made. But that's a different case and you're haven't shown me documents related to the -- that case.
Q Yeah, no. I'm asking generally what factors -- I know you mentioned the safety of the university community as a whole. What other factors would warrant expulsion versus suspension.
A I don't recall. It's two different cases, Anthony. They're not apples to apples.
Q I understand that. No one's been able to



tell me what factors you consider when determining that you're going to expel someone versus suspension. So I'm just trying to figure out if you recall what factors would be considered.
MS. DYSON: I object to your comment. It's not accurate.
MR. SEVERINO: Well, the transcripts will say what they say.
BY MR. SEVERINO:
Q So the -- is the sanction of expulsion something that you had full discretion to impose, or is something that you had to get approval from someone else?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A As I recall, the adjudication of expulsion could be grieved. And the ultimate decision of the university was the Dean of Students.
Q All right. So let me back up so I can understand that. All right. You said, "could be grieved." Is that what you said?
A Mm-hmm. I believe that the student had the opportunity to grieve. I don't remember the exact word of what that was called. I'm sorry, Anthony. But if they didn't like the sanctions, or they



disagreed with the sanctions, they could grieve that sanction, and the decision would go to the Dean of Students, ultimately, on behalf of the university.
Q Right. I understand that part. I'm just focused on when you impose the sanction of expulsion in line 20, is that something that someone has to approve before you impose that sanction, or do you have full discretion and authority to do that?
A I don't recall.
Q All right. So I'm still sharing my screen here. I've gone back to Exhibit 5, which we talked about a moment ago. So, I want to go --
MR. SEVERINO: Actually, I'm going to have a decent amount of questions for this. So is everyone okay if we take a quick bathroom break? Five minutes before we start this subject?
MS. DYSON: Yes. Do you know how much longer you have?
MR. SEVERINO: No. Maybe an hour. Maybe.
MS. DYSON: Okay.
MR. SEVERINO: It's 2:30. I don't know. I'd like to be done by 3:30, 4:00 is kind of my goal. So why don't we take five minutes, then we can go through this and a couple of other things?

MS. DYSON: Okay.
MR. SEVERINO: All right. Thanks guys.
REPORTER: This marks the end of media number one. The time is 11:32 a.m. We are off the record.
(Off the record.)
REPORTER: This marks the beginning of media number two. The time is 11:45 a.m. We are on the record.
MR. SEVERINO: All right. So I'm going to share my screen and bring back up here Exhibit 5, which was the hearing transcript from December 8, 2017.
BY MR. SEVERINO:
Q First, I asked you about Ms. Cutsinger earlier, but it says here that she was the initial review officer. In your time at USF, did you ever serve in that role throughout the CFS?
A No. No.
Q All right. All right. So we are at Bates label 80. And I am looking at this paragraph here that is lines 5 through 16. If you could, just take a quick moment to read that to yourself, and then I'll ask you a couple questions.
A Okay.



Q So I -- I asked you earlier about whether or not you needed approval to impose a sanction of expulsion. And I believe your testimony was you didn't recall one way or the other. So I'd like to look at line 10 through 11 here, where you say the Administrative Officer will make a recommendation of whether Kevaughn is responsible or not for the alleged violations.
So what I'm interested in is where it says, "we'll make a recommendation," what does that mean?
A I don't know. I'm reading a transcript just like you are.
Q I understand, but these are your words. So I'm just trying to --
A No, they're not. I am reading off of a document when I read this. They are not my words.
Q This is transcribed from the hearing and this is you speaking.
A Correct. But I'm actually reading a document in the hearing.
Q Okay. So do you agree that the hearing was transcribed and this is the transcription from the hearing?
A I agree that the hearing was transcribed. Yes. I have never seen this document, so I can only



reply that it's the transcript because you said it is.
Q USF produced it. They told me it was. So it's not me.
A Okay. Yeah. I don't know. I've never seen -- I've never seen a transcript from a hearing.
Q Okay. Understanding that you haven't seen it, do you have any reason to doubt the authenticity of this transcript?
A I don't know.
Q Okay. So where it's transcribed here where you're speaking where it says, "The administrative officer will make a recommendation," what does that mean?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I think it says it. We'll make a recommendation.
Q Okay. Who are you making a recommendation to?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A To the Office of Student Rights and Responsibilities?
Q Okay. This goes back to my earlier question. When you recommend a sanction, like in this



case, that is something that is recommended to the OSRR; is that correct?
MS. DYSON: Object to the form. She's already testified she doesn't recall.
BY MR. SEVERINO:
A I don't recall, and I feel like we've answered this, Anthony. Like we're going in a big circle here.
Q We're -- we're actually not. I'm just asking you. You said, "We'll make a recommendation." And your testimony now is that you will make that recommendation to the OSRR; is that correct?
A In a case -- yes.
MS. DYSON: That's not her testimony. You're misrepresenting --
MR. SEVERINO: Go ahead. You're talking over each other. Go ahead.
MS. DYSON: Yes. You're misrepresenting what she's saying. She said she didn't recall the process. It's what she said many questions ago. And what you're trying to do is say that these words are -- are -- I don't know. Are you trying to ask if they refresh her recollection? Because you haven't asked that question. So I think what you're trying to do is mischaracterize the

testimony, and that's -- I have an issue with.
BY MR. SEVERINO:
Q Okay. You do not recall whether you needed approval to impose the sanction of expulsion; is that correct?
A I don't recall.
MS. DYSON: Objection.
BY MR. SEVERINO:
Q I know. I'm asking -- I'm -- I'm confirming that so I can ask my next question. Now, we're looking at the transcript, which is Exhibit 5; okay? Does reading this where it says where the Administrator Officer will make a "recommendation of whether Kevaughn is responsible or not" refresh your recollection of whether or not you needed approval?
A No.
Q Okay. When you served as an administrative hearing officer, was there any kind of script or outline that was provided to you to follow during the hearings?
A Yes.
Q Okay. And who provided that to you?
A The Office of Student Rights and Responsibilities.
Q Okay. Okay. So we're on page 97. And if



you could, read lines 6 through 14 for me to yourself real quick?
A Okay.
Q So now that you've read this, do you recall listening to the audio recording of the provisional suspension hearing prior to this formal hearing?
A No. I don't even recall this hearing. I would have to rely on this transcript, Anthony.
Q Okay. That's fair. So when a formal hearing like this one is concluded -- and let me be clear about that. You've received all the testimony and the actual hearing itself is closed. What do you do after that?
A It depends on the particular case.
Q Okay. What are your -- what are the different options of what you can do following the close of the hearing?
A I can make a decision. I can postpone the decision for a period of time. I cannot make a decision. Those are a few of the options.
Q Okay. Let's start with postponing the decision. In what instances did you postpone making a decision?
A I felt in instances, for example, of expulsion, I -- I usually would sit and really think



about it and look at -- review all of the testimony, all the evidence that was presented prior to my making decision. I would not make a decision typically when it involves something that egregious on the spot.
Q Okay. So following the close of the hearing when you're deliberating on making a decision, do you actually have all of the evidence with you that was presented for you to review?
A I may.
Q Okay. When --
MS. DYSON: I'm sorry. Can I interrupt? Anthony, I'm sorry to interrupt you.
Madam Court Reporter, is Ms. Adamchak in the waiting room?
REPORTER: There is nobody in the waiting room at this time that I see.
MS. DYSON: Okay. She was having difficulty getting back in. But that's fine.
REPORTER: Oh, okay.
MS. DYSON: My apologies.
BY MR. SEVERINO:
Q So we talked about -- or you talked about one of the reasons to postpone the decision would be an instance where expulsion was possible. You know, you wanted to review everything and deliberate. Are



there any other instances where you may have postponed making a decision?
A I don't recall.
Q Okay. What about postponing to gather additional information?
A I don't recall.
Q All right. I'm sorry, I -- you gave me a couple of options of what you can do following the close of the hearing. I know the second one was postponing the decision. What was the third one again?
A I don't recall.
Q Okay. All right. I'm sharing the screen again here. And this is the document produced by USF. It's Bates label 75 through 76. So this is titled "University of South Florida Student Rights and Responsibilities. Administrative Hearing Officer University Conduct Board Documentation. December 8, 2017. Student name Devaughn Dingle. And then the chair administrative officer, Kristin Steffen."
Do you recognize this document?
A I do not.
Q Okay.
A I will say it is my handwriting, but I do not recall this document specifically.

Page 74

Q Okay. That was going to be my next question, so -- which I didn't tell you that earlier, you may anticipate my question. Which is okay for now. We haven't had a big problem with that.
So, okay. So just to confirm, I've showed you page one here. That's your handwriting. And then I want to go down here. Is this also your handwriting?
A Yes.
Q Okay. All right. Is this the document that you would use following a formal hearing to render your decision?
A I don't recall specifically. But yes. If - - if not this, similar to this. Yes.
Q All right. And let's talk about this specific document, which, before I forget, we'll mark this as Exhibit 7.
(Exhibit 7 was marked for Identification.)
BY MR. SEVERINO:
Q So with respect to Exhibit 7 here, is the information that you handwrote in here under paragraph one something that you would have done on your own, or did you have input from someone else?
A I -- I had the discretion to put information

Page 75

on there that I chose. Yes.
Q Okay. So did anyone help you prepare this?
A I don't know.
Q Okay. In other cases where you served as a hearing officer or UCB member and you would have filled out a similar document, do you recall if anyone assisted you in filling out this?
A I do not.
Q Following the hearing, when you are reviewing the case, is there anyone else reviewing it with you?
A I don't recall. This was a long time ago, Anthony.
Q So I want to read -- actually, go ahead and read paragraph one here, your handwriting. Just let me know when you're done.
A I've read it.
Q Okay. So in the second line there, it says, "Sexual intercourse occurred without expressed, ongoing, affirmative consent." Is that your own language, or does that come from some university policy or guideline?
A I don't recall.
Q At the time that you handwrote this, do you recall what "expressed, ongoing, affirmative consent"

Page 76

meant?
A No. You're showing a document from 2017, Anthony.
Q I know when it's from. Let me ask you this: did USF, in any of its policies and procedures, defined -- define what consent meant?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't recall. I'm not the university.
Q Prior to serving as the Administrative Hearing Officer in this case, do you recall reviewing the Student Code of Conduct?
A Yes.
MS. DYSON: Object to the form.
BY MR. SEVERINO:
Q Okay. Is that something that you did every time you served as an administrative hearing officer?
A I don't recall.
Q Okay. Do you recall the specific reason you reviewed it prior to this proceeding?
A No.
MS. DYSON: Object to the form.
BY MR. SEVERINO:
Q All right. So page two here, Learning Outcomes, can you -- obviously I can read what it

Page 77

says, but can you explain what number one means as far as a learning outcome?
A I don't recall my thoughts during that time. All I can do is read this to you.
Q All right. Is this -- do you recognize this language?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A No.
Q Okay. All right. Was there any kind of document or guidance that was provided to you in serving as an administrative hearing officer with respect to specific learning outcomes based on the alleged violations?
A Yes.
Q Okay. What was that document if you recall?
A I don't recall.
Q I know you don't recall the document, but more generally, was it a document that essentially had a list of learning outcomes?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't what it specifically looked like, Anthony. I'm sorry.
Q Okay. So now I'm going to zoom in. There's

Page 78

a stamp here. Can you read any of that?
A I can barely read "Received" and "4:45 p.m." Those are the two things I can receive -- I can see.
Q Can you read at all what's in the middle there?
A No. I'd be speculating. Is it "December?" "DEC?"
Q Can you read anything else?
A Mm-mm. Is it "88?"
Q I'm sorry, I didn't hear you. I talked over you.
A Does that say "88," Anthony?
Q I mean, I know what it says, but if you can't read it, that's fine. Do you recall in this specific case whether you made the decision with respect to Mr. Dingle, the same day of the hearing?
A No.
Q Just to go down here. We didn't talk about this. I didn't ask you this. But the last page here, 76; that's your handwriting as well?
A Yes.
Q Okay. And the sanctions that you listed were number one, expulsion. Two, no contact order; correct?
A As it relates to this document, yes.

Page 79

Q And last question. You know -- these look like initials. Do you have any idea who those initials are?
A I'm sorry. I don't recognize that signature.
Q Okay. When you served as an administrative hearing officer, did you report to anyone in that role?
A What do you mean by report?
Q Did you have a superior, or was there a hierarchy where, for instance, if you had a question about something, you could go ask someone?
A The Office of Student Rights and Responsibilities.
Q All right. Was there someone specific there?
A Not that I recall. I think it depended on the case. That type of thing.
Q All right. So we're on page 94 of Exhibit 5 here. And I'd like you to take a look and read for me to yourself real quick lines 18 through 25, and then I'll go to the next page when you're ready.
A Okay.
Q And then, if you can just read through line five. I'm sorry. Go ahead and read through line 11.

Page 80

A Okay.
Q All right. So it appears from this transcript that -- there was the only thing that was provided from the police department is what's been referred to as this synopsis, a man notification, and the Title IX Incident Report Form filled out by Officer Madsen as well.
And you had asked Ms. Cutsinger if she spoke with Officer Madsen, which she did not. Is there any reason at this point that you didn't postpone the hearing in order to secure testimony or further information from Officer Madsen and the campus police?
A I don't recall. Again, I do not remember this case specifically, Anthony. I don't even remember this student's name.
Q I understand. I think you said earlier that you would rely on what's in this transcript; correct?
A That is correct.
Q Let me go down. All right. So we're on page 109. Read 22 through 25 for me real quick, then I'll go to the next page.
A Okay.
Q And then, I'm going to read this whole page. So just let me know when I can scroll down to read the rest.

Page 81

A Okay.
MS. DYSON: I'm confused. What lines are we on?
MR. SEVERINO: It's the whole page. I was just scrolling down for her to finish. It's page 110.
MS. DYSON: Okay.
BY MR. SEVERINO:
A Okay.
Q Okay. So if we go up -- up here again on page 110, you reference -- or the transcript references it's here that you stated that, "We did receive an email regarding the questions that you would have for the police officer." Mr. Dingle said, "Yes, ma'am." And then you said, "The police officer is not here, so we can't address these questions for you."
Again, is there any reason why at this point you didn't postpone the hearing to obtain testimony from the police officer?
A I don't recall.
Q In other instances where you served as an administrative hearing officer or UCB member, did you have any experience with campus police or other law enforcement providing testimony at the formal

Page 82

hearings?
A Yes.
Q Okay. And in those instances, do you recall if you ever had an issue with getting them to attend the formal hearing?
A I don't recall.
Q All right. One sec. So were -- oh, sorry. I haven't shared that with you. So back taking a look at Exhibit 7. And I'm just going to read this for the record. Paragraph One.
"USF Code of Conduct 4.14 Sexual Harassment. 4.14b Non-Consensual Sexual Intercourse." And then next to that, there's an R and an NR. I assume R is rationale. That you're going to provide a rationale; is that correct?
A No.
Q Okay. What is R?
A Responsible.
Q Responsible. Okay. Glad I asked that. And then, I think you testified about this earlier. You don't have to provide a rationale? That's just something you had the option to do; is that correct?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I always provided a rationale as I recall.

Page 83

Q Okay. Is that something you were required to do, or due to your practice?
A I don't remember.
Q Okay. So the rationale under paragraph one states, "Based on the information provided, it is more likely than not that vaginal sexual intercourse occurred without expressed ongoing, affirmative consent. Student 1 verbally indicated, 'No', to vaginal sex intercourse to Kevaughn, and Kevaughn acknowledged to university officials that he heard," it's redacted, "say, 'No,' during the course of the incident on November 16, 2017."
Okay. So now I want you to take a look -- I'm going to pull back up the transcript here. And we're going to go to page 138.
So we are on Bates label 138. All right. And I'm just going to have you read this page. I'll scroll down when you're ready.
A Okay. Okay.
Q All right. And then his -- Mr. Dingle's statement continues on this next page on lines 1 through 13. You can go ahead and read that as well.
A Okay.
Q So in your rationale, you said that the victim stated that she said, "No," during the course

Page 84

of the incident. And then we just read this from Mr. Dingle saying that it was consensual.
A I don't believe that's what that other document said. It didn't say victim
Q Okay. Let's take a look. That's Student 1. Let's just both back up.
A As I recall, the statement -- let's look at the document, but it says, "Kevaughn acknowledged to university officials that he heard blank say 'No.'"
Q So, okay, let's start --
A That doesn't say that, the victim said it. He said that he heard her say, "No." That's how I read that. Do you agree?
Q All right. So -- well, I'm going start at the sentence before that, and then we'll get to that. The sentence before that says, "Student 1 verbally indicated, 'No,' to vaginal sexual intercourse with Kevaughn." So that's the first part. So your back now, you put in here that the Student 1 verbally indicated, "No;" correct?
A That's what the document says.
Q And then the second part is, "And Kevaughn acknowledged to university officials that he heard," it's redacted, but Student 1, "say, 'No,' during the e course of the incident on November 16, 2017."

Page 85

Do you recall how and when Kevaughn acknowledged that he heard her say, "No," during the course of the incident?
A No.
Q Okay. And what we just read in Mr. Dingle's statement here from the transcript in his very last comment, at least as part of this statement was, it was consensual. And so my question is how do you reconcile his testimony or his statement with that of Student 1 to come to the conclusion that he's responsible for the alleged violations.
MS. DYSON: Objection.
BY MR. SEVERINO:
A I don't remember. I am simply reading a transcript like you are.
Q All right. And got a couple more. 142. It starts at line 24. And then, we'll go on to 143 and go to line -- oh, I'm sorry. Line 15 -- or line 14.
A Okay.
Q All right. So based on the transcript and your question, it appears that you're trying to identify if there's a discrepancy between what Mr. Dingle is saying and what this synopsis says; is that accurate?
MS. DYSON: Object to the form.

BY MR. SEVERINO:
A I don't know.
Q Okay. Well, it says, "In the information that we have provided to us in the police synopsis, it indicates that blank continuously said, 'no,' and I was trying to understand if there was a discrepancy in that that you are aware of."
A Well, you're reading the transcript, Anthony. So if that's what it said, that's what it said.
Q Do you recall what you meant by that?
A I don't.
Q All right. If there was a discrepancy between what Mr. Dingle said and what the synopsis said, why did you not postpone the hearing at this point to obtain additional information from campus police?
A I can only speculate. This was five and a half years ago.
Q Yeah. I'm asking.
A I don't know.
Q All right. So start on 148. This is just line 20. This is you speaking here. And what I am most interested in here is the next page, lines 1 through 8. Just let me know when you're done.



A Okay.
Q So at the end there, it says, "The Administrative Officer will review files of any prior misconduct before recommending any educational sanctions." Do you recall -- first, do you recall doing that in this instance?
A I do not. No.
Q And understanding that you don't recall actually reviewing files, do you recall whether or not Mr. Dingle had any prior misconduct with the university?
A No. I don't even recall the student's name, Anthony.
Q Okay. Are you familiar, or do you recognize the name Samantha Garrett?
A No.
Q I'll stop sharing this and show you something. There. Let's read again here. And for the record, this is USF 153 through 155. Do you recognize this document?
A No.
Q Following -- after you prepare the -- I'm sorry. I've got to find this. One sec. Back to this again. After you prepare this document, which is Exhibit 7, what -- what did you do with this document



after you filled it out?
A I don't remember preparing this document out specifically. But as I recall, my responsibility ends, and the office of Student Rights and Responsibilities takes any next action as necessary.
Q Okay. So after you fill out what you filled out with your handwriting, are you the one that actually submits it or transmits it to the OSRR?
A No.
Q Okay. Who would do that?
A I don't know what they're called. I think it's the Student Conduct Board Advisor. I -- I don't recall the specific -- it's the -- the other person, not the initial review officer, that's in the hearing usually takes the next actions.
Q Okay. And do you have any involvement following that part of the process?
A No.
Q Do you recall whether anyone from the OSRR contacted you to discuss your rationale after you submitted it to the OSRR?
A No.
Q Okay. All right.
MR. SEVERINO: All right. Sacha, give me about five minutes to go through my notes.



MS. DYSON: Okay.
MR. SEVERINO: I actually think I did it at exactly the time I said.
MS. DYSON: Yeah, you did. Good job.
MR. SEVERINO: So give me about five minutes and I may have a couple of follow ups. But that should be just about it.
MS. DYSON: Okay. We'll be back in five then.
THE WITNESS: Okay. Five-minute break, Anthony?
MS. DYSON: Yes.
MR. SEVERINO: You got it.
THE WITNESS: Okay.
REPORTER: This marks the end of media number 2. The time is 12:28 p.m. We are off the record.
(Off the record.)
REPORTER: This marks the beginning of media number 3. The time is 12:34 p.m. We are on the record.
BY MR. SEVERINO:
Q Were you -- do you recall being advised or instructed by anyone at the University of South Florida that the university expected Mr. Dingle to be

Page 90

expelled, regardless of the evidence presented at the formal hearing?
A No.
Q But you -- you recall that did not happen?
A I do not recall that it did happen.
Q Did that ever occur in any other instances where you were service as the hearing officer or on the UCB that you recall?
A No. I have never felt pressure to make a decision one way or another.
Q Did you -- did you have professional interactions with President Genshaft that you recall prior to this formal hearing?
A Brief -- I don't know if it was prior to the hearing, but briefly. Yes.
Q One last set of questions. We talked earlier about your -- your "colleague letters." Do you recall that, generally?
A I recall us discussing it. Yes.
Q Are you familiar with the September 22, 2017 Dear Colleague letter that rescinded certain prior Dear Colleague letters and guidances?
A Not specifically. No.
Q Is that something in your role as Deputy Title IX Coordinator and Investigator and Hearing

Page 91

Officer that you would have been periodically reviewing -- looking to see if there were any updates in the guidance from the federal government?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A You're -- you're relating two different distinct positions as if they're one, based on the questions. So you're telling me the Title IX Coordinator role and Investigator role aligns with the Hearing Officer role. That is not true.
So the Hearing Officer role might, right? A Title IX violation might move forward for adjudication, but they're not the same position.
Q Okay. Does being the Title IX Coordinator and Investigator, and at the same time serving as Administrative Hearing Officer create a conflict of interest?
A No. Because I wouldn't be the investigator of a case that I'm hearing. That would create a conflict of interest. If I investigate the case and then I do the adjudication, that would be inappropriate. I would never do that.
Q At your time at USF, do you recall whether USF was ever under federal investigation for its handling of Title IX claims?

Page 92

A Yes.
Q Okay. Do you recall when that was?
A No.
Q Okay. And if USF would have been found to have been violation Title IX based on those federal investigations, what would the consequence, if you know, have been for USF?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't know. It depends. I'm not the adjudicating body. I -- I don't work for the Department of Education.
Q But you did work in Title IX -- or in the Title IX Office at USF for a period of time, and would one of the potential --
A I did not work in the Office of Title IX.
Q Okay. You worked as a Title IX Coordinator and Investigator; correct?
A Yes, but I did not work in the office. It was an appointment.
Q Just to clear this up, did you report to anyone in that role? I know it was an appointment and you weren't in the office. I'm just trying to figure out kind of how the hierarchy worked with that.
MS. DYSON: Object to the form.

Page 93

BY MR. SEVERINO:
A No, I didn't. I don't know how to say it. It -- it wasn't a report. It wasn't a supervisory relationship.
Q Okay.
A But there was a Title IX Coordinator for the system that I worked with closely. Yes.
Q All right. And if -- if you know, if USF were to have violated Title IX, could USF have lost federal funding?
MS. DYSON: Object to the form.
BY MR. SEVERINO:
A I don't know. That's not within my purview. Nor was it then.
MR. SEVERINO: Okay. Those are all the questions that I have, Ms. Steffen-Zonsius. Hopefully I said that correctly. So thank you for your time this afternoon. I appreciate it. And unless Ms. Dyson has questions for you, you will be free to go.
MS. DYSON: I have no questions, and we'll break.
MR. SEVERINO: All right.
REPORTER: And before I read us off the record, may I get video orders on the record, starting with Mr. Severino. Does the standard delivery of this

video work for you?
MR. SEVERINO: I don't need a video right now.
REPORTER: Okay. And Ms. Dyson?
MS. DYSON: We're not ordering either.
REPROTER: Okay. We are off the record at 12:41 p.m. And this concludes today's testimony given my Kristin Steffen-Zonsius. The total number of media units used was four -- I'm sorry, three, and will be retained by Veritext Legal Solutions.

(Whereupon, at 12:41 p.m., the proceeding was concluded.)



CERTIFICATE OF NOTARY PUBLIC

I, MELISSA MCCANN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

M. McCann

MELISSA MCCANN
Notary Public in and for the
STATE OF CALIFORNIA



CERTIFICATE OF TRANSCRIBER

I, SONYA LEDANSKI HYDE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Sonya M. Ledanski Hyde

SONYA LEDANSKI HYDE



Sacha Dyson, Esquire
sacha.dyson@gray-robinson.com

June 29, 2023

RE: Kevaughn Dingle vs. University Of South Florida Board Of Trustees
6/13/2023 DEPOSITION OF KRISTEN STEFFEN-ZONSIUS
Job No. FLA5937569

The above-referenced transcript is available for review.

The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

RE: Kevaughn Dingle vs. University Of South Florida Board Of Trustees
6/13/2023 DEPOSITION OF KRISTEN STEFFEN-ZONSIUS
Job No. FLA5937569

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

__________________________________________________
KRISTEN STEFFEN-ZONSIUS DATE

**0**

**02861** 1:8

**1**

**1** 3:7 8:13,14 49:21 83:8,21 84:5,16,19,24 85:10 86:24
**1.310** 97:25
**10** 67:5
**109** 80:20
**10:02** 1:16 4:5
**11** 67:5 79:25
**110** 81:6,11
**11:32** 66:4
**11:45** 66:8
**11th** 49:5
**12151** 96:18
**12:28** 89:16
**12:34** 89:20
**12:41** 94:7,12
**13** 1:15 4:9 43:5 49:11 83:22
**138** 83:15,16
**13th** 25:25
**14** 50:2 71:1 85:18
**142** 85:16
**143** 85:17
**148** 86:22
**15** 85:18
**150** 56:7
**153** 87:19
**155** 87:19
**16** 59:10 66:22 83:12 84:25
**18** 79:21
**1998** 13:24
**1:00** 50:16

**2**

**2** 3:8 32:4,5 89:16
**20** 59:7 62:2 65:6 86:23
**2006** 9:11,13
**2011** 14:6 21:24 30:24
**2014** 14:11
**2015** 58:23 59:23
**2017** 14:18 32:14 37:10,12 37:19 49:11 50:16 56:18 59:10,11,14 66:13 73:19 76:2 83:12 84:25 90:20
**2019** 17:20,21 30:25 58:23
**2021** 16:5 20:6
**2023** 1:15 4:9 17:12,15 25:25 43:5 49:6 97:3
**21** 62:25
**218** 49:7
**22** 80:20 90:20
**225** 49:9
**24** 85:17
**25** 79:21 80:20
**29** 97:3
**29857** 95:21
**2:30** 65:22

**3**

**3** 3:9 39:21 42:23,25 43:1 89:20
**30** 97:16,24
**32** 3:8
**33602** 2:6,14
**3:30** 65:23

**4**

**4** 3:11 53:9,10
**4.14** 82:11
**4.14b** 82:12
**400** 2:5
**401** 2:13
**43** 3:9
**4:00** 65:23
**4:45** 78:2

**5**

**5** 3:12 58:7,9 65:11 66:11,22 70:11 79:19
**5/25/16** 37:5
**500** 44:8
**53** 3:11
**540** 58:14
**542** 59:6
**543** 58:14
**566** 36:19 38:7
**58** 3:12
**5937596** 1:20

**6**

**6** 3:3,14 61:6,7 71:1
**6/13/2023** 97:5 98:2
**61** 3:14

**7**

**7** 3:16 74:17,18 74:21 82:9 87:25
**71** 53:15
**74** 3:16 53:16
**75** 73:15
**76** 73:15 78:20
**77** 56:7

**8**

**8** 3:7 50:16 56:18 59:11,13 66:12 73:18 86:25
**80** 66:21
**813-273-5000** 2:16
**813-868-6167** 2:8
**88** 78:9,12
**8:21** 1:8
**8th** 12:15,17,21

**9**

**9/14/17** 37:8
**9/15/17** 37:9
**90017** 1:18
**94** 79:19

**97** 70:25

**a**

**a.m.** 1:16 4:5 66:4,8
**ability** 54:14 95:10 96:7
**able** 7:6,18 48:19 52:9 63:25
**above** 97:6
**absent** 4:13
**academic** 15:19
**accounts** 55:3
**accuracy** 97:9
**accurate** 31:1 64:6 85:24 95:9 96:5
**achievement** 45:16
**acknowledged** 83:10 84:8,23 85:2
**acknowledge...** 4:11
**acronym** 29:11
**acted** 40:1
**action** 8:3 34:25 35:1 88:5 95:12 95:16 96:8,12
**actions** 88:15
**active** 47:21
**actual** 71:12
**actually** 32:12 33:12 65:13 67:19 69:9 72:7 75:14 87:9 88:8 89:2
**adamchak** 2:20 5:5 12:12,20,25 72:13
**addition** 20:23 52:12
**additional** 55:13 73:5 86:16
**additionally** 4:13
**address** 44:6 81:16
**adhering** 18:12
**adjudicate** 41:4 41:9
**adjudicating** 61:10 92:11
**adjudication** 46:17,23 47:1 62:1,17 64:16 91:13,21
**administer** 4:11
**administration** 21:2
**administrative** 38:8 47:6 50:15 50:22 53:24 55:11 56:17,19 59:1,6,12,22 60:7,15 61:12 67:6 68:11 70:17 73:17,20 76:10,17 77:12 79:6 81:23 87:3 91:16
**administrator** 22:2,4,21 23:3 24:5 70:13
**advised** 89:23
**advisor** 88:12
**advisory** 45:17
**affairs** 18:1,7,24 19:10 20:10,18
**affect** 62:22
**affected** 54:10
**affiliation** 22:11
**affirm** 5:18
**affirmative** 75:20,25 83:7
**afternoon** 5:3 93:18
**ago** 6:20 7:14 44:10 50:12 65:12 69:21 75:12 86:19
**agree** 4:12,16 67:21,24 84:13
**agreed** 49:21
**agreements** 22:11
**ahead** 8:12 10:2 26:19 41:13 42:24 69:16,17 75:14 79:25 83:22
**aligns** 91:9
**allegation** 54:7 54:25 60:23 62:17
**allegations** 28:2 54:8,9,10 59:25 60:2,4,8 61:25
**alleged** 3:12,14 41:2,4,9 54:7,18 54:25 58:21 60:16 61:10 67:7 77:14 85:11
**allow** 16:8 43:13
**allowed** 7:14
**alumni** 47:25 48:3
**amount** 23:11 65:14
**angeles** 1:18
**annual** 49:12
**answer** 9:21 10:1,2,20,24 26:19 30:14 43:13,16,19,22 44:10 45:6,7,9 46:4
**answered** 11:4 41:11 69:7
**anthony** 2:3 4:25 23:8,16 24:25 25:12 28:19 29:15 30:15,19 31:16 34:2 39:20 41:15 43:11 46:22 50:11

52:1 59:17 61:16 63:6,24 64:24 69:7 71:8 72:12 75:13 76:3 77:24 78:12 80:14 86:9 87:13 89:11
**anticipate** 74:3
**anybody** 11:11
**apart** 27:17
**apologies** 72:20
**apologize** 34:5
**apparently** 44:1
**appear** 37:23
**appears** 80:2 85:21
**apples** 63:24,24
**applicable** 4:18
**appointed** 27:19 34:13 35:11,19 35:23
**appointment** 92:20,22
**appreciate** 93:18
**approached** 30:10
**appropriate** 44:18 55:25
**approval** 64:12 67:2 70:4,15
**approve** 65:7
**approximate** 18:23
**approximately** 9:13
**arena** 19:15
**article** 49:11
**aseverino** 2:7
**asked** 10:11 19:3,8 30:18 41:10 44:24 66:15 67:1 69:24 80:8 82:19
**asking** 21:18 26:16 37:18 45:2 63:19 69:10 70:9 86:20
**aspect** 38:19
**assess** 41:17 55:5
**assigned** 4:4 24:16
**assistant** 25:5,7 26:23 27:8 28:14 30:23
**assisted** 75:7
**associate's** 13:13,18,21
**association** 47:25 48:3
**assume** 6:17 10:21 36:24 82:13
**atixa** 29:9,17,19 36:11 37:23 38:1
**attached** 44:23 97:11
**attain** 31:18
**attend** 82:4
**attendance** 4:23
**attended** 37:21 38:1
**attending** 37:13 37:18
**attorney** 95:14 96:10 97:13
**audio** 71:5 95:8 96:4
**authenticity** 68:7
**authority** 65:8
**authorized** 4:10
**available** 51:15 51:16 55:20 97:6
**award** 32:14 45:16
**awarded** 45:16
**awards** 32:9,11
**aware** 86:7

**b**

**b** 3:5
**bachelor's** 13:13,16,25 14:1,3,7 15:18
**back** 9:2 26:13 54:15 58:8 61:4 64:19 65:11 66:11 68:24 72:18 82:8
83:14 84:6,18 87:23 89:8
**background** 13:4,5,11
**backwards** 17:14
**barely** 78:2
**barrios** 2:4
**based** 9:12 42:19 43:19 54:8,13 59:19 77:13 83:5 85:20 91:7 92:5
**basic** 10:16
**basically** 60:9
**bates** 36:19 49:6 50:2 56:7 58:14 66:20 73:15 83:16
**bathroom** 65:15
**bear** 25:11 53:12
**becoming** 28:22 29:21
**began** 28:14
**beginning** 58:22 66:7 89:19
**behalf** 2:2,10 5:1 65:3
**believe** 5:13 6:2 10:5 15:8 30:18 39:1 54:19 55:25 64:22 67:3 84:3

**best** 54:13 95:10 96:6
**better** 28:5 48:21
**big** 69:7 74:4
**bit** 11:10
**bits** 58:24
**blank** 84:9 86:5
**board** 1:9 4:8 8:6 32:23 33:13 38:10 40:2,13 40:15,19 41:1,8 47:2,7 50:23 51:7,13 52:25 53:25 55:12 57:11,18 63:8 63:13 73:18 88:12 97:4 98:1
**boards** 32:19
**body** 16:12 92:11
**bottom** 26:12 36:17 49:6,8
**break** 10:25 23:22,22 35:3 65:15 89:10 93:21
**breast** 23:13
**brief** 13:8,10 90:14
**briefly** 90:15
**bring** 66:11
**building** 14:25
**bulls** 48:2
**burden** 54:17

**c**

**c** 2:1 4:1
**ca** 1:17,18
**california** 4:9 4:11 95:23
**call** 11:2 48:15
**called** 6:8 48:10 64:24 88:11
**campbell** 4:9
**campus** 47:18 62:16 80:12 81:24 86:16
**cancer** 23:13,13 31:17,18
**capacity** 10:11 10:13
**caps** 49:16
**capture** 26:2
**caregiver** 31:15 31:21
**case** 1:7 6:22 8:5 43:13 44:21 45:13,20 46:8 49:22 51:23 53:3,4,4 54:5,6 55:4,9 57:19 58:21 62:4,22 63:6,16,18 69:1 69:13 71:14 75:10 76:11 78:15 79:18 80:14 91:19,20
**cases** 60:1,8 61:2 63:23 75:4
**certain** 17:25 90:21
**certainly** 44:2 44:19 62:9,23
**certificate** 14:25 15:6,7,14,17 95:1 96:1
**certificates** 13:13,19 14:23 15:21
**certification** 16:6,8,14
**certifications** 13:14,15 15:22 15:24
**certified** 4:16 15:25 16:3
**certify** 95:4 96:2
**cfs** 66:18
**chair** 34:9,12 35:11 45:17 73:20
**champion** 48:20
**change** 31:19 98:4,7,10,13,16
**changed** 5:25
**changes** 45:14 46:9,14 47:10 97:9
**charged** 56:18
**chart** 36:17
**child** 9:8
**choose** 54:21
**chose** 75:1
**circle** 69:8
**civil** 8:3 97:24 97:24
**claims** 91:25
**clarify** 57:16
**clarity** 10:10
**clear** 10:9 43:21 71:11 92:21
**clinics** 22:13
**close** 9:9 71:17 72:5 73:9
**closed** 43:25 71:12
**closely** 93:7
**code** 3:13,15 19:22 22:25 42:4 58:22 60:17 61:11,14 76:12 82:11
**colleague** 38:21 38:24 39:1,6,16 90:17,21,22
**column** 58:25
**come** 9:2 30:8 51:1 58:8 75:21 85:10
**coming** 34:19
**comment** 64:5 85:7
**committee** 34:9 34:12,21 35:12 35:12 36:7 45:18
**committee's** 34:16,18

**common** 60:9
**community** 48:20,21,21 62:9,12,14,22 62:23 63:13,21
**complainant** 54:22,23
**complainants** 19:20
**complaint** 47:15 59:9
**completed** 97:16
**completely** 44:21
**compliance** 18:10,11,16,20 42:11
**concerned** 62:11
**concluded** 71:10 94:13
**concludes** 94:7
**conclusion** 85:10
**conduct** 3:13,15 19:22 23:1 32:14,16,23 33:13 38:10 40:2,13,15,19 41:1,8 42:5 47:2 47:7 50:23 51:7 51:13,21,22 52:10,25 53:25 55:1,12 56:24 57:11,18 58:22 60:17 61:11,15 63:3 73:18 76:12 82:11 88:12
**conducted** 46:18
**conducting** 38:7
**conference** 37:9 37:11,14,19
**conferences** 37:21
**confirm** 74:5
**confirming** 70:9
**conflict** 91:16 91:20
**confused** 81:2
**consensual** 62:20,21 63:1 82:12 84:2 85:8
**consent** 75:20 75:25 76:6 83:8
**consequence** 92:6
**consider** 30:16 38:25 42:18 64:1
**considered** 64:4 97:17
**constitute** 4:21
**consult** 19:3,4 19:12
**consultant** 16:24
**consulted** 19:25
**consulting** 19:18 20:12 23:5
**contact** 62:3,21 63:2 78:23
**contacted** 88:20
**contest** 34:5
**continue** 20:12
**continues** 83:21
**continuing** 20:23
**continuously** 86:5
**contract** 22:2,3 22:20 23:2 24:5
**contracts** 22:5,9 22:10
**coordination** 27:13
**coordinator** 26:24 27:9,11 27:18,22 28:4 28:16,22 29:22 30:23 38:5 39:5 39:15 42:10,17 42:21 46:24 48:24 90:25 91:9,14 92:17 93:6
**copies** 97:14
**correct** 8:10 12:2 20:3 27:23 46:25 50:18 51:24 60:6 67:19 69:2,12 70:5 78:24 80:17,18 82:15 82:22 84:20 92:18
**correctly** 6:18 40:3 93:17
**counsel** 6:2 10:4 11:25 12:1 23:24 95:11,14 96:7,10
**counsel's** 43:20
**counselor** 37:15 46:5
**counselors** 5:22
**couple** 10:18 23:24 37:3 65:25 66:24 73:8 85:16 89:6
**course** 21:11 83:11,25 84:25 85:3
**courses** 15:15 15:16,16 21:3,5 21:13
**court** 1:1 10:15 42:23 72:13
**cover** 6:2
**create** 91:16,19
**creating** 17:2
**credibility** 41:17 55:5
**currently** 16:19
**cursor** 37:4

**cutsinger** 56:21 56:23 66:15 80:8
**cuva** 2:4
**cv** 1:8

**d**

**d** 3:1 4:1
**dash** 6:16
**date** 1:15 15:5 15:12 37:5,20 56:17 59:9,10 97:12 98:24
**dates** 37:25 59:17
**day** 78:16
**days** 51:4 97:17
**deal** 38:16
**dean** 64:18 65:2
**dear** 38:21,24 39:1,5,16 90:21 90:22
**dec** 78:7
**december** 50:16 56:18 59:11,13 66:12 73:18 78:6
**decent** 65:14
**decision** 54:13 62:10 63:14 64:17 65:2 71:18,19,20,22 71:23 72:3,3,6 72:23 73:2,10 74:12 78:15 90:10
**decisions** 63:16
**declare** 98:20
**decline** 43:19
**defendant** 2:10
**defendants** 1:11
**define** 76:6
**defined** 76:6
**degree** 13:13,14 13:18,21,23 14:1,3,7,9,21
**degrees** 13:12 13:25
**deliberate** 72:25
**deliberating** 72:6
**delivery** 93:25
**department** 9:7 17:25 22:6 24:9 57:3,4 80:4 92:12
**departments** 33:23
**depended** 79:17
**depending** 5:3 27:19
**depends** 55:4,9 61:25 71:14 92:10
**depo** 44:9
**deposed** 8:17,21 9:4 10:17
**deposing** 97:13
**deposition** 1:13 4:3,6,12,20 8:3 9:13 10:8,16 11:18,22 12:4 12:11,14,20,25 43:24 44:3,15 44:17 97:5 98:2
**deputy** 26:24 27:9,11,16,22 27:22 28:15,22 29:21 30:23 39:4,15 42:10 42:17 90:24
**describe** 14:24 54:1
**description** 3:6
**desk** 32:13
**determination** 63:11
**determine** 61:22 63:5
**determining** 42:3 64:1
**devaughn** 56:18 73:19
**died** 31:14
**difference** 3:10 33:16 43:7
**different** 7:11 23:14 61:17 63:16,23 71:16 91:6
**differing** 55:3
**difficult** 31:16 31:22
**difficulty** 72:18
**digital** 95:8 96:3
**dingle** 1:5 4:7 5:1 8:5 49:7,9 49:22,24 56:19 73:19 78:16 81:14 84:2 85:23 86:14 87:10 89:25 97:4 98:1
**dingle's** 83:20 85:5
**director** 17:23 17:24,24 18:1,6 18:24 19:9 20:10,18,22,23 20:24 25:5,7 26:24 27:8 28:14 30:23
**disabled** 7:3,9
**disagreed** 65:1
**disciplinary** 20:1 22:24 58:1
**discontinue** 35:14
**discovery** 43:25 45:3 46:1
**discrepancies** 55:2
**discrepancy** 85:22 86:6,13
**discretion** 55:16 55:20 64:11 65:8 74:25
**discrimination** 42:19 45:13,20 46:8

**discuss** 88:20
**discussing** 47:14 90:19
**distinct** 91:7
**district** 1:1,2
**division** 1:3
**divorced** 23:14
**document** 3:16 8:7 26:4,7,17 36:21 37:16,17 39:20 43:18 44:20,21,24 45:23 46:1 49:8 50:3,5,11,20 53:15,18,21 56:6,12,13 58:12,17,20 60:1,5 67:16,20 67:25 73:14,21 73:25 74:10,16 75:6 76:2 77:11 77:16,18,19 78:25 84:4,8,21 87:20,24,25 88:2 98:20
**documentation** 73:18
**documents** 3:12 3:14 12:3 43:12 43:14,23,25 44:14,16 45:3 50:7 52:9 53:21 63:17
**doing** 26:21 44:13,15 55:6 87:6
**doubt** 68:7
**due** 83:2
**duly** 6:8 95:5
**dumped** 44:8
**dyson** 2:11 5:2,4 9:14,19,23 10:7 10:9 11:8,12 12:1,11,13,17 12:25 17:6 22:16 26:4,7,16 27:3 28:7,17 29:3 30:2,12 31:3 33:19,25 35:17 36:13 38:12,17 39:19 40:7,22 41:10 42:13 43:11,22 43:23 44:7,12 45:2,8,22 46:6 47:22 50:8 51:9 54:3 55:7,23 57:7,22 58:3 59:15 60:10,19 61:23 62:6 64:5 64:14 65:17,21 66:1 68:14,20 69:3,14,18 70:7 72:11,17,20 76:7,14,22 77:7 77:21 81:2,7 82:23 85:12,25 89:1,4,8,12 91:4 92:8,25 93:11 93:19,20 94:4,5 97:1

**e**

**e** 2:1,1 3:1,5 4:1 4:1 6:15,15 84:24 97:24,25 98:3,3,3
**earlier** 49:20 57:16 66:16 67:1 68:24 74:2 80:16 82:20 90:17
**east** 2:13
**education** 13:6 92:12
**educational** 13:4,10 87:4
**egregious** 72:4
**either** 12:24 47:6 94:5
**email** 50:25 51:1,11 52:5 57:20 58:1 81:13 97:13
**emailed** 51:17 97:15
**employed** 9:3 9:10 21:20,22 54:17 95:11,14 96:8,11
**employee** 10:12 37:5 95:13 96:10
**employment** 13:5 16:15 17:14,18 47:20
**enable** 41:8
**encompassed** 19:9
**ends** 88:4
**enforcement** 9:8 81:25
**enjoy** 30:17
**ensuring** 42:11
**enterprise** 15:1
**entries** 37:22
**equitable** 54:19
**ere** 22:18
**errata** 97:11,13 97:16
**es** 95:4
**esquire** 2:3,11 97:1
**essentially** 26:1 43:4 77:19
**evidence** 41:21 54:16,23 55:13 55:18,22 62:18 72:2,7 90:1
**evidentiary** 4:19
**exact** 15:5,12 64:23
**exactly** 89:3
**examination** 3:2 6:11
**examined** 6:10
**example** 71:24
**executive** 20:10 20:17,23 21:1

**exhibit** 3:7,8,9 3:11,12,14,16 8:13,14 32:4,5 39:21 42:23,25 43:1 49:21 53:9 53:10 58:7,9 61:6,7 65:11 66:11 70:11 74:17,18,21 79:19 82:9 87:25
**expected** 89:25
**expel** 63:5 64:2
**expelled** 62:24 90:1
**experience** 19:15 26:22 28:23 29:25 45:15 81:24
**expert** 38:25
**expertise** 45:15
**explain** 14:24 27:6 33:15,21 35:10 77:1
**expressed** 75:19 75:25 83:7
**expulsion** 62:3,5 62:10 63:22 64:10,16 65:5 67:3 70:4 71:25 72:24 78:23
**extent** 10:10 45:22,25

**f**

**f** 6:15,15
**face** 28:10
**facilitator** 48:17 48:18,25 49:2
**fact** 47:5
**factors** 62:4 63:19,21 64:1,4
**facts** 54:5 98:20
**faculty** 18:1,6,9 18:24 19:9 20:10,18
**fails** 97:20
**fair** 71:9
**faith** 54:13
**familiar** 38:22 45:21 48:9 49:13 53:18,20 87:14 90:20
**far** 29:24 77:1
**federal** 18:16,19 18:22 38:15 91:3,24 92:5 93:10 97:18,24
**feedback** 11:6 21:16
**feel** 62:16 69:6
**felt** 52:10 71:24 90:9
**fight** 31:17
**figure** 63:4 64:3 92:23
**file** 51:23 52:13 52:22 53:4
**files** 87:3,9
**fill** 13:9 30:11 88:6
**filled** 75:6 80:6 88:1,6
**filling** 75:7
**financially** 95:15 96:11
**find** 17:8 25:16 42:4 47:12 87:23
**findings** 46:17 46:18,23 47:5
**fine** 6:19 23:19 25:1,14 28:13 28:21 41:14 43:16 44:11 59:18 72:18 78:14
**finish** 11:1 44:7 81:5
**firm** 2:12 5:4
**first** 6:8,13,22 10:20 14:9 21:22 32:22 39:11 44:16,25 49:12,23 56:6 56:10 59:5 66:15 84:18 87:5
**five** 23:12 26:13 50:11 65:15,24 79:25 86:18 88:25 89:5,9,10
**fl** 2:6,14 97:14
**fla5937569** 97:5 98:2
**florida** 1:2,9 4:8 5:6 8:6 9:7 13:22 14:4,13 14:20 15:3,10 21:21,23 22:8 41:3 49:12,23 73:16 89:25 97:4,18,24 98:1
**focus** 58:25
**focused** 65:5
**folks** 11:4
**follow** 70:19 89:6
**following** 30:22 71:16 72:5 73:8 74:11 75:9 87:22 88:17
**follows** 6:10
**font** 58:12
**foregoing** 95:3,4 96:4 98:20
**forget** 74:16
**form** 9:14,19,24 17:6 22:16 28:7 28:17 29:3 30:2 30:12 31:3 33:19,25 35:17 36:13,24 38:12 38:17 39:19 40:7,22 42:13 47:22 50:8 51:9 54:3 55:7,23

57:7,22 58:3 59:15 60:10,19 61:23 62:6 64:14 68:14,20 69:3 76:7,14,22 77:7,21 80:6 82:23 85:25 91:4 92:8,25 93:11
**formal** 59:10 71:6,9 74:11 81:25 82:5 90:2 90:13
**former** 10:11
**forward** 91:12
**found** 61:14 92:4
**foundations** 21:6,12
**four** 31:16,22 37:22 94:9
**free** 93:19
**friday** 50:16
**friends** 36:1
**full** 64:11 65:8
**funding** 93:10
**further** 80:11 95:13 96:9

**g**

**g** 4:1
**gaps** 13:9
**garrett** 87:15
**gather** 34:6 55:12,21 73:4
**generally** 15:13 39:25 40:17 45:24 63:19 77:19 90:18
**genshaft** 35:21 35:22 36:4 90:12
**getting** 7:15 11:6,6 21:17,17 72:18 82:4
**give** 5:19 7:4 13:3,8,10 25:15 88:24 89:5
**given** 62:16 94:8
**glad** 82:19
**go** 5:8 6:17 8:12 10:1 13:2 20:20 24:3 25:19 26:1 26:12,13,19 37:2,8 41:13 42:24 43:5,8 48:2 49:7 51:15 51:21 52:6 53:3 65:2,12,25 69:16,17 74:7 75:14 78:18 79:12,22,25 80:19,21 81:10 83:15,22 85:17 85:18 88:25 93:19
**goal** 65:24
**goes** 30:25 56:7 68:24
**going** 6:13,22 6:23 13:2 17:13 23:15 25:15 26:12 31:6,12 32:2 37:2,3,15 42:23,24 43:5 43:13,15,19 44:23 46:5 51:12 56:11 57:20 58:7,7 59:4 64:2 65:13 66:10 69:7 74:1 77:25 80:23 82:9,14 83:14 83:15,17 84:14
**good** 4:2 5:2,2,3 10:23 54:13 89:4
**gotten** 5:25 23:14
**government** 38:15 91:3
**graduate** 13:12 13:19 14:25 15:7,13,15,16 15:17
**gray** 2:15 97:1
**grayrobinson** 2:12 5:5
**grieve** 64:23 65:1
**grieved** 64:17 64:21
**grooming** 46:13
**ground** 10:16 10:18
**group** 16:22
**guidance** 38:15 38:16 39:2,16 77:11 91:3
**guidances** 90:22
**guideline** 75:22
**guys** 66:2

**h**

**h** 3:5 98:3
**half** 50:11 86:19
**hand** 5:18
**handle** 9:25 46:23,25
**handling** 91:25
**handwriting** 73:24 74:6,8 75:15 78:20 88:7
**handwritten** 3:16
**handwrote** 74:22 75:24
**happen** 90:4,5
**happened** 23:12 55:3
**harassment** 82:11
**health** 14:15 15:7 21:6,12 22:8 23:21 24:11
**healthcare** 17:3 17:5,9 21:2

**hear** 21:18 78:10
**heard** 11:9 60:1 83:10 84:9,12 84:23 85:2
**hearing** 3:11 5:15 11:8 32:20 32:23 33:12 38:8,8 40:1 47:1 47:7,7 50:16,17 50:22 51:5,6,12 52:24 53:6,25 55:11,12,21 56:17,19 57:10 57:17 59:6,10 59:12 60:25 61:12 63:10 66:12 67:17,20 67:21,23,24 68:5 70:18 71:6 71:6,7,10,12,17 72:5 73:9,17 74:11 75:5,9 76:11,17 77:12 78:16 79:7 80:11 81:19,23 82:5 86:15 88:14 90:2,7,13 90:15,25 91:10 91:11,16,19
**hearings** 54:17 55:3 70:20 82:1
**help** 17:8 25:16 48:20 75:2
**helpful** 23:16
**hereto** 95:15 96:11
**hierarchy** 63:14 79:11 92:24
**hiring** 18:9
**history** 13:5 17:14
**hm** 7:16
**hmm** 29:12 31:14 35:2 50:13 64:22
**hold** 18:2 25:17 58:6
**home** 48:10,11 48:11 49:11,16
**hope** 23:20,20
**hopefully** 93:16
**hospitals** 22:12
**host** 7:3,9
**hosts** 49:12
**hour** 65:19
**hours** 23:25
**huh** 11:15
**human** 15:25 16:1,4,7,10,13
**hyde** 96:2,19

**i**

**idea** 79:2
**identification** 8:15 32:6 43:2 58:10 61:8 74:19
**identified** 5:13 53:11 59:5 60:18
**identify** 4:23 85:22
**identifying** 58:21
**implement** 35:14
**implemented** 40:21
**impose** 42:3 61:13,22 64:11 65:5,7 67:2 70:4
**imposed** 62:3 63:2
**inappropriate** 44:21 46:2 91:22
**incident** 54:7 80:6 83:12 84:1 84:25 85:3
**incredible** 23:11
**indicated** 39:2 83:8 84:17,20
**indicates** 86:5
**individual** 45:16 54:8
**information** 13:4 34:6 52:4 54:12 55:13,18 55:22 58:24 73:5 74:22,25 80:12 83:5 86:3 86:16
**initial** 56:20 59:25 60:22 66:16 88:14
**initials** 79:2,3
**initiated** 47:14
**input** 74:24
**instance** 63:12 72:24 79:11 87:6
**instances** 71:22 71:24 73:1 81:22 82:3 90:6
**instruct** 43:16
**instructed** 10:1 89:24
**instructing** 43:22 44:10 45:5,7,8
**instructor** 21:1
**intended** 4:17 44:3
**interactions** 90:12
**intercourse** 62:20 63:1 75:19 82:12 83:6,9 84:17
**interest** 91:17 91:20
**interested** 30:10 39:9,12 67:9 86:24 95:15 96:12
**interim** 20:22
**internet** 44:1
**interrupt** 72:12 72:12

**interrupting** 44:12
**investigate** 28:2 91:20
**investigation** 46:15,16 47:5 47:13 91:24
**investigations** 20:3 35:4 46:22 92:6
**investigator** 26:25 27:10,17 27:23,25 28:5 28:16 29:25 30:4,7,24 38:4 39:5,15 46:19 46:24 90:25 91:9,15,18 92:18
**involved** 19:23 20:1 30:8 54:12 54:23 58:1 63:6
**involvement** 18:25 22:21 24:22 36:10 57:19 88:16
**involves** 72:4
**involving** 60:8
**issue** 9:25 38:15 70:1 82:4
**ix** 18:25 19:5,13 19:15,25 20:4 20:13 22:22 24:19,22 26:24 27:9,11,13,16 27:20,22,22,25 28:2,15,22,23 29:1,21,24 30:4 30:7,9,23 33:16 34:9,14 35:1,2,4 35:7,15 36:11 36:24 37:9,11 37:19 38:16 39:2,5,15 42:10 42:12,17 45:12 45:17 46:19,22 46:24 57:13 80:6 90:25 91:8 91:12,14,25 92:5,13,14,16 92:17 93:6,9

**j**

**jackson** 2:13
**january** 17:12 17:15 49:5
**jasmine** 2:19 7:21
**joanne** 2:20 5:5 12:12
**job** 1:20 17:22 20:15,25 21:25 31:10 89:4 97:5 98:2
**jobs** 17:8
**judy** 35:21
**july** 58:23
**june** 1:15 4:8 12:15,17,21 25:25 43:5 97:3

**k**

**kaiser** 16:22,23 21:7,8
**keep** 11:3 17:9 21:17 24:3 61:6
**kevaughn** 1:5 4:7 5:1 8:5 49:22,24 67:7 70:14 83:9,9 84:8,18,22 85:1 97:4 98:1
**kind** 10:15 13:3 15:17 17:13 35:10 63:13 65:23 70:18 77:10 92:24
**know** 8:4 10:16 10:22 11:1,5,20 15:19 19:23 21:7,16 22:19 23:5,20,23 24:24,24 28:13 29:13 30:21 33:15,24 34:6,7 35:22 36:25 37:6,10 39:25 41:13 47:8,9 49:24 53:20 56:14 57:12 58:12 60:5,23 63:20 65:17,23 67:11 68:4,9 69:22 70:9 72:24 73:9 75:3 75:16 76:4 77:18 78:13 79:1 80:24 86:2 86:21,25 88:11 90:14 92:7,10 92:22 93:2,8,13
**knowledge** 16:12 95:10 96:6
**kristen** 1:13,14 97:5 98:2,24
**kristin** 4:6 5:12 6:7,19 8:3,4 56:20 63:9 73:20 94:8

**l**

**label** 36:19 50:2 56:7 58:14 66:21 73:15 83:16
**labeled** 53:15
**lack** 28:5
**language** 75:21 77:6
**las** 17:17
**law** 2:12 5:4 81:24
**law.com** 2:7
**laws** 4:19
**lawyers** 36:18
**leadership** 15:8
**learning** 76:24 77:2,13,20
**leave** 31:9
**led** 47:6

**ledanski** 96:2,19
**left** 62:19
**legal** 6:1 9:25 94:10 97:23
**letter** 38:24 90:21
**letters** 38:16,21 39:1,6,16 90:17 90:22
**letting** 23:20
**level** 15:16
**lgbtq** 48:20
**life** 23:11
**lifetime** 47:24
**likely** 54:6,24 83:6
**line** 59:7 62:2 62:25 65:6 67:5 75:18 79:24,25 85:17,18,18,18 86:23 98:4,7,10 98:13,16
**lines** 66:22 71:1 79:21 81:2 83:21 86:24
**linkedin** 3:8 26:2,10,15 30:22 32:3 34:8
**list** 77:20
**listed** 37:3 38:6 59:19 78:22
**listen** 34:4 54:5
**listening** 71:5
**little** 11:9 57:15
**loaded** 25:25
**location** 1:17
**long** 12:16 17:10 18:2 20:17 22:18 50:14 56:6 75:12
**longer** 65:18
**look** 25:8 26:15 26:23 29:14 49:20 51:15 52:6 54:23 56:11 59:25 61:19 62:25 67:5 72:1 79:1 79:20 82:8 83:13 84:5,7
**looked** 77:23
**looking** 50:10 66:21 70:11 91:2
**looks** 31:6 37:11 56:16 62:19
**loop** 9:9
**los** 1:18
**lost** 93:9
**lot** 23:17 60:1

**m**

**ma'am** 81:15
**madam** 42:23 72:13
**made** 7:17 44:14 63:16 78:15
**madsen** 80:7,9 80:12
**make** 6:24 34:24 35:12 54:13 57:16 60:13 63:11 67:6,10 68:12 68:16 69:10,11 70:13 71:18,19 72:3 90:9
**makes** 10:2 63:14
**making** 3:9 43:7 47:15 62:10 68:18 71:22 72:2,6 73:2
**man** 80:5
**management** 14:22 15:8 16:2 16:7
**manager** 24:7,8 24:12 25:2 27:1
**managerial** 16:24
**manner** 4:20
**marathon** 23:23
**maria** 56:21
**mark** 8:12 32:2 42:25 53:8 58:7 61:5 74:16
**marked** 8:14 32:5 43:1 53:10 58:9 61:7 74:18
**marking** 39:20
**marks** 66:3,7 89:15,19
**married** 5:25
**master** 21:1
**master's** 13:12 13:15 14:9,14 14:16,21 15:18
**materials** 51:15 51:16,20
**matter** 4:7
**matters** 34:14 35:2 39:3 40:18
**mccann** 1:19 4:3 95:2,22
**mean** 11:20 15:14 16:11 23:4,15 32:18 37:15 40:24 50:10 54:20 57:2 62:13 67:10 68:13 78:13 79:9
**meaning** 30:9
**means** 4:20 15:15 16:12 17:4,8 36:25 77:1
**meant** 76:1,6 86:11
**media** 66:3,8 89:15,20 94:9
**medical** 16:22 19:14,16
**medicine** 18:9

**meeting** 63:3
**melissa** 1:19 4:3 5:7,12,24 7:2 95:2,22
**member** 32:19 38:11 40:1,4 41:1 47:1,24 50:22 57:11,18 59:1,13,22 60:8 60:16,25 61:12 62:15 63:3,8 75:5 81:23
**memory** 34:5
**mentioned** 6:20 54:15 63:20
**message** 7:13
**middle** 1:2 78:4
**mind** 11:3 24:3 31:15
**minute** 6:20 7:14 32:22 35:3 58:8,13 61:20 89:10
**minutes** 65:16 65:24 88:25 89:6
**mischaracterize** 69:25
**misconduct** 41:2 87:4,10
**misrepresenting** 69:15,19
**mitigate** 42:19
**mm** 29:12 31:14 35:2 50:13 64:22 78:9,9
**molesting** 46:13
**moment** 7:4 65:12 66:23
**morning** 4:2 5:2 5:3 26:10
**mother** 31:14 31:17,21
**move** 91:12
**moved** 23:14
**mrm** 1:8
**mss** 1:8
**mt** 31:12
**multiple** 13:14 54:10
**multitude** 24:17
**mute** 5:12
**muted** 11:13,13

**n**

**n** 2:1 3:1 4:1 6:15,16
**name** 4:2 5:25 6:1,14,15 21:10 28:9,10,12 37:2 49:16 58:25 73:19 80:15 87:12,15
**necessarily** 48:16
**necessary** 9:25 62:1 88:5
**need** 10:25 11:3 23:21 60:12 61:20 94:2
**needed** 19:15 67:2 70:3,15
**neither** 95:11 96:7
**nevada** 17:17
**never** 30:6 44:14,17 46:1 56:13 67:25 68:4,5 90:9 91:22
**new** 20:6 25:1
**nice** 48:2
**non** 60:21 62:20 62:20 63:1 82:12
**north** 2:5
**notary** 1:19 4:10 95:1,22
**note** 3:16 97:10
**notes** 12:6,7 88:25
**notice** 3:7
**noticed** 1:14
**notification** 57:20 80:5
**notified** 50:23 51:5,11,18
**november** 30:24 49:11 58:22 59:9,23 83:12 84:25
**nr** 82:13
**number** 29:15 36:18 59:7 66:4 66:8 77:1 78:23 89:16,20 94:8
**numbers** 49:7

**o**

**o** 4:1 6:16
**oaths** 4:11
**object** 9:14,19 9:23 17:6 22:16 26:16 28:7,17 29:3 30:2,12 31:3 33:19,25 35:17 36:13 38:12,17 39:19 40:7,22 42:13 45:23 47:22 50:8 51:9 54:3 55:7,23 57:7,22 58:3 59:15 60:10,19 61:23 62:6 64:5,14 68:14,20 69:3 76:7,14,22 77:7 77:21 82:23 85:25 91:4 92:8 92:25 93:11
**objection** 4:14 5:16 9:24 10:2 27:3 41:10 43:11 44:14 70:7 85:12
**obtain** 13:21,23 14:2,10,17 15:4 15:9 51:20 81:19 86:16
**obtained** 31:10

**obviously** 76:25
**occasional** 21:16
**occur** 90:6
**occurred** 54:25 75:19 83:7
**october** 30:24
**office** 19:5,13 20:13 24:11 27:20 33:9,16 33:17 35:15 51:21,23 52:10 52:13,15 56:24 57:9,13 68:22 70:23 79:13 88:4 92:14,16 92:19,23
**officer** 4:3,12 32:20,23 33:13 38:8 40:1 47:1 50:16,17,22 51:6,12 52:24 53:25 55:11 56:19,21 57:11 57:18 59:1,6,13 59:22 60:7,15 61:1,12 63:10 66:17 67:6 68:12 70:13,18 73:17,20 75:5 76:11,17 77:12 79:7 80:7,9,12 81:14,15,20,23 87:3 88:14 90:7 91:1,10,11,16 95:2
**offices** 33:22
**official** 16:23
**officials** 83:10 84:9,23
**oh** 7:11 39:22 42:22 47:24 72:19 82:7 85:18
**okay** 5:11 6:4 6:17,20 7:10,16 7:19 8:1,9,19 9:2,9,12 10:7 11:15,18,21,24 12:3,6,19 13:20 13:25 14:9,23 15:6,13,17,23 16:3,8,11,14,17 16:21 17:10,18 18:16,19 19:2,7 19:17 20:9,17 21:5,10,18,19 21:22,25 22:9 22:15,20,24 23:7,21 24:18 24:21 25:4,7,10 25:18,19 26:21 27:6,11,16,21 27:25 28:11,25 29:7,10,20,24 30:8,21 31:9 32:11,17,25 33:4 34:15 35:10,19 36:3,9 37:13,22 38:2 38:24 39:8 40:5 40:10,14 41:4,7 41:16,20,24 42:2,7,9,16 43:3 45:10 46:11,14 46:21,25 47:4,9 48:1,3,14 52:6 52:19,19 54:20 56:8,17 57:5,15 57:25 58:15,17 58:20 59:5,18 60:3,6,12,24 61:3 62:2,13,25 63:12 65:15,21 66:1,25 67:21 68:4,6,10,18,24 70:3,11,17,22 70:25,25 71:3,9 71:15,21 72:5 72:10,17,19 73:4,13,23 74:1 74:3,5,10 75:2,4 75:18 76:16,19 77:10,16,25 78:22 79:6,23 80:1,22 81:1,7,9 81:10 82:3,17 82:19 83:1,4,13 83:19,19,23 84:5,10 85:5,19 86:3 87:1,14 88:6,10,16,23 89:1,8,10,14 91:14 92:2,4,17 93:5,15 94:4,6
**once** 10:2 51:11
**one's** 63:25
**ones** 60:18
**ongoing** 75:20 75:25 83:7
**opportunity** 31:24 64:23
**option** 82:22
**options** 71:16 71:20 73:8
**order** 55:12 62:4 63:2 78:23 80:11
**ordering** 94:5 97:15
**orders** 93:24
**organization** 48:9,16 49:18
**organizations** 47:18 48:5
**osrr** 52:13,20,23 69:2,12 88:8,19 88:21
**outcome** 77:2 95:16 96:12
**outcomes** 76:25 77:13,20
**outline** 70:19
**outside** 46:6 47:20
**outstanding** 45:16
**ovarian** 31:17
**overheard** 41:2

**oversaw** 22:5 24:14 34:12
**overseeing** 18:20
**oversight** 17:2 18:8,22
**own** 39:9 74:23 75:20

**p**

**p** 2:1,1 4:1
**p.a** 2:4
**p.m.** 50:16 78:2 89:16,20 94:7 94:12
**page** 3:2,6,8,10 25:24,25 26:2 26:10,15 30:22 32:3 43:3 49:5 56:6,10 70:25 74:6 76:24 78:19 79:19,22 80:20,21,23 81:4,5,11 83:15 83:17,21 86:24 98:4,7,10,13,16
**pages** 26:13 44:8
**paragraph** 66:21 74:22 75:15 82:10 83:4
**pardon** 49:13
**part** 11:4 22:25 35:14 39:11,12 42:10 47:17 48:4 51:7,13 52:24 65:4 84:18,22 85:7 88:17
**participant** 7:9
**participating** 32:16,17
**particular** 71:14
**particularly** 20:14
**parties** 4:12,15 54:12 95:12,14 96:8,11 97:15
**passionate** 3:9 43:7
**penalties** 98:20
**people** 17:8 30:16
**perform** 19:8 33:2
**period** 59:20 71:19 92:14
**periodically** 91:1
**perjury** 98:20
**permanente** 16:22
**permit** 16:9
**permitted** 4:18
**person** 51:2,2 88:13
**personal** 12:7 52:4
**personnel** 45:14 46:8,14 47:10
**pertains** 40:12
**phone** 11:2,11
**physical** 52:13 52:22
**physically** 52:6
**pipelines** 17:3,5
**places** 60:21
**plaintiff** 1:6 2:2 5:1
**planning** 16:18 16:19
**please** 4:23 5:9 5:17 10:22 27:7 97:12
**plenty** 44:13
**point** 80:10 81:18 86:16
**police** 80:4,12 81:14,15,20,24 86:4,17
**policies** 18:12 18:14,17 35:7 35:13 76:5
**policy** 75:22
**position** 18:2,6 35:20 45:6,12 91:13
**positions** 17:3,5 91:7
**possible** 72:24
**postpone** 55:21 71:18,22 72:23 80:10 81:19 86:15
**postponed** 73:1
**postponing** 55:12 71:21 73:4,10
**potential** 92:15
**potentially** 62:24
**practice** 83:2
**preparation** 11:18 12:4,8
**prepare** 11:19 40:6 51:14 52:23 53:5 75:2 87:22,24
**prepared** 96:3
**preparing** 88:2
**preponderance** 54:6,16 62:17
**present** 2:18 12:22
**presented** 41:21 55:19 72:2,8 90:1
**president** 34:13 34:25 35:11,24 90:12
**president's** 24:10
**presidential** 34:9 45:17
**pressure** 90:9
**primary** 27:8
**prior** 21:19 28:21 29:1 30:1

30:6 32:25 35:22 44:15 51:4 59:13,22 71:6 72:2 76:10 76:20 87:3,10 90:13,14,21 95:5
**privacy** 52:7,10
**private** 52:3
**privileges** 10:5
**proactive** 42:20
**probation** 63:3
**problem** 74:4
**procedural** 4:19
**procedure** 97:24,24
**procedures** 35:8 35:13 76:5
**proceed** 7:7
**proceeding** 1:17 4:5,17 51:14 76:20 94:13 96:4
**proceedings** 41:18,22 95:3,5 95:6,9 96:6
**process** 20:1 22:24 40:20,24 58:2 69:20 88:17
**produced** 4:16 26:5,8,17 36:19 43:12 44:9 45:3 46:1 50:2 58:20 59:19 68:2 73:14
**producing** 44:16
**production** 44:6
**professional** 16:1,4,10 36:4 90:11
**professor** 46:12 47:6,10
**program** 9:8 21:2
**programs** 20:11
**project** 24:7,8 24:12 25:2 27:1
**projects** 24:14 24:15,17
**promoted** 20:8 20:9 25:5
**promotion** 18:9 31:11,13,24
**pronounce** 6:18
**prove** 54:18
**provide** 10:10 20:12 82:14,21
**provided** 19:19 29:18,19 33:7 42:2 43:14,24 59:20 60:5 70:19,22 77:11 80:4 82:25 83:5 86:4
**provides** 16:6 39:1
**providing** 81:25
**provisional** 71:5
**public** 1:19 14:15 21:6,12 62:15 95:1,22
**pull** 25:16 53:13 83:14
**pulled** 44:1,2
**purposes** 4:18
**pursuant** 8:9
**pursue** 30:20
**pursuing** 30:10 30:15
**purview** 93:13
**put** 74:25 84:19

**q**

**qualified** 95:7
**question** 6:13 9:24 10:20,21 10:23 11:1 26:17 31:12 38:10 39:11,13 45:24,25 46:6 59:11 68:25 69:24 70:10 74:2,3 79:1,11 85:8,21
**questioning** 6:3
**questions** 10:11 13:8 43:13 44:4 44:24 65:14 66:24 69:21 81:13,16 90:16 91:8 93:16,19 93:20
**quick** 43:6 56:5 65:15 66:23 71:2 79:21 80:20
**quoting** 45:23

**r**

**r** 2:1 4:1 82:13 82:13,17 98:3,3
**raise** 5:17
**random** 51:2
**rather** 44:15
**rationale** 82:14 82:14,21,25 83:4,24 88:20
**reactive** 42:20
**read** 37:15,16 66:23 67:16 71:1,4 75:14,15 75:17 76:25 77:4 78:1,2,4,8 78:14 79:20,24 79:25 80:20,23 80:24 82:9 83:17,22 84:1 84:13 85:5 87:18 93:23 97:8 98:20
**reading** 67:11 67:15,19 70:12 85:14 86:8
**ready** 5:23 31:18 79:22 83:18
**real** 43:6 56:5 71:2 79:21

80:20
**really** 71:25
**realtor** 30:25 31:7
**reason** 23:22 68:7 76:19 80:10 81:18 97:10 98:6,9,12 98:15,18
**reasonable** 97:17
**reasons** 52:10 72:23
**recall** 8:19,20 9:17,22 12:16 15:5,11,12 22:23 23:6,17 27:14 28:9,10 28:13,14 29:7 29:20 32:15,22 33:5,11,14 35:16,19 36:6,9 37:13,18,24,25 38:2,9,14 39:4 39:13,14 40:14 40:16,17 41:15 41:16,19,20 42:1,7 47:4,16 48:4,8,22 49:1 49:15,25 50:4,6 50:10,20 51:3,4 51:19,25 52:3,9 55:10,14,15 58:5 59:11,17 59:21,24 60:6 60:15 61:3,13 61:16,18,20,21 63:15,23 64:3 64:16 65:9 67:4 69:4,6,20 70:3,6 71:4,7 73:3,6,12 73:25 74:13 75:6,12,23,25 76:9,11,18,19 77:3,16,17,18 78:14 79:17 80:13 81:21 82:3,6,25 84:7 85:1 86:11 87:5 87:5,8,9,12 88:3 88:13,19 89:23 90:4,5,8,12,18 90:19 91:23 92:2
**receipt** 97:17
**receive** 32:8,11 33:1 41:24 54:12 57:20,25 78:3 81:13
**received** 6:25 36:10 40:15 48:19 53:1 71:11 78:2
**receiving** 41:16 41:20
**recent** 25:24
**recently** 5:25 9:18
**recognition** 18:9
**recognize** 26:14 43:10,18 56:12 73:21 77:5 79:4 87:14,20
**recognized** 45:15
**recollection** 49:17 69:23 70:15
**recommend** 68:25
**recommendati...** 67:6,10 68:12 68:17,18 69:10 69:12 70:13
**recommendati...** 34:24 35:13
**recommended** 69:1
**recommending** 87:4
**reconcile** 85:9
**record** 4:4,5,14 4:23 5:24 31:15 42:22 44:11 50:2 56:6 58:13 66:5,6,9 82:10 87:19 89:17,18 89:21 93:24,24 94:6 95:9 96:5
**recorded** 4:20 95:6
**recording** 4:17 71:5 95:8 96:4
**recruitment** 18:10
**redacted** 83:11 84:24
**reduced** 95:7
**refer** 19:21 36:18
**reference** 81:11
**referenced** 97:6
**references** 81:12
**referred** 38:20 80:5
**referring** 12:1 35:4,7
**reflect** 44:11
**refresh** 49:17 69:23 70:14
**regard** 10:3 35:24 97:19
**regarding** 16:13 34:13 39:2 81:13
**regardless** 90:1
**regulations** 18:13,14,17,19 18:22
**related** 38:4 60:22 63:17 95:11 96:7
**relates** 10:5 23:2 48:6 78:25
**relating** 91:6
**relationship** 36:3 93:4

**relative** 95:13 96:10
**rely** 44:3 71:8 80:17
**relying** 39:15 45:25
**remarks** 43:20
**remember** 8:22 9:3 24:25 25:9 28:12,19 34:2 47:19 48:23 64:23 80:13,15 83:3 85:14 88:2
**remote** 1:17
**remotely** 4:13
**render** 74:11
**rephrase** 10:22
**reply** 68:1
**report** 79:7,9 80:6 92:21 93:3
**reported** 1:19
**reporter** 4:2 5:9 5:15,22 6:2,5 7:4,6,10,16,21 10:15 42:23 66:3,7 72:13,15 72:19 89:15,19 93:23 94:4
**represented** 10:3,12
**representing** 5:6 10:7
**reproter** 94:6
**required** 33:12 83:1
**requirement** 29:21 39:10,13
**rescinded** 90:21
**resolve** 55:2
**resource** 15:25 16:1,4,7,10
**resources** 15:20 16:13
**respect** 24:8 29:1 35:1 36:10 42:3 47:10,13 53:2,4 57:17 60:16 74:21 77:13 78:16
**respondent** 54:22,22
**respondents** 19:19
**responsibilities** 16:25 18:5 27:12 28:1 33:10,18 42:16 52:16 57:10 68:23 70:24 73:17 79:14 88:5
**responsibility** 42:11,18 88:3
**responsible** 18:20,21 37:5 67:7 70:14 82:18,19 85:11
**rest** 62:23 80:25
**restroom** 11:2
**result** 46:15,16 46:17,22
**resulted** 20:2 45:14 46:8
**resume** 25:8
**retained** 94:10
**retrieved** 32:13
**returned** 97:16
**revenue** 9:7
**review** 12:3,6 44:14 51:23 54:11 56:20 66:17 72:1,8,25 87:3 88:14 97:7
**reviewed** 76:20
**reviewing** 39:5 52:12,22 75:10 75:10 76:11 87:9 91:2
**right** 5:18 7:19 9:17 11:15 17:10,21 20:5 20:20 21:7,10 21:13,15,19 23:7 25:14 26:22 27:21 29:11 30:21,21 32:21 35:22 36:16,17 37:8 39:25 47:14 49:6,20 51:22 52:11,12,19 53:3,14 56:2 58:12,14 59:4,7 60:24 64:19,20 65:4,10 66:2,10 66:20,20 73:7 73:13 74:10,15 76:24 77:5,10 79:15,19 80:2 80:19 82:7 83:16,20 84:14 85:16,20 86:13 86:22 88:23,24 91:11 93:8,22 94:3
**rights** 33:9,17 52:15 57:9 68:22 70:23 73:16 79:13 88:4
**roadmap** 13:3
**robinson.com** 2:15 97:1
**role** 17:1,11,15 19:7,11 20:4,6,9 20:24 22:18 23:4 24:6,12,18 24:20,22 25:2,2 25:4,6 26:25 27:8,14,17,18 29:6 30:1,16 33:2 34:16,18 34:20,22 35:23 39:4,17 40:5,6 42:9,19,21 46:19 50:24 51:6 52:24 54:1 54:21 57:17,21 61:11 66:18

79:8 90:24 91:9 91:9,10,11 92:22
**roles** 18:6 27:4 27:9 28:1,4 30:11 32:25 55:16
**room** 72:14,16
**rule** 97:24,25
**rules** 4:19 10:16 10:18 97:18

**s**

**s** 2:1 3:5 4:1 6:15,16,16 98:3
**sacha** 2:11 5:4 88:24 97:1
**sacha.dyson** 2:15 97:1
**safe** 48:10,11,12 48:14,16,18,22 49:1,11,16 62:16,16
**safety** 62:9,11 62:13 63:20
**samantha** 87:15
**sanction** 42:3 61:22 63:2 64:10 65:2,5,7 67:2 68:25 70:4
**sanctions** 61:13 61:17,21 62:3 64:25 65:1 78:22 87:5
**saying** 31:15 40:2 60:14
69:19 84:2 85:23
**says** 7:2,9 26:23 30:24 36:23 37:4 45:12 49:7 62:3 63:8 66:16 67:9 68:11,16 70:12 75:18 77:1 78:13 84:8 84:16,21 85:23 86:3 87:2
**sced** 36:25
**scedeix** 36:23
**scheduled** 51:5
**school** 18:8 19:14,16 20:1
**sciences** 14:8
**screen** 6:23 7:3 7:24 25:10,21 25:22 36:17 40:11 44:18 49:4 50:1 56:4 65:10 66:11 73:13
**screens** 53:15
**screenshot** 3:8 26:1 32:3 43:4
**script** 70:18
**scroll** 8:1 43:6 59:4 62:19 80:24 83:18
**scrolling** 81:5
**sec** 25:15 82:7 87:23
**second** 7:14 14:16 25:11 36:15 39:12 73:9 75:18 84:22
**secondary** 27:9
**secure** 80:11
**see** 7:11,23 25:21 26:14 28:9 32:13 36:18 43:4 49:6 54:24 56:14,21 58:15,23 59:2,7 59:18 60:4 72:16 78:3 91:2
**seeing** 49:16 50:6,21
**seek** 54:5,11
**seen** 8:7 29:10 36:20 38:20 44:17,25 50:3,6 53:21 56:13 58:17 67:25 68:4,5,6
**senior** 16:24 17:23,24,24 18:1,6,23 19:9 24:10
**sentence** 84:15 84:16
**separate** 19:7 19:11 27:17 33:22
**september** 90:20
**serve** 33:12 40:6 40:15 50:21 52:24 53:24 57:21 60:15,21 66:18
**served** 17:11 27:21 32:22 55:10,16 57:10 59:12 60:7 70:17 75:4 76:17 79:6 81:22
**service** 90:7
**serving** 32:25 50:24 51:6,12 59:21 76:10 77:12 91:15
**set** 90:16
**severino** 2:3 3:3 4:24,25,25 6:12 7:2,5,8,12,13,19 7:22 8:12,16 9:15,20 10:14 11:5,11,15,17 17:7 22:17 23:9 23:19 24:2,4 25:14,19,20 26:6,9,11,18 27:5 28:8,18 29:4 30:3,13 31:4 32:2,7 33:20 34:1 35:18 36:14 38:13,18 39:22 39:24 40:8,23

41:12 42:14,22 43:9,15,17,21 44:5,8,22 45:5 45:10,11 46:3 47:23 50:9 51:10 53:8,12 53:17 54:4 55:8 55:24 56:2,9 57:8,23 58:4,6 58:11,16 59:16 60:11,20 61:5,9 61:24 62:7 64:7 64:9,15 65:13 65:19,22 66:2 66:10,14 68:15 68:21 69:5,16 70:2,8 72:21 74:20 76:8,15 76:23 77:8,22 81:4,8 82:24 85:13 86:1 88:24 89:2,5,13 89:22 91:5 92:9 93:1,12,15,22 93:25 94:2
**sex** 42:20 45:13 45:20 46:7 83:9
**sexual** 62:20,21 63:1 75:19 82:11,12 83:6 84:17
**share** 6:23 25:10 66:11
**shared** 52:5 53:14 82:8
**sharing** 7:3,9 42:24 44:17 49:4 50:1 53:9 56:4 58:11 65:10 73:13 87:17
**sheet** 97:11,13
**should've** 43:24 44:9
**show** 6:24 55:19 87:17
**showed** 62:18 74:5
**showing** 60:22 76:2
**shown** 63:17
**side** 62:19
**sign** 97:12
**signature** 79:5 95:21 96:18
**signed** 97:21
**similar** 60:18 74:14 75:6
**simply** 17:8 85:14
**sinkavitch** 2:19 7:17 11:9
**sit** 9:18 37:16 41:8 71:25
**sitting** 32:12
**skills** 95:10 96:6
**slowly** 8:1
**slut** 49:13
**small** 58:12
**social** 14:8
**society** 16:1,7
**solutions** 94:10 97:23
**sonya** 96:2,19
**sorry** 5:8 13:20 14:2 21:15 28:10 29:14 34:2,17,23 64:24 72:11,12 73:7 77:24 78:10 79:4,25 82:7 85:18 87:23 94:9
**sorts** 13:5
**south** 1:8 4:8 5:6 8:6 14:13,20 15:3,10 21:21 21:23 22:8 41:3 49:12,23 73:16 89:24 97:4 98:1
**speak** 11:24 12:10,13,19
**speaking** 67:18 68:11 86:23
**specific** 18:14 22:6 24:8 27:4 28:19 33:1 35:4 37:20,25 48:21 50:5 51:1 53:3,3 53:4,21 57:19 59:25 61:14,21 62:4 74:16 76:19 77:13 78:15 79:15
88:13
**specifically** 18:21 24:20 25:9 35:16 42:1 55:4 61:16,18 73:25 74:13 77:23 80:14 88:3 90:23
**specifics** 23:18 33:5 40:16 63:15
**speculate** 25:13 28:20 56:1 86:18
**speculating** 30:19 78:6
**spell** 6:14
**spend** 31:7
**spent** 31:1
**split** 7:14
**spoke** 12:16,24 80:8
**spot** 72:4
**staff** 63:3
**stamp** 78:1
**stand** 29:13
**standard** 54:16 93:25
**standpoint** 55:1
**start** 13:3,6 37:4 49:10 62:2 65:16 71:21 84:10,14 86:22
**started** 17:21 60:25

**starting** 93:24
**starts** 85:17
**state** 9:7 13:22 14:4 95:23
**stated** 81:12 83:25 98:21
**statement** 83:21 84:7 85:6,7,9
**states** 1:1 23:15 83:5
**statute** 97:18
**steffen** 1:13,14 4:6 5:7,12,17 6:1,7,15,17 7:23 8:4,4 46:4 56:20 63:9 73:20 93:16 94:8 97:5 98:2,24
**stenographic** 4:20
**step** 44:25
**stipulation** 4:21
**stop** 11:1 42:24 53:9 56:10 87:17
**strategic** 20:11
**street** 2:5,13
**strike** 29:17
**student** 3:13,15 19:22 20:4 22:25 32:16,23 33:9,13,17 38:10 40:2,13 40:15,19 41:1,8 42:4 47:2,7 50:23 51:7,13 51:21,22 52:9 52:15,25 53:25 55:1,11 56:18 56:24 57:9,11 57:18 58:22 60:17 61:11 64:22 68:22 70:23 73:16,19 76:12 79:13 83:8 84:5,16,19 84:24 85:10 88:4,12
**student's** 80:15 87:12
**students** 41:2 46:13 54:10 64:18 65:3
**subject** 38:25 40:17 65:16
**submits** 88:8
**submitted** 88:21
**subpoena** 3:7 6:24 8:2,10 10:6 49:21
**subpoenaed** 5:14 6:21
**suggested** 97:16
**summary** 13:8 13:10
**superior** 28:6 79:10
**supervisory** 93:3
**support** 9:8 19:19
**supposed** 40:21
**sure** 5:9 6:24 7:4 57:16 60:13
**suspect** 23:24
**suspend** 63:5
**suspension** 63:2 63:22 64:2 71:6
**sustainable** 15:1
**swear** 4:13 5:16 5:18
**sworn** 4:15 6:8 95:5
**sympathize** 31:20
**synopsis** 80:5 85:23 86:4,14
**system** 19:6 45:18 93:7

**t**

**t** 3:5 6:15 29:11 98:3,3
**take** 4:4,10 23:22 25:1 34:25 35:1 52:9 56:2,11 65:15 65:24 66:22 79:20 83:13 84:5
**taken** 4:7 95:3 95:12 96:9
**takes** 88:5,15
**talk** 11:21 32:21 74:15 78:18
**talked** 57:15 65:11 72:22,22 78:10 90:16
**talking** 26:22 69:17
**tampa** 1:3 2:5,6 2:12,14
**tcb** 2:7
**teach** 21:3,5,6 21:11
**teaching** 21:8
**tell** 6:9 15:23 17:4 21:10 23:10,22 30:20 40:25 63:7,13 64:1 74:2
**telling** 91:8
**term** 28:6 38:22
**testified** 6:10 69:4 82:20
**testify** 8:2
**testifying** 95:5
**testimony** 5:18 9:13 67:3 69:11 69:14 70:1 71:11 72:1 80:11 81:19,25 85:9 94:7 97:8 97:17
**thank** 5:9,15,22 6:4,5 7:5,8,20 7:21 21:18 23:20 24:2 93:17

**thanks** 66:2
**theme** 60:4
**themed** 61:1
**thing** 31:21 52:11 79:18 80:3
**things** 13:5 19:17 44:20 65:25 78:3
**think** 5:11 10:10 29:10 30:17 48:25 59:6 68:16 69:24 71:25 79:17 80:16 82:20 88:11 89:2
**third** 73:10
**thoughts** 77:3
**threat** 62:8,21
**three** 23:14 27:3 94:9
**time** 1:16 4:22 5:3 8:21 9:12,17 9:23 10:25 12:7 12:22,24 20:13 21:19 22:1 24:21 28:19 29:5 30:25 31:1 31:7 32:8 39:14 44:6,13,16 50:7 50:14 51:17 55:10 57:1,6 59:5,20 66:4,8 66:17 71:19 72:16 75:12,24 76:17 77:3 89:3 89:16,20 91:15 91:23 92:14 93:17
**timeframe** 28:15
**times** 8:19 18:18 32:20 37:3
**timing** 24:24 25:13 60:23
**title** 16:23 17:22 18:25 19:5,12 19:15,25 20:4 20:13,15 21:25 22:21 24:19,22 26:24 27:9,11 27:13,16,20,22 27:22,25 28:2 28:15,22,23 29:1,21,24 30:4 30:7,9,23 33:16 34:9,14 35:1,2,4 35:7,14 36:11 36:24 37:9,11 37:19 38:16 39:2,4,15 42:10 42:12,17 43:7 45:12,17 46:19 46:22,23 48:23 57:12 80:6 90:25 91:8,12 91:14,25 92:5 92:13,14,16,17 93:6,9
**titled** 73:15
**titles** 20:25 49:11
**today** 5:13,19 6:21 7:1 8:7,9 9:18 10:4 11:19 12:4,8,11,14,20 12:25 43:4 44:2 49:22 56:14 58:18
**today's** 94:7
**told** 23:24 68:2
**took** 26:25 27:14 29:5,8 40:9 49:20
**top** 25:24 26:14 36:23 37:4 49:10
**total** 94:8
**totalitarian** 54:9
**track** 61:6
**trained** 29:5,9
**training** 29:1,7 29:17,20 33:1,4 33:6,7,8,11 36:9 36:24,25 38:1 40:9,10,14,18 40:20 41:7,15 41:16,20,24 42:2,7 48:19 53:1
**trainings** 37:23 37:24 38:2,6
**transcribed** 67:17,22,24 68:10
**transcriber** 96:1
**transcript** 3:11 4:16 56:16 66:12 67:11 68:1,5,8 70:11 71:8 80:3,17 81:11 83:14 85:6,15,20 86:8 96:3,5 97:6,20
**transcription** 67:22
**transcriptionist** 95:8
**transcripts** 64:7 97:14
**transitioned** 20:6
**transmits** 88:8
**true** 54:8 91:10 95:9 96:5 98:21
**trustees** 1:10 4:8 8:6 97:4 98:1
**truth** 5:19,19,20 6:9,9,10
**try** 7:10,11 10:22 11:16 13:9 23:15
**trying** 30:17 53:13 63:4 64:3 67:14 69:21,23 69:25 85:21

86:6 92:23
**tuesday** 1:15 4:8 25:25 43:5
**turkal** 2:4
**twice** 23:13
**two** 8:25 13:7 13:12,12,15,15 13:18,25 14:23 18:4,23 20:5 33:22 44:23 63:23 66:8 76:24 78:3,23 91:6
**type** 37:5,9 42:3 79:18
**types** 19:17 22:9 24:15 60:4 61:1 61:13,17
**typewriting** 95:7
**typically** 51:4 72:3

**u**

**u** 6:16
**ucb** 59:1,13,22 60:8,16 61:12 63:13 75:5 81:23 90:8
**ultimate** 64:17
**ultimately** 47:6 63:11 65:3
**unbiased** 54:11
**uncover** 45:13 46:7,7
**uncovered** 45:20
**under** 4:18 74:22 83:4 91:24 97:18 98:20
**undergraduate** 15:16
**understand** 4:15 10:21 23:17 24:1 25:15 31:23 32:1 45:6 48:21 50:20 53:2 57:17 61:19 63:25 64:20 65:4 67:13 80:16 86:6
**understanding** 60:14 68:6 87:8
**understood** 61:3
**united** 1:1
**units** 94:9
**university** 1:8 4:7 5:6 8:6 13:22 14:4,13 14:20 15:3,10 17:17 19:5 21:21,23 22:6,8 32:13 34:13 35:5,25 41:3 45:14 47:21 49:12,23 62:9 62:12,14,16 63:8,13,20 64:18 65:3 73:16,18 75:21 76:9 83:10 84:9 84:23 87:11 89:24,25 97:4 98:1
**university's** 22:25 42:11
**unlv** 17:19 18:3 18:14 19:13,21 20:4,7,15,21,25 21:8,20 23:5 31:1,6,10
**unrelated** 61:1
**updates** 91:2
**ups** 89:6
**use** 11:2 16:14 43:12 44:20 74:11
**used** 94:9 97:20
**uses** 4:18
**usf** 10:6,12 12:7 22:8,22 24:9,11 24:23 25:2,4 26:23 27:1 29:18,22 30:1,6 30:9,11 31:2,9 32:8 33:10,17 35:7,13 36:11 36:19 39:10,14 45:18 46:8,9 47:17,20,24 48:6,9,20 50:3,7 57:1,6 58:21 59:19 66:17 68:2 73:14 76:5 82:11 87:19 91:23,24 92:4,7 92:14 93:8,9
**using** 43:23,25
**usually** 71:25 88:15
**uterine** 23:13

**v**

**v** 1:7
**vaginal** 83:6,9 84:17
**various** 32:19 37:23 58:24
**vault** 3:10 25:24 43:3 49:5
**vegas** 17:17
**verbally** 83:8 84:16,19
**verify** 97:9
**veritext** 4:4 94:10 97:14,23
**veritext.com** 97:14
**versus** 15:16 63:5,22 64:2
**vice** 24:10
**victim** 83:25 84:4,11
**video** 93:24 94:1 94:2
**violated** 42:4 61:14 93:9

**violation** 54:18 54:25 91:12 92:5
**violations** 3:12 3:14 28:3 41:5,9 58:21 60:17 61:10 67:8 77:14 85:11
**vs** 4:7 8:5 49:22 97:4 98:1

**w**

**waiting** 72:14 72:16
**walk** 49:13
**wall** 32:4
**want** 5:8 13:7,9 23:10,16 25:13 28:20 44:3,11 44:19 45:23 57:16 58:25 60:13 65:12 74:7 75:14 83:13
**wanted** 72:25
**warrant** 62:5,23 63:22
**watch** 31:17
**way** 6:23 7:11 11:4 38:20 48:1 54:11 59:21 67:4 90:10
**ways** 13:7 16:17 19:2,12
**we've** 69:6
**weigh** 41:21
**went** 31:25
**wide** 22:7
**witness** 4:13,14 4:15 5:11,13,16 5:21,24 6:4,8,21 11:14 23:8,10 24:1 25:12,18 89:10,14 95:4 97:8,10,12,20
**witnesses** 41:17 55:6
**word** 34:19 64:24
**words** 67:13,16 69:22
**work** 10:6 11:16 15:19 16:18,19 17:13 20:12 21:8 22:7 35:11 56:25 57:2 92:11,13,16,19 94:1
**worked** 17:11 24:10 29:16 33:17 57:5,9,12 92:17,24 93:7
**workforce** 16:18,19 17:2,4 17:9
**working** 17:16 30:6
**works** 56:24 63:14
**written** 4:21

**x**

**x** 3:1,5 29:11

**y**

**yeah** 23:4 34:23 39:22 40:4 48:19 60:13 63:19 68:4 86:20 89:4
**year** 8:23 20:19 44:10
**years** 8:25 18:4 18:23 20:5 23:12 29:15 31:16,22 50:11 86:19
**young** 19:14

**z**

**z** 6:16
**zale** 56:21
**zone** 5:3 48:13 48:14,16,18,23 49:1
**zonsius** 1:13 5:7 5:12 6:1,16,18 7:23 8:4 93:16 94:8 97:5 98:2 98:24
**zoom** 58:13,15 77:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.