UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEVAUGHN DINGLE,

      Plaintiff,

v.

UNIVERSITY OF SOUTH
FLORIDA BOARD OF
TRUSTEES,

      Defendant.

_____/

Case No..: 8:21-CV-02861-MSS-AEP

## PLAINTIFF'S RESPONSE TO THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Kevaughn Dingle ("Plaintiff" or "Mr. Dingle"), by counsel files his Response in Opposition to Defendant University of South Florida Board of Trustees' ("USF" or the "University") Motion for Summary Judgment (the "Motion" of "MSJ") [Doc. 54]. The Court should deny the Motion for the following reasons.

## INTRODUCTION

Mr. Dingle's reputation, life, and future were completely destroyed when USF discriminated against him based on his race and gender through a predetermined and one-sided student "disciplinary proceeding" that can only be described as a complete sham. The record evidence establishes that USF never intended to discover the truth during its purported investigation and ensuing administrative hearing:

**Q**     **Is it USF's position that it's more important to resolve these investigations timely than to actually get to the truth of what happened?**

MS. DYSON: Objection. Outside the scope.

**THE WITNESS:  It is USF's goal to resolve the case in a timely manner, giving appropriate due process to all parties.**

Q      So USF does not have the goal of uncovering what actually happened?

MS. DYSON: Objection. Outside the scope.

**THE WITNESS: We have the a resolution of what may -- what -- based on our evidence and what we have and creating our learning outcomes and protecting our community and resolving the case.**

(Corp. Rep. 169: 3-18).[1] Consistent with this mantra, USF intentionally omits numerous material facts and other record evidence which establishes that USF discriminated against Mr. Dingle. Given that USF has thwarted every attempt by Mr. Dingle to discover further evidence of USF's discrimination, it is not surprising that USF relies on Mr. Dingle's own testimony to argue that it did not discriminate against him while at the same time ignoring its own records which were only provided after motions and orders compelling their production. USF should not be rewarded for its intentional efforts to obfuscate the truth and conceal its discrimination against Mr. Dingle. Mr. Dingle should have his day in Court before a jury of his peers.

## <u>SUMMARY OF DISCRIMINATION EVIDENCE</u>

<u>First</u>, USF compiled and prepared a chart from its own records that identifies every sexual misconduct case brought before USF's Office of Students Rights and Responsibilities ("OSRR") for the time period November 12, 2015 through July 8,

---

[1] Deposition testimony will be cited to herein by the deponent's last name followed by the line and page numbers. Testimony of USF's Corporate Representative will be cited to herein as Corp. Rep.

2019 (the "Comparator Chart") (SJE 1).[2] The Comparator Chart includes, among other things, the complainant's gender and race, the respondent's gender and race, the formal charges, whether the respondent was found responsible for the formal charges, and the corresponding sanctions imposed, if any. **Out of the 34 entries on the Comparator Chart, only 4 students were expelled – all of whom were black males.** According to current and former USF employes involved with Mr. Dingle's disciplinary process, expulsion was a severe sanction used sparingly; unless, of course, you were a Black male. (Cutsinger 84:25-85:4 and Cutchens 41:10-24)

Second, USF offers no evidence of mitigating or distinguishing facts demonstrating why the other 30 students on the Comparator Chart received less severe sanctions, or no sanctions at all. In fact, not one USF witness could testify as to the specific facts in the cases of the other 30 students on the Comparator Chart, including USF's Corporate Representative who unabashedly testified she could not explain why only the four Black male students were expelled and no one else:

> **Q      Does USF have an explanation as to why the only students on this spreadsheet that were expelled were black?**
>
> MS. DYSON: Objection. Outside the Scope.
>
> **THE WITNESS: I do not.**

Third, USF departed both procedurally and substantively from the norms and procedures set forth in its own Student Code of Conduct (the "Code") (SJE2) when

---

[2] References to SJE correspond Plaintiff's Notice of Filing Documents in Support of Plaintiff's Response to the MSJ.

handling Mr. Dingle's case. For example, among other things, USF did not provide Mr. Dingle an opportunity to accept responsibility with recommended sanctions as mandated by the Code, USF substituted the formal hearing officer without notifying Mr. Dingle, and the formal hearing officer did not submit her decision for approval. These reasons alone are sufficient to deny summary judgment.

## STATEMENT OF UNDISPUTED FACTS[3]

There were no witnesses to the underlying sexual misconduct allegations and USF's statement of undisputed facts ignores Mr. Dingle's account of events. USF also presents facts which are contradicted by the record citations upon which it relies.

## Introduction

1.      Mr. Dingle is an African American male student-athlete who attended college at USF as a scholarship student-athlete on the USF football team. (*See* SJE 3 - Provisional Suspension Hearing Transcript; 32:11-12; 39:6-10).

2.      Prior to accepting a full athletic scholarship to attend USF, Mr. Dingle demonstrated similar strength of character throughout his childhood and high school career while helping raise his six siblings, being a 4-year member of his high school

---

[3] In support of this Response, Plaintiff filed the audio recording of his interview with the USF Campus Police Department. *See* Doc. 66. The audio recording in its entirety provides further support for Plaintiff's Statement of Undisputed Facts. USF argues in its Motion that the audio recording is inadmissible because Mr. Dingle's records relating to this incident were expunged. However, the entire file from the State Attorney's Office, including the audio recording, was obtained prior to the expunction by a public records request. Det. Pearson confirmed during his deposition that the voice on the recording was his and Mr. Dingle's. Further, Plaintiff can establish a chain of custody concerning the entire State Attorney's file through the Honorable Lyann Goudie, Circuit Court Judge in the Thirteenth Judicial Circuit Hillsborough County, who obtained the information during her representation of Plaintiff. **Finally, in the final 30 seconds of the recording Det. Pearson can be overheard whispering "he just admitted the whole [expletive] thing" and "that's all I need"** which is entirely inconsistent with the preceding interview.

4

football team, and maintaining good grades. (*Id.* at 39: 2-16)

### Mr. Dingle and Jane Roe

3.      Mr. Dingle, an eighteen-year-old freshman at the time, engaged in consensual sex with USF student, Jane Roe. (*Id.* at 22-24: 7-24)

4.      On November 16, 2017, Jane Roe texted Plaintiff that she was out of class and headed to his dorm. (*Id.* at 12-13: 22-4). She was let into the dormitory complex by the janitor. (*See* SJE 4 - Administrative Hearing Transcript., 53:13-17).

5.      Plaintiff let Jane Roe into his dorm and the two proceeded to his individual room where they initially sat on the bed, played with Plaintiff's dog, and watched the movie "Lizzy McGuire." (SJE 3, 14:4-22)

6.      During the movie, Jane Roe asked Plaintiff what his intentions were, and he responded that he wanted to get to know her. (*Id.* at 14-15: 23-4). Jane Roe then responded that they both knew that was not true and then Plaintiff told her he wanted to get to know her sexually. (*Id.* at 15: 8-13). Jane Roe said she appreciated his honesty and told him she wanted to see if he was bold enough to say it. (*Id.* at 15-16:14-1)

7.      Plaintiff began touching Jane Roe. (*Id.* at 20:7-11). Plaintiff asked if she liked it and Jane Roe responded yes. (*Id.* 19: 8-13.) Jane Roe then told Plaintiff that she had to go to the bathroom, and she got off the bed, exited his dorm room, and went to the bathroom. (*Id.* at 2:20-21). The bathroom was not located in Plaintiff's actual dorm room, but in a common area shared with three other dorm rooms. (SJE 4, 41:10-25). At all times, Jane Roe was free to leave, and Plaintiff took no actions to

prevent her from doing so. (*Id*. at 15-16:24-3).

8.     After going to the bathroom, Jane Roe returned to Plaintiff's dorm and closed the door when she entered. (*Id*. at 56:13-15).

9.     Jane Roe then removed Plaintiff's shirt and told him she was "wet." (SJE 3, 16:21-24)

10.     Plaintiff and Jane Roe then engaged in kissing and fondling, and she told him that if they were going to have sex, he needed a condom. (*Id*. at 23: 12-24; SJE 4, 16:21-25). Plaintiff texted a friend for a condom but could not locate one. (SJE 5, Synopsis). Notwithstanding, Jane Roe proceeded to have consensual sex with Plaintiff. (SJE 3, 23:12-24).

11.     After they had sex, and after a short passage of time, Jane Roe voluntarily performed oral sex on Plaintiff. (*Id*. at 26-27:11-19). Jane Roe later testified that she performed oral sex "because she didn't want to pass on anything she might have to him" and that her "fluids might irritate him." (SJE 4, 48: 2-8). Jane Roe had also told USF Campus Police Detective Pearson that "she didn't want her secretions on him" and "didn't want [Plaintiff] to get any kind of disease." (*Id*. at. 17: 7-10; SJE 5).

12.     Jane Roe admitted that during the encounter she did hear someone come into the dorm suite but did not say anything or seek assistance. (*Id*. at 56: 23-25).

### USF's Sham Investigation

13.     The OSRR assigned Maria Cutsinger ("Cutsinger") to investigate Jane Roe's allegations. Cutsinger could not recall whether she assigned herself to

investigate but testified that the nature of the allegations would have impacted who she assigned to investigate, including assigning herself. (Cutsinger 39:20-40:6).

14.     At the time, Cutsinger, a former USF Campus Police Officer ("CPO"), was the Interim Director of the OSRR responsible for, among other things, ensuring that USF's policies and procedures complied with Title IX.  (Cutsinger 14:1-8; 26:9-12).

15.     As a CPO, Cutsinger was involved in the investigation of sex crimes and referred to the OSRR for adjudication. (Cutsinger 17:3-6 and 17:21-18:1). Cutsinger testified that her role as a CPO  "assisted" her in her role as Interim Director of the OSRR (Cutsinger 29:11-13) and that she had worked with Detective Brian Pearson ("Pearson") at the Campus Police Department and considered him a colleague. (Cutsinger 75:3-76:1)

16.     Cutsinger could not recall the training she received, if any, to serve in roles with OSRR, including training concerning investigating sexual misconduct allegations. (Cutsinger 27:22-28:1)

17.     CPO Danyelle Madsen responded to the initial report of sexual battery. Pearson was then assigned to continue the investigation. (Madsen 13:8-14:18)

18.     Based solely on Jane Doe's statement, Pearson prepared an affidavit to obtain a search warrant for Plaintiff's dorm room. (Pearson, 37-40:7-17). Pearson's Affidavit in Support of a Search Warrant (SJE 6) omitted three critical facts from Jane Roe's statement that militated against a finding of probable cause: (1) when Jane Roe

returned to Plaintiff's dorm room after using the bathroom, she shut the door behind her; (2) during the alleged incident, Jane Roe asked Plaintiff to use a condom and he texted a friend looking for a condom; and (3) after sexual intercourse, Jane Roe initiated and performed oral sex on Plaintiff because "she didn't want her secretions on him" and "didn't want [Plaintiff] to get any kind of disease or infection."

19.     Plaintiff voluntarily appeared for questioning and agreed to speak Pearson without the presence of a lawyer. (SJE 5). Pearson audio recorded the interview. (*Id.*)

20.     Based on Pearson's investigation and the results of the search warrant, on November 22, 2017 (the day before Thanksgiving), an Emergency Provisional Suspension Hearing was held during which Cutsinger—who was responsible for the investigation—served as the hearing officer.

21.     On November 28, 2017, Cutsinger emailed Mr. Dingle a letter informing him that the matter must proceed to a Formal Hearing and scheduled the Formal Hearing for December 8, 2017 at 1:00 p.m. (eight business days later) (the "Formal Hearing"). (*See* SJE 7, November 18, 2017 correspondence)

22.     Contrary to the Code, the correspondence did not provide Mr. Dingle an opportunity to accept responsibility, nor did it provide recommended sanctions. Instead, it mandated that Mr. Dingle attend the Formal Hearing. (*Id.* comp. to SJE 2, pg. 25)

23.     The November 28, 2017 correspondence also included an agenda for

the Hearing which, among other things, identified Lauren Keroack as the hearing officer and identified two University witnesses – Ofc. Madsen and Jane Roe. Pearson was not identified as a witness despite leading the investigation. *Id.*

24.     The Formal Hearing was conducted on December 8, 2017 at 1:00 pm. Keroack did not participate, and without notice to Mr. Dingle, Kristen Steffen replaced Keroack as the hearing officer.(*See* SJE 4)

25.     Steffen could not recall when she was assigned to act as the hearing officer, could not recall the materials she reviewed in preparation for the hearing, did not request additional information, and did not interview any potential witnesses prior to the hearing. (Steffen 50:1-51:25 and 53:2-7). Nor could Steffen recall the type of training she received, if any, in assessing the credibility of witnesses, weighing evidence, or determining sanctions. (Steffen 40:14-42:8) (emphasis supplied)

26.     Steffen described her role as hearing officer, in part, as "[l]isten to the facts of the case. **<u>Seek</u> a preponderance of the case, more likely than not, that there was an incident, or the alleged allegation or <u>allegations are true</u>,** based on the individual allegations, not as a totalitarian." (Steffen 54:4-25)

27.     Steffen also testified that she understood the burden of proof at the formal hearing to be "equitable" (*Id.*) despite the Code placing the burden on the OSRR (SJE 2, pg. 27).

28.     During the hearing, only Jane Roe testified by way of a prepared type-written statement. The audio recording of Plaintiff's interview with Pearson was not

presented by USF nor did Ofc. Madsen or Pearson testify. Instead, only a synopsis of the interview with Mr. Dingle was submitted. (SJE 4, Pg. 18, lines 18-23).

29.     Despite Mr. Dingle's testimony that the synopsis was false and inconsistent with his recorded statement, Steffen could not recall why she did not exercise her discretion to postpone and/or adjourn the formal hearing to gather additional information. (Steffen 79:24-80:15 and 81:10-21)

30.     Similarly, Cutsinger did not interview Pearson nor did she know who actually prepared the synopsis. (Cutsinger 79:2-19)

### The Erroneous and Unsupported Finding of Responsibility

31.     Steffen rendered her decision to expel Mr. Dingle no later than 4:45 pm the same day of the hearing. (*See* SJE 8, OSRR Hearing Documentation)

32.     On December 13, 2017, Plaintiff received an email from Jonathan Monti with Steffen's determination and imposition of sanctions:

- USF Code of Conduct/4.14 Sexual Harassment/4.14(b) Non-Consensual Sexual Intercourse: Based on the information provided, it is more likely than not that vaginal intercourse occurred **without expressed ongoing affirmative consent**. Jane Roe verbally indicated "no" to vaginal sexual intercourse to Plaintiff and Plaintiff acknowledged to University officials that he heard her say "no" during the course of the incident on November 16, 2017.

- USF Code of Conduct/4.14 Sexual Harassment/4.14(c) Non-Consensual Sexual Contact: Based on the information provided, it is more likely than not that non-consensual sexual contact occurred **without expressed ongoing affirmative consent**. Specifically, non-consensual sexual contact occurred when Plaintiff used force to intentionally make contact to touch Jane Roe's breasts and buttocks in a sexual manner.

(*See* SJE 9, December 13, 2017 correspondence) (emphasis added).

33.     Monti did not recall sending the email nor any involvement in Mr. Dingle's case. (Monti 48:20-50:10 and 51:11-52:19). Monti also could not recall any training he received regarding determining relevancy and credibility of witnesses in a given case. (Monti 27:12-14 and 58:3-59:5)

34.     At the time of Mr. Dingle's hearing, the Code defined consent as:

> An informed, knowing, and voluntary agreement to engage in sexual activity. Consent to engage in sexual activity must exist from beginning to end of each instance of sexual activity. ***Consent is demonstrated through mutually understandable words and/or actions that clearly indicate a willingness to engage in a specific sexual activity.*** Silence or an absence of resistance alone, without actions evidencing permission, does not imply consent.

(*See* SJE 10, USF's Sexual Misconduct/Sexual Harassment Policy, pg. 23) (emphasis supplied).

35.     Steffen's finding was inconsistent with the Student Code of Conduct's definition of consent. Steffen could not explain why she relied on the language "expressed affirmative ongoing consent" instead of the definition of consent provided in the Code despite testifying that she reviewed the Code prior to the hearing. (Steffen 74:1-76:21)

36.     Jane Roe did, in fact, consent to sexual touching and intercourse through her actions and words. For example, after Jane Roe told Plaintiff sexual intercourse was not for her "right now" she  (1) Roe exited Plaintiff's dorm to use the bathroom and when she returned, shut the door behind her; (2) removed Plaintiff's shirt; (3) told Plaintiff that she was "wet"; (4) asked Plaintiff to find a condom; and (5) initiated and performed oral sex on Plaintiff after they completed sexual intercourse. (SJE 4, 16: 21-

25; 55:22-24; 56:13-15; 26-27:11-19; SJE 3, 16: 21-24)

### State Attorney Does Not File Charges Against Mr. Dingle

37.    On February 13, 2018, only two months after Plaintiff was expelled from USF, the State Attorneys' Office in and for the Thirteen Judicial Circuit, Hillsborough County, Florida, after reviewing the evidence compiled by Pearson and conducting its own investigation, found insufficient evidence to constitute probable cause to file criminal charges against Plaintiff and determined that there was insufficient evidence that Plaintiff had engaged in nonconsensual sex. (*See* SJE 11, State Attorney's Memo)

### USF faces federal and local pressure to comply with Title IX.

38.    On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL" or "2011 Dear Colleague Letter"). The DCL directed schools to "take immediate action to eliminate [] harassment, prevent its recurrence and address its effects." DCL at p. 4. (SJE 12)

39.    The DCL relied on faulty statistics in making a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with  rape  and  sexual  assault."

http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. (SJE 13). Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

40.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." (SJE 14). Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

41.    In April 2014, the White House issued a report entitled "*Not Alone*" which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report included a warning that if the OCR found that if a Title IX violation occurred, the "school risk[ed] losing federal funds." (SJE 15)

13

42.     On May 1, 2014, the DOE issued a press release identifying 55 colleges and universities being investigated for violating Title IX. stating that "[a]ll universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action." (SJE 16)

43.     On September 22, 2017, DOE repealed the April 2011 Dear Colleague Letter relating to use of the "preponderance of evidence standard" and issued new guidance permitting colleges and universities to apply the "clear and convincing evidence standard." (SJE 17). Despite the guidance being published prior to Mr. Dingle's formal hearing, USF applied the "preponderance of evidence" standard.

44.     At the same time, a swarm of bad press was circulating around USF's handling of sexual misconduct cases:

(1) On November 2, 2017, the Tampa Bay Times published an article titled "New federal investigation targets USF handling of sexual violence case" which identified that a week prior USF had been notified by the OCR that USF was under investigation following a student complaint in August regarding USF's mishandling of her sexual assault complaint. https://www.tampabay.com/news/education/college/New-federal-investigation-targets-USF-handling-of-sexual-violence-case_162227030/(SJE 18);

(2) On November 13, 2017, an article was published detailing Safe HOME at USF's first Annual "Slut Walk" protest which was described as "an effort to call to attention that University of South Florida was not doing enough to ensure the safety of their students, instead opting to continue to accept the tuition checks of perpetrators." The protest was centered on how USF does not have a zero-tolerance policy in place towards sexual assault. https://ncfcatalyst.com/respect-my-existence-or-expect-resistance-safe-home-at-university-of-south-florida-hosts-first-annual-slut-walk/ (SJE 19);

(3) The Tampa Bay Times, on November 30, 2017, published a story titled "Lawsuit: USF ignored student's fears after she alleged sexual assault" relating to Ms. Garrett's Complaint. Lawsuit: USF ignored student's fears after she alleged sexual

assault (tampabay.com). The story also referenced the two pending federal investigations related to USF's potential mishandling of sexual violence cases. (SJE 20); and

(4) On December 6, 2017, two days before Mr. Dingle's Formal Hearing, the Tampa Bay Times published an editorial titled "USF should revisit approach to Title IX protections" which highlighted USF's struggles with dealing with sexual assault allegations (SJE 21).

45. Finally, On November 30, 2017, eight days before Mr. Dingle's formal hearing, a USF student filed a lawsuit in this court against USF alleging that USF failed to adequately punish a sexual assault perpetrator and attempted to silence those speaking out against the inadequate punishment. *See Garrett v. University Board of Trustees*, Case No. 8:17-CV-2874-T-33AAS, Doc. 1.

## MEMORANDUM OF LAW

### I.    Summary Judgment Standard.

Summary judgment should be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Khoury v. Miami-Dade County Sch. Bd.*, 4 F.4th 1118, 1124–25 (11th Cir. 2021). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Khoury*, 4 F.4th at 1124. "A court assessing motions for summary judgment must resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Khoury*, 4 F.4th at 1124.

## II.  The record deposition testimony of USF's designated representative.

It is difficult to describe the record testimony of USF through its designated representative, Danielle McDonald, without simply stating "you have to read it to believe it." The designee entered the deposition with a notebook which included a prepared "script" for answering questions. The witness read verbatim from the script, at times being directed by USF's attorney to the relevant topic area, after which she would read the answer prepared by counsel. She did nothing to prepare for the designated topics, instead limiting her preparation to reviewing the prepared scripted answers from her counsel – which were prepared without the designated representative's participation (Corp. Rep. Ex. 21). The testimony was lawyer-engineered, similar to the testimony of other USF witnesses in the case. *See* FN 7, *infra.*

USF is bound by its representative's testimony and cannot change its answers by introducing evidence at trial. *See QBE Ins. Corp. v. Jorda Enterprises, Inc.,* 277 F.R.D. 676, 690 (S.D. Fla. 2012) ("the lack of knowledge answer is itself an answer which will bind the corporation at trial. . . a 30(b)(6) designee who testifies that the corporation does not know the answers to the questions will not be allowed effectively to change its answer by introducing evidence at trial." (citations and quotations omitted)).

## III.  The record evidence establishes that USF discriminated against Mr. Dingle because he was black.

### A.   Elements of a Title VI Claim.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* provides that "no person in the United States shall, on the ground of race, color, or national origin,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

       i.    *The Eleventh Circuit does not analyze Title VI claims under McDonnel Douglas Framework.*

The Eleventh Circuit Court of Appeals has stated that a Title VI analysis "duplicates exactly our equal protection analysis." *Carr v. Bd. of Regents of Univ. Sys. of Georgia*, 249 Fed. Appx. 146, 149 (11th Cir. 2007) (unpublished opinion) (internal citations omitted). In order to establish a violation of equal protection, a plaintiff must demonstrate that the challenged action was motivated by an intent to discriminate. *Id.* (internal citations omitted). "Discriminatory intent **may be established** by evidence of such factors as substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision." *Id.* (internal citations omitted) (emphasis supplied); *see also Farrukh v. Univ. of S. Florida Bd. of Trustees*, 8:20-CV-73-VMC-TGW, 2021 WL 2156222, at *5 (M.D. Fla. May 27, 2021).

      ii.    *McDonnell Douglas Framework.*

In the context of Title VII claims, the Eleventh Circuit of Appeals has applied the three-part burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) as one of a variety of ways to prove intentional discrimination. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213,

1217 (11th Cir. 2019). "Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by proving, among other things, that [he] was treated differently from another 'similarly situated' individual–in court-speak, a 'comparator.'" *Id*. (internal citations omitted). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id*. (internal citations omitted). If the defendant meets its burden, the burden then shifts back to the plaintiff to demonstrate the defendant's proffered reason was merely a pretext for unlawful discrimination. *Id*.

The similarly situated comparator analysis is conducted on a case-by-case basis. *Holley v. Georgia Dep't of Corr.*, 845 Fed. Appx. 886, 889 (11th Cir. 2021). A similarly situated comparator will ordinarily (1) have been engaged in the same basic misconduct, (2) have been subject to the same policy, guideline, or rule, (3) shared the same supervisor, and (4) shared the plaintiff's disciplinary history. *Id*.

## B. Under *Carr*, the record evidence establishes that USF discriminated against Mr. Dingle.

In *Carr*, the Eleventh Circuit held that discriminatory intent may be established in a variety of ways including, but not limited to, substantial disparate impact, a history of discriminatory official actions, and procedural substantive departures from the norms generally followed by the decision-maker. *Carr*, 249 Fed. Appx. at 149. Here, it is undisputed that the only students expelled for the same or similar conduct as Mr. Dingle were Black males. Not a single white student or Hispanic student was expelled for the same or similar conduct.

18

In *Carr*, the plaintiff, a Black nursing student, was suspended for two years following allegations that she sold stolen textbooks back to the university bookstore in violation of the university's student code of conduct. *Id.* at 147. The district court granted summary judgment in favor of the university while analyzing the plaintiff's claims under the *McDonnell Douglas* framework. Although the judgment was affirmed on appeal, the Eleventh Circuit rejected the district court's analysis and instead analyzed the claim under the "familiar equal protection analysis." *Id.* at 149. In doing so, the Eleventh Circuit reviewed the evidence presented by plaintiff concerning the five white students who were accused of theft and received lesser sanctions. *Id.* at 149-150. In affirming the district court's judgment, the Eleventh Circuit relied entirely on the plaintiff's failure to respond to the university's evidence that the punishments of the five white students were mitigated because of the individual circumstances of those students rather than their race. *Id.*

Here, the Comparator Chart establishes that similarly situated students were treated more favorably than Mr. Dingle for the same alleged violations of the Code. Specifically, white and Hispanic students were not expelled while Black students were expelled. USF has presented no evidence that the non-Black students on the Comparator Chart were treated more favorably than Mr. Dingle was because of mitigating circumstances. USF cannot offer such evidence because USF's Corporate Representative testified that USF does not know the facts of each case and has no explanation for the disparate sanctions imposed. Therefore, the Court, and Mr. Dingle, are left with the undisputable evidence from the Comparator Chart, which

19

USF compiled and prepared, demonstrating that USF had a pattern and practice of imposing the most severe sanctions only on Black males.

Not only does the Comparator Chart establish a discriminatory pattern and practice and substantial disparate impact as it relates to Black males, but throughout Mr. Dingle's disciplinary process, USF ignored its own policies and procedures at almost every turn without explanation. Based on USF's Corporate Representative's testimony, the Code prohibits hearing and initial review officers from deviating from the process in the Code in any manner. (McDonald 72: 9-16)

The Code, as it relates to the provisional suspension hearing process, requires that USF provide Mr. Dingle with recommended sanctions and the opportunity to accept responsibility via a "charge letter." USF did not provide this opportunity to Mr. Dingle.[4] Cutsinger, who authored the charge letter and served as the provisional suspension hearing officer, testified as follows:

> **Q      …why did you not advise Mr. Dingle in this charge letter that he could accept responsibility and recommended sanctions?**
>
> MS. DYSON: Object to the form.
>
> **A      I don't recall having conversations with Mr. Dingle…**
>
> **Q      How does the student accept responsibility if he was never provided with recommended sanctions?**
>
> MS. DYSON: Object to the form.

---

[4] USF misrepresents in its Statement of Undisputed Facts that Mr. Dingle was provided that opportunity. However, the relevant citation does not support USF's contention and is contrary to the sworn testimony of Cutsinger and USF's Corporate Representative.

**A**      If the student -- I don't see how that would have been possible, but, again, this is a while ago and I don't recall this case. I don't know how that would have been possible.

**Q**      And so you agree with me that you told Mr. Dingle that this is going to have to go to hearing because it is a sexual -- sexual misconduct case; correct?

**A**      That's what typed there.

**Q**      But that's not what the Student Code of Conduct says with respect to the provisional suspension process; is it?

**A**      Not in the section that we just read that you showed me…

Similarly, as it relates to complying with its own policies and procedures under

the Code, USF's Corporate Representative testified as follows:

**Q**      …you mentioned USF was focused on applying its policies and procedures. Correct?

**A**      Yes.

**Q**      And, again, you read that verbatim from what your counsel provided you?

**A**      Yes.

     MS. DYSON: Objection. Outside the scope.

**Q**      If USF was so concerned with applying its policies and procedures, why was Mr. Dingle not given an opportunity to accept recommended sanctions and responsibility?

     MS. DYSON: Objection. Outside the scope.

**WITNESS: Can I take a break?**

**[Mr. Severino]: Yeah. Sure.**[5]

---

[5] During the deposition, it was common for the witness to request a break when the answer to a question was not specifically answered in the script prepared for the witness by USF' counsel.

Upon returning from the "break," USF's Corporate Representative testified she did not know why USF did not follow its own policies and procedures despite testifying directly from the script prepared by her counsel that USF was focused on properly applying its policies and procedures throughout Mr. Dingle's disciplinary process.

Meanwhile, USF provided recommended sanctions and the opportunity to accept responsibility to avoid a formal administrative hearing to every white and Hispanic student on the Comparator Chart who was subject to the same provisional suspension process. Moreover, USF did not provide students 2 and 3 on the Comparator Chart, who were both black, the opportunity to accept responsibility with recommended sanctions. (Corp. Rep. 102:1-103:16)[6]

Following a determination that a matter will proceed to a formal hearing, and only after a charged student declines to accept responsibility and the recommended sanctions, the student is notified in writing of, among other things, the identity of the hearing officer and the witnesses USF intends to call to testify at the hearing. In selecting a hearing officer, USF takes into consideration the availability of personnel and, more importantly, whether there are any conflicts of interest. (Corp. Rep. 32:17-38:5). The charged student then has the opportunity to challenge the selection of the hearing officer based on any purported or perceived conflicts of interest. *Id.* USF identified Lauren Keroack as the 1 hearing officer. However, at the hearing, and

---

[6] After a recess, the Corporate Representative asked to clarify her previous response and said that she spoke with her secretary who "confirmed" that students 2 and 3 were given an opportunity to accept responsibility with recommended sanctions. USF did not produce documents memorializing the "clarification" during the deposition or at any time thereafter. (Corp. Rep. 103:23-106:17)

without notice to Mr. Dingle, USF replaced Ms. Keroack with Steffen thereby, depriving Mr. Dingle of his right under the Code to challenge Steffen's impartiality. In addition to serving as the hearing officer, USF's President appointed Steffen to serve as Chair of the Title IX Presidential Committee which made recommendations directly to the University's President concerning Title IX matters at USF. The loss of federal funding for the University is a well-known consequence of a university failing to comply with Title IX. (Corp. Rep. 89:16-25)

USF only identified Jane Roe and Ofc. Madsen as witnesses for the hearing. Ofc. Madsen testified, however, that she does not recall ever being asked to attend the hearing and in other instances in which she was asked to testify she complied. (Madsen 21:18-22:2). Moreover, Pearson, the lead detective on the case, testified that USF Campus Police policies require that officers testify at OSRR hearings when requested to do so. (Pearson 17-23-18:10). USF never requested Pearson appear to testify at the formal hearing nor did Steffen or Cutsinger interview Pearson despite Mr. Dingle's testimony that the synopsis of Pearson's interview was false (SJE 4, 62:16-63:13). The Code permitted Steffen to postpone the hearing, but she chose not to without explanation. (Steffen 79:24-81:21)

Finally, Steffen rendered her decision expelling Mr. Dingle in less than an hour following the conclusion of the formal hearing. The Code expressly provides that Steffen's decision served only as a recommendation to the OSRR or its designee. (SJE 2, pg. 21) but to her knowledge she did not need approval from the OSRR or its designee. Even more alarming, Steffen testified that:

23

**Q      Okay. What are your -- what are the different options of what you can do following the close of the hearing?**

**A      I can make a decision. I can postpone the decision for a period of time. I cannot make a decision. Those are a few of the options.**

**Q      Okay. Let's start with postponing the decision. In what instances did you postpone making a decision?**

A      **I felt in instances, for example, of <u>expulsion</u>, I -- I usually would sit and really think about it and look at -- review all of the testimony, all the evidence that was presented prior to my making decision. I would not make a decision typically when it involves something that egregious on the spot.**

(Steffen 71: 9-25 - 72 1-4). The hearing began at 1:00 pm and Steffen's decision to expel Mr. Dingle was received by the OSRR the same day at 4:45 pm. (SJE 8). But, again, because Steffen cannot even remember who Mr. Dingle is, and she rendered her decision five years ago, she does not "recall" why she rushed the decision in Mr. Dingle's case.[7]

USF's pattern and practice of punishing Black males more harshly than non-Black students combined with USF's failure to follow its own policies and procedures establishes a mosaic of circumstances sufficient for  a jury to rule in Mr. Dingle's favor. The MSJ should be denied.

### C.      Alternatively, the Comparator Chart establishes that similarly situated non-Black students were treated more favorably than Mr. Dingle.

As set forth by the Eleventh Circuit, under the *McDonnell Douglas* Framework, Mr. Dingle may establish intentional discrimination by identifying similarly situated

---

[7] "I don't know," "I don't recall," and "I don't remember" was a common answer to deposition questions. Collectively, USF witnesses testified "I don't know," "I don't recall," and "I don't remember" 138 times. (SJE 22)

students who were treated differently. *Holley v. Georgia Dep't of Corr.*, 845 Fed. Appx. 886, 889 (11th Cir. 2021). The Comparator Chart identifies other students who were alleged to be engaged in the same or similar conduct as Mr. Dingle, were all subject to the Code, shared the same supervisor (*i.e.*, the University), and shared the same lack of disciplinary history.

USF argues that Steffen presided over three of the cases on the Comparator Chart all of which involved Black males as the respondents, and, because she only expelled Mr. Dingle, there is no discriminatory intent. In essence, USF is arguing that the Court should only look to the cases where Steffen was the "supervisor," or hearing officer, in its analysis. Accepting this non-sensical and legally unsupported argument would allow USF to escape liability for discrimination by acting through different hearing officers, regardless of an otherwise discriminatory application of the Code. The natural consequence of USF's argument is that universities can discriminate as long as the right hearing officer is deployed to do so. There is no basis in the law for this contention. The decisions made by all hearing officers are imputed to USF, their common employer/principal.

USF goes to great lengths to distinguish the facts and circumstances of the *Garret* case from Mr. Dingle's case. However, the *McDonnell Douglas* framework does not require comparators to be identical. The Eleventh Circuit rejected such an approach in *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1229 (11th Cir. 2019). Instead, comparators must only be similar in all material respects. *Id.* Here, the alleged comparator, a white male student at USF, was subject to the same code of conduct as

Mr. Dingle, accused of the same violation as Mr. Dingle, and given the option to accept a deferred suspension which meant he was never actually absent from the University. [Doc. 15, ¶ 31(v)]. In contrast, Mr. Dingle was not provided with any "options;" instead, USF conducted a sham and hurried investigation with a predetermined outcome motivated by Mr. Dingle's race and gender. Also, it is not mere coincidence that USF's decision to expel Mr. Dingle, as opposed to a deferred suspension (as offered in *Garrett*), came just weeks after numerous media outlets highlighted USF's mishandling of sexual assault cases and a lawsuit was filed involving the alleged comparator from *Garrett*.

Regardless of whether the Court finds the comparator from *Garrett* to be sufficient, the remaining students identified on the Comparator Chart are sufficient comparators to withstand summary judgment. Tellingly, USF offers no evidence, or even sufficient knowledge, to distinguish the facts and circumstances of the students identified on the Comparator Chart from Mr. Dingle. Further, the information identified on the Comparator Chart meets the standard set forth in *Lewis*.

During the deposition of USF's Corporate Representative, Mr. Dingle's counsel questioned the Corporate Representative as to the facts and circumstances of the cases on the Comparator Chart. She could not provide sworn testimony on any of them. In fact, the Corporate Representative had not even reviewed USF's records in preparation for the deposition and did not know if there were any mitigating or distinguishing factors present in the Comparator cases. By claiming through the representative that it has no knowledge or memory regarding the Comparator Chart cases, it is undisputed

that no mitigating and/or distinguishing factors exist. The Court should deny summary judgment.

**IV.** **The record evidence established that Mr. Dingle was discriminated against because he was a male.**

USF relies on *Doe v. Samford Univ.*, 29 F.4th 675 (11th Cir. 2022), which was decided at the motion to dismiss stage, to argue that Mr. Dingle's Title IX claim cannot proceed under an erroneous outcome theory. *Samford* simply does not stand for that proposition. Moreover, subsequent to *Samford*, the Eleventh Circuit analyzed a Title IX claim arising from a university's student disciplinary process under the erroneous outcome theory at summary judgment. *Doe v. Rollins Coll.*, 77 F.4th 1340, 1354 (11th Cir. 2023). To state a Title IX erroneous outcome claim, a plaintiff must plausibly allege "both that he was innocent and wrongly found to have committed an offense and that there is a causal connection between the flawed outcome and [sex] bias." *Id.* (internal citations omitted). The Comparator Chart and media attacks on USF provide such an evidentiary connection.

**A.** **The record evidence sufficiently establishes articulable doubt on the outcome of the proceeding.**

At the summary judgment stage, the first prong of an erroneous outcome claim is easily satisfied. Mr. Dingle has  denied, consistently, that he engaged in non-consensual sexual activity with Jane Roe. The record evidence confirms that Mr. Dingle denied having non-consensual throughout the entire disciplinary process. Mr. Dingle's first-hand version, if believed, is sufficient to create a fact issue as to prong one. *Doe v. Rollins Coll.*, 77 F.4th at 1354 ("Doe denied that he engaged in sexual

activity with Roe without her consent. We agree with the district court that his first-hand version of events, if believed, was sufficient to create an issue of fact on the first prong of the erroneous outcome standard."); *see also United States v. Stein*, 881 F.3d 853, 857–58 (11th Cir. 2018) (en banc). Notably, USF has offered no sworn record testimony from Jane Roe.

**B.   The record evidence establishes a causal connection between the flawed outcome and gender bias sufficient to withstand summary judgment.**

The Court must assess the evidence under prong two collectively because "the whole is often greater than the sum of its parts." *District of Columbia v. Wesby*, 583 U.S. 48, 138 S.Ct. 577, 588, 199 L.Ed.2d 453 (2018) (discussing the "totality of the circumstances" standard for assessing probable cause). *Cf. Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019) (en banc) (explaining that a plaintiff may show discriminatory intent by presenting a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination).

Here, viewed in the light most favorable to Plaintiff, the record evidence establishes or, at minimum, creates an issue of fact, that USF intentionally discriminated against Mr. Dingle based on his gender because: (1) there were numerous procedural flaws during Mr. Dingle's disciplinary process, (2) there is evidence of external pressure, and (3) evidence establishing patterns of decision-making at USF.

The procedural flaws are set forth above in detail in Section III.B. The evidence of external media pressure is set forth above in detail in Paragraphs 38-45. As to

evidence regarding patterns of decision-making at USF, the Comparator Chart identifies two instances in which females were found responsible for the same or similar conduct as Mr. Dingle but were not expelled. (SJE 1, lines 1 and 26). USF's Corporate Representative could not testify to the facts and circumstances surrounding those two cases.

**V.      USF's discrimination caused Mr. Dingle injury.**

USF argues, astonishingly, that Mr. Dingle suffered no injury as a result of USF's discrimination. Mr. Dingle has produced the Expert Report of Amanda Thomas M.Ed., Ed. S. and Julianne Frain, Ph.D., C.R.C., C.L.C.P., ABVE/D identifying his damages. (*See* SJE 23). Further, as to USFs argument that he had other opportunities to pursue a bachelor's degree, his testimony contradicts such assertions and, at a minimum,  fact issues exists precluding summary judgment.

**VI.     Mr. Dingle timely filed his lawsuit.**

USF raised their same argument in its Motion to Dismiss which was denied by the Court. USF relied on *Stafford v. George Washington Univ.*, 18-CV-2789 (CRC), 2022 WL 35627, (D.D.C. Jan. 4, 2022) in its Motion to Dismiss for the proposition that a one-year statute of limitation applied. However, USF deliberately does not rely on *Stafford* in its MSJ because *Stafford* was **overturned**. *Stafford v. George Washington Univ,* 56 F.4th 50 (D.C. Cir. 2022).

The Supreme Court has held that the statute of limitations for Title VI and Title IX actions should be borrowed from "the most closely analogous statute of limitations

29

under state law." *DelCostello v. Int'l Broth. of Teamsters*, 462 U.S. 151, 159 (1983). Here, the most analogous statute of limitations under Florida law is the four-year statute of limitation that serves as a catchall for injury actions. § 95.11(3)(p), Fla. Stat. Other federal courts in Florida have acknowledged that a four-year statute of limitations applies to Title IX claims. *See, e.g. Doe No. 6 v. Sch. Bd. of Highlands Cnty. Florida*, 2:19-CV-14487, 2021 WL 271461, at *1 (S.D. Fla. Jan. 26, 2021); *Palmer ex rel. Palmer v. Santa Rosa Cnty., Fla., Sch. Bd.*, 2005 WL 3338724 (N.D. Fla. Dec. 8, 2005) (court rejected same arguments being made by USF). The same analysis applied to Title IX claims should apply to Title VI claims. *See Cannon v. University of Chicago,* 441 U.S. 677, 694–95, 99 S.Ct. 1946, 1956–57, 60 L.Ed.2d 560 (1979).

/s/ Kenneth G. Turkel
Kenneth G. Turkel - FBN 867233
E-mail:  kturkel@tcb-law.com
Anthony J. Severino – FBN 093452
E-mail:  aseverino@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 N. Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 834-9191
Fax: (813) 443-2193
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of September, 2023, the foregoing document was filed with the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Kenneth G. Turkel
Attorney