# ATTACHMENT 1

Page 1

1             IN THE UNITED STATES DISTRICT COURT

             FOR THE MIDDLE DISTRICT OF FLORIDA

2                     TAMPA DIVISION

3    KEVAUGHN DINGLE,

4           Plaintiff,

5    vs.                         CASE NO. 8:21-CV-02861

6    UNIVERSITY OF SOUTH FLORIDA

     BOARD OF TRUSTEES,

7

8           Defendants.

9

10   DEPOSITION OF:      JOSHUA B. CUTCHENS (Via VTC)

11   DATE:               April 18, 2023

12   TIME:               9:02 a.m.

13   LOCATION:           Boone, NC

14   TAKEN BY:           Counsel for the Plaintiff

15   REPORTED BY:        SOLANGE RUIZ-URIBE, Court Reporter

                         Via Videoteleconference

16   _____

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:
 2          ATTORNEYS FOR THE PLAINTIFF
                  KEVAUGHN DINGLE:
 3
                  TURKEL CUVA BARRIOS
 4                BY:  ANTHONY SEVERINO
                  100 N. Tampa Street, Suite 1900
 5                Tampa, FL 33602
                  (813) 834-9191
 6                aseverino@tcb-law.com
 7          ATTORNEYS FOR THE DEFENDANT
                  UNIVERSITY OF SOUTH FLORIDA BOARD OF
 8                TRUSTEES:
 9                GRAY ROBINSON
                  BY:  SASHA DYSON
10                401 East Jackson Atreet
                  Tampa, FL 33602
11                (813) 273-5000
                  sasha.dyson@gray-robinson.com
12
13
14
15          ALSO PRESENT:
16                SEAN LOWTHER, Videographer
17                JOANNE M. ADAMCHAK, University of South
18                Florida General Counsel
19
20                (INDEX AT REAR OF TRANSCRIPT)
21
22
23
24
25
```

Page 3

```
 1              THE VIDEOGRAPHER:  Good morning, everyone.
 2    We are going on the record.  The time on the monitor
 3    is approximately 9:02 a.m. and the date is
 4    April 18th, 2023.
 5              Please note that this deposition is being
 6    conducted virtually, quality of recording depends on
 7    the quality of camera and Internet connection of
 8    participants.  What is seen from the witness and heard
 9    on the screen is what will be recorded.
10              Audio and video recording will continue to
11    take place until all parties agree to go off the
12    record.  This is media unit number one of the video
13    recorded deposition of Joshua Brandon Cutchens taken by
14    counsel for the plaintiff in the matter of Kevaughn
15    Dingle, plaintiff, versus The University of South
16    Florida Board of Trustees.
17              The case is filed in the United States
18    District Court for the Middle District of Florida,
19    Tampa Division, Case No. 8:21-CV-02681.
20              My name is Sean Lowther, I'm the
21    videographer.  Our court reporter is Solange Ruiz-Uribe
22    and we are representing Veritext Legal Solutions.  The
23    court reporter and I are not related to any party in
24    this action, nor are we financially interested in the
25    outcome.
```

Page 4

1           If there are any objections to proceeding,
2    please state them at the time of your appearance.  At
3    this time if counsel and all present will now state
4    their appearances and affiliation for the record
5    beginning with the noticing attorney.  Attorney
6    Severino.
7           MR. SEVERINO:  Yes, Anthony Severino from
8    the law firm Turkel Cuva Barrios on behalf of
9    plaintiff, Kevaughn Dingle.
10           THE VIDEOGRAPHER:  Thank you, sir.
11   Attorney Adamchak.
12           MS. ADAMCHAK:  Joanne Adamchak, attorney
13   for the defendant, the University of the South
14   Florida.
15           THE VIDEOGRAPHER:  Thank you.  Attorney
16   Dyson.
17           MS. DYSON:  Good morning.  I'm Sacha Dyson
18   with the law firm Gray Robinson for the defendant,
19   University of South Florida.
20           THE VIDEOGRAPHER:  Thank you.  And at this
21   time if our court reporter would please swear in the
22   witness.
23           JOSHUA B. CUTCHENS,
24   after first being duly sworn, testified as follows:
25                   EXAMINATION

Page 5

1    BY MR. SEVERINO:

2        Q.    Good morning, Mr. Cutchens.  As I

3    mentioned, my name is Anthony Severino and I

4    represent Mr. Dingle in this case.  So we are

5    just -- we are not going to be long today.  Have you

6    ever been deposed before?

7        A.    Not to my recollection.

8        Q.    Okay.  So this is basically a question and

9    answer session.  I'm going to be asking you a series

10   of questions.  If you respond I'm going to assume

11   that you understood my question.  If you don't let

12   me know.  I'll reask it, I'll clarify anything if

13   you have any questions.

14            If you need to take a break at any point just

15   let me know but I don't suspect we'll be here long so

16   hopefully that won't be an issue.

17            The other thing is you have to make

18   sure you answer verbally.  I saw you just nodding

19   your head like you are right now.  The court

20   reporter can't take down nonverbal answers so just

21   make sure you answer out loud and verbally so she

22   can record that.

23            The only other real housekeeping is

24   make sure you let me finish my question for the same

25   reason, so that the court reporter can get a clean

1    transcript.  It will also make it go much faster for

2    you, so we don't have to repeat questions.

3                So with that being said, can you go ahead and

4    state your full name for me?

5        A.    Sure, it's Joshua Brandon Cutchens.

6        Q.    And how old are you?

7        A.    I'm 37 years old.

8        Q.    Okay.  And do you have a college degree?

9        A.    I do.

10       Q.    From where?

11       A.    My bachelor's is from the University of

12   Florida, my master's is from the University of South

13   Florida.

14       Q.    Okay.  And what did you get your

15   bachelor's in?

16       A.    In History.

17       Q.    Any minors or anything else or just a

18   major in history?

19       A.    Minor in geography.

20       Q.    Okay.  When did you graduated from UF?

21       A.    2007.

22       Q.    All right.  You and I are the same age and

23   graduated at the same time.  Master's, what did you

24   get your master's in at USF?

25       A.    Curriculum and instruction with a focus in

1    college student affairs.

2         Q.   All right.  So curriculum instruction with

3    a focus on college student affairs?

4         A.   Curriculum and instruction with a focus in

5    college student affairs.

6         Q.   And forgive me, but what does that mean?

7    What is that?

8         A.   It -- the degree is for individuals who

9    want to work at an institution in a student affairs

10   department, whether it be student conduct, student

11   activities, returning to student life, those facets

12   of the university campus.

13        Q.   All right.  And when did you earn that

14   master's degree from USF?

15        A.   In 2013.

16        Q.   Is there anything in particular which

17   motivated you to seek that degree or seek to work in

18   that field?

19        A.   It's a longer answer but I was working in

20   business prior to that and decided that I wanted a

21   shift in my career and so I went to USF to pursue

22   that degree.

23        Q.   And in -- when you decided to pursue that

24   degree you had some sort of special interest in

25   working in student affairs at that point?

Page 8

1      A.    Yes.

2      Q.    Okay.  Was there a reason for that or are

3  you just looking for a change?

4      A.    I was looking for a change at the time.

5      Q.    Okay.  And how long did it take for you to

6  obtain that master's degree?

7      A.    Two years.

8      Q.    And while you were studying and earning

9  that degree were you also working?

10     A.    Yes.

11     Q.    And where were you working?

12     A.    At the time I was working as a graduate

13  assistant in what was then titled the Office of

14  Student Rights and Responsibilities.

15     Q.    Okay.  And before I go any further with

16  some of this background, you understand at least the

17  background case or facts that you are here about

18  today, do you understand that?

19     A.    At this point I do not.

20     Q.    Okay.

21     A.    I just don't recall the case in any

22  capacity.

23     Q.    Okay.  You don't recall Mr. Dingle's, I

24  guess investigation by the University and

25  disciplinary proceeding?

1      A.   I recall the name but I do not recall the

2   case, specifics of the case or anything along those

3   lines, no.

4      Q.   Okay.  So no specifics.  Tell me what you

5   recall about it as you sit here today.

6            THE COURT REPORTER:  You're muted, I can't

7   hear anything.

8            THE WITNESS:  At present the only thing I

9   recall is the party's name.  I do not recall

10   anything regarding any action taken based off of

11   memory.

12   BY MR. SEVERINO:

13      Q.   Okay.  You were a -- you said a graduate

14   assistant with the Office of Student Rights and

15   Responsibilities while you were earning your

16   master's, correct?

17      A.   That's correct.

18      Q.   And what was your role in that position?

19      A.   To hear low level alleged policy

20   violations, overall to assist in training

21   capacities.  That's all I recall at the time.

22      Q.   Were you -- let's break that down for a

23   minute.  What are low level violations?

24      A.   Those would be potential copyright

25   infringements, low level alcohol types of

1    violations, those types of incident reports.

2         Q.   Is low level, that term something that the

3    University uses or is that just your description of

4    what you were handling?

5         A.   That's my description.

6         Q.   Okay.  Were you prevented from -- or did

7    the University tell you the only types of cases that

8    you could handle or were they just assigned to you?

9              MS. DYSON:  Objection.

10             THE WITNESS:  Sorry, it sounded like

11   somebody was talking at the same time.

12             MS. DYSON:  I said objection to the form

13   of the question.

14   BY MR. SEVERINO:

15        Q.   Okay.  And I didn't -- I don't know if she

16   explained it to you but there will be times where

17   some attorneys may object to the question, that's a

18   legal issue.  Unless someone tells you not to answer

19   which I don't expect that to happen, you can go

20   ahead and answer the question.  That's just an issue

21   between lawyers.

22        A.   If you could repeat the question, please.

23        Q.   Yes.  So you described that you handled

24   low level, potential violations when you were a

25   graduate assistant in the Office of Student Rights

Page 11

1    and Responsibilities.  Were you assigned cases to

2    review by the University, is that how you got your

3    cases?

4         A.   The cases for me to hear were assigned to

5    me by a professional staff member in the office.

6         Q.   Okay.  And did you have a boss or superior

7    in that role?

8         A.   Yes.

9         Q.   And who was that?

10        A.   If I recall correctly, my supervisor at

11   that time was Cara Bernstein Chernoff.

12        Q.   And were you actually assigned to hear the

13   case as a formal hearing officer or other similar

14   capacity?

15        A.   If I recall the process because it has

16   been several years since I worked at USF and even

17   more years since working as a graduate assistant, a

18   case would be assigned to an individual to then

19   conduct outreach to the party, to have them come in

20   and meet with the Office and in what was called I

21   believe an initial review.  To then better

22   understand the alleged misconduct to determine

23   whether or not there was a preponderance of the

24   evidence for a violation of the policy.

25        Q.   Okay.  And again, I'm just talking about

1    when you were a graduate assistant right now.  Did

2    you handle investigations or cases that were

3    assigned to you on your own, meaning did you have

4    help from anyone else or were you kind of given

5    carte blanche authority to handle that violation?

6         A.   I was the sole, initial review officer

7    with those types of cases.

8         Q.   And did you determine responsibility in

9    those cases?

10         A.   If I recall the process correctly, I

11    would -- the initial review officer would provide

12    the student the -- an outcome where the student

13    would have the ability to accept that initial review

14    outcome or to request a hearing.

15         Q.   Okay.  If the student requested the

16    hearing would you be the hearing officer when you

17    were a graduate assistant or would that go to

18    someone else?

19         A.   If I recall the process correctly that

20    would go to someone else.

21         Q.   Okay.  So you were not involved in the

22    formal hearing process as an administrative hearing

23    officer as a graduate assistant; is that correct?

24         A.   Can you restate the question, make sure I

25    answer it correctly?

1    Q.    Yep.  So you talked about there was an

2    initial review process, initial hearing, where you

3    would determine if there was a preponderance of the

4    evidence and then you would provide the accused with

5    the ability to accept that and your recommended

6    sanction or they could accept a formal hearing,

7    right?  Is that generally the process?

8        A.    From what I recall, they could accept the

9    initial review outcome or request a hearing.

10       Q.    Okay.  If they requested a hearing were

11   you then the hearing officer in that next hearing?

12       A.    No, I was not.

13       Q.    So your role as a graduate assistant was

14   limited to the initial hearing process?

15       A.    Yes.

16       Q.    Okay.  And if you recall in all of the

17   violations you investigated or were the initial

18   hearing officer, you always provided the respondent

19   the option to accept responsibility and the

20   recommended sanctions?

21       A.    From what I recall that was the process.

22       Q.    That was the process, okay.  All right.

23   So how long were you a graduate assistant, two

24   years?

25       A.    Two years, yes.

Page 14

1     Q.    That was roughly 2011 to '13?

2     A.    Yes.

3     Q.    Okay.  And then you graduated and you

4  stayed at USF and began working at USF?

5     A.    No.

6     Q.    Okay.  Where did you go?

7     A.    Upon graduation I secured full-time

8  employment at Florida Golf Coast University in Fort

9  Myers.

10    Q.    And what was your role and title there?

11    A.    I was the coordinator for Student Conduct

12  in the Dean of Students office.

13    Q.    How long were you there?

14    A.    From June of 2013 roughly until October of

15  2014 I believe, give or take a month in there.

16    Q.    And your role there, coordinator, you said

17  coordinator for Student -- Office of Student

18  Conduct; is that correct?

19    A.    Coordinator for Student Conduct, yes.

20    Q.    And what were your responsibilities and

21  roles in that position?

22    A.    To hear alleged policy violations, to

23  assist in training for hearing panelists.  To take

24  lead on programming events for the Dean of Students

25  office for students.

1        Q.   So somewhat similar to what you did when
2    you were a graduate assistant at USF?
3        A.   Yes.
4        Q.   Okay.  All right.  You leave in 2014 from
5    Florida Golf Coast, where do you go after that?
6        A.   I went back to the University of South
7    Florida.
8        Q.   Okay.  And why did you leave Florida Golf
9    Coast?
10        A.   Because my wife and newborn child were
11    still in Tampa and I was doing remote dad from Fort
12    Myers to Tampa every weekend and it was an
13    opportunity to go home.
14        Q.   That's a very good reason.  And so you go
15    back to USF sometime in 2014 and you are hired in
16    what role?
17        A.   As the coordinator in the Office of
18    Student Rights and Responsibilities.
19        Q.   Okay.  And what were your job duties and
20    responsibilities in that role?
21        A.   To be a person to hear alleged policy
22    violations, to assist with training so very similar
23    roles overall.
24        Q.   And again, in the hear violations
25    component of your job, was that at the initial

1    review process again?

2         A.    Yes.

3         Q.    So that was not at the actual formal

4    hearing after the initial review?

5         A.    Correct.

6         Q.    Okay.  Did you ever serve in the capacity

7    as a formal hearing officer while at USF?

8         A.    No.

9         Q.    Okay.  You mentioned also that -- let me

10   back up.  So that was in 2014.  How long did you

11   hold that role at USF?

12        A.    As the coordinator roughly a year, maybe

13   two.

14        Q.    Okay.  And then did you take on a new role

15   at USF?

16        A.    Yes.

17        Q.    And what was that?

18        A.    The assistant director in the Office of

19   Student Rights and Responsibilities.

20        Q.    And how long did you hold that?

21        A.    From -- I'd have to pull up my resume but

22   from the start 2015, 2016 until I left the

23   University of South Florida in 2019.

24        Q.    Okay.  That's fine and listen, this isn't

25   a memory test.  I don't need specific dates, I'm

1    just trying to get an idea of where you were when

2    some of this stuff transpired.

3                    So you were the assistant director

4    from 2016 to 2019.  I assume you had more

5    responsibilities so can you describe for me what

6    your role and responsibilities were in that

7    position?

8         A.    Sure.  So I served as the liaison for

9    residential education in the Office of Student

10   Rights and Responsibilities, so assisting residents

11   like coordinators and assistant residents like

12   coordinators with their training on hearing, policy

13   violation allegations, served as a supervisor for

14   graduate students in the conduct office.

15                    I served as the primary reviewer for

16   preadmission reviews, so applicants who had prior

17   criminal or institutional misconduct, served as

18   hearing alleged policy violations as well.

19               THE COURT REPORTER:  Just a second.  I'm

20   sorry to interrupt you, Mr. Severino.

21               MR. SEVERINO:  Yes.

22               THE COURT REPORTER:  Ms. Dyson, I just

23   caught that it looks like you're saying something.

24   You are muted so if you've been saying things

25   throughout the depositions or objections, I have --

1    we can't hear you.  I just caught that so FYI.

2              MS. DYSON:  Okay.  Thank you.  I didn't

3    realize I was muting you too.

4              MR. SEVERINO:  I got a free pass there for

5    a few minutes.  Fair enough.

6    BY MR. SEVERINO:

7         Q.   Okay.  So in your time at USF and I'm

8    going to recap this real quick so I can ask you a

9    couple questions.  You were a graduate assistant

10   2011 to '13 in the Office of Student Rights and

11   Responsibilities.  You go to Florida Golf Coast for

12   a year or two and you come back to USF, 2014, around

13   there, where you were the coordinator of Student

14   Rights and Responsibilities.  And then you move into

15   the assistant director role from 2016 until when you

16   leave in approximately 2019; is that fair?

17        A.   That's fair.

18        Q.   Okay.  And one of the things that you

19   mentioned was part of your roles and

20   responsibilities in all of those positions was to

21   assist and provide training with respect to the

22   hearing process, right?

23        A.   Correct.

24        Q.   Okay.  Let's start with when you were the

25   assistant director from 2016 to 2019.  What type of

1    training did you provide to other USF employees?

2         A.   There were materials within the Office of

3    Student Rights and Responsibilities to help

4    facilitate that training, those training sessions.

5         Q.   So was it basically some sort of document

6    or presentation that was already put together that

7    you would use to facilitate that training?

8         A.   I recall that there were documents to

9    assist with that training session overall, yes.

10        Q.   And those trainings that dealt with the

11   actual disciplinary process?

12        A.   Can you unpack your question a little bit

13   more because --

14        Q.   Yeah, I'm -- I know it's been a while but

15   you're probably more familiar in this than me but my

16   understanding, which we talked about earlier, is

17   there will be a complaint that will get assigned to

18   someone as far as a violation of the Student Code of

19   Conduct, correct?

20        A.   Correct.

21        Q.   You'll get a complaint, it'll get assigned

22   to someone, it goes to an initial review, there is

23   an initial hearing, the recommendations are made or

24   they can go to a formal hearing.  It then goes to a

25   formal hearing and then a decision is made about

1    responsibility and then there is an appeals process.

2    So when I talk about the disciplinary process,

3    that's what I'm referring to.

4            A.    Okay.

5            Q.    Is that fair to refer to it that way?

6            A.    Sure, that helps, yes.   Thank you.

7            Q.    Okay.   So in that process, what was your

8    training related to that you provided?

9            A.    Ultimately to, again, if I recall

10   correctly, it's been a while since I've seen those

11   materials, where we would discuss what -- how to

12   hear a case.   So there would be, you know, the party

13   would be present, the represent -- the person who

14   heard the initial review would be present to provide

15   any information, any witnesses who would be called,

16   may be in attendance to answer questions.

17                   And then from there discussing

18   preponderance of the evidence, what that entails,

19   like a lot of foundational information to help them

20   serve in the role.

21        Q.    In your time at USF as a graduate

22   assistant and then as an actual employee, were you

23   involved in any disciplinary proceeding that

24   involved sexual misconduct?

25        A.    I recall serving I believe at the time the

1   investigative model or process could incorporate a

2   dual investigator role.  I did serve as a dual

3   investigator in some allegations of sexual

4   misconduct, overall as the assistant director in the

5   office.

6         Q.   Okay.  And that's a good clarification.

7   So is the investigator different than the initial

8   hearing officer or is that the same role?

9         A.   That initial review?

10              MS. DYSON:  Form.

11              THE WITNESS:  That initial review, those

12   are separate roles.

13   BY MR. SEVERINO:

14         Q.   Okay.  So you did participate and to your

15   recollection in some sexual assault Student Code of

16   Conduct alleged violations, correct?

17         A.   I don't remember the specifics, if they

18   were sexual assaults, sexual harassment per case but

19   involving sexual matters, there were some that I did

20   serve as coinvestigator for, yes.

21         Q.   And did you serve as the initial hearing

22   officer in sexual misconduct cases?

23         A.   From what I recall the process did not

24   permit that.

25         Q.   Okay.  All right.  And to go back to the

1   training that you participated and facilitated, was

2   there any training provided that you recall with

3   respect to how to weigh the evidence in a

4   disciplinary case?

5        A.   Without -- it's been years since I've seen

6   the documents, I don't recall the very specifics of

7   matters involving that overall.

8        Q.   Okay.  And I haven't asked this yet.

9   Where -- where are you currently employed?

10       A.   Appalachian State University.

11       Q.   And in a similar role to that you've held

12  at USF and Florida Gulf Coast?

13            MS. DYSON:   Object to the form.

14  BY MR. SEVERINO:

15       Q.   I'm sorry, I didn't hear you, she

16  objected.  Go ahead.

17       A.   Presently I serve as the assistant

18  director in Title IX Compliance, the senior deputy

19  federal coordinator for the University.

20       Q.   Okay.  And you went to Florida Gulf

21  Coast -- I mean, I'm sorry, Appalachian State in --

22  sometime in 2019?

23       A.   Yes.

24       Q.   And when you initially went to App State

25  what was your job title?

1      A.    The associate director of Student Conduct

2    in the Office of Student Conduct.

3      Q.    And that role would have been similar to

4    the role at USF that you just left?

5      A.    In some capacities, yes.

6      Q.    Okay.  Did you act as an initial hearing

7    officer in any sexual misconduct cases in

8    Appalachian State?

9      A.    The process at Appalachian State did not

10   permit that.

11     Q.    Okay.  So were you involved in the

12   disciplinary process at Appalachian State with

13   respect to any sexual misconduct cases?

14     A.    The process is separate.  The office of

15   Title IX Compliance oversees the entire process

16   involving cases such as those.

17     Q.    Okay.  So then you moved into the Title IX

18   office where you are currently at, correct?

19     A.    Yes.

20     Q.    Okay.  And that role at Appalachian State,

21   were you involved in the disciplinary process for

22   sexual misconduct cases?

23     A.    I -- in my position I assist in meeting

24   with parties to navigate our procedures.  I do not

25   serve as a hearing officer or as a decision maker in

1    those capacities.

2        Q.   Okay.  So back to the training at USF, do

3    you recall any training with respect to determining

4    the credibility of the witnesses throughout the

5    disciplinary process?

6        A.   I do not recall if that information is in

7    the training materials.

8        Q.   Okay.  Whether or not it was in the

9    training materials, do you recall receiving any

10   training on that issue?

11       A.   Me personally?

12       Q.   Yes, you.

13       A.   I would assume that I would have received

14   training but I don't -- I can't specifically state

15   at this point I received this training or at this

16   point I received that training.

17       Q.   Okay.  All right.  You told me that you do

18   not recall any specifics of the underlying case that

19   we are here about today, correct?

20       A.   That's correct.

21       Q.   Okay.  Give me one second, I'm going --

22   I'm going to pull something up and show it to you so

23   just bear with me.  I'm attempting to share my

24   screen here.  Can you look on my screen now?

25       A.   I can see a document, yes.

1      Q.    Okay.  So this is -- this was produced by

2   the University of South Florida in this case and

3   this is Bates labeled, which is the number on the

4   bottom so if I refer to the, what's called a Bates

5   label, it's in the bottom right-hand corner there in

6   bold.  And this is Bates labeled 77.

7                   This is the cover page to the

8   administrative hearing transcript which was held on

9   December 8th, 2017.  And you can see here charged

10  student Kevaughn Dingle, administrative hearing

11  officer Kristen Stephan, and then the initial review

12  officer Maria Zale Cutsinger.  And then here we've

13  got you, advisor, the administrative hearing

14  officer, Joshua Cutchens.  Okay.

15                  Does this refresh your recollection

16  at all with respect to this incident?

17      A.    The incident, no.  That I served as the

18  adviser, that helps because I did not recall serving

19  as the advisor for -- I don't -- for this type of

20  incident at all.  So okay, I was the advisor for the

21  hearing itself, okay.

22      Q.    Okay.  And so I'm going to ask you about

23  that in a minute but I'm going to go down here

24  because you introduce yourself again.  This is Bates

25  labeled 78, Joshua Cutchens, advisor to the

1   administrative officer and to the administrative

2   hearing process.

3                   And then this is the hearing officer,

4   Kristen Stephan which is Bates labeled 79.  She

5   again introduces you and then she goes on to say in

6   line 12, he does not have a part in recommending the

7   responsibility for this case.  However, he will be

8   present during the hearing and deliberations to

9   assist with the proceedings.  Okay.

10                  So my first question here is, can you

11  describe for me what your role is in this hearing as

12  the advisor to the administrative officer and to the

13  hearing?  What does that mean?

14              MS. DYSON:  Objection.

15              THE WITNESS:  From my recollection --

16  sorry.

17              MS. DYSON:  I just objected to the form.

18  BY MR. SEVERINO:

19      Q.   Go ahead, you can answer.

20      A.   To my recollection, I would assist with

21  the hearing recording.  I would assist with any

22  witnesses who were present to help them come into

23  the room or exit the room and to ensure that there

24  was no administrative hick-up, if the recorder may

25  have stopped working, to assist in getting that

1    fixed, et cetera, those types of actions, that will

2    be it.

3         Q.    Okay.  And had you served, and I want to

4    make sure that I have this title correctly, had you

5    served as the advisor to administrating hearing

6    officer in other formal hearings while at USF?

7         A.    If you could scroll up to the date for me,

8    please.

9         Q.    Yes.

10        A.    So that was 2017, yes, I would have served

11   as the advisor to hearings prior.

12        Q.    Okay.  And as the advisor to hearings

13   prior, your role would have been the same in those

14   hearings?

15        A.    Correct, to assist with the process.

16        Q.    Okay.  And when you say assist with the

17   process, as the advisor to that process, when does

18   the process begin for you, right?  When does your

19   role come into play?

20             MS. DYSON:  Object to the form.

21   BY MR. SEVERINO:

22        Q.    You can answer.

23        A.    As I stated previously with the recorders

24   it would be to ensure that they were functional and

25   making sure that they were working.  With the

1   hearing itself, if there were witnesses present I

2   would step out of the room to bring the witness in

3   and then walk out with the witness to excuse them.

4   So it would depend on the part of the hearing as to

5   when that might be in play.

6       Q.   Okay.  So what about prior to the actual

7   hearing, do you do anything to prepare for the

8   hearing as the advisor to the administrative hearing

9   officer?

10      A.   If I recall correctly, the advisor may

11  assist with sending documentation but I don't know,

12  I don't recall if that was for every single hearing,

13  that the advisor would do that work or not.

14      Q.   And when you say sending information,

15  would you be part of the prehearing process of

16  gathering evidence to be used at the hearing?

17      A.   I -- the structure of the question, I

18  would say the advisor role would be to ensure that

19  the documentation was communicated to parties

20  involved but not to assist with the investigatory

21  work.

22      Q.   Okay.  So more communication-driven,

23  right?  So more to make sure that every party had

24  whatever documents were going to be used at the

25  hearing, is that what you're saying?

1          MS. DYSON:  Object to the form.

2     BY MR. SEVERINO:

3          Q.   Go ahead.

4          A.   To assist in that capacity, that's what I

5     recall.

6          Q.   Do you recall doing that with respect to

7     this December 8, 2017 administrative hearing?

8          A.   Not specifically, no.

9          Q.   With respect to the December 8th, 2017

10    administrative hearing, did you have any prehearing

11    meetings or discussions with the administrative

12    hearing officer Kristen Stephan?

13         A.   I do not recall.

14         Q.   What about with represent to Maria Zale

15    Cutsinger?

16         A.   I do not recall.

17         Q.   Although you don't recall, is that

18    something that you would typically do as the

19    administrative -- as the advisor to the

20    administrative hearing officer in these types of

21    hearings?

22         MS. DYSON:  Object to the form.

23    BY MR. SEVERINO:

24         Q.   You can answer.

25         A.   I'd ask if you could reask the question.

1       Q.   What I'm trying to figure out is, you

2   know, prior to an actual administrative hearing when

3   you serve as the advisor to that hearing or the

4   advisor to the hearing officer, what did you do

5   prior to the hearing to prepare yourself to serve in

6   that role?

7       A.   As I said, I would potentially assist with

8   communicating information, making sure letters were

9   going out, et cetera.  And that the procedural

10  script was prepared, those types of actions.

11      Q.   What about the agenda, did you have any

12  role in preparing that?

13      A.   As in the process --

14           MS. DYSON:  Object to the form.

15           THE WITNESS:  Sorry.

16  BY MR. SEVERINO:

17      Q.   Go ahead, you can answer.

18      A.   As in the process of the hearing?

19      Q.   Yes.  So there was an agenda that was

20  provided to my client that describes when the

21  hearing is going to take place, who the hearing

22  officer is going to be, who the advisor is going to

23  be, who the witnesses are and the alleged violations

24  of the Student Code of Conduct.  And so my question

25  is, did you participate in any way in preparing that

1   document?

2       A.   I may have but I don't specifically recall

3   if I did.

4       Q.   Okay.  Were you involved with respect to

5   this December 8th, 2017 hearing with securing

6   witnesses to attend the hearings?

7       A.   If I remember correctly the role of the

8   advisor was not to work to secure witnesses overall

9   or attendance.  We assist in communicating

10  information to a witness to inform them that they

11  are being called but not to specifically seek to

12  ensure their attendance, I don't recall that being

13  the role.

14      Q.   Okay.  Do you know whose role or

15  responsibility that was?

16      A.   From what I recall whenever a notice would

17  be sent it would be required to provide witnesses

18  who are called to the hearing, to the parties

19  involved to know that they've been called so they

20  can prepare questions and prepare for that witness's

21  potential participation and then the Office would

22  send a notice to the witness asking them too.  I

23  don't recall specifically whose responsibility that

24  was at that time overall.

25      Q.   I'll start specifically with this

Page 32

1    December 8th, 2017 administrative hearing.  Do you

2    recall how you were notified that you were the

3    advisor to the administrative hearing officer in

4    this hearing?

5         A.    No, I do not recall that.

6         Q.    Okay.  How would you typically be notified

7    that you would be serving as the advisor to an

8    administrative hearing officer in an administrative

9    hearing?

10        A.    I -- I don't specifically recall a

11   specific process in that overall as to how that

12   would occur.

13        Q.    So I want to go back down here.  Do you

14   recall being involved or present during the quote,

15   deliberations with respect to this administrative

16   hearing?

17             MS. DYSON:   Object to the form.

18   BY MR. SEVERINO:

19        Q.    You can go ahead.

20        A.    From what I recall of the process the

21   advisor would be present during deliberations.

22        Q.    And what was your role in those

23   deliberations?

24        A.    If there was a question regarding the

25   code, to assist in trying to locate an answer.  If

1    the party was found responsible, to relay any prior

2    misconduct but only if there was a finding of

3    responsibility.

4         Q.   And when you say, relay any prior

5    misconduct, is that something that you would have

6    investigated prior to the hearing to have that

7    answer available?

8         A.   I may have stepped out to go and review to

9    see if there was any to relay.  I don't recall the

10   specifics for this case.

11        Q.   Okay.  And when we're talking about prior

12   misconduct, are you only referring to Student Code

13   of Conduct violations?

14             MS. DYSON:  Object to the form.

15   BY MR. SEVERINO:

16        Q.   You can answer -- I can keep telling you

17   that but unless someone tells you not to answer you

18   can just answer.

19        A.   It would be if the student was found

20   responsible for any prior misconduct.

21        Q.   Okay.  And these deliberations, who else

22   was present specifically with respect to the

23   December 8, 2017 hearing?

24        A.   I don't recall.

25             MS. DYSON:  Objection.

1    BY MR. SEVERINO:

2         Q.    In your prior experience serving as

3    advisor to the hearing officer, did you attend

4    deliberations with respect to those hearings?

5              MS. DYSON:   Object to the form.

6    BY MR. SEVERINO:

7         Q.    Go ahead.

8         A.    If I had served as an advisor for a

9    hearing then I would have been present for the

10   deliberations.

11        Q.    Okay.   And that -- in those prior

12   hearings, do you recall not the names but the roles

13   of the individuals who were present during the

14   deliberations?

15        A.    If I recall the only parties permitted in

16   deliberations would be the advisor to the hearing

17   entity and the hearing entity.

18        Q.    So that would be the hearing officer and

19   you as the advisor; is that correct?

20              MS. DYSON:   Object to the form.

21              THE WITNESS:   If it was an administrative

22   hearing officer hearing then it would have been just

23   the advisor to the administrative hearing officer

24   and the administrative officer.

25   BY MR. SEVERINO:

1      Q.   Okay.  And during that process, and I

2    think you alluded to this earlier but I'm just

3    trying to understand what the actual deliberations

4    would be if it's only the administrative hearing

5    officer and the advisor, right?  So is the

6    administrative hearing officer asking you questions

7    about the evidence in the case?

8              MS. DYSON:  Object to the form.

9    BY MR. SEVERINO:

10     Q.   Go ahead.

11     A.   Not to my recollection, no.  The

12   administrative hearing officer would not be asking

13   the advisor questions about evidence or anything

14   along those lines to make a determination.

15     Q.   So what is your understanding of the

16   purpose of the deliberations in an administrative

17   hearing?

18     A.   For the hearing entity to review all of

19   the information provided during the hearing, whether

20   it be documentary information, whether it be

21   information provided orally during the hearing, to

22   then make a determination whether or not the entity

23   believes there was a policy violation by a

24   preponderance of the evidence.

25     Q.   So to clarify, using the term entity, are

1   we using that interchangeably with the hearing

2   officer?

3       A.   Yes.  There is the ability to have an

4   administrative hearing officer.  Some institutions

5   provide the ability to have a board which is a

6   panel, but in this case specifically from what

7   you've shown on your screen with an administrative

8   hearing officer it would have been just that person.

9       Q.   Okay.  And your understanding of the

10  purpose of those deliberations is for the hearing

11  officer to review all of the evidence that was

12  presented during the hearing, correct?

13          MS. DYSON:  Object to the form.

14          MR. SEVERINO:  What's the objection?

15          MS. DYSON:  Leading.

16          MR. SEVERINO:  He was a party and he

17  worked for USF.

18          MS. DYSON:  Still a leading question.

19  It's inappropriate on direct examination.

20          MR. SEVERINO:  He's an adverse witness, he

21  worked for USF.

22          MS. DYSON:  He is not but if you want to

23  debate the question we can --

24  BY MR. SEVERINO:

25      Q.   All right.  Go ahead.  What was your

Page 37

1    answer?  Go ahead.
2         A.   If you could please reask the question.
3              MR. SEVERINO:  Madam Court Reporter, can
4    you repeat that question for me?.
5              (Whereupon the Court Reporter read the
6    previous question.)
7              MS. DYSON:  It's a leading question.
8              THE WITNESS:  Yes, the administrative
9    hearing officer would have used the deliberation
10   period to review all of the information provided
11   during the hearing.
12   BY MR. SEVERINO:
13        Q.   To your knowledge, did a hearing officer
14   do anything else during the deliberations other than
15   review the materials that were presented during the
16   hearing?
17             MS. DYSON:  Object to the form.
18   BY MR. SEVERINO:
19        Q.   Go ahead.
20        A.   If I recall correctly during that session
21   in deliberations if the administrative hearing
22   officer believed there was, by a preponderance of
23   the evidence a violation of policy, they would then
24   provide a rationale for that finding.  Then I would
25   provide if there was any prior misconduct.  They

1    would then, if I remember the process correctly,

2    develop learning -- determine learning outcomes and

3    then discuss or develop educational sanctions.

4         Q.   With respect to the December 8, 2017

5    hearing, do you recall reviewing the rationale from

6    the hearing officer with respect to these

7    violations?

8         A.   I do not recall if I did or didn't.

9         Q.   Is that something in your role as the

10   advisor that you would normally review?

11        A.   I do not recall if the advisor would or

12   the advisor would not write a rationale in any

13   capacity for a hearing officer.

14        Q.   But would you provide any recommendations

15   with respect to the rationale?

16        A.   I do not recall doing that as an advisor,

17   no.

18        Q.   Okay.  You testified that part of your

19   role as the advisor was to answer any questions that

20   the hearing officer may have with respect to the

21   Student Code of Conduct; is that correct?

22        A.   Yes.

23        Q.   Okay.  Do you recall if during the

24   deliberations in this December 8, 2017 hearing

25   whether the advisor had any questions with respect

1    to the Student Code of Conduct?

2         A.    No, I don't recall if the administrative

3    hearing officer did or did not.

4         Q.    Okay.  Do you recall at the time with

5    December 8, 2017 hearing the definition that USF

6    employed for the term consent?

7         A.    I do not recall that definition.

8         Q.    Okay.  Where would that definition be

9    found?

10              MS. DYSON:  Object to the form.

11   BY MR. SEVERINO:

12        Q.    You can answer, if you know.

13        A.    I don't know where that definition would

14   have been held.  I don't know if it would have been

15   in the Student Code of Conduct or in a different --

16   in a different place.

17        Q.    When you were at USF, were you provided

18   any training with respect to the definition of

19   consent?

20        A.    I may have been, I don't recall specific

21   trainings overall as it relates to that.

22        Q.    As your role as the advisor in the

23   administrative hearing to the administrative hearing

24   officer, were you involved in any way with the

25   sanctions that were to be imposed?

1          MS. DYSON:  Object to the form.

2     BY MR. SEVERINO:

3          Q.   You can answer.

4          A.   As in determining sanctions, no, I would

5     not have been.

6          Q.   Okay.  Are you familiar with the range of

7     sanctions that were available for a violation of the

8     Student Code of Conduct?

9          A.   Yes.

10         Q.   And do you know the factors that an

11    administrative hearing officer would consider when

12    determining which sanction or sanctions to impose?

13         A.   Yes, it would depend on the situation, the

14    case itself, the situation itself as to what may

15    then result in sanctions being selected.

16         Q.   Do you recall any specific factors that

17    were considered to determine which sanctions to

18    impose?

19         A.   In this specific case, no, I do not

20    recall.

21         Q.   And what about in any other case that you

22    were involved in?

23         A.   Again, it would depend on the case itself

24    as each case is different.  So you know, the alleged

25    policy violation is that, if there's prior

1    misconduct, if the party is found responsible it may

2    play a part in that.  The impact to the community

3    overall plays a part in that.  There are a lot of

4    different things that could be in consideration

5    depending on the case itself.

6         Q.   While at USF were you provided any

7    training on how to determine sanctions to be imposed

8    for violation of the Student Code of Conduct?

9         A.   I would have been, yes, as serving as

10   initial review officer in providing those during the

11   initial review.

12        Q.   When you served as the initial review

13   officer at USF for Student Code of Conduct

14   violations, do you recall whether you ever

15   recommended expulsion after your initial review?

16        A.   I do not recall if I ever recommended

17   expulsion, no.

18        Q.   Is expulsion a common sanction that's

19   imposed during this disciplinary process?

20             MS. DYSON:  Object to the form.

21   BY MR. SEVERINO:

22        Q.   You can answer.

23        A.   Not to my recollection, expulsion was not

24   a common sanction that was utilized.

25        Q.   And I understand that you don't remember

1   what training you received but you do, you know,

2   generally recall the range of sanctions that could

3   be imposed, so with that background, are you aware

4   or can you identify any factors that would warrant

5   expulsion in a disciplinary proceeding?

6           MS. DYSON:   Object to the form.

7   BY MR. SEVERINO:

8       Q.   You can answer.

9       A.   Specific individual factors, no, I do not

10  recall but they go back to what I previously

11  answered, depending on the scope of the incident,

12  depending on if there was any prior misconduct, if

13  there was any concern for the campus community

14  overall, those types of factors would be considered.

15      Q.   What is the key -- can you explain for me

16  the concern to the community overall, what that

17  means?

18      A.   If the -- from my recollection or my

19  understanding, if the alleged behavior that a party

20  has been found responsible for, if their continued

21  presence and based off of the continued presence

22  with the University in actions that had transpired,

23  would their continued presence be a potential

24  concern for the campus community as a whole.

25      Q.   Are you familiar with the disciplinary

1   proceeding involving Samantha Garrett and a

2   gentleman, Mr. Thurston?

3           MS. DYSON:   Object to the form.

4   BY MR. SEVERINO:

5       Q.   You can answer.

6       A.   I recall the name overall, yes.

7       Q.   Okay.  Were you involved in that actual

8   disciplinary process?

9       A.   I believe I had some part in that entirety

10  of events but my specific remembrance of my detailed

11  role in that I do not recall.

12      Q.   Do you recall whether or not Ms. Garrett

13  filed a lawsuit against the University of South

14  Florida arising from that disciplinary process?

15          MS. DYSON:   Object to the form.

16  BY MR. SEVERINO:

17      Q.   You can answer.

18      A.   From what I recall I do believe that there

19  was litigation filed.

20      Q.   Okay.  Do you recall whether that

21  litigation made the newspapers?

22      A.   Possibly.  I don't recall specific -- that

23  specifically but possibly.

24      Q.   And I'm about done, I'm going to wrap up

25  here so we'll be done in about five minutes unless

1  Ms. Dyson has some questions for you.

2              This -- what we're here about today,

3  the underlying incident, you see that the

4  administrative hearing was held on December 8, 2017,

5  correct?  I can pull this up so you can see it.

6       A.   Yes, I do recall that being on page one,

7  yes.

8       Q.   Okay.  And do you recall when the Samantha

9  Garrett and Andrew Thurston disciplinary process or

10  proceeding occurred?

11           MS. DYSON:  Object to the form.

12  BY MR. FRANKLIN:

13       Q.   I'm sorry, did you answer?  I couldn't

14  hear you.

15       A.   No, I do not recall specifically when that

16  may have occurred.

17       Q.   Do you recall if it was before or after

18  this December 8, 2017 administrative hearing?

19           MS. DYSON:  Object to the form.

20           THE WITNESS:  Again, I don't recall the

21  date of when that may have been.

22  BY MR. SEVERINO:

23       Q.   Okay.  Are you familiar with the Me Too

24  Movement?

25       A.   I am familiar and understand the Me Too

1    Movement, yes.

2         Q.    Okay.  Do you recall when the Me Too

3    Movement rose to prominence?

4         A.    Specific dates, I do not recall those, no.

5         Q.    Do you remember the year?

6         A.    Not without Googling it, no.

7         Q.    While you were at USF do you recall any

8    internal memos or any direction from the University

9    with respect to response to the Me Too Movement?

10        A.    I do not recall anything like that, no.

11        Q.    Okay.  Are you familiar with what a Dear

12   Colleague letter is?

13        A.    Yes.

14        Q.    What are they or what is one?

15        A.    From my understanding a Dear Colleague

16   letter is a document that the federal government can

17   provide to outline a particular stance regarding a

18   particular matter and that the Obama Administration

19   published a Dear Colleague letter in 2011 overall.

20        Q.    And is that something -- strike that.

21             You just mentioned the 2011 letter.

22   How did you come to find out about that 2011 Dear

23   Colleague letter?

24             MS. DYSON:  Objection.

25             THE WITNESS:  In 2000 -- sorry.

1    BY MR. SEVERINO:

2         Q.   Go ahead, you can answer.

3         A.   In 2011 I was as I mentioned earlier the

4    graduate assistant in the Office of Student Rights

5    and Responsibilities so that is when I would have

6    been made aware of what a Dear Colleague letter is

7    because from my recollection that was a very

8    important Dear Colleague letter that was published

9    at that time.

10        Q.   So I've got on my screen here a

11   September 22nd, 2017 Dear Colleague letter and I'll

12   scroll just through it to the end here, so you can

13   see it's one, two pages.  Have you seen this before?

14        A.   When it was published, I may have seen it.

15   In 2017 that would have been under the, I believe

16   the Trump Administration so I believe this was from

17   his Department of Education.

18        Q.   Okay.  And again, you said you may have

19   seen it in 2017.  Is this something that you would

20   have been notified about from the University of

21   South Florida?

22        A.   Possibly.  From my recollection I don't

23   recall specifically receiving this document.  Where

24   it stands out in my memory to say yes, I received

25   this I do not recall that in any way, shape or form.

1       Q.    Okay.  Do you recall if the University of

2    South Florida took any action in response to this

3    September 22nd, 2017 Dear Colleague letter?

4       A.    I have no knowledge if they would have or

5    not.

6       Q.    Okay.  So you left USF in 2019, correct?

7       A.    That is correct, yes.

8       Q.    So from the time that the federal

9    government issued this letter until the time that

10   you left in 2019, you do not recall whether the

11   University took any action in response to this Dear

12   Colleague letter?

13      A.    I do not recall if -- I do not recall

14   that, no.

15      Q.    Okay.  With respect to the Student Code of

16   Conduct and your role as the advisor to answer any

17   questions with respect to that during an

18   administrative hearing, what would you do, if

19   anything, if you couldn't find the answer in the

20   Student Code of Conduct to a question presented by

21   the hearing officer?

22            MS. DYSON:  Object to the form.

23   BY MR. SEVERINO:

24      Q.    You can answer.

25      A.    Not completely sure that that had happened

1    but if it did I believe we would have consulted with

2    general counsel.

3         Q.   Give me just one second here and I should

4    be about done.  Let's see.

5              MR. SEVERINO:  I can't hear what you guys

6    are saying but I can hear you whispering, just so

7    you know.

8              MS. DYSON:  That's fine.  All I'm saying

9    is that the next witness is on a different link.

10             MR. SEVERINO:  No, that's fine.  Just in

11   case you guys were having attorney-client

12   communications I just wanted to let you know.

13             MS. ADAMCHAK:  These witnesses were kind

14   enough to agree to these times --

15             MR. SEVERINO:  I'm -- it's 10:03.  Give me

16   about 10 seconds.  I'm wrapping up, I just have to

17   check my notes and I think we're done so just bear

18   with me a few more seconds.

19             MS. DYSON:  Joshua, it's up to you, you

20   agreed to an hour and yesterday you learned about

21   this so I respect your time.

22             THE WITNESS:  Thank you.

23             MR. SEVERINO:  I don't think there's any

24   indication I don't respect your time either, I'm

25   wrapping up here just so we're clear.

1          Okay.  So that's all I have unless there's

2     anything you want to add that you think is pertinent

3     to why you're here today.  If not, those are all the

4     questions unless Ms. Dyson has questions, but if

5     not, thank you for being here today and taking the

6     time to do this for us.

7               THE WITNESS:  You're welcome.

8               MR. SEVERINO:  Ms. Dyson, do you have any

9     questions?

10              MS. DYSON:  I don't have any questions.

11    I'm not sure if that last statement was a question

12    or not, if it was I object to the form of it,

13    otherwise I don't have any questions.

14              MR. SEVERINO:  I also object to the

15    insinuation that I don't respect his time because

16    I'm three minutes past 10:00 o'clock.

17              MS. ADAMCHAK:  I did not say you did not,

18    I just said I did.

19              MR. SEVERINO:  Okay.  All right.  Well,

20    that's it, Mr. Cutchens.  Thank you again for your

21    time.

22              THE VIDEOGRAPHER:  Let me take us off the

23    record.  This concludes the deposition and testimony

24    of Joshua Brandon Cutchens.  The time on the monitor

25    is approximately 10:04 a.m. and we are off the

Page 50

1    record.

2              (The deposition concluded at 10:04 a.m.)

3              (The witness, after having been advised of

4    his right to read and sign this transcript, does not

5    waive that right.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 51

1                 CERTIFICATE OF REPORTER

2

3        I, Solange Ruiz-Uribe, Notary Public for the

4   State of North Carolina at Large, do hereby certify

5   that the foregoing transcript is a true, accurate, and

6   complete record.

7        I further certify that I am neither related to

8   nor counsel for any party to the cause pending or

9   interested in the events thereof.

10       Witness my hand, I have hereunto affixed my

11   official seal this 5th day of June, 2023 at

12   Charlotte, Mecklenburg County, North Carolina.

13

14

15

16

17

18

19                 Solange Ruiz-Uribe

                   My Commission expires

20                 March 7, 2017

21

22

23

24

25

Page 52

1                    I N D E X

2                                        Page/Line

3    WITNESS EXAMINATION

4    JOSHUA B. CUTCHENS                  4          23

5    EXAMINATION

6    BY MR. SEVERINO                     4          25

7    CERTIFICATE OF REPORTER             51         1

8

9

10

11            REQUESTED INFORMATION INDEX

12

13         (No Information Index Requested)

14

15

16

17

18

19

20

21

22

23

24

25

Page 53

1    SASHA DYSON, ESQUIRE

     sasha.dyson@gray-robinson.com

2

3                          June 5, 2023

4     RE: Kevaughn Dingle vs. University Of South Florida

          University Of South Florida Board Of Trustees

5         4/18/2023 DEPOSITION OF JOSHUA B. CUTCHENS

          Job No. FLA5876255

6         The above-referenced transcript is available for

7    review.

8         The witness should read the testimony to

9    verify its accuracy. If there are any changes,

10   the witness should note those with the reason

11   on the attached Errata Sheet.

12        The witness should, please, date and sign the

13   Errata Sheet and email to the deposing attorney as well as

14   to Veritext at Transcripts-fl@veritext.com and copies will

15   be emailed to all ordering parties.

16        It is suggested that the completed errata be returned 30

17   days from receipt of testimony, as considered reasonable

18   under Federal rules*, however, there is no Florida statute

19   to this regard.

20        If the witness fails to do so, the transcript may be used

21   as if signed.

22                    Yours,

23                    Veritext Legal Solutions

24

      *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure

25     Rule 1.310(e).

Page 54

```
 1    RE: Kevaughn Dingle vs. University Of South Florida
           University Of South Florida Board Of Trustees
 2         4/18/2023 DEPOSITION OF JOSHUA B. CUTCHENS
           Job No. FLA5876255
 3                     E R R A T A   S H E E T
 4    PAGE_____ LINE_____ CHANGE_____
 5    _____
 6    REASON_____
 7    PAGE_____ LINE_____ CHANGE_____
 8    _____
 9    REASON_____
10    PAGE_____ LINE_____ CHANGE_____
11    _____
12    REASON_____
13    PAGE_____ LINE_____ CHANGE_____
14    _____
15    REASON_____
16    PAGE_____ LINE_____ CHANGE_____
17    _____
18    REASON_____
19
20    Under penalties of perjury, I declare that I have
      read the foregoing document and that the facts
21    stated in it are true.
22
23
24    _____
         JOSHUA B. CUTCHENS                    DATE
25
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.