# ATTACHMENT 3

Page 1

1              UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                    TAMPA DIVISION

4      _____

5      KEVAUGHN DINGLE,

6              Plaintiff,

7         v.                      Case No.

8      UNIVERSITY OF SOUTH        8:21-CV-02861-MSS-MRM

9      FLORIDA BOARD OF

10     TRUSTEES,

11             Defendants.

12     _____

13     DEPOSITION OF KRISTEN STEFFEN-ZONSIUS

14     NOTICED AS:   KRISTEN STEFFEN

15     DATE:         Tuesday, June 13, 2023

16     TIME:         10:02 a.m.

17     LOCATION:     Remote Proceeding - CA

18                   Los Angeles, CA 90017

19     REPORTED BY:  Melissa McCann, Notary Public

20     JOB No.:      5937596

21

22

23

24

25

Page 2

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3         ANTHONY SEVERINO, ESQUIRE
 4         TURKAL CUVA BARRIOS, P.A
 5         400 North Tampa Street
 6         Tampa, FL 33602
 7         aseverino@tcb-law.com
 8         813-868-6167
 9
10    ON BEHALF OF DEFENDANT:
11         SACHA DYSON, ESQUIRE
12         GrayRobinson Tampa Law Firm
13         401 East Jackson Street
14         Tampa, FL 33602
15         sacha.dyson@gray-robinson.com
16         813-273-5000
17
18    ALSO PRESENT:
19         JASMINE SINKAVITCH
20         JOANNE ADAMCHAK
21
22
23
24
25
```

Page 3

1                        I N D E X

2    EXAMINATION:                                    PAGE

3       By Mr. Severino                              6

4

5                     E X H I B I T S

6    NO.            DESCRIPTION                      PAGE

7    Exhibit 1      Subpoena Notice                  8

8    Exhibit 2      Screenshot of LinkedIn Page      32

9    Exhibit 3      Passionate About Making a        43

10                  Difference Page Vault

11   Exhibit 4      Hearing Transcript               53

12   Exhibit 5      Documents of Alleged Violations  58

13                  of the Student Code of Conduct

14   Exhibit 6      Documents of Alleged Violations  61

15                  of the Student Code of Conduct

16   Exhibit 7      Handwritten Note on Document     74

17                  (Exhibits Retained by Counsel.)

18

19

20

21

22

23

24

25

Page 4

```
1                    P R O C E E D I N G S
2              REPORTER:  Good morning again.  My name
3    is Melissa McCann.  I am the deposition officer
4    assigned by Veritext to take the record of this
5    proceeding.  We are now on the record at 10:02 a.m.
6              This is a deposition of Kristin Steffen
7    taken in the matter of Kevaughn Dingle vs. University
8    of South Florida Board of Trustees on Tuesday, June
9    13, 2023, in Campbell, California.
10             I am a notary authorized to take
11   acknowledgements and administer oaths in California.
12   Parties agree that as a deposition officer, I will
13   swear in the witness remotely.  Additionally, absent
14   an objection on the record before the witness is
15   sworn, all parties and the witness understand and
16   agree that any certified transcript produced from the
17   recording of this proceeding is intended for all
18   purposes -- for all uses permitted under applicable
19   procedural and evidentiary rules and laws in the same
20   manner as a deposition recorded by stenographic means
21   and shall constitute written stipulation of such.
22             At this time, will everyone in
23   attendance please identify yourselves for the record.
24   We can begin with Mr. Severino.
25             MR. SEVERINO:  Anthony Severino, on
```

Page 5

1    behalf of the Plaintiff, Kevaughn Dingle.

2              MS. DYSON:  Good morning -- good

3    morning.  Good afternoon, depending on the time zone

4    you're in.  I'm Sacha Dyson of the law firm

5    GrayRobinson.  I'm here with Joanne Adamchak,

6    representing the University of South Florida.

7              MS. STEFFEN-ZONSIUS:  Melissa, did you

8    want me to go next?  Sorry.

9              REPORTER:  Sure, yes.  Please.  Thank

10   you.

11             THE WITNESS:  Okay.  I think you're on

12   mute, Melissa, but I'm Kristin Steffen-Zonsius.  I

13   believe I am identified as the witness today that has

14   been subpoenaed.

15             REPORTER:  Thank you.  Hearing no

16   objection, I will now swear in the witness.

17             Ms. Steffen, can you please raise your

18   right hand?  Do you swear or affirm that the testimony

19   you give today will be the truth, the whole truth, and

20   nothing but the truth.

21             THE WITNESS:  I do.

22             REPORTER:  Thank you.  Counselors, when

23   you're ready.

24             THE WITNESS:  Melissa, for the record,

25   my name is changed.  I have recently gotten married.

Page 6

1    So my legal name is Steffen-Zonsius.

2                    REPORTER:  I believe counsel will cover

3    that in questioning.

4                    THE WITNESS:  Okay.  Thank you.

5                    REPORTER:  Thank you.

6    WHEREUPON,

7                        KRISTIN STEFFEN,

8    called as a witness, and having been first duly sworn

9    to tell the truth, the whole truth and nothing but the

10   truth, was examined and testified as follows:

11                           EXAMINATION

12   BY MR. SEVERINO:

13       Q    So that was going to be my first question.

14   Can you spell your last name for us?

15       A    So my last name is Steffen, S-T-E-F-F-E-N,

16   dash, Zonsius, Z-O-N-S-I-U-S.

17       Q    Okay.  So I assume you go by Ms. Steffen-

18   Zonsius?  Did I pronounce that correctly?

19       A    Yes.  Kristin is also fine.

20       Q    Okay.  So you mentioned a minute ago that

21   you were subpoenaed today to be here as a witness in

22   this case.  So what I'm going to do first, just to get

23   this out of the way, I'm going to share my screen with

24   you.  And I will show you the subpoena to make sure

25   that this is what you received, and this is what you

```
                                                      Page 7
  1    are here for today.
  2                    MR. SEVERINO:  Melissa?  It says the
  3    host has disabled screen sharing.
  4                    REPORTER:  Sure.  Give me one moment.
  5                    MR. SEVERINO:  Thank you.
  6                    REPORTER:  You should be able to
  7    proceed now.
  8                    MR. SEVERINO:  Thank you.  No, it still
  9    says, "Host disabled participant sharing."
 10                    REPORTER:  Okay.  Let me try it a
 11    different way.  Oh, I see.  Can you try that again,
 12    Mr. Severino?
 13                    MR. SEVERINO:  Same message, but a
 14    minute ago, for a split second, it allowed me to.  But
 15    now I'm getting that again.
 16                    REPORTER:  Hm, okay.
 17                    MS. SINKAVITCH:  I just made it so you
 18    should be able to do it, so...
 19                    MR. SEVERINO:  Okay.  All right, I'm
 20    in.  Thank you.
 21                    REPORTER:  Thank you, Jasmine.
 22    BY MR. SEVERINO:
 23        Q    Ms. Steffen-Zonsius, can you see what's on
 24    the screen?
 25        A    Yes.
```

1          Q    Okay.  So I will just slowly scroll through

2     it here, and this is a subpoena to testify at

3     deposition in civil action.  And that is you, Kristin

4     Steffen, which we now know is Kristin Steffen-Zonsius.

5     And this is in the case Kevaughn Dingle vs. The

6     University of South Florida Board of Trustees.  Have

7     you seen this document before today?

8          A    Yes.

9          Q    Okay.  And you're here today pursuant to

10    this subpoena; correct?

11         A    Yes.

12              MR. SEVERINO:  I'll go ahead and mark

13    this as Exhibit 1.  So we have that.

14              (Exhibit 1 was marked for

15              Identification.)

16    BY MR. SEVERINO:

17         Q    Have you ever been deposed before?

18         A    Yes.

19         Q    Okay.  How many times, do you recall?

20         A    I don't recall.

21         Q    When was the last time you were deposed?

22         A    I don't remember.

23         Q    Was it in the last year?

24         A    No.

25         Q    In the last two years?

Page 9

1        A    No, before.

2        Q    Okay.  And we'll come back to that.  Do you

3    remember where you were employed when you were

4    deposed?

5        A    Yes.

6        Q    Where was that?

7        A    The State of Florida Department of Revenue

8    Child Support Enforcement Program.

9        Q    Okay.  And, just to close the loop on this

10   one, when were you employed there?

11       A    2006.

12       Q    Okay.  So based on that, last time you did a

13   deposition or testimony was approximately 2006?

14              MS. DYSON:  Object to form.

15   BY MR. SEVERINO:

16       A    Perhaps.

17       Q    All right.  You don't recall any other time

18   more recently than that as we sit here today?

19              MS. DYSON:  Object to the form.

20   BY MR. SEVERINO:

21       Q    You can answer.

22       A    I don't recall.

23       Q    And at time, Ms. Dyson may object to the

24   form of the question.  That is her objection -- a

25   legal issue that her and I can handle if necessary.

1    But unless you're instructed not to answer, you can go

2    ahead and answer once she makes that objection.

3              In that regard, are you represented by

4    counsel today?

5         A    I believe I have privileges as it relates to

6    this subpoena as my work from USF.

7         Q    Okay.  So is Ms. Dyson representing you in

8    this deposition?

9              MS. DYSON:  Well, just to be clear, I

10   think I can provide clarity there as to the extent

11   that she's asked questions in her former capacity as

12   an employee of USF, she's represented in that

13   capacity.

14   BY MR. SEVERINO:

15        Q    The court reporter kind of gave you the

16   basic ground rules of a deposition, and I know it may

17   have been a while since you've last been deposed. So

18   just a couple more ground rules before we get into

19   everything.

20             First, if you answer my question, I'll

21   assume that you understand the question.  If you

22   don't, please let me know, and I will try to rephrase

23   it so that we can get a good question for you to

24   answer.

25             If you need a break at any time, just let me

```
 1    finish my question.  Just let me know and we'll stop
 2    and you can use the restroom, phone call, whatever you
 3    need to do.  So keep that in mind.
 4              Folks shouldn't be answered part way.
 5                        MR. SEVERINO:  I don't know who that
 6    is, but I'm getting feedback.  Anyone else getting
 7    that?
 8                        MS. DYSON:  No, I'm not hearing that.
 9                        MS. SINKAVITCH:  I heard it a little
10    bit, too.
11                        MR. SEVERINO:  Is anybody on the phone?
12                        MS. DYSON:  No.  No one that's not
13    muted.  It's just me and you that aren't muted, and
14    the witness.
15                        MR. SEVERINO:  Huh.  Okay.  All right,
16    we'll try and work through that.
17    BY MR. SEVERINO:
18        Q    Okay.  So in preparation for your deposition
19    today, did you do anything to prepare?
20        A    I don't know what you mean.
21        Q    Okay.  Did you talk to anyone about your
22    deposition?
23        A    Yes.
24        Q    Okay.  Who did you speak with?
25        A    Counsel.
```

Page 12

1       Q    Counsel.  You're referring to Ms. Dyson?

2       A    Correct.

3       Q    Okay.  And did you review any documents in

4   preparation for your deposition today?

5       A    No.

6       Q    Okay.  Did you review any notes that you may

7   have had, personal notes from your time at USF, or

8   anything like that in preparation for today?

9       A    No.

10       Q    Did you speak with anyone else other than

11   Ms. Dyson about your deposition today?

12       A    Joanne Adamchak.

13       Q    When did you speak with Ms. Dyson about your

14   deposition today?

15       A    June 8th.

16       Q    And do you recall about how long you spoke

17   with Ms. Dyson on June 8th?

18       A    I do not.

19       Q    Okay.  And when did you speak with Ms.

20   Adamchak about your deposition today?

21       A    June 8th.

22       Q    Were they both present at the same time?

23       A    Yes.

24       Q    Is that the only time you spoke to either

25   Ms. Dyson or Ms. Adamchak about your deposition today?

Page 13

1        A    Yes.

2        Q    So we're going to go through -- I'll just

3    kind of give you a roadmap here just to start.  Mainly

4    some background information to get your educational

5    background, employment history, those sorts of things.

6             So we'll start with your education.  If you

7    want, we can do this one of two ways.  I can ask all

8    the questions, or you can give me a brief summary and

9    I can try and fill in the gaps.  So if you want, just

10   give me a brief summary of your educational

11   background.

12       A    I have two master's degrees, two graduate

13   certificates, a bachelor's degree, and associate's

14   degree, and multiple certifications.

15       Q    So two master's, two certifications, a

16   bachelor's, and then you said something after that as

17   well.

18       A    I have an associate's degree and I have two

19   graduate certificates.

20       Q    Okay.  Sorry about that.  Where did you

21   obtain your associate's degree?

22       A    Florida State University.

23       Q    And when did you obtain that degree?

24       A    1998.

25       Q    Okay.  And then two bachelor's degrees.

1          A      I have one bachelor's degree.

2          Q      One.  I'm sorry.  Where did you obtain your

3     bachelor's degree?

4          A      Florida State University.

5          Q      When was that?

6          A      2011.

7          Q      And what was that bachelor's degree in?

8          A      Social sciences.

9          Q      Okay.  And your first master's degree.  When

10     did you obtain that?

11          A      2014.

12          Q      From where?

13          A      University of South Florida.

14          Q      And what is that master's in?

15          A      Public health.

16          Q      And your second master's.  When did you

17     obtain that?

18          A      2017.

19          Q      Where from?

20          A      University of South Florida.

21          Q      And what is that master's degree in?

22          A      Management.

23          Q      Okay.  And the two certificates.  Can you

24     describe or explain those for me?

25          A      I have a graduate certificate in building

Page 15

1   sustainable enterprise.

2        Q    Where is that from?

3        A    University of South Florida.

4        Q    And when did you obtain that?

5        A    I don't recall the exact date.

6        Q    Okay.  And what about the other certificate?

7        A    My other graduate certificate is in health

8   management and leadership I believe.

9        Q    And where did you obtain that?

10       A    University of South Florida.

11       Q    Do you recall when?

12       A    I don't recall the exact date of that one.

13       Q    Okay.  Just generally, what is a graduate

14   certificate?  What does that mean?

15       A    It means you're taking graduate courses,

16   graduate level courses, versus undergraduate courses.

17       Q    Okay.  So is a graduate certificate kind of

18   in between a bachelor's and a master's?

19       A    I don't know.  I don't work in academic

20   resources.

21       Q    Do you have any other certificates?

22       A    I have certifications.

23       Q    Okay.  Why don't you tell me those

24   certifications?

25       A    I am certified as a human resource

1    professional by the Society of Human Resource

2    Management.

3        Q    Okay.  And when were you certified as a

4    human resource professional?

5        A    2021

6        Q    And who provides that certification?

7        A    The Society of Human Resource Management.

8        Q    Okay. And what does that certification allow

9    or permit you to do?

10       A    I'm a human resource professional.

11       Q    Okay.  What does that mean?

12       A    It means that I have a body of knowledge

13   regarding human resources.

14       Q    Okay.  Is that a certification that you use

15   in your employment?

16       A    Yes.

17       Q    Okay.  In what ways?

18       A    I work in workforce planning.

19       Q    You currently work in workforce planning?

20       A    Yes.

21       Q    Okay.  Where at?

22       A    Kaiser Permanente Medical Group.

23       Q    And what is your official title at Kaiser?

24       A    Senior Managerial Consultant.

25       Q    And what are your responsibilities in that

Page 17

1    role?

2        A    I have oversight of creating workforce

3    pipelines into healthcare positions?

4        Q    Can you tell me what that means?  Workforce

5    pipelines into healthcare positions?

6                MS. DYSON:  Object to the form.

7    BY MR. SEVERINO:

8        A    It simply means that I help people find jobs

9    and keep them in our healthcare workforce.

10       Q    Okay.  All right.  And how long have you

11   worked at -- served in that role?

12       A    Since January of 2023.

13       Q    And so I'm just going to kind of work

14   backwards now through your employment history.  So you

15   were in that role in January 2023.  Where were you

16   working before that?

17       A    University of Nevada Las Vegas.

18       Q    Okay.  And when did you begin employment at

19   UNLV?

20       A    2019.

21       Q    All right.  And when you started in 2019,

22   what was your job title?

23       A    Senior Director.

24       Q    Just Senior Director or Senior Director of a

25   certain department?

Page 18

1        A       Senior Director of Faculty Affairs.

2        Q       And how long did you hold that position at

3    UNLV?

4        A       About two years.

5        Q       And what were your responsibilities and

6    roles in that position as Senior Director of Faculty

7    Affairs?

8        A       I had oversight of all of our School of

9    Medicine faculty, promotion, recognition, hiring, and

10   recruitment, and as well as compliance.

11       Q       Compliance with what?

12       A       Adhering to our policies and our

13   regulations.

14       Q       UNLV specific regulations and policies?

15       A       I would say yes.

16       Q       Okay.  Any compliance with federal

17   regulations and policies?

18       A       At times, yes.

19       Q       Okay.  What federal regulations were you

20   responsible for overseeing compliance with?

21       A       I was not specifically responsible for

22   oversight of federal regulations.

23       Q       During that approximate two years as Senior

24   Director of Faculty Affairs, did you have any

25   involvement with Title IX?

```
 1        A     Yes.

 2        Q     Okay.  In what ways?

 3        A     I was asked to consult.

 4        Q     Consult with who?

 5        A     The Title IX office of the university

 6    system.

 7        Q     Okay.  Was that a separate role that they

 8    asked you to perform, or was that something that was

 9    encompassed within your Senior Director of Faculty

10    Affairs?

11        A     That would be a separate role.

12        Q     And in what ways did you consult the Title

13    IX office at UNLV?

14        A     We are a young medical school, and they

15    needed more experience in the Title IX arena in

16    medical school.

17        Q     Okay.  So what types of things did you do

18    when you were consulting?

19        A     Provided support to respondents and

20    complainants.

21        Q     Does UNLV have a what I'll refer to as a

22    student code of conduct?

23        A     I don't know.  I was not involved in any of

24    that.

25        Q     So when you consulted with Title IX, you
```

Veritext Legal Solutions

800-726-7007                                          305-376-8800

Page 20

1    were not involved in the school disciplinary process
2    that may or may not have resulted from those
3    investigations; is that correct?
4         A    I had no role in student Title IX at UNLV.
5         Q    All right.  So that's for about two years.
6    So sometime in 2021, you transitioned to a new role at
7    UNLV?
8         A    Yes.  I was promoted.
9         Q    Okay.  And promoted to what role?
10        A    Executive Director of Faculty Affairs and
11   Strategic Programs.
12        Q    Did you continue to provide consulting work
13   to the Title IX office during that time?
14        A    No, not particularly.
15        Q    Any other job title while at UNLV?
16        A    Yes.
17        Q    Okay.  So how long were you Executive
18   Director of Faculty Affairs?
19        A    About a year.
20        Q    All right.  And then where did you go within
21   UNLV after that?
22        A    I also was the Interim Director of
23   Continuing Director in addition to the executive
24   director role.
25        Q    Any other job titles while at UNLV?

```
 1        A    I am an instructor in the Executive Master

 2   of Healthcare Administration program.

 3        Q    So do you teach courses?

 4        A    I do.

 5        Q    Okay.  What courses do you teach?

 6        A    I teach Foundations of Public Health.

 7        Q    And I know you're at Kaiser right now.  Are

 8   you still teaching at UNLV while you work at Kaiser?

 9        A    Yes.

10        Q    Okay.  All right.  So tell me again the name

11   of the course that you teach?

12        A    Foundations of Public Health.

13        Q    All right.  Any other courses?

14        A    No.

15        Q    All right.  Where were you in -- I'm sorry.

16   There's occasional feedback.  I don't know if you're

17   getting that, but I keep getting it, so --

18        A    I can hear you okay.  Thank you for asking.

19        Q    Okay.  All right.  So prior to your time at

20   UNLV, where were you employed?

21        A    University of South Florida.

22        Q    Okay.  So when did you first become employed

23   at the University of South Florida?

24        A    2011.

25        Q    Okay.  And what was your job title at that
```

1    time?

2         A    Contract Administrator.

3         Q    And what did you do as Contract

4    Administrator?

5         A    I oversaw contracts.

6         Q    Within a specific department, or university-

7    wide?  How did that work?

8         A    University of South Florida USF Health.

9         Q    Okay.  And these contracts -- what types of

10   contracts were they?

11        A    Affiliation agreements.

12        Q    Would that be with hospitals and other

13   clinics?

14        A    Yes.

15        Q    Okay.

16             MS. DYSON:  Object to the form.

17   BY MR. SEVERINO:

18        Q    How long ere you in that role?

19        A    I don't know.

20        Q    Okay.  While you were a contract

21   administrator, did you have any involvement in Title

22   IX at USF?

23        A    I don't recall.

24        Q    Okay.  How about any disciplinary process

25   that was part of the university's student code of

Page 23

1    conduct?

2         A    As it relates to being a contract

3    administrator?

4         Q    Yeah, when you were in that role.  I mean, I

5    know you did consulting at UNLV --

6         A    I don't recall.

7         Q    Okay.  All right.

8                   THE WITNESS:   Anthony?

9                   MR. SEVERINO:  Yes.

10                  THE WITNESS:   I just want to tell you

11   I've had an incredible amount of life that has

12   happened to me in the last five years or so.  I've had

13   cancer twice.  I've had uterine and breast cancer.

14   I've gotten divorced.  I've moved to three different

15   states.  I mean, I just -- I'm going to try to be

16   helpful to you, Anthony, but I just want you to

17   understand that I -- I don't recall a lot of

18   specifics.

19                  MR. SEVERINO:  And that's fine and

20   thank you for letting me know that.  I hope -- hope

21   your health is okay.  So like I said, if you need a

22   break for any reason, just tell me to take a break.

23   This isn't a marathon.  And I don't know if your

24   counsel told you, but I suspect we'll be a couple

25   hours, and that should be it.

Page 24

1                    THE WITNESS:  I understand.

2                    MR. SEVERINO:  So thank you for that,

3      and I will keep that in mind as we go.

4      BY MR. SEVERINO:

5           Q     So after Contract Administrator, what was

6      your next role?

7           A     I was a project manager.

8           Q     Project manager with respect to a specific

9      department at USF?

10          A     I worked in the Senior Vice President's

11     office of USF Health.

12          Q     And it that role as project manager, what

13     did you do?

14          A     I oversaw projects.

15          Q     What types of projects?

16          A     Anything that was assigned to me.  I had a

17     multitude of projects.

18          Q     Okay.  And in that role, anything to do with

19     Title IX?

20          A     Not specifically in that role.  No.

21          Q     Okay.  But during that time when you were in

22     that role, did you have any involvement with Title IX

23     at USF?

24          A     I don't know.  I just don't know the timing,

25     Anthony, and I don't remember.

1       Q     That's fine.  After -- did you take on a new

2    role after your project manager role at USF?

3       A     Yes.

4       Q     Okay.  And what was your next role at USF?

5       A     I was promoted to the Assistant Director

6    role.

7       Q     Okay.  Assistant Director of what?

8       A     I'd have to look at my resume.  I don't

9    remember specifically.

10      Q     Okay.  So let me -- let me share my screen

11   with you.  Just bear with me a second.

12             THE WITNESS:  Anthony, I just -- I

13   don't want to speculate my timing.

14             MR. SEVERINO:  That's fine.  All right.

15   I understand.  I'm just -- give me a sec.  I'm going

16   to pull something up that may help us if I can find

17   out where this is.  Hold on.

18             THE WITNESS:  Okay.

19             MR. SEVERINO:  Okay, there we go.

20   BY MR. SEVERINO:

21      Q     Can you see what's on my screen?  Or it

22   should be on your screen as well.

23      A     Yes.

24      Q     So this is the top of the recent page vault

25   and the page loaded Tuesday, 13th of June, 2023.  And

1   if we go down here, this is essentially a screenshot

2   or capture of your LinkedIn page.

3        A    Yes.

4                  MS. DYSON:  Is this a document that's

5   been produced?

6                  MR. SEVERINO:  What's that?

7                  MS. DYSON:  Has this document been

8   produced?

9                  MR. SEVERINO:  No.  We just got it this

10  morning.  It's a LinkedIn page.

11  BY MR. SEVERINO:

12       Q    So I'm going to go down to the bottom here.

13  And it is five pages.  And I'll just go back up to the

14  top and see if you can -- if you recognize this.  Does

15  this look like your LinkedIn page?

16                  MS. DYSON:  I object to this.  Asking a

17  question about a document that hasn't been produced.

18  BY MR. SEVERINO:

19       Q    You can go ahead an answer.

20       A    Yes.

21       Q    Okay.  I'm only doing this because you have

22  experience on here.  Right now, we're talking about

23  USF.  And if you look here, it says Assistant

24  Director, Deputy Title IX Coordinator, and

25  Investigator.  Is that the role that you took on after

1    being a project manager at USF?

2         A    No.

3              MS. DYSON:   Objection.   That is three

4    specific roles.

5    BY MR. SEVERINO:

6         Q    Okay.  Explain those to me if you would,

7    please.

8         A    My primary role was Assistant Director.   My

9    secondary roles were Deputy Title IX Coordinator and

10   Investigator.

11        Q    Okay.   And as a Deputy Title IX Coordinator,

12   what would be your responsibilities?

13        A    Coordination of Title IX.

14        Q    Do you recall when you took on that role?

15        A    I do not.

16        Q    Okay.   And is the Deputy Title IX

17   Investigator -- you said that's a separate role apart

18   from the coordinator role?

19        A    Yes, depending on how you were appointed by

20   the Title IX office.

21        Q    Okay.  All right.   So you served as both a

22   deputy Title IX coordinator and a deputy Title IX

23   investigator; correct?

24        A    Yes.

25        Q    Okay.  As a Title IX investigator, what were

1   your roles and responsibilities?

2       A    Investigate allegations of Title IX

3   violations.

4       Q    And in both of those roles as coordinator

5   and investigator, who was your, for lack of a better

6   term, superior?

7               MS. DYSON:  Object to the form.

8   BY MR. SEVERINO:

9       A    I don't recall her name.  I can see her

10  face, but I don't recall her name.  Sorry.

11      Q    It's okay.

12      A    I don't remember her name.

13      Q    That's fine.  I know you don't recall when

14  you began as Assistant Director, but do you recall the

15  timeframe when you became a deputy Title IX

16  coordinator or investigator?

17              MS. DYSON:  Object to the form.

18  BY MR. SEVERINO:

19      A    Anthony, I don't remember the specific time.

20  I just don't want to speculate.

21      Q    That's fine.  Did you have -- prior to

22  becoming a deputy Title IX coordinator, did you have

23  any experience with Title IX?

24      A    No.

25      Q    Did you have any -- okay.  So you didn't

1   have any training with respect to Title IX prior to

2   this?

3                    MS. DYSON:  Object to the form.

4   BY MR. SEVERINO:

5       A     I became trained at the same time I took the

6   role.

7       Q     Okay.  What do you recall was the training

8   that you took when you --

9       A     I was trained through ATIXA.

10      Q     Okay.  I -- I think I've seen that's an

11  acronym.  What is it?  A-T-I-X-A?  Is that right?

12      A     Mm-hmm.

13      Q     What does that stand for if you know?

14      A     I would have to look it up.  I'm sorry,

15  Anthony.  It's been a number of years since I've

16  worked in --

17      Q     What -- strike that.  Was the ATIXA training

18  something that was provided by USF?

19      A     No, it was provided by ATIXA.

20      Q     Okay.  Do you recall if that training was a

21  requirement to you becoming a deputy Title IX

22  coordinator at USF?

23      A     I do not.

24      Q     Okay.  And now, as far as a Title IX

25  investigator, did you have any experience with that

1  prior to taking on this role at USF?

2              MS. DYSON:  Object to the form.

3  BY MR. SEVERINO:

4      A    Being a Title IX investigator?

5      Q    Yes.

6      A    No.  prior to working at USF, I had never

7  been a TITLE IX investigator.

8      Q    Okay.  How did you come to be involved with

9  Title IX at USF?  Meaning, was this something you were

10  pursuing and interested in, or were you approached by

11  someone at USF to maybe fill these roles?

12              MS. DYSON:  Object to the form.

13  BY MR. SEVERINO:

14      Q    You can answer.

15      A    I -- I was not pursuing it, Anthony.  This

16  is -- I wouldn't consider this a role where people

17  enjoy it.  It's more -- it's -- I'm trying to think

18  when I -- how I got into it.  I believe I was asked.

19  But again, I would be speculating, Anthony.  I did not

20  pursue it.  I can tell you that.

21      Q    Okay.  All right.  All right.  You know,

22  I've got here on this LinkedIn page here, following

23  Assistant Director, Deputy Title IX Coordinator, and

24  Investigator, it says from November 2011 to October

25  2019.  And then it goes into realtor and your time at

1   UNLV.  Is this accurate as to the time you spent at
2   USF?
3                  MS. DYSON:  Object to the form.
4   BY MR. SEVERINO:
5        A    Yes.
6        Q    And so, before going to UNLV, it looks like
7   -- did you spend some time as a realtor?
8        A    Yes.
9        Q    Okay.  Why did you leave USF?
10       A    I obtained a job with UNLV that was a
11  promotion.
12       Q    That was going to be mt next question.  So
13  it was a promotion?
14       A    Mm-hmm.  My mother had died, and I was her
15  caregiver.  I don't mind saying this on the record,
16  Anthony.  It was a very, very difficult four years for
17  me to watch my mother fight ovarian cancer for which I
18  attain I got cancer as well.  And I was ready for a
19  change.
20       Q    I can -- I can sympathize with being a
21  caregiver for your mother.  I do the same thing, so --
22       A    It was a very difficult four years.
23       Q    I understand.
24       A    So I had an opportunity for a promotion.  I
25  went.

Page 32

```
1        Q    I understand.
2                  MR. SEVERINO:  So I'm going to mark the
3     LinkedIn that we just had up -- screenshot or page
4     wall as Exhibit 2.
5                       (Exhibit 2 marked for
6                        Identification.)
7     BY MR. SEVERINO:
8        Q    During your time at USF, did you receive any
9     awards?
10       A    Yes.
11       Q    Okay.  What awards did you receive?
12       A    Actually, I've got one of them sitting on my
13    desk here.  Let's see.  I retrieved the University
14    Conduct Award in 2017.
15       Q    And do you recall what that was for?
16       A    Participating in student conduct.
17       Q    Okay.  And when you say participating, what
18    do you mean?
19       A    Sometimes I was a member on various boards.
20    Other times I was a hearing officer.
21       Q    All right.  Let's -- let's talk about that
22    for a minute.  Do you recall when you first served as
23    a hearing officer or on a student conduct board?
24       A    No.
25       Q    Okay.  And prior to serving in those roles,
```

Page 33

1    did you receive any specific training on how to

2    perform that role?

3          A    Yes.

4          Q    Okay.  What training was that?

5          A    I don't recall the specifics of the

6    training.

7          Q    Was the training -- who provided the

8    training?

9          A    The Office of Student Rights and

10   Responsibilities at USF.

11         Q    And do you recall if that training was

12   required before you could actually serve as a hearing

13   officer or on a student conduct board?

14         A    I do not recall.

15         Q    If -- if you know, can you explain for me

16   the difference between the Title IX office where you

17   worked at USF and the Office of Student Rights and

18   Responsibilities?

19              Ms. DYSON:  Object to the form.

20   BY MR. SEVERINO:

21         A    I can't explain that.

22         Q    Are they two separate offices or

23   departments?

24         A    I don't know.

25              MS. DYSON:  Object to form.

```
 1    BY MR. SEVERINO:
 2         A    I'm sorry, Anthony.  I just don't remember
 3    these --
 4         Q    No, listen, you don't have to -- you don't
 5    have to apologize.  It's not a memory contest.  I'm
 6    just here to gather information.  And if you know, you
 7    know.  And if you don't, you don't.
 8              I had -- on your LinkedIn, it said that you
 9    were the chair on the Title IX Presidential Committee?
10         A    Yes.
11         Q    What was that?
12         A    I oversaw as the chair a committee that was
13    appointed by the President of the university regarding
14    matters of Title IX.
15         Q    Okay.  And what did that -- what was that
16    committee's role?
17         A    What was the -- I'm sorry.
18         Q    What was that committee's role?
19         A    The last word is not coming out.
20         Q    Role.  What did you -- what did that
21    committee --
22         A    Role.
23         Q    Yeah, sorry.
24         A    I -- I -- we would make recommendations to
25    the President to take action.
```

Page 35

1      Q      Take action with respect to Title IX?

2      A      Title IX matters.  Mm-hmm.

3      Q      So let me break that down for a minute.  Are

4   you referring to specific Title IX investigations at

5   the university?

6      A      No.

7      Q      Are you referring to USF Title IX policies

8   and procedures?

9      A      Yes.

10      Q      Okay.  So kind of explain to me how that

11   would work.  You're appointed president -- chair of

12   this committee.  And does this committee make

13   recommendations about policies and procedures that USF

14   should implement or discontinue as part of its Title

15   IX office?

16      A      I don't recall specifically.

17              MS. DYSON:  Object to form.

18   BY MR. SEVERINO:

19      Q      Okay.  Do you recall who appointed you to

20   this position?

21      A      Judy Genshaft.

22      Q      All right.  Did you know Ms. Genshaft prior

23   to being appointed to that role?

24      A      In what regard?  Yes.  She was the president

25   of the university.

Page 36

1      Q     Were you friends with her?

2      A     No.

3      Q     Okay.  So your relationship with Ms.

4   Genshaft was professional?

5      A     Yes.

6      Q     Do you recall who else was on that

7   committee?

8      A     I do not.

9      Q     Okay.  So can you recall any other training

10  that you received with respect to your involvement

11  with Title IX at USF, other than the ATIXA?

12     A     No.

13            MS. DYSON:  Object to form.

14  BY MR. SEVERINO:

15     Q     Just a second.

16            All right.  So you should have on your

17  screen now a chart, which down at the bottom right

18  you'll see a number.  That's what us lawyers refer to

19  as the Bates label 566.  And this was produced by USF.

20            Let me ask you this: have you seen this

21  document before?

22     A     No.

23     Q     So at the top here, it says SCEDEIX

24  Training.  I assume that's some form of Title IX

25  training.  Do you know what SCED means?

Page 37

1      A    No.

2      Q    I'm going to go down here.  Your name is

3  listed on here a couple of times, so I'm just going to

4  start at the top here where my cursor is.  It says

5  "Date 5/25/16.  Type: Responsible Employee."  Do you

6  know what that mean

7      A    No.

8      Q    All right.  Go to the next one.  "9/14/17

9  through 9/15/17.  Type, again, Title IX Conference

10  2017."  Do you know what that was?

11      A    Looks like it was a Title IX Conference

12  2017.

13      Q    Okay.  Do you recall attending that

14  conference?

15      A    I mean, Counselor, are we just going to read

16  a document?  Because I could sit here and read the

17  document along with you, but --

18      Q    I'm asking you do you recall attending a

19  Title IX conference in 2017?

20      A    That specific date?  No.  But yes, I

21  attended conferences.

22      Q    Okay.  And then, there are four more entries

23  after that that appear to be various ATIXA trainings.

24  Do you recall those trainings at all?

25      A    I don't recall the specific dates, but yes,

Page 38

1    I attended ATIXA training.

2         Q    Okay.  Do you recall what those trainings

3    were about?

4         A    They're related to me being an investigator

5    and a coordinator.

6         Q    Do any of the trainings that are listed here

7    on 566, do they have anything to do with conducting a

8    hearing as an administrative hearing officer?

9         A    I don't recall.

10        Q    And same question as a student conduct board

11   member?

12              MS. DYSON:  Object to the form.

13   BY MR. SEVERINO:

14        A    No.  I don't recall.

15        Q    Does the federal government issue guidance

16   or guidance letters on how to deal with Title IX?

17              MS. DYSON:  Object to the form.

18   BY MR. SEVERINO:

19        A    In what aspect?

20        Q    Well, the way that I've seen them referred

21   to are these "dear colleague" letters.  Are you

22   familiar with that term?

23        A    Yes.

24        Q    Okay.  What is a "dear colleague' letter?

25        A    I wouldn't consider myself a subject expert

Page 39

1    on "dear colleague" letters.  I believe it provides,

2    just as you indicated, guidance regarding Title IX

3    matters.

4         Q    Do you recall in your role as Deputy Title

5    IX Coordinator and Investigator ever reviewing "dear

6    colleague" letters?

7         A    Yes.

8         Q    Okay.  And was that just something that you

9    just did on your own because you were interested, or

10   was that something that was a requirement of USF?

11        A    To the first part of your question, yes, I

12   was interested in it.  To the second part of your

13   question, no, I do not recall it being a requirement.

14        Q    Do you recall during your time at USF as the

15   Deputy Title IX Investigator and Coordinator relying

16   on those "dear colleague" letters for guidance in that

17   role.

18        A    No.

19             MS. DYSON:  Object to form.

20             Anthony, are you marking this document

21   as Exhibit 3?

22             MR. SEVERINO:  Oh, yeah.  When I'm

23   done, I will.  Yes.

24   BY MR. SEVERINO:

25        Q    All right.  So generally, I know you've said

1    that you acted as a hearing officer and as a member of

2    the student board of conduct.  Is that -- am I saying

3    that correctly?  I have that --

4          A    Yes?  Yeah, member of.  Yes.

5          Q    Okay.  In that role -- what did you do to

6    prepare to serve in that role?

7                    MS. DYSON:  Object to the form.

8    BY MR. SEVERINO:

9          A    Took training.

10         Q    Okay.  And would it be the training that's

11   here on the screen?

12         A    No.  Not as it pertains to being on the

13   student conduct board.

14         Q    Okay.  So what training do you recall that

15   you received to serve on the student conduct board?

16         A    I do not recall the specifics.

17         Q    Do you recall, generally, the subject

18   matters of the training?

19         A    Student conduct board.

20         Q    Was there training on how that process was

21   supposed to be implemented?

22                    MS. DYSON:  Object to the form.

23   BY MR. SEVERINO:

24         A    What do you mean by process?

25         Q    Well, why don't you tell me?  What did you

1    do as a member of the student conduct board?

2         A    Overheard alleged misconduct of students at

3    the University of South Florida.

4         Q    Okay.  And did you adjudicate those alleged

5    violations.

6         A    Yes, sometime.

7         Q    Okay.  And what training did you have, if

8    any, to enable you to sit on the student conduct board

9    and adjudicate those alleged violations.

10                   MS. DYSON:   Objection.   Asked and

11   answered.

12   BY MR. SEVERINO:

13        Q    You can go ahead if you know.   If you don't

14   that's fine, too.

15        A    I just recall having training, Anthony.

16        Q    Okay. Do you recall receiving any training

17   on how to assess the credibility of witnesses during

18   those proceedings?

19        A    I do not recall.

20        Q    Okay.  Do you recall receiving any training

21   on how to weigh the evidence that was presented in

22   those proceedings?

23        A    Yes.

24        Q    Okay.  What training did you receive for

25   that?

1      A    I don't recall specifically.

2      Q    Okay.  Were you provided any training with

3   respect to determining the type of sanction to impose

4   if you did find someone violated the student code of

5   conduct?

6      A    Yes.

7      Q    Okay.  Do you recall that training?

8      A    No.

9      Q    Okay.  As the -- or in your role as the

10  Deputy Title IX Coordinator, was part of your

11  responsibility ensuring the university's compliance

12  with Title IX?

13              MS. DYSON:  Object to the form.

14  BY MR. SEVERINO:

15     A    I would say no.

16     Q    Okay.  What were your responsibilities then

17  as the Deputy Title IX Coordinator?

18     A    I would consider my responsibility in that

19  role to be more -- to mitigate discrimination based on

20  sex.  So I was more proactive instead of reactive in

21  that role as the coordinator.

22              MR. SEVERINO:  Oh, and for the record,

23  Madam Court Reporter, this is going to be Exhibit 3.

24  So I'm going to stop sharing, but we'll go ahead and

25  mark this as Exhibit 3.

Page 43

```
 1                  (Exhibit 3 was marked for

 2                  Identification.)

 3                  Okay.  So this is another page vault.

 4      Essentially screenshot from today.  Let's see here.

 5      Tuesday, June 13, 2023.  And I'm going to go down here

 6      and I will just scroll through it real quick.  But the

 7      title is "Passionate About Making a Difference."  And

 8      I'll go down here.

 9      BY MR. SEVERINO:

10          Q    Do you -- you recognize this?

11                  MS. DYSON:  Objection.  Anthony, you

12      can't use documents that haven't been produced in this

13      case.  I'm not going to allow her to answer questions

14      about documents that haven't been provided.

15                  MR SEVERINO:  If you're going to

16      instruct her not to answer, that's fine.

17      BY MR. SEVERINO:

18          Q    But do you recognize this document?

19          A    I'm going to decline to answer based on

20      Counsel's remarks.

21                  MR. SEVERINO:  So just so we're clear,

22      Ms. Dyson, are you instructing her not to answer?

23                  MS. DYSON:  You are using documents

24      that should've been provided before this deposition.

25      Discovery has closed.  You are using documents that
```

1    apparently are pulled from the internet.  That

2    certainly could have been pulled before today if you

3    intended to rely on them in this deposition.  You want

4    to ask her questions?

5                    MR. SEVERINO:  Let's not -- let's not

6    address the time of production.

7                    MS. DYSON:  No, let me finish.

8                    MR. SEVERINO:  You dumped 500 pages on

9    me before the last depo that should've been produced a

10   year ago.  So if you're instructing her not to answer,

11   that's fine.  I just want the record to reflect that.

12                   MS. DYSON:  You are interrupting me is

13   what you're doing.  And you had plenty of time to

14   review any documents.  You never made any objection in

15   any prior deposition.  But rather what you're doing is

16   you are producing documents for the first time in this

17   deposition that I have never seen before by sharing

18   your screen.  And that's not appropriate.

19                   You can certainly ask her, if you want

20   to ask her about things in that document.  But to use

21   the document in this case is completely inappropriate.

22                   MR. SEVERINO:  I haven't -- I haven't

23   even attached it yet.  I'm going to ask her two

24   questions about this document.  I asked her if she had

25   seen it before.  That's the first step. So if you're

1    --

2              MS. DYSON:  You're asking her about

3    documents that should have been produced in discovery

4    and were not.

5              MR. SEVERINO:  Are you instructing her

6    not to answer?  I understand your position.  Are you

7    instructing her not to answer?

8              MS. DYSON:  Yes, I'm instructing her

9    not to answer.

10             MR. SEVERINO:  Okay.

11   BY MR. SEVERINO:

12       Q    Down here, it says in her Title IX position,

13   she would uncover a sex discrimination case that

14   resulted in personnel changes at the university.  Her

15   experience -- expertise was recognized with her being

16   awarded the Individual Outstanding Achievement Award

17   and as the chair of the Title IX Presidential Advisory

18   Committee by the USF system.

19             So what I'd like to ask you about is this

20   sex discrimination case that was uncovered.  Are you

21   familiar with that?

22             MS. DYSON:  To the extent that you're

23   quoting from a document, I object to it.  If you want

24   to ask her generally that question, you should ask her

25   that question.  But to the extent you're relying on a

Page 46

 1  document that's never been produced in discovery,
 2  that's inappropriate.
 3  BY MR. SEVERINO:
 4      Q    You can answer, Ms. Steffen.
 5      A    Counselor, are you going to ask me the
 6  question outside of it as Ms. Dyson has said?
 7      Q    Did you uncover -- did you uncover a sex
 8  discrimination case at USF that resulted in personnel
 9  changes at USF?
10      A    Yes.
11      Q    Okay.  What was that about?
12      A    I'm -- it was about a professor who was
13  grooming and molesting students.
14      Q    Okay.  And were there personnel changes as a
15  result of your investigation?
16      A    Not as a result of my investigation.  As a
17  result of the adjudication of my findings.
18      Q    And your findings, were those conducted in
19  your role as Title IX Investigator?
20      A    Yes.
21      Q    Okay.
22      A    So Title IX investigations, Anthony, result
23  in findings.  We do not handle adjudication as a Title
24  IX Coordinator or Investigator.
25      Q    Correct.  Okay.  But you do handle

Page 47

1    adjudication as a hearing officer or as a member of

2    the student board of conduct?

3        A    Yes.

4        Q    Okay.  And do you recall whether this

5    investigation or your findings of fact with this

6    professor ultimately led to either an administrative

7    hearing or a student board of conduct hearing?

8        A    I don't know.

9        Q    Okay.  But you do know that there were

10   personnel changes with respect to that professor,

11   whatever they may have been?

12       A    Yes, I did find that out.

13       Q    And with respect to that investigation that

14   we're discussing right now, was that initiated by

15   someone making a complaint?

16       A    I don't recall.

17       Q    While you were at USF, were you a part of

18   any on-campus organizations?

19       A    I don't remember.

20       Q    Outside of your employment at USF, would you

21   say you were active with the university?

22            MS. DYSON:  Object to the form.

23   BY MR. SEVERINO:

24       A    Oh, yes.  I'm a lifetime member of the USF

25   Alumni Association.

Page 48

1      Q    Okay.  As am I, by the way.

2      A    Nice.  Go Bulls.

3      Q    Okay.  So other than the Alumni Association,

4  were you -- do you recall being a part of any other

5  organizations?

6      A    As it relates to USF?

7      Q    Yes.  Yes.

8      A    I don't recall.

9      Q    Are you familiar with an organization at USF

10 called Safe Home?

11     A    Safe Home?  No.  Not home.

12     Q    Safe what then?

13     A    Zone.

14     Q    Safe Zone?  Okay.  What's that?

15     A    It is -- I wouldn't -- I wouldn't call it

16 necessarily an organization.  I was a Safe Zone

17 facilitator.

18     Q    What is a Safe Zone Facilitator?

19     A    Yeah.  So I received training to be able to

20 be a champion for the LGBTQ+ community to help our USF

21 community understand that specific community better.

22     Q    Do you recall when you were a -- it's Safe

23 Zone, but I don't remember what your title was.  Was

24 it coordinator?  Or what did you --

25     A    Facilitator I think it was.

Page 49

1      Q    Do you recall when you became a Safe Zone

2  Facilitator?

3      A    I don't.

4      Q    Sharing my screen with you again.  And this

5  is another page vault.  This is from January 11th of

6  2023.  Down on the bottom right you'll see those Bates

7  numbers.  It says Dingle 218.  And I'll go down here

8  to the bottom, so we can get the whole document

9  through Dingle 225.

10          And we'll start up here at the top.  This is

11  an article from November 13, 2017 titles "Safe HOME at

12  University of South Florida Hosts First Annual,"

13  pardon me, "Slut Walk."  Are you familiar with this at

14  all?

15      A    I don't recall.

16      Q    Seeing this name, Safe, in all caps, HOME,

17  does that refresh your recollection at all about

18  whether or not that organization --

19      A    Not at all.  No.

20      Q    All right.  So when we took a look earlier

21  at Exhibit 1, which was a subpoena, we agreed that the

22  case we're here today about was Kevaughn Dingle vs.

23  the University of South Florida.  So let me first ask

24  do you know who Kevaughn Dingle is?

25      A    No.  I don't recall.

Page 50

1      Q     I'm sharing my screen with you again.   For

2   the record, this is Bates label 14.   This was produced

3   by USF.   Have you ever seen this document before?

4      A     I don't recall it.   No.

5      Q     Not this specific document, but have you

6   seen -- or did you -- do you recall seeing other

7   documents like this during your time at USF?

8                  MS. DYSON:   Object to the form.

9   BY MR. SEVERINO:

10      A     I don't recall.   I mean, just looking at

11   this document, Anthony, this was five and a half years

12   ago.

13      Q     Mm-hmm.

14      A     That's a long time.

15      Q     So it does have up here administrative

16   officer hearing Friday, December 8, 2017 at 1:00 p.m.

17   And then this has Hearing Officer.   And that's you;

18   correct?

19      A     Yes.

20      Q     I understand you don't recall this document

21   or seeing this, but when you would serve as an

22   administrative hearing officer or as a member of the

23   student conduct board, how would you be notified that

24   you would be serving in that role?

25      A     Email.

Page 51

1          Q     And did the email come from a specific
2    person, or was it just a random person?
3          A     I don't recall.
4          Q     Do you recall typically how many days prior
5    to a scheduled hearing that you would be notified that
6    you would be serving in the role as a hearing officer
7    or as -- or as part of the student conduct board?
8          A     I do not.
9                MS. DYSON:   Object to the form.
10   BY MR. SEVERINO:
11         Q     Once you were notified via email that you
12   were going to be serving as a hearing officer or as
13   part of the student conduct board, what would you do
14   to prepare yourself for that proceeding?
15         A     I would go and look at materials available.
16         Q     And those materials that are available,
17   would those also be emailed to you at the same time
18   that you were notified?
19         A     No.  I don't recall.
20         Q     How would you obtain those materials?
21         A     I would go to the Student Conduct office.
22         Q     Right.  And so at the Student Conduct
23   office, there would be a case file for you to review?
24   Is that correct?
25         A     Yes.  I recall that.

Page 52

1           Anthony?

2       Q    Yes.

3       A    I recall that this was private and very

4  personal.  And so therefore that information was not

5  shared over email.

6       Q    Okay.  So you had to physically go look at

7  it for privacy?

8       A    No.  You couldn't -- you couldn't -- I don't

9  recall being able to take documents out of the Student

10  Conduct office for privacy reasons.  I felt that was

11  the right thing to do.

12       Q    All right.  So in addition to reviewing the

13  physical file at the -- was it at the OSRR office?

14  Was that where it was?

15       A    The Office of Student Rights and

16  Responsibilities?

17       Q    Yes.

18       A    Yes.

19       Q    Okay.  All right.  So -- is it okay if I say

20  OSRR?

21       A    Yes.  Yes.

22       Q    So other than reviewing the physical file at

23  OSRR, did you do anything else to prepare yourself to

24  serve in the role as a hearing officer or as part of

25  the student conduct board?

1      A    I received training.

2      Q    I understand that, but with respect to a

3    specific case, right.  So you would go the specific

4    case file, and with respect to that specific case, is

5    there anything else you would do to prepare for the

6    hearing?

7      A    No.

8               MR. SEVERINO:  We'll mark this.  It

9    should be on Exhibit 4.  And I'll stop sharing this.

10              (Exhibit 4 was marked and

11              Identified.)

12              MR. SEVERINO:  Just bear with me.  I'm

13   trying to pull something up

14              All right.  I've -- I've shared another

15   document on our screens, and it's labeled 71 through

16   74.

17   BY MR. SEVERINO:

18     Q    Are you familiar with this document?

19     A    No.

20     Q    I know you may not be familiar with this

21   specific document, but have you seen documents like

22   this?

23     A    No.

24     Q    So when you serve as an administrative

25   hearing officer or on the student conduct board, can

1    you just describe to me what you do and what your role

2    is?

3                    MS. DYSON:   Object to the form.

4    BY MR. SEVERINO:

5        A    Listen to the facts of the case.   Seek a

6    preponderance of the case, more likely than not, that

7    there was an incident, or the alleged allegation or

8    allegations are true, based on the individual

9    allegations, not as a totalitarian.   Because some

10   students were affected by multiple allegations.

11                   Seek, in an unbiased way, to review and

12   receive information from all parties involved, and

13   make a decision based on good faith and the best of my

14   ability.

15       Q    In -- let me back up.   You mentioned the

16   preponderance of the evidence standard that was

17   employed.   Whose burden at these hearings was it to

18   prove the alleged violation.

19       A    I believe it was equitable.

20       Q    Okay.   What do you mean by that?

21       A    Well, my role was not to choose a

22   complainant over a respondent or a respondent over a

23   complainant.   It was to look at the evidence involved,

24   and -- and see if there was, more likely than not,

25   that the alleged allegation had occurred, or violation

Page 55

1    of the student conduct from this standpoint.

2        Q    How would you resolve discrepancies or

3    differing accounts of what happened at these hearings?

4        A    Depends on the case specifically.

5        Q    Would you have to assess the credibility of

6    witnesses in doing that?

7                    MS. DYSON:  Object to the form.

8    BY MR. SEVERINO:

9        A    Depends on the case.

10        Q    Do you recall, at any time when you served

11    as an administrative hearing officer or on the student

12    conduct board, postponing a hearing in order to gather

13    additional evidence or information?

14        A    I don't recall.

15        Q    Do you recall if that's something you had

16    the discretion to do when you served in those roles?

17        A    Yes.

18        Q    So if there was evidence or information that

19    wasn't presented because someone didn't show up, or it

20    wasn't available, would you have the discretion to

21    postpone that hearing until you could gather that

22    information or evidence?

23                    MS. DYSON:  Object to the form.

24    BY MR. SEVERINO:

25        A    If appropriate, I believe so.  Yes.  I can

1    speculate on that.

2                    MR. SEVERINO:  All right.  Let me take

3    this down.

4                    So I am sharing my screen with you

5    again.  And let me just do this real quick for the

6    record, because this is a long document.  First page

7    is Bates label 77.  And then it goes through 150.

8    Okay.

9    BY MR. SEVERINO:

10        Q     And I will stop here at this first page and

11   let you take a look at that.  And then I'm going to

12   ask you whether or not you recognize this document.

13        A     No.  I have never seen this document.

14        Q     Now that you see it today, do you know what

15   this is?

16        A     It looks like a transcript.

17        Q     Okay.  And administrative hearing.  The date

18   is December 8, 2017.  The charged student, Devaughn

19   Dingle.  And then the Administrative Hearing Officer

20   is you, Kristin Steffen.  And also, the Initial Review

21   Officer is Maria Zale Cutsinger.  Can you see that?

22        A     Yes.

23        Q     Who is Ms. Cutsinger?

24        A     She works in the Student Conduct Office.

25        Q     Did you work with her at all during your

Page 57

1   time at USF?

2        A    What do you mean "work with her?"

3        Q    Were you in the same department?

4        A    No.  Not in the same department.

5        Q    Okay.  Then how would you have worked with

6   her during your time at USF?

7                    MS. DYSON:  Object to the form.

8   BY MR. SEVERINO:

9        A    She worked in the Office of Student Rights

10  and Responsibilities, and I served as a hearing

11  officer and a member of the Student Conduct Board.

12       Q    Do you know whether she worked in the Title

13  IX Office at all?

14       A    I do not.

15       Q    Okay.  And we talked about this a little

16  earlier, but I just want to clarify to make sure I

17  understand.  With respect to your role as a hearing

18  officer or Student Conduct Board member, your

19  involvement in a specific case, would that begin when

20  you receive that email notification that you're going

21  to serve in that role?

22                    MS. DYSON:  Object to the form.

23  BY MR. SEVERINO:

24       A    Yes.

25       Q    Okay.  Is there anything before you receive

1   that email where you're involved in this disciplinary

2   process?

3                    MS. DYSON:   Object to the form.

4   BY MR. SEVERINO:

5        A    No.  I don't recall

6                    MR. SEVERINO:  Let me -- hold on.  I'm

7   going to mark this as Exhibit 5, and we're going to

8   come back to it in just a minute.

9                    (Exhibit 5 was marked for

10                   identification.)

11                   MR. SEVERINO:  So sharing another

12  document.  I know that the font is small right now.  I

13  will zoom in in just a minute, but for the record,

14  this is Bates label 540 through 543.  All right.

15  Okay.  Let's see if I can zoom in.

16  BY MR. SEVERINO:

17       Q    Okay.  Have you seen this document before

18  today?

19       A    No.

20       Q    Okay.  This was a document that was produced

21  by USF in this case identifying alleged violations of

22  the student code of conduct beginning in November of

23  2015 through July of 2019.  And as you can see,

24  there's various bits of information here, but for now

25  I just want to focus on this column here that has name

Page 59

1    and Administrative Officer or member of the UCB.  You

2    see that?

3         A    Yes.

4         Q    All right.  So I'm going to scroll down.

5    Okay.  So the first time that you're identified I

6    think is 542, as the Administrative Hearing Officer is

7    line number 20.  Do you see that right here?

8         A    Yes.

9         Q    And the date of the complaint is November

10   16, 2017, and the date of the formal hearing is

11   December 8, 2017.  So my question is do you recall

12   whether you served as an Administrative Hearing

13   Officer or member of the UCB prior to December 8,

14   2017?

15              MS. DYSON:   Object to the form.

16   BY MR. SEVERINO:

17        A    I don't recall the dates, Anthony.

18        Q    Okay.  And that's fine, but I didn't see you

19   listed.  And again, this was produced by USF based on

20   the time period they provided.  So let me ask it this

21   way.  Do you recall whether you were serving as an

22   Administrative Officer or member of the UCB prior to

23   November of 2015?

24        A    I don't recall.  Though I will say, the

25   initial allegations look very specific in this

Page 60

1   document.  I heard a lot of cases that had nothing to

2   do with these allegations.

3        Q    Okay.  So --

4        A    Types of allegations.  I see a theme here.

5   I don't know from this document you provided.

6        Q    Correct.  Okay.  So you don't recall whether

7   you may have served as an Administrative Officer or

8   member of the UCB in cases involving allegations not

9   common to these, basically?

10                  MS. DYSON:  Object to the form.

11  BY MR. SEVERINO:

12       A    Okay.  I need you to ask that one again.

13       Q    Yeah.  I just want to make sure that I'm

14  understanding what you're saying, which is you don't

15  recall, but you may serve as an Administrative Officer

16  or member of the UCB with respect to other alleged

17  violations of the Student Code of Conduct that are not

18  similar to the ones identified here?

19                  MS. DYSON:  Object to the form.

20  BY MR. SEVERINO:

21       A    I did serve in other places that were non-

22  related to what you're showing me in this initial

23  allegation.  I just don't know the timing of it.

24       Q    Okay.  All right.

25       A    And I started as a member and a hearing

1    officer in those other unrelated types of themed

2    cases.

3        Q    Understood.  Okay.  Do you recall -- let me

4    back up.

5                MR. SEVERINO:  I'll mark this as

6    Exhibit 6.  We can keep track here.

7                (Exhibit 6 was marked for

8                Identification.)

9    BY MR. SEVERINO:

10       Q    When adjudicating alleged violations of the

11   Student Code of Conduct in your role as an

12   administrative hearing officer or member of the UCB,

13   do you recall the types of sanctions you could impose

14   if you found someone violated specific code of

15   conduct?

16       A    Not specifically.  I can recall, Anthony,

17   that there were different types of sanctions.  I just

18   don't recall specifically what they were.

19       Q    And I understand, and we can look at that in

20   a minute if we need to.  Although you don't recall the

21   specific sanctions, do you recall how you would

22   determine which sanction to impose?

23               MS. DYSON:  Object to the form.

24   BY MR. SEVERINO:

25       A    Depends on the allegations and if

1    adjudication was necessary.

2         Q    Okay.  So let's start with line 20.  It

3    says, "Sanctions imposed: Expulsion and No Contact

4    Order."  Are there any specific factors in a case that

5    would warrant expulsion?

6                   MS. DYSON:  Object to the form.

7    BY MR. SEVERINO:

8         A    I would say is there a threat to the

9    university community and their safety.  Certainly, in

10   decision making such as something that is expulsion, I

11   would very much be concerned with the safety of the

12   university community as a whole.

13        Q    Okay.  And what do you mean by the safety of

14   the university community as a whole?

15        A    Would any member of the public that is on

16   the university campus feel safe or be safe given the

17   adjudication or what this allegation, preponderance of

18   the evidence showed.

19             If I scroll over to the left side, it looks

20   like it was non-consensual sexual intercourse and non-

21   consensual sexual contact.  Is there a threat to the

22   community in a case like that that could affect the

23   rest of the community.  That would certainly warrant

24   potentially being expelled.

25        Q    Okay.  And so, if you look at line 21, again

1    it's got non-consensual sexual intercourse.  And the

2    sanction imposed was suspension, no contact order,

3    conduct probation, and meeting with staff member.  So

4    what I'm just trying to figure out is how do you

5    determine to expel someone versus suspend them?

6         A    I wasn't involved in that case, Anthony.  I

7    couldn't tell you.

8         Q    Well, it says University Board Member up

9    there, Kristin Steffen?

10        A    But I was the Hearing Officer.  I didn't

11   make the determination ultimately.

12        Q    Okay.  So in this instance where there's a

13   UCB, or University Community Board, tell me how kind

14   of that hierarchy works and who makes the decision.

15        A    I don't recall the specifics of how the

16   decisions were made.  But that's a different case and

17   you're haven't shown me documents related to the --

18   that case.

19        Q    Yeah, no.  I'm asking generally what factors

20   -- I know you mentioned the safety of the university

21   community as a whole.  What other factors would

22   warrant expulsion versus suspension.

23        A    I don't recall.  It's two different cases,

24   Anthony.  They're not apples to apples.

25        Q    I understand that.  No one's been able to

1    tell me what factors you consider when determining

2    that you're going to expel someone versus suspension.

3    So I'm just trying to figure out if you recall what

4    factors would be considered.

5                      MS. DYSON:  I object to your comment.

6    It's not accurate.

7                      MR. SEVERINO:  Well, the transcripts

8    will say what they say.

9    BY MR. SEVERINO:

10        Q    So the -- is the sanction of expulsion

11   something that you had full discretion to impose, or

12   is something that you had to get approval from someone

13   else?

14                      MS. DYSON:  Object to the form.

15   BY MR. SEVERINO:

16        A    As I recall, the adjudication of expulsion

17   could be grieved.  And the ultimate decision of the

18   university was the Dean of Students.

19        Q    All right.  So let me back up so I can

20   understand that.  All right.  You said, "could be

21   grieved."  Is that what you said?

22        A    Mm-hmm.  I believe that the student had the

23   opportunity to grieve.  I don't remember the exact

24   word of what that was called.  I'm sorry, Anthony.

25   But if they didn't like the sanctions, or they

1    disagreed with the sanctions, they could grieve that

2    sanction, and the decision would go to the Dean of

3    Students, ultimately, on behalf of the university.

4         Q    Right.  I understand that part.  I'm just

5    focused on when you impose the sanction of expulsion

6    in line 20, is that something that someone has to

7    approve before you impose that sanction, or do you

8    have full discretion and authority to do that?

9         A    I don't recall.

10         Q    All right.  So I'm still sharing my screen

11    here.  I've gone back to Exhibit 5, which we talked

12    about a moment ago.  So, I want to go --

13              MR. SEVERINO:  Actually, I'm going to

14    have a decent amount of questions for this.  So is

15    everyone okay if we take a quick bathroom break?  Five

16    minutes before we start this subject?

17              MS. DYSON:  Yes.  Do you know how much

18    longer you have?

19              MR. SEVERINO:  No.  Maybe an hour.

20    Maybe.

21              MS. DYSON:  Okay.

22              MR. SEVERINO:  It's 2:30.  I don't

23    know.  I'd like to be done by 3:30, 4:00 is kind of my

24    goal.  So why don't we take five minutes, then we can

25    go through this and a couple of other things?

                                                        Page 66

1                    MS. DYSON:  Okay.

2                    MR. SEVERINO:  All right.  Thanks guys.

3                    REPORTER:  This marks the end of media

4    number one.  The time is 11:32 a.m.  We are off the

5    record.

6                    (Off the record.)

7                    REPORTER:  This marks the beginning of

8    media number two.  The time is 11:45 a.m.  We are on

9    the record.

10                   MR. SEVERINO:  All right.  So I'm going

11   to share my screen and bring back up here Exhibit 5,

12   which was the hearing transcript from December 8,

13   2017.

14   BY MR. SEVERINO:

15        Q    First, I asked you about Ms. Cutsinger

16   earlier, but it says here that she was the initial

17   review officer.  In your time at USF, did you ever

18   serve in that role throughout the CFS?

19        A    No.  No.

20        Q    All right.  All right.  So we are at Bates

21   label 80.  And I am looking at this paragraph here

22   that is lines 5 through 16.  If you could, just take a

23   quick moment to read that to yourself, and then I'll

24   ask you a couple questions.

25        A    Okay.

Page 67

1      Q    So I -- I asked you earlier about whether or

2   not you needed approval to impose a sanction of

3   expulsion.  And I believe your testimony was you

4   didn't recall one way or the other.  So I'd like to

5   look at line 10 through 11 here, where you say the

6   Administrative Officer will make a recommendation of

7   whether Kevaughn is responsible or not for the alleged

8   violations.

9           So what I'm interested in is where it says,

10  "we'll make a recommendation," what does that mean?

11     A    I don't know.  I'm reading a transcript just

12  like you are.

13     Q    I understand, but these are your words.  So

14  I'm just trying to --

15     A    No, they're not.  I am reading off of a

16  document when I read this.  They are not my words.

17     Q    This is transcribed from the hearing and

18  this is you speaking.

19     A    Correct.  But I'm actually reading a

20  document in the hearing.

21     Q    Okay.  So do you agree that the hearing was

22  transcribed and this is the transcription from the

23  hearing?

24     A    I agree that the hearing was transcribed.

25  Yes.  I have never seen this document, so I can only

Page 68

1    reply that it's the transcript because you said it is.

2         Q    USF produced it.  They told me it was.  So

3    it's not me.

4         A    Okay.  Yeah.  I don't know.  I've never seen

5    -- I've never seen a transcript from a hearing.

6         Q    Okay.  Understanding that you haven't seen

7    it, do you have any reason to doubt the authenticity

8    of this transcript?

9         A    I don't know.

10        Q    Okay.  So where it's transcribed here where

11   you're speaking where it says, "The administrative

12   officer will make a recommendation," what does that

13   mean?

14                  MS. DYSON:  Object to the form.

15   BY MR. SEVERINO:

16        A    I think it says it.  We'll make a

17   recommendation.

18        Q    Okay.  Who are you making a recommendation

19   to?

20                  MS. DYSON:  Object to the form.

21   BY MR. SEVERINO:

22        A    To the Office of Student Rights and

23   Responsibilities?

24        Q    Okay.  This goes back to my earlier

25   question.  When you recommend a sanction, like in this

Page 69

1    case, that is something that is recommended to the

2    OSRR; is that correct?

3              MS. DYSON:  Object to the form.  She's

4    already testified she doesn't recall.

5    BY MR. SEVERINO:

6        A    I don't recall, and I feel like we've

7    answered this, Anthony.  Like we're going in a big

8    circle here.

9        Q    We're -- we're actually not.  I'm just

10   asking you.  You said, "We'll make a recommendation."

11   And your testimony now is that you will make that

12   recommendation to the OSRR; is that correct?

13       A    In a case -- yes.

14             MS. DYSON:  That's not her testimony.

15   You're misrepresenting --

16             MR. SEVERINO:  Go ahead.  You're

17   talking over each other.  Go ahead.

18             MS. DYSON:  Yes.  You're

19   misrepresenting what she's saying.  She said she

20   didn't recall the process.  It's what she said many

21   questions ago.  And what you're trying to do is say

22   that these words are -- are -- I don't know.  Are you

23   trying to ask if they refresh her recollection?

24   Because you haven't asked that question.  So I think

25   what you're trying to do is mischaracterize the

1    testimony, and that's -- I have an issue with.

2    BY MR. SEVERINO:

3         Q    Okay.  You do not recall whether you needed

4    approval to impose the sanction of expulsion; is that

5    correct?

6         A    I don't recall.

7              MS. DYSON:  Objection.

8    BY MR. SEVERINO:

9         Q    I know.  I'm asking -- I'm -- I'm confirming

10   that so I can ask my next question.  Now, we're

11   looking at the transcript, which is Exhibit 5; okay?

12   Does reading this where it says where the

13   Administrator Officer will make a "recommendation of

14   whether Kevaughn is responsible or not" refresh your

15   recollection of whether or not you needed approval?

16        A    No.

17        Q    Okay.  When you served as an administrative

18   hearing officer, was there any kind of script or

19   outline that was provided to you to follow during the

20   hearings?

21        A    Yes.

22        Q    Okay.  And who provided that to you?

23        A    The Office of Student Rights and

24   Responsibilities.

25        Q    Okay.  Okay.  So we're on page 97.  And if

1    you could, read lines 6 through 14 for me to yourself

2    real quick?

3         A    Okay.

4         Q    So now that you've read this, do you recall

5    listening to the audio recording of the provisional

6    suspension hearing prior to this formal hearing?

7         A    No.  I don't even recall this hearing.  I

8    would have to rely on this transcript, Anthony.

9         Q    Okay.  That's fair.  So when a formal

10   hearing like this one is concluded -- and let me be

11   clear about that.  You've received all the testimony

12   and the actual hearing itself is closed.  What do you

13   do after that?

14        A    It depends on the particular case.

15        Q    Okay.  What are your -- what are the

16   different options of what you can do following the

17   close of the hearing?

18        A    I can make a decision.  I can postpone the

19   decision for a period of time.  I cannot make a

20   decision.  Those are a few of the options.

21        Q    Okay.  Let's start with postponing the

22   decision.  In what instances did you postpone making a

23   decision?

24        A    I felt in instances, for example, of

25   expulsion, I -- I usually would sit and really think

1  about it and look at -- review all of the testimony,

2  all the evidence that was presented prior to my making

3  decision.  I would not make a decision typically when

4  it involves something that egregious on the spot.

5      Q    Okay.  So following the close of the hearing

6  when you're deliberating on making a decision, do you

7  actually have all of the evidence with you that was

8  presented for you to review?

9      A    I may.

10     Q    Okay.  When --

11              MS. DYSON:  I'm sorry.  Can I

12  interrupt?  Anthony, I'm sorry to interrupt you.

13              Madam Court Reporter, is Ms. Adamchak

14  in the waiting room?

15              REPORTER:  There is nobody in the

16  waiting room at this time that I see.

17              MS. DYSON:  Okay.  She was having

18  difficulty getting back in.  But that's fine.

19              REPORTER:  Oh, okay.

20              MS. DYSON:  My apologies.

21  BY MR. SEVERINO:

22     Q    So we talked about -- or you talked about

23  one of the reasons to postpone the decision would be

24  an instance where expulsion was possible.  You know,

25  you wanted to review everything and deliberate.  Are

Page 73

1    there any other instances where you may have postponed

2    making a decision?

3         A    I don't recall.

4         Q    Okay.  What about postponing to gather

5    additional information?

6         A    I don't recall.

7         Q    All right.  I'm sorry, I -- you gave me a

8    couple of options of what you can do following the

9    close of the hearing.  I know the second one was

10   postponing the decision.  What was the third one

11   again?

12        A    I don't recall.

13        Q    Okay.  All right.  I'm sharing the screen

14   again here.  And this is the document produced by USF.

15   It's Bates label 75 through 76.  So this is titled

16   "University of South Florida Student Rights and

17   Responsibilities.  Administrative Hearing Officer

18   University Conduct Board Documentation.  December 8,

19   2017.  Student name Devaughn Dingle.  And then the

20   chair administrative officer, Kristin Steffen."

21             Do you recognize this document?

22        A    I do not.

23        Q    Okay.

24        A    I will say it is my handwriting, but I do

25   not recall this document specifically.

1     Q     Okay.  That was going to be my next

2   question, so -- which I didn't tell you that earlier,

3   you may anticipate my question.  Which is okay for

4   now.  We haven't had a big problem with that.

5            So, okay.  So just to confirm, I've showed

6   you page one here.  That's your handwriting.  And then

7   I want to go down here.  Is this also your

8   handwriting?

9     A     Yes.

10    Q     Okay.  All right.  Is this the document that

11  you would use following a formal hearing to render

12  your decision?

13    A     I don't recall specifically.  But yes.  If -

14  - if not this, similar to this.  Yes.

15    Q     All right.  And let's talk about this

16  specific document, which, before I forget, we'll mark

17  this as Exhibit 7.

18                  (Exhibit 7 was marked for

19                   Identification.)

20  BY MR. SEVERINO:

21    Q     So with respect to Exhibit 7 here, is the

22  information that you handwrote in here under paragraph

23  one something that you would have done on your own, or

24  did you have input from someone else?

25    A     I -- I had the discretion to put information

1    on there that I chose.  Yes.

2         Q    Okay.  So did anyone help you prepare this?

3         A    I don't know.

4         Q    Okay.  In other cases where you served as a

5    hearing officer or UCB member and you would have

6    filled out a similar document, do you recall if anyone

7    assisted you in filling out this?

8         A    I do not.

9         Q    Following the hearing, when you are

10   reviewing the case, is there anyone else reviewing it

11   with you?

12        A    I don't recall.  This was a long time ago,

13   Anthony.

14        Q    So I want to read -- actually, go ahead and

15   read paragraph one here, your handwriting.  Just let

16   me know when you're done.

17        A    I've read it.

18        Q    Okay.  So in the second line there, it says,

19   "Sexual intercourse occurred without expressed,

20   ongoing, affirmative consent."  Is that your own

21   language, or does that come from some university

22   policy or guideline?

23        A    I don't recall.

24        Q    At the time that you handwrote this, do you

25   recall what "expressed, ongoing, affirmative consent"

1  meant?

2      A    No.  You're showing a document from 2017,

3  Anthony.

4      Q    I know when it's from.  Let me ask you this:

5  did USF, in any of its policies and procedures,

6  defined -- define what consent meant?

7              MS. DYSON:  Object to the form.

8  BY MR. SEVERINO:

9      A    I don't recall.  I'm not the university.

10      Q    Prior to serving as the Administrative

11  Hearing Officer in this case, do you recall reviewing

12  the Student Code of Conduct?

13      A    Yes.

14              MS. DYSON:  Object to the form.

15  BY MR. SEVERINO:

16      Q    Okay.  Is that something that you did every

17  time you served as an administrative hearing officer?

18      A    I don't recall.

19      Q    Okay.  Do you recall the specific reason you

20  reviewed it prior to this proceeding?

21      A    No.

22              MS. DYSON:  Object to the form.

23  BY MR. SEVERINO:

24      Q    All right.  So page two here, Learning

25  Outcomes, can you -- obviously I can read what it

1    says, but can you explain what number one means as far

2    as a learning outcome?

3         A    I don't recall my thoughts during that time.

4    All I can do is read this to you.

5         Q    All right.  Is this -- do you recognize this

6    language?

7                   MS. DYSON:  Object to the form.

8    BY MR. SEVERINO:

9         A    No.

10        Q    Okay.  All right.  Was there any kind of

11   document or guidance that was provided to you in

12   serving as an administrative hearing officer with

13   respect to specific learning outcomes based on the

14   alleged violations?

15        A    Yes.

16        Q    Okay.  What was that document if you recall?

17        A    I don't recall.

18        Q    I know you don't recall the document, but

19   more generally, was it a document that essentially had

20   a list of learning outcomes?

21                   MS. DYSON:  Object to the form.

22   BY MR. SEVERINO:

23        A    I don't what it specifically looked like,

24   Anthony.  I'm sorry.

25        Q    Okay.  So now I'm going to zoom in.  There's

1     a stamp here.  Can you read any of that?

2          A    I can barely read "Received" and "4:45 p.m."

3     Those are the two things I can receive -- I can see.

4          Q    Can you read at all what's in the middle

5     there?

6          A    No.  I'd be speculating.  Is it "December?"

7     "DEC?"

8          Q    Can you read anything else?

9          A    Mm-mm.  Is it "88?"

10         Q    I'm sorry, I didn't hear you.  I talked over

11    you.

12         A    Does that say "88," Anthony?

13         Q    I mean, I know what it says, but if you

14    can't read it, that's fine.  Do you recall in this

15    specific case whether you made the decision with

16    respect to Mr. Dingle, the same day of the hearing?

17         A    No.

18         Q    Just to go down here.  We didn't talk about

19    this.  I didn't ask you this.  But the last page here,

20    76; that's your handwriting as well?

21         A    Yes.

22         Q    Okay.  And the sanctions that you listed

23    were number one, expulsion.  Two, no contact order;

24    correct?

25         A    As it relates to this document, yes.

Page 79

```
 1        Q    And last question.  You know -- these look
 2   like initials.  Do you have any idea who those
 3   initials are?
 4        A    I'm sorry.  I don't recognize that
 5   signature.
 6        Q    Okay.  When you served as an administrative
 7   hearing officer, did you report to anyone in that
 8   role?
 9        A    What do you mean by report?
10        Q    Did you have a superior, or was there a
11   hierarchy where, for instance, if you had a question
12   about something, you could go ask someone?
13        A    The Office of Student Rights and
14   Responsibilities.
15        Q    All right.  Was there someone specific
16   there?
17        A    Not that I recall.  I think it depended on
18   the case.  That type of thing.
19        Q    All right.  So we're on page 94 of Exhibit 5
20   here.  And I'd like you to take a look and read for me
21   to yourself real quick lines 18 through 25, and then
22   I'll go to the next page when you're ready.
23        A    Okay.
24        Q    And then, if you can just read through line
25   five.  I'm sorry.  Go ahead and read through line 11.
```

Page 80

1      A    Okay.

2      Q    All right.  So it appears from this

3  transcript that -- there was the only thing that was

4  provided from the police department is what's been

5  referred to as this synopsis, a man notification, and

6  the Title IX Incident Report Form filled out by

7  Officer Madsen as well.

8           And you had asked Ms. Cutsinger if she spoke

9  with Officer Madsen, which she did not.  Is there any

10 reason at this point that you didn't postpone the

11 hearing in order to secure testimony or further

12 information from Officer Madsen and the campus police?

13     A    I don't recall.  Again, I do not remember

14 this case specifically, Anthony.  I don't even

15 remember this student's name.

16     Q    I understand.  I think you said earlier that

17 you would rely on what's in this transcript; correct?

18     A    That is correct.

19     Q    Let me go down.  All right.  So we're on

20 page 109.  Read 22 through 25 for me real quick, then

21 I'll go to the next page.

22     A    Okay.

23     Q    And then, I'm going to read this whole page.

24 So just let me know when I can scroll down to read the

25 rest.

Page 81

1        A      Okay.

2                         MS. DYSON:   I'm confused.   What lines

3        are we on?

4                         MR. SEVERINO:   It's the whole page.   I

5        was just scrolling down for her to finish.   It's page

6        110.

7                         MS. DYSON:   Okay.

8        BY MR. SEVERINO:

9        A      Okay.

10       Q      Okay.   So if we go up -- up here again on

11       page 110, you reference -- or the transcript

12       references it's here that you stated that, "We did

13       receive an email regarding the questions that you

14       would have for the police officer."   Mr. Dingle said,

15       "Yes, ma'am."   And then you said, "The police officer

16       is not here, so we can't address these questions for

17       you."

18                         Again, is there any reason why at this point

19       you didn't postpone the hearing to obtain testimony

20       from the police officer?

21       A      I don't recall.

22       Q      In other instances where you served as an

23       administrative hearing officer or UCB member, did you

24       have any experience with campus police or other law

25       enforcement providing testimony at the formal

1    hearings?

2         A    Yes.

3         Q    Okay.  And in those instances, do you recall

4    if you ever had an issue with getting them to attend

5    the formal hearing?

6         A    I don't recall.

7         Q    All right.  One sec.  So were -- oh, sorry.

8    I haven't shared that with you.  So back taking a look

9    at Exhibit 7.  And I'm just going to read this for the

10   record.  Paragraph One.

11          "USF Code of Conduct 4.14 Sexual Harassment.

12   4.14b Non-Consensual Sexual Intercourse."  And then

13   next to that, there's an R and an NR.  I assume R is

14   rationale.  That you're going to provide a rationale;

15   is that correct?

16        A    No.

17        Q    Okay.  What is R?

18        A    Responsible.

19        Q    Responsible.  Okay.  Glad I asked that.  And

20   then, I think you testified about this earlier.  You

21   don't have to provide a rationale?  That's just

22   something you had the option to do; is that correct?

23             MS. DYSON:  Object to the form.

24   BY MR. SEVERINO:

25        A    I always provided a rationale as I recall.

Page 83

1          Q    Okay.  Is that something you were required
2     to do, or due to your practice?
3          A    I don't remember.
4          Q    Okay.  So the rationale under paragraph one
5     states, "Based on the information provided, it is more
6     likely than not that vaginal sexual intercourse
7     occurred without expressed ongoing, affirmative
8     consent.  Student 1 verbally indicated, 'No', to
9     vaginal sex intercourse to Kevaughn, and Kevaughn
10    acknowledged to university officials that he heard,"
11    it's redacted, "say, 'No,' during the course of the
12    incident on November 16, 2017."
13              Okay.  So now I want you to take a look --
14    I'm going to pull back up the transcript here.  And
15    we're going to go to page 138.
16         So we are on Bates label 138.  All right.  And
17    I'm just going to have you read this page.  I'll
18    scroll down when you're ready.
19         A    Okay.  Okay.
20         Q    All right.  And then his -- Mr. Dingle's
21    statement continues on this next page on lines 1
22    through 13.  You can go ahead and read that as well.
23         A    Okay.
24         Q    So in your rationale, you said that the
25    victim stated that she said, "No," during the course

1  of the incident.  And then we just read this from Mr.
2  Dingle saying that it was consensual.
3       A    I don't believe that's what that other
4  document said.  It didn't say victim
5       Q    Okay.  Let's take a look.  That's Student 1.
6  Let's just both back up.
7       A    As I recall, the statement -- let's look at
8  the document, but it says, "Kevaughn acknowledged to
9  university officials that he heard blank say 'No.'"
10       Q    So, okay, let's start --
11       A    That doesn't say that, the victim said it.
12  He said that he heard her say, "No."  That's how I
13  read that.  Do you agree?
14       Q    All right.  So -- well, I'm going start at
15  the sentence before that, and then we'll get to that.
16  The sentence before that says, "Student 1 verbally
17  indicated, 'No,' to vaginal sexual intercourse with
18  Kevaughn."  So that's the first part.  So your back
19  now, you put in here that the Student 1 verbally
20  indicated, "No;" correct?
21       A    That's what the document says.
22       Q    And then the second part is, "And Kevaughn
23  acknowledged to university officials that he heard,"
24  it's redacted, but Student 1, "say, 'No,' during the e
25  course of the incident on November 16, 2017."

Page 85

1           Do you recall how and when Kevaughn
2    acknowledged that he heard her say, "No," during the
3    course of the incident?
4           A     No.
5           Q     Okay.  And what we just read in Mr. Dingle's
6    statement here from the transcript in his very last
7    comment, at least as part of this statement was, it
8    was consensual.  And so my question is how do you
9    reconcile his testimony or his statement with that of
10   Student 1 to come to the conclusion that he's
11   responsible for the alleged violations.
12                   MS. DYSON:  Objection.
13   BY MR. SEVERINO:
14          A     I don't remember.  I am simply reading a
15   transcript like you are.
16          Q     All right.  And got a couple more.  142.  It
17   starts at line 24.  And then, we'll go on to 143 and
18   go to line -- oh, I'm sorry.  Line 15 -- or line 14.
19          A     Okay.
20          Q     All right.  So based on the transcript and
21   your question, it appears that you're trying to
22   identify if there's a discrepancy between what Mr.
23   Dingle is saying and what this synopsis says; is that
24   accurate?
25                   MS. DYSON:  Object to the form.

Page 86

```
1    BY MR. SEVERINO:
2         A    I don't know.
3         Q    Okay.  Well, it says, "In the information
4    that we have provided to us in the police synopsis, it
5    indicates that blank continuously said, 'no,' and I
6    was trying to understand if there was a discrepancy in
7    that that you are aware of."
8         A    Well, you're reading the transcript,
9    Anthony.  So if that's what it said, that's what it
10   said.
11        Q    Do you recall what you meant by that?
12        A    I don't.
13        Q    All right.  If there was a discrepancy
14   between what Mr. Dingle said and what the synopsis
15   said, why did you not postpone the hearing at this
16   point to obtain additional information from campus
17   police?
18        A    I can only speculate.  This was five and a
19   half years ago.
20        Q    Yeah.  I'm asking.
21        A    I don't know.
22        Q    All right.  So start on 148.  This is just
23   line 20.  This is you speaking here.  And what I am
24   most interested in here is the next page, lines 1
25   through 8.  Just let me know when you're done.
```

Page 87

1      A    Okay.

2      Q    So at the end there, it says, "The

3  Administrative Officer will review files of any prior

4  misconduct before recommending any educational

5  sanctions."  Do you recall -- first, do you recall

6  doing that in this instance?

7      A    I do not.  No.

8      Q    And understanding that you don't recall

9  actually reviewing files, do you recall whether or not

10  Mr. Dingle had any prior misconduct with the

11  university?

12      A    No.  I don't even recall the student's name,

13  Anthony.

14      Q    Okay.  Are you familiar, or do you recognize

15  the name Samantha Garrett?

16      A    No.

17      Q    I'll stop sharing this and show you

18  something.  There.  Let's read again here.  And for

19  the record, this is USF 153 through 155.  Do you

20  recognize this document?

21      A    No.

22      Q    Following -- after you prepare the -- I'm

23  sorry.  I've got to find this.  One sec.  Back to this

24  again.  After you prepare this document, which is

25  Exhibit 7, what -- what did you do with this document

Page 88

1    after you filled it out?

2         A    I don't remember preparing this document out

3    specifically.  But as I recall, my responsibility

4    ends, and the office of Student Rights and

5    Responsibilities takes any next action as necessary.

6         Q    Okay. So after you fill out what you filled

7    out with your handwriting, are you the one that

8    actually submits it or transmits it to the OSRR?

9         A    No.

10        Q    Okay.  Who would do that?

11        A    I don't know what they're called.  I think

12   it's the Student Conduct Board Advisor.  I -- I don't

13   recall the specific -- it's the -- the other person,

14   not the initial review officer, that's in the hearing

15   usually takes the next actions.

16        Q    Okay.  And do you have any involvement

17   following that part of the process?

18        A    No.

19        Q    Do you recall whether anyone from the OSRR

20   contacted you to discuss your rationale after you

21   submitted it to the OSRR?

22        A    No.

23        Q    Okay.  All right.

24             MR. SEVERINO:  All right.  Sacha, give

25   me about five minutes to go through my notes.

Page 89

1              MS. DYSON:  Okay.

2              MR. SEVERINO:  I actually think I did

3    it at exactly the time I said.

4              MS. DYSON:  Yeah, you did.  Good job.

5              MR. SEVERINO:  So give me about five

6    minutes and I may have a couple of follow ups.  But

7    that should be just about it.

8              MS. DYSON:  Okay.  We'll be back in

9    five then.

10             THE WITNESS:  Okay.  Five-minute break,

11   Anthony?

12             MS. DYSON:  Yes.

13             MR. SEVERINO:  You got it.

14             THE WITNESS:  Okay.

15             REPORTER:  This marks the end of media

16   number 2.  The time is 12:28 p.m.  We are off the

17   record.

18                  (Off the record.)

19             REPORTER:  This marks the beginning of

20   media number 3.  The time is 12:34 p.m.  We are on the

21   record.

22   BY MR. SEVERINO:

23       Q    Were you -- do you recall being advised or

24   instructed by anyone at the University of South

25   Florida that the university expected Mr. Dingle to be

1    expelled, regardless of the evidence presented at the

2    formal hearing?

3         A    No.

4         Q    But you -- you recall that did not happen?

5         A    I do not recall that it did happen.

6         Q    Did that ever occur in any other instances

7    where you were service as the hearing officer or on

8    the UCB that you recall?

9         A    No.  I have never felt pressure to make a

10   decision one way or another.

11        Q    Did you -- did you have professional

12   interactions with President Genshaft that you recall

13   prior to this formal hearing?

14        A    Brief -- I don't know if it was prior to the

15   hearing, but briefly.  Yes.

16        Q    One last set of questions.  We talked

17   earlier about your -- your "colleague letters."  Do

18   you recall that, generally?

19        A    I recall us discussing it.  Yes.

20        Q    Are you familiar with the September 22, 2017

21   Dear Colleague letter that rescinded certain prior

22   Dear Colleague letters and guidances?

23        A    Not specifically.  No.

24        Q    Is that something in your role as Deputy

25   Title IX Coordinator and Investigator and Hearing

Page 91

1   Officer that you would have been periodically

2   reviewing -- looking to see if there were any updates

3   in the guidance from the federal government?

4                MS. DYSON:  Object to the form.

5   BY MR. SEVERINO:

6       A    You're -- you're relating two different

7   distinct positions as if they're one, based on the

8   questions.  So you're telling me the Title IX

9   Coordinator role and Investigator role aligns with the

10  Hearing Officer role.  That is not true.

11               So the Hearing Officer role might, right?  A

12  Title IX violation might move forward for

13  adjudication, but they're not the same position.

14      Q    Okay.  Does being the Title IX Coordinator

15  and Investigator, and at the same time serving as

16  Administrative Hearing Officer create a conflict of

17  interest?

18      A    No.  Because I wouldn't be the investigator

19  of a case that I'm hearing.  That would create a

20  conflict of interest.  If I investigate the case and

21  then I do the adjudication, that would be

22  inappropriate.  I would never do that.

23      Q    At your time at USF, do you recall whether

24  USF was ever under federal investigation for its

25  handling of Title IX claims?

Page 92

1          A     Yes.

2          Q     Okay.  Do you recall when that was?

3          A     No.

4          Q     Okay.  And if USF would have been found to

5     have been violation Title IX based on those federal

6     investigations, what would the consequence, if you

7     know, have been for USF?

8                    MS. DYSON:  Object to the form.

9     BY MR. SEVERINO:

10         A     I don't know.  It depends.  I'm not the

11    adjudicating body.  I -- I don't work for the

12    Department of Education.

13         Q     But you did work in Title IX -- or in the

14    Title IX Office at USF for a period of time, and would

15    one of the potential --

16         A     I did not work in the Office of Title IX.

17         Q     Okay.  You worked as a Title IX Coordinator

18    and Investigator; correct?

19         A     Yes, but I did not work in the office.  It

20    was an appointment.

21         Q     Just to clear this up, did you report to

22    anyone in that role?  I know it was an appointment and

23    you weren't in the office.  I'm just trying to figure

24    out kind of how the hierarchy worked with that.

25                    MS. DYSON:  Object to the form.

Page 93

1    BY MR. SEVERINO:

2         A    No, I didn't.  I don't know how to say it.

3    It -- it wasn't a report.  It wasn't a supervisory

4    relationship.

5         Q    Okay.

6         A    But there was a Title IX Coordinator for the

7    system that I worked with closely.  Yes.

8         Q    All right.  And if -- if you know, if USF

9    were to have violated Title IX, could USF have lost

10   federal funding?

11              MS. DYSON:  Object to the form.

12   BY MR. SEVERINO:

13        A    I don't know.  That's not within my purview.

14   Nor was it then.

15              MR. SEVERINO:  Okay.  Those are all the

16   questions that I have, Ms. Steffen-Zonsius.  Hopefully

17   I said that correctly.  So thank you for your time

18   this afternoon.  I appreciate it.  And unless Ms.

19   Dyson has questions for you, you will be free to go.

20              MS. DYSON:  I have no questions, and

21   we'll break.

22              MR. SEVERINO:  All right.

23              REPORTER:  And before I read us off the

24   record, may I get video orders on the record, starting

25   with Mr. Severino.  Does the standard delivery of this

Page 94

1    video work for you?

2                    MR. SEVERINO:  I don't need a video

3    right now.

4                    REPORTER:  Okay.  And Ms. Dyson?

5                    MS. DYSON:  We're not ordering either.

6                    REPROTER:  Okay.  We are off the record

7    at 12:41 p.m.  And this concludes today's testimony

8    given my Kristin Steffen-Zonsius.  The total number of

9    media units used was four -- I'm sorry, three, and

10   will be retained by Veritext Legal Solutions.

11

12                    (Whereupon, at 12:41 p.m., the

13                    proceeding was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1               CERTIFICATE OF NOTARY PUBLIC

2            I, MELISSA MCCANN, the officer before whom

3     the foregoing proceedings were taken, do hereby

4     certify that any witness(es) in the foregoing

5     proceedings, prior to testifying, were duly sworn;

6     that the proceedings were recorded by me and

7     thereafter reduced to typewriting by a qualified

8     transcriptionist; that said digital audio recording of

9     said proceedings are a true and accurate record to the

10    best of my knowledge, skills, and ability; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this was taken;

13    and, further, that I am not a relative or employee of

14    any counsel or attorney employed by the parties

15    hereto, nor financially or otherwise interested in the

16    outcome of this action.

17

18

19

20

21            *M. McCann*

22            MELISSA MCCANN
              Notary Public in and for the
23            STATE OF CALIFORNIA

24

25

1             CERTIFICATE OF TRANSCRIBER

2             I, SONYA LEDANSKI HYDE, do hereby certify

3     that this transcript was prepared from the digital

4     audio recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

15

16

17

18

              _Sonya N. Ledanski Hyde_

19            SONYA LEDANSKI HYDE

20

21

22

23

24

25

```
                                                    Page 97
1    Sacha Dyson, Esquire
     sacha.dyson@gray-robinson.com
2
3                          June 29, 2023
4     RE: Kevaughn Dingle vs. University Of South
           Florida Board Of Trustees
5           6/13/2023 DEPOSITION OF KRISTEN STEFFEN-ZONSIUS
           Job No. FLA5937569
6        The above-referenced transcript is available for
7    review.
8        The witness should read the testimony to
9    verify its accuracy. If there are any changes,
10   the witness should note those with the reason
11   on the attached Errata Sheet.
12       The witness should, please, date and sign the
13   Errata Sheet and email to the deposing attorney as well as
14   to Veritext at Transcripts-fl@veritext.com and copies will
15   be emailed to all ordering parties.
16       It is suggested that the completed errata be returned 30
17   days from receipt of testimony, as considered reasonable
18   under Federal rules*, however, there is no Florida statute
19   to this regard.
20       If the witness fails to do so, the transcript may be used
21   as if signed.
22               Yours,
23               Veritext Legal Solutions
24
      *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure
25     Rule 1.310(e).
```

Page 98

1    RE: Kevaughn Dingle vs. University Of South
         Florida Board Of Trustees
2        6/13/2023 DEPOSITION OF KRISTEN STEFFEN-ZONSIUS
         Job No. FLA5937569
3                    E R R A T A   S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19
20   Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts
21   stated in it are true.
22
23
24   _____
       KRISTEN STEFFEN-ZONSIUS                    DATE
25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreground transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.